IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JENNIFER ROUSSELL, ON BEHALF OF          §
HERSELF AND OTHERS SIMILARLY SITUATED,   §
                                         §
        PLAINTIFF,                       §
                                         §        CIVIL ACTION NO. 4:05-CV-03733
                                         §
VS.                                      §
                                         §
BRINKER INTERNATIONAL, INC.,             §
                                         §        Jury Requested
                                         §
        DEFENDANT.                       §
                                         §

DEFENDANT BRINKER INTERNATIONAL, INC.'S

MOTION TO DECERTIFY COLLECTIVE ACTION AND MEMORANDUM IN SUPPORT

Respectfully submitted,

**Fraser A. McAlpine**
State Bar No. 13321300
Federal I.D. No. 3407
AKIN GUMP STRAUSS HAUER & FELD LLP
1111 Louisiana Street, 44th Floor
Houston, Texas 77002
(713) 220-5800 (telephone)
(713) 236-0822 (facsimile)

ATTORNEY-IN-CHARGE FOR DEFENDANT
BRINKER INTERNATIONAL, INC.

Of COUNSEL:
**Jordan Cowman**
Federal I.D. No. 14468
State Bar No. 4932800
**Marcia N. Jackson**
State Bar No. 24008411
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
(214) 969-2800 (telephone)
(214) 969-2828 (facsimile)

TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

1.   INTRODUCTION AND SUMMARY OF ARGUMENT .................................................1

2.   STATEMENT OF ISSUES ...................................................................................3

3.   FACTS ..........................................................................................................4

    3.A.   QA Differences ................................................................................4

        3.A.(1).  The QA Position In General ...............................................4

        3.A.(2).  QA Staffing .......................................................................5

        3.A.(3).  QA Duties ..........................................................................7

            a.      Variances By Restaurant And Shift .............................7

            b.      Variances By Individual QA, Server Experience, And
                Manager On Duty ........................................................9

    3.B.   Tipping Differences .........................................................................10

        3.B.(1).  Restaurant QA Tip Out Activity .........................................10

        3.B.(2).  Restaurant Management's Role In QA Tip Outs ................12

        3.B.(3).  Perception Of "Voluntary" Or "Mandatory" .......................14

        3.B.(4).  Perception Of And Reaction To Alleged Pressure/Coercion ..........16

        3.B.(5).  Frequency And Amount Of QA Tip Outs .........................17

4.   ARGUMENT ....................................................................................................19

    4.A.   Plaintiff Is Not "Similarly Situated" To The Class Members She
        Seeks To Represent. ........................................................................19

    4.B.   There Is No Evidence Of A Single Decision, Policy, Or Plan That
        Violates The FLSA. ...........................................................................20

    4.C.   Highly Individualized Fact Determinations Are Necessary To Resolve
        The Claims Of Each Server. .............................................................21

    4.D.   Allowing This Case To Proceed As A Collective Action Would Be
        Unfair, Unmanageable, And Unnecessarily Burdensome. ................23

5.   CONCLUSION AND PRAYER ..............................................................................25

CERTIFICATE OF SERVICE ....................................................................................27

TABLE OF AUTHORITIES

CASES

*Anderson v. Cagle's, Inc.*
   488 F.3d 945 (11th Cir. 2007) ................................................................... 3, 21

*Basco v. Wal-Mart Stores, Inc.*
   No. 00-3184, 2004 WL 1497709 (E.D. La. Jul. 2, 2004) ....................... 20, 24

*Bayles v. Am. Medical Response of Colorado, Inc.*
   950 F. Supp. 1053 (D. Colo. 1996) ............................................................. 23

*Brooks v. Bellsouth Telecommunications, Inc.*
   164 F.R.D. 561 (N.D. Ala. 1995) ................................................................ 20

*Burlington Northern and Santa Fe Ry. Co. v. White*
   126 S. Ct. 2405 (2006) ................................................................................. 22

*Carlson v. C.H. Robinson Worldwide, Inc.*
   No. CIV 02-3780 JNE/JJG, 2006 WL 2830015 (D. Minn. Sept. 26, 2006) ................. 24

*Castano v. American Tobacco Co.*
   84 F.3d 734 (5th Cir. 1996) .......................................................................... 25

*Comer v. Wal-Mart Stores, Inc.*
   454 F.3d 544 (6th Cir. 2006) .......................................................................... 3

*England v. New Century Fin. Corp.*
   370 F. Supp. 2d 504 (M.D. La. 2005) ..................................................... 20, 24

*Harper v. Lovett's Buffet, Inc.*
   185 F.R.D. 358 (M.D. Ala. 1999) ................................................................ 20

*Hinojos v. The Home Depot, Inc.*
   No. 2:06-CV-00108 (D. Nev. Dec. 1, 2006) ................................................ 20

*Jackson v. Wal-Mart Stores, Inc.*
   No. 258498, 2005 WL 3191394 (Mich. Ct. App. Nov. 29, 2005) ................ 22

*Jimenez v. Domino's Pizza, Inc.*
   238 F.R.D. 241 (C.D. Cal. 2006) ................................................................ 21

*Johnson v. TGF Precision Haircutters, Inc.*
   No. CIV. A. H-03-3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) ....... 3, 21, 23, 24

*Lentz v. Spanky's Restaurant II, Inc.*
   491 F. Supp. 2d 663 (N.D. Tex. 2007) ........................................................ 25

*Lusardi v. Xerox Corp.*
    118 F.R.D. 351 (D.N.J. 1987) ........................................................... 24

*Lusardi v. Xerox Corp.*
    122 F.R.D. 463 (D.N.J. 1988) ........................................................... 20

*Mitchell v. Abercrombie & Fitch, Co.*
    428 F. Supp. 2d 725 (S.D. Ohio 2006) ............................................. 4

*Mooney v. Aramco Services Co.*
    54 F.3d 1207 (5th Cir. 1995) .............................................. 3, 20, 21

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
    259 F.3d 154 (3d Cir. 2001) .............................................................. 21

*O'Brien v. Ed Donnelly Enters., Inc.*
    No. 2:04-CV-00085, 2006 WL 3483956 (S.D. Ohio Nov. 30, 2006) ....................... 3, 23

*O'Donnell v. Robert Half Int'l, Inc.*
    429 F. Supp. 2d 246 (D. Mass. 2006) .............................................. 21

*Polion v. Wal-Mart Stores, Inc.,*
    22 Mass. L. Rep. 31 (Mass. Sup. Ct. 2006) .................................. 22

*Ray v. Motel 6 Operating, Ltd. P'ship*
    No. 3-95-828, 1996 WL 938231 (D. Minn. Mar. 18, 1996) ................. 20, 24

*Reyes v. Texas EZpawn, L.P.*
    No. CV-03-128, 2007 WL 101808 (S.D. Tex. Jan. 8, 2007)....................... 3, 21, 23, 24

*Smith v. T-Mobile USA, Inc.*
    No. CV-05-5274, 2007 WL 2385131 (C.D. Cal. Aug. 15, 2007) .................. 24

*Simer v. Rios*
    661 F.2d 655 (7th Cir. 1981) ........................................................... 21

*Simmons v. T-Mobile USA, Inc.*
    No. CIV. A. H-06-1820, 2007 WL 210008 (S.D. Tex. Jan. 24, 2007) ........................... 20

*Wal-Mart Stores, Inc. v. Lopez*
    93 S.W.3d 548 (Tex. App.—Houston [14th Dist.] 2002, no pet.)................. 22

*West v. Border Foods, Inc.*
    No. 05-2525, 2006 WL 1892527 (D. Minn. Jul. 10, 2006) ........................... 20

*Williams v. Accredited Home Lenders, Inc.*
    No. 1:05-CV-1681-TWT, 2006 WL 2085312 (N.D. Ga. Jul. 25, 2006) ....................... 23

STATUTES AND REGULATIONS

29 U.S.C. § 203 ............................................................................................................... 4, 23

29 C.F.R. § 203 ..................................................................................................................... 4

OTHER AUTHORITIES

7B Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE § 1807 (3d ed. 2005) ............ 3

1.    INTRODUCTION AND SUMMARY OF ARGUMENT[1]

Plaintiff Jennifer Roussell, a former Chili's Grill & Bar food Server in Texas, seeks to litigate as a collective action the claims of more than 3,200 former and current Chili's Servers across the nation who purportedly were "required," in different ways, at different times, by different Managers, at different restaurants, to share tips with Quality Assurance workers ("QAs"), allegedly in violation of the Fair Labor Standards Act. As Defendant suggested at a prior status conference, the notion that such claims could proceed as a collective action was extremely suspect in the first place.[2] Substantial evidence obtained in discovery over the past several months, however, eliminates any doubt as to whether the collective action device is appropriate for this case. Clearly, it is not. The Court should grant Defendant's motion to decertify because Plaintiff cannot show, under a "strict" second-stage decertification analysis, that she is "similarly situated" to the class of Servers she seeks to represent.

The deposition testimony of approximately 100 current and former Servers, QAs, and Managers convincingly negates any argument that Plaintiff is similarly situated to other Servers. A strong majority of these witnesses deny that they, or others with whom they have worked, have ever been "required" to tip out QAs.[3] Even those witnesses who claim to the contrary report

---

[1] The evidence cited in this Motion and Memorandum in Support can be found in Defendant's Appendix of Evidence in Support of Motion to Decertify Collective Action ("Df's MTD App."), filed concurrently herewith.
[2] See, e.g., Jul. 9, 2007 Status Conf. Trans. at 4, 12-13, 18-19, Df's MTD App. at ex. B97. Moreover, the Court appears to have shared some of Defendant's concerns. See id. at 32 (expressing reservation about whether the issue of QA participation in tip pools is appropriate for class-wide determination due to possible regional variations); id. at 39 (responding to comment about QA job duties by noting "That doesn't sound to me like a class-wide issue. Sounds to me like a restaurant by restaurant thing.").
[3] Notably, some opt-in Servers denied that they tipped QAs at all, while other opt-ins denied that they were "required" to tip QAs. See, e.g., Parsons dep. 68:4-25 (never tipped out the QA); Davis dep. 8:4-9, 46:13-19, 49:9-20 ("never" required); Buonopane dep. 8:13-23 (never discussed tipping QAs with any Manager). Multiple Servers testified that they do not agree with the lawsuit (see, e.g., Edwards dep. 7:3-13; Luca dep. 9:18-10:4; Owen dep. 6:16-7:13), and some openly disparaged the lawsuit. See, e.g., Bogert dep. 56:11-15, 64:4-11 (lawsuit is "silly;" Bloomington, Illinois Servers laughed about the opt-in letter); Connolly dep. 6:11-19 ("ridiculous"); Hunt dep. 41:25-42:6 ("they're just screwing the system however which way they can do it to get money"); Montoya dep. 5:15-6:1 ("not a just lawsuit" and "d[oes]n't seem right"); Wilks dep. 45:20-24 ("silly and petty").

substantially different experiences, as compared to Plaintiff, as compared to each other, and as they personally experienced over time. There is wide variation on numerous issues, including QA job duties (differences based on Server experience, Manager expectations, restaurant volume, use of hybrid QA positions, and other things), QA customer interaction (wide variance in frequency and type), whether and to what extent Servers tip out QAs (never, sometimes, always), why Servers tip out QAs (voluntary, required, voluntary in part), why Servers voluntarily tip out QAs (reward, investment, karma, friendship, sharing), why some Servers feel required to tip out QAs (instruction, pressure, suggestion, assumption), how much Servers tip out QAs (none, subjective amounts, objective amounts, matching coworker tips), and other things. These facts not only vary considerably by restaurant, Server, QA, and Manager, but in many cases can and do change over time, and thereby preclude a "similarly situated" finding.

Moreover, contrary to Plaintiff's prior representations to the Court, there is no evidence of a national decision, policy, or plan under which Managers "require" Servers to tip out QAs, much less any decision, policy, or plan authorizing Managers to pressure or coerce Servers to do so.[4] To the contrary, the only "policy" that speaks to QA tipping, reinforced by numerous independent regional standards, expressly provides that QA tipping is voluntary, not mandatory. This means that Plaintiff is relegated to attempting to persuade this Court that discrete alleged violations of a lawful policy somehow are appropriate for collective action treatment, despite case after case holding that she cannot do so. The reason is apparent. The viability of Plaintiff's claim, or any opt-in's claim, turns on individualized proof that a particular Manager acted to pressure or coerce a particular Server to honor an alleged QA tipping "requirement" in violation

---

[4] Thus, several of Plaintiff's representations to the Court on this issue are overstated and insupportable. *See, e.g.*, Jul. 9, 2007 Status Conf. Trans. at 5, Df's MTD App. at ex. B97 ("all employees were coerced"); *id.* at 11 ("there is already in existence, but there will be additional evidence of a nationwide policy [requiring Servers to tip QAs]").

of a lawful company policy, proof that necessarily require a careful analysis of the Manager's actions, the Server's interpretation thereof and response thereto, the credibility of the witnesses, and other things, all of which can and do vary significantly. Such highly individualized fact determinations by their very nature do not lend themselves to class treatment, and weigh heavily in favor of decertification.

Finally, allowing this case to proceed as a collective action would be unmanageable and unduly burdensome, given the absence of common proof, the extreme variances in evidence, and the necessity of highly individualized fact determinations to adjudicate the individual claims of more than 3,200 Servers. To paraphrase the concerns of sister courts who have granted decertification motions, individualized fact determinations would not only "dominate," but would "swallow and consume the entire case," rendering it unsuitable for collective treatment. And as the Fifth Circuit has already recognized, the case for decertification is even stronger where, as here, novel claims are asserted that present "unique problems" that "consume more judicial resources than certification will save."

2.   STATEMENT OF ISSUES

The sole issue presented here is whether Plaintiff can meet her burden of proving she is "similarly situated" to the class she seeks to represent.[5] Where, as here, sufficient discovery has been completed to permit the Court to make fact determinations, a "stricter" "second stage" analysis is employed. *See, e.g., Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007).[6]

---

[5] *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995); *Reyes v. Texas EZpawn, L.P.*, No. CV-03-128, 2007 WL 101808, at *1 (S.D. Tex. Jan. 8, 2007).

[6] *Accord Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 547 (6th Cir. 2006); *O'Brien v. Ed Donnelly Enters., Inc.*, No. 2:04-CV-00085, 2006 WL 3483956, at *3 (S.D. Ohio Nov. 30, 2006); *Johnson v. TGF Precision Haircutters, Inc.*, No. CIV. A. H-03-3641, 2005 WL 1994286, at *1 (S.D. Tex. Aug. 17, 2005); 7B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1807, at 497 (3d ed. 2005) (recognizing that the "second stage" analysis "require[s] a higher level of proof").

3.    FACTS[7]

   3.A.   QA Differences

      3.A.(1).   The QA Position In General

In general, a QA acts as a Server's helper, performing duties otherwise done by Servers when no QA is present. *E.g.*, Edwards dep. 55:12-56:1 (QA is an extension of the Server); Luca 25:10-13 (Servers perform QA duties when QA is not there).[8]  While the QA job description provides general guidelines for the position, a QA's actual duties "will be left up to the management team at that particular restaurant as the restaurant['s] needs dictate."  Sandidge dep. 123:15-18.  Indeed, QA duties vary considerably, depending on the restaurant, shift, restaurant volume, individual QA, types and amounts of customer interaction, Server experience level, Manager expectations, and other things.  *See* Section 3.A.(3), *infra*.

Not only do QA duties vary, but the way in which the QA position functions in any given restaurant varies.  For instance, some lower volume restaurants combine the QA and To Go positions, while others maintain them separately.  Leslie dep. 50:1-2, 102:13-25.[9]  Some restaurants have QA assistants ("QA2") or Back of the House ("BOH") Expediters in addition to QAs.  *E.g.*, Carbone dep. 39:14-22, 40:9-18, 41:24-42:6 (Wareham, Massachusetts restaurant has

---

[7] Plaintiff asserts claims against Defendant Brinker International, Inc.  Pl's Compl. ¶¶ 11, 18-20.  However, Brinker International, Inc. has no employees – Plaintiff and the other opt-ins were employed and compensated by Brinker International Payroll Company, L.P., not Brinker International, Inc.  Sandidge dep. 10:2-4; 12:6-22.  Therefore, Plaintiff has sued the wrong entity, precluding maintenance of a collective action against Brinker International, Inc. at the threshold.  *See* 29 C.F.R. § 203(m) (defining legal obligations owed by employer to employee); 29 U.S.C. §§ 203(d) & (e) (defining "employer"); *accord Mitchell v. Abercrombie & Fitch, Co*, 428 F. Supp. 2d 725, 744-45 (S.D. Ohio 2006) (dismissing claims against defendant holding company with no employees, payroll, or stores, reasoning that FLSA claims "require the existence of an employer-employee relationship").

[8] *See also* Sandidge dep. 79:14-16, 84:21-86:6; Meyer dep. 29:3-9; Posa dep. 66:20-67:11.  A summary of material QA differences and tipping differences is attached hereto as Exhibit A, "Summary of Evidence Highlighting QA And Tipping Differences," for the Court's ease of reference.

[9] *See also* Wamsley dep. 21:19-24 (QAs are only scheduled in summer at Canon City, Colorado Chili's; other times To Go person or Manager fills QA position); Acosta dep. 49:10-50:5 (QAs and Servers covered To Go position until restaurant permanently filled the position); Wilks dep. 15:23-16:10.

QA and QA2 position, which is "basically the assistant to the main QA, without tips"); Paolillo

dep. 11:24-12:10, 15:11-22 (BOH expediter works in the BOH, while QA works in "[P]ass

[T]hrough [A]lley"). The Burlington, Massachusetts restaurant has a unique position called a

"Back-Up QA" to aid the main QA on extremely busy shifts. Mason dep. 69:10-70:1. In

addition to QAs, some restaurants staff certain employees to act solely as Food Runners during

peak hours and holidays. *E.g.*, Hill dep. 35:10-36:1 (Gastonia, North Carolina Chili's has a Food

Runner every Friday and Saturday night, occasional Sunday nights, and every night during the

holidays).[10] The Los Lunas, New Mexico Chili's staffs Rovers on Fridays and Saturdays to run

food and back-up the main QA. Wilson dep. 40:6-16. Whether a Food Runner, QA2, Rover, or

other type of QA assistant is on duty or not affects QA duties.[11]

Restaurants also vary in whether they staff the QA position with Servers, employees who

work exclusively as QAs, or a combination of both. Paolillo dep. 32:15-25 (Powers, Colorado

has dedicated QA who typically works the five highest-volume shifts); Anzini dep. 14:7-17

(Phoenix Bell Chili's QA shifts are staffed by Servers and Bartenders; no one works exclusively

as a QA).[12] Whether the QA position at a particular restaurant is staffed by Servers or by

employees who work exclusively as QAs may change over time.[13]

### 3.A.(2). QA Staffing

Whether and how often the QA position is staffed varies by restaurant and shift,

depending on business volume. Sandidge dep. 139:7-16. Less busy restaurants do not staff or

---

[10] *See also* Luca dep. 88:18-89:13 (Reading, Massachusetts Chili's schedules Food Runners for IMAX showings).
[11] *E.g.*, Hill dep. 35:10-36:1, 46:10-47:7 (when Food Runners are staffed, QA never runs food or drinks or refills drinks); Nicholas dep. 52:4-10; Carbone dep. 91:21-92:14; Wilson dep. 40:6-16, 63:6-64:20.
[12] *See also* Miller dep. 13:8-25 (Clark, New Jersey Chili's Servers work majority of QA shifts; only one employee works exclusively as QA).
[13] Oldakowski dep. 58:1-59:4 (since 2002 or 2003, Burlington, Massachusetts Chili's has had employees who work exclusively as QAs; previously used Servers to fill QA position).

rarely staff QAs because their Servers have time to handle the duties QAs perform at busier restaurants.  Leslie dep. 102:13-25 (QA is scheduled only a couple times per week at low volume restaurants); Youngman dep. 96:15-19 (not all restaurants have QAs).[14]  Higher volume restaurants schedule QAs "pretty much all the time."  Anderson dep. 48:13-19; *see also* Kaddy dep. 43:24-44:3 (QA on every shift at Tampa, Florida restaurant).  QA staffing also varies over time.  Anzini dep. 27:9-15 (Phoenix restaurants have added QAs as the city has grown); Nicholas dep. 10:13-11:14 (Hot Springs, Arkansas Chili's scheduled QAs every shift when the restaurant opened due to high business volume; now QAs scheduled only weekends).

 QAs may be scheduled more often during peak weekend hours, busy holidays, and local events.[15]  The number of QAs per shift also varies by restaurant volume and seasonal needs.  Anzini dep. 28:10-20, 30:6-31:18 (two QAs and four Food Runners on duty during Fiesta Bowl block party due to "outrageous" sales volume; extra Food Runners and QA on duty during rib promotion).[16]  Even when QAs are scheduled, the length of their shifts varies.[17]  Some QAs are released from their shifts before the Servers, others stay the entire shift.[18]

---

[14] *See also* Platz dep. 14:25-17:5 (no QAs at Detroit Farmington Hills Chili's; other Detroit Chili's have QAs); Mason dep. 22:12-23:23 (staffing QAs at Burlington, Massachusetts Chili's is different from Westford, Massachusetts restaurant; Westford does not have a QA on every shift because volume is lower than Burlington).

[15] *E.g.*, Wilks dep. 16:11-19:14, 19:19-20:4 (Canon City, Colorado Chili's schedules a QA during busy summer months, seasonal festivals, and sporting events); Martino dep. 52:16-53:6 (QAs work busy weekend nights); Jandera dep. 47:10-48:9 (QAs are scheduled on college game days); Spears dep. 17:1-23 (no QAs are scheduled during summer when college town's business slows); Roussell dep. 37:24-38:6; Carbone dep. 122:1-7, 124:1-125:12.

[16] *See also* Garner dep. 18:24-19:2 (always two QAs at Fayetteville, North Carolina Chili's on weekends); Gearhart dep. 40:25-41:2 (Phoenix Bell never has more than one QA working at a time); Walker dep. 21:2-7, 48:4-19.

[17] Oldakowski dep. 6:24-7:8, 28:2-7 (length of shift varies from two to six hours depending on the day and whether it is a lunch or dinner shift; QAs are released before Servers; no QAs on duty the first 45 minutes the restaurant is open and between 2:30-5:30 p.m.); C. Fox dep. 14:20-15:7 (length of QA shift varies by day and season).

[18] Carbone dep. 124:1-125:12 (whether QA leaves early varies by shift); Linville dep. 22:17-22; Gearhart dep. 33:3-9; Evans dep. 19:5-10.

### 3.A.(3).  QA Duties[19]

#### a.        Variances By Restaurant And Shift

At certain restaurants, QAs run food, directly interact with guests, refill drinks, take food and drink orders, sing "Happy Birthday" to guests, and other things, while at other restaurants QAs may not perform some or any of those functions.[20]  For instance, Bedford, Texas Chili's QAs perform opening duties that Cross Creek, North Carolina Chili's QAs do not perform. Plane dep. 34:19-35:5.  QAs at some restaurants greet and seat guests, while QAs at other restaurants do not.  Wamsley dep. 28:13-29:3; Connolly dep. 24:2-25:12.  QAs visit with guests concerning menu items, food allergies, and dietary needs at some restaurants, while Managers fill that role at other restaurants.[21]  QAs run food and refill drinks at some restaurants, while Bussers or other employees run food at other restaurants.  *E.g.*, Paolillo dep. 32:4-14 (QAs at Powers, Colorado Chili's run drinks and food); Antley dep. 57:22-58:8 (saw Bussers but not QAs run food at Houma, Louisiana restaurant).  Some restaurants restrict QA access to guest areas, while others do not.  Kaddy dep. 16:3-8 (Tampa, Florida Chili's QAs are "not allowed" in the Front of the House); Flanagin dep. 61:15-22 (QAs at Houston Buffalo Speedway, Texas Chili's are discouraged from running food to the Lounge); Held dep. 54:3-7, 55:4-7 (no rule at

---

[19] As explained in Defendant's Motion for Summary Judgment, QA customer interaction is not necessary to determine whether QAs "customarily and regularly" receive tips under the proper legal standard.  *See* Df's MSJ at Section IV.A.(v).  However, to the extent the Court may determine that QA customer interaction is relevant, variance in QA customer interaction is another individual issue that precludes a "similarly situated" finding.

[20] *Compare* Bryant dep. 58:25-18, 60:24-62:5 (Hanes Mall, North Carolina QAs never refill drinks, answer phone, assist in To Go area, or visit regular guests), *with* C. Fox dep. 22:20-24:2 (Powers, Colorado QA provides drink and chip refills, answers questions about the menu, speaks with guests about food allergies, seats guests, and picks up dishes from guest tables); *compare* Mason dep. 15:6-16:9, 91:19-93:12 (Burlington, Massachusetts Chili's QAs help Servers serve large parties "[o]n a daily basis"), *with* Williams dep. 37:7-12 (QA at American Fork, Utah Chili's never runs food to guests); *compare* Tatro dep. 42:9-12 (Williston, Vermont Chili's QA does not sing "Happy Birthday" to guests), *with* Edwards dep. 34:9-12 (Wellington, Florida Chili's QA joins Servers on the floor to sing "Happy Birthday"); *see also* Smith-Crowder dep. 37:17-21; Roberson dep. 32:14-33:10.

[21] Miller dep. 39:22-24 (Managers, not QAs, at Clark, New Jersey Chili's visit with guests regarding food preparation); Corno dep. 82:15-21 (Tampa, Florida; same); C. Fox dep. 24:7-14 (Powers, Colorado QA discusses food allergies with guests).

LaPlace, Louisiana Chili's that prevents QAs from running food); Anzini dep. 48:18-24 (Phoenix Bell Chili's does not prohibit QAs from delivering food).[22]

Additionally, a QA's duties and amount of guest interaction vary by shift. *E.g.*, Anzini dep. 58:5-13 (impossible to track how much time a QA spends interacting with guests "because it's just going to vary so much").[23] For example, QAs spend different amounts of time running food depending on the restaurant's busyness on any given day and shift.[24] The number of times a QA runs food per shift also depends on whether anyone else is available to run it, if a Server is "in the weeds" and asks the QA to help, if an order was wrong and the QA takes the corrected order to the guest, and other things. Wamsley dep. 23:8-24:7; Nicholas dep. 8:25-10:9.[25] The amount and type of a QA's other direct guest interaction and other duties likewise depend on shift-to-shift circumstances, such as, for example, whether a regular guest asks to visit the QA, whether a Server asks a QA to visit tables, whether the restaurant runs out of something requiring the QA to go to a table and offer a replacement, whether other restaurant positions need

---

[22] The QA dress code varies by restaurant, frequently depending on whether the restaurant restricts QA access to guest areas or not. QAs at the Wellington, Florida Chili's, for example, wear Server attire because "the QAs need to be ready to go on the floor and help or serve . . . at anytime" and if "they have to run food." Green dep. 24:23-25:6. However, the QA at the American Fork, Utah Chili's was allegedly not allowed in the Front of the House and had to stay in the kitchen; she dressed dirtily and wiped food all over her apron. Williams dep. 37:13-29; *but see* Zimmerman ¶ 11 (American Fork, Utah Chili's QAs are allowed to go to the Front of the House). Declarations from restaurant employees will be referred to hereafter solely by the last name of the declarant.

[23] *E.g.*, Sandidge dep. 116:16-19 (guest interaction varies by shift); Berveiller dep. 23:22-24:5 (how frequently QA runs food "depends on the volume" of the restaurant that shift); C. Fox dep. 14:20-15:7 (restaurant busyness varies by shift, day, and season); Nicholas dep. 47:4-8 ("It would just really be based on . . . how the operations are going; how busy we are; what the strength of the floor would be. But there always exists that circumstance where that QA may have to spend a lot more time out on the floor than maybe another shift. . .").

[24] *E.g.*, Edwards dep. 42:23-43:5 (QA runs food to tables "on every shift. It may only happen once or twice. It may happen ten or twelve times, depending on how busy the shift is and perhaps how short staffed we are."); Phillips dep. 37:8-38:9 ("On my slower shifts . . . generally I won't usually run food to a table [in the Dining Room], I'll have enough [S]ervers on. . . . On my busy shifts, like Saturday nights, Friday nights, anywhere from 5-15 times a night."); Rumski dep. 21:3-25 (QA runs food to tables when Servers are "very busy" but not when the Servers are "just up front talking"); Connolly dep. 20:9-21; K. McDonald dep. 30:24-31:8; Acosta dep. 46:7-10; Smith-Crowder dep. 37:3-8; Meyer dep. 21:1-23; Garner dep. 22:13-18; Latka dep. 12:5-23.

[25] *See also* C. Fox dep. 18:19-22:4 (QA visits with guests concerning "refires," "meaning something needed to come back or . . . needed to be remade"); Watson dep. 36:3-19 (QAs "dress desserts" – i.e., add ice cream, syrup, and spoons – and deliver them to guests on busy shifts); Allen dep. 32:12-33:22 (QA may run food 2-10 times per shift).

assistance, and other things.  *E.g.*, Standifer dep. 127:13-128:23 ("there's more than just a

running of the food interaction with the guest;" QA's regular guests ask to visit with QA); C. Fox

dep. 18:19-22:4 (when guests ordered steaks that were "frozen solid" and would take 45 minutes

to cook, QA presented the guests with a different option and visited them again after the food

was served "just to make sure everything was okay and see how they were doing.").[26]

> **b.**     Variances By Individual QA, Server Experience, And Manager
> On Duty

Even at the same restaurant, QAs may perform different duties.  For example, only two

out of the six QAs at the Jackson, Mississippi restaurant run food.  Anderson dep. 38:5-39:21,

94:7-12; *see also* Kaddy dep. 40:19-23 (some but not all QAs at Tampa, Florida Chili's deliver

food to tables).  Some Burlington, Massachusetts Chili's QAs are more proactive than others

with respect to addressing guests, and some QAs there are more willing than others to run food.

Mason dep. 91:19-93:12.  At the Wareham, Massachusetts Chili's, a QA named Jennifer ran

food to guests for Server Carbone when the restaurant was "crazy busy" because Carbone and

Jennifer were friends, while a QA named Kevin did not run food for Carbone, and Jennifer did

not run food as often for other Servers with whom she was not friendly.  Carbone dep. 102:17-

104:12.[27]  Additionally, QA duties may vary depending on the QA's personal preference or

unique skills.  Stallings dep. 15:16-25, 17:6-10 (whether QA runs food "[d]epends on . . . the

---

[26] *See also* Nicolas dep. 46:3-49:3 ("A lot of times we have the QA just go out there, when it's slow, and touch base
with the guests and make sure their food is all right."); Paolillo dep. 41:10-23 (there could be a big flow of food just
coming in and out, and the QA would be in the Window the entire time; varies by day and season); Hill dep. 47:14-
48:18; Linville dep. 23:14-24:7; Rumski dep. 22:4-23:8; Edwards dep. 29:22-30:12; Allen dep. 45:15-46:11; Posa
dep. 129:22-132:3.  Witnesses from the same restaurants note variances in the amount and frequency of QA guest
interaction.  *E.g.*, Owens ¶ 4; McKelvey dep. 70:13-71: 11; Spears dep. 13:5-10, 13:22-14:2, 65:14-17; Brenner dep.
47:8-18; Standifer dep. 64:2-65:18; Jones dep. 40:20-41:1; Johnston dep. 6:13-7:16, 9:6-13, 22:8-11, 38:6-14; K.
McDonald dep. 37:13-20, 29:20-40:16, 62:18-63:9; Sawyer dep. 20:4-23:18; Connolly dep. 23:9-25:12.  A summary
of material intra-restaurant QA differences and tipping differences is attached hereto as Exhibit B, "Summary Of
Evidence Highlighting Intra-Restaurant QA And Tipping Differences," for the Court's ease of reference.
[27] *See also* Spears dep. 67:3-13; Beaulieu dep. 47:8-48:10; Nass dep. 95:1-96:6, 135:7-136:6.

mood I'm in"); Davis dep. 69:20-70:11 (QA is the "rescue 911 when it comes to the screaming

brat").[28] Due to her ability to "schmooz[e]," the QA at the Powers, Colorado Chili's is one of

the first people a Server calls to explain delays and errors to guests if a Manager is unavailable.

Wamsley dep. 24:23-26:17 (QA makes guests "almost forg[e]t that the food ha[s] taken so

long"). A Burlington, Massachusetts Chili's QA has even received "nice e-mails" from guests

for her personal attention to their special dietary needs. Connolly dep. 24:2-25:12.

 Some QAs have more guest contact, such as serving food, when new Servers are on duty

to "pick up the slack" for them. K. McDonald dep. 30:24-31:8. One QA "frequently" visits

tables to check on unclear orders, "[e]specially if it is a new Server" who entered the order.

Edwards dep. 31:3-32:6; *see also* Nicholas dep. 46:3-49:3. Further, QAs may have different

duties depending on which Manager is on duty. *E.g.*, Allen dep. 34:12-17 (how often Lawton,

Oklahoma Chili's QAs take drink orders "really depends on what Manager is working").

### 3.B. Tipping Differences

#### 3.B.(1). Restaurant QA Tip Out Activity[29]

 No national corporate policy requires Servers to share tips with QAs; to the contrary,

company policy expressly prohibits mandatory tip sharing with QAs.[30] At the restaurant level,

whether a "policy" of tipping QAs exists, and, if it exists, whether it is "mandatory" – *i.e.*,

imposed or enforced by management – varies by restaurant, by Manager, by individual Server

---

[28] *See also* Wilson dep. 35:18-25 (QA is vegetarian and only QA at Los Lunas, New Mexico Chili's that talks to guests about vegetarian and vegan menu options); Edwards dep. 31:3-32:6; Meyer dep. 22:22-23:6; Laegel ¶ 3.
[29] Several states, such as Colorado, regulate tip pool participation. *See* Colorado Agreement to Contribute to Tip Pool, Df's MTD App. at ex. B98. Indeed, all 37 opt-ins from Colorado signed acknowledgements that they only are required to tip out to Bartenders and Bussers. *Id.*; *e.g.*, Parsons dep. 33:6-33:16.
[30] *See* Sandidge dep. ex. 5, Jan. 19, 2006 Mem. to Chili's Management Teams Re. QA Position and Guidelines, Df's MTD App. at ex. B79; August 2006 QA Certification, Df's MTD App. at ex. B99; *see also* Sandidge dep. 41:1-3, 61:12-21, 141:7-20 (Chili's position is that a QA "may receive voluntary tips directly from a Server;" a Server can voluntarily tip any hourly employee); Leslie dep. 55:9-14, 56:14-25, 100:24-101:2, 63:2-19 (Area Managers and Regional Directors can create guidelines that do not contradict Chili's policy).

perception, and also can vary over time.  Whether Servers even tip out QAs varies by restaurant.
Oldakowski dep. 19:23-20:11, 53:7-8 (voluntary QA tip outs at Burlington, Massachusetts
restaurant; QAs are not tipped out at Andover, Massachusetts restaurant); Phillips dep. 16:5-8
("[e]very Chili's location is different, and it really kind of depends on their business;" Phoenix
Bell Chili's is "extremely busy," so it is "our practice" to tip out QAs); Wilks dep. 32:1-32:22
("[I]t is an unusual situation for the QA to get tipped at all" at Canon City, Colorado Chili's).

At the restaurants where QAs are tipped out, whether and how tipping out is addressed in
training varies.  Some Trainers do not mention QA tipping, others do.  Garner dep. 56:2-4
(tipping out QAs not mentioned during training at Fayetteville, North Carolina Chili's); Hill dep.
52:21-54:13 (Manager and Trainers at Gastonia, North Carolina Chili's discussed tipping QAs in
orientation in terms of "[t]ake care of your QA and your QA will take care of you").[31]  Some
Servers learn about the restaurant's tip out practice once they begin working shifts.[32]

Policies and practices at certain restaurants regarding tipping QAs also have changed
over time.  Indeed, Plaintiff herself admits that at the Sugarland, Texas restaurant, Servers
formerly passed a bag to collect tips for QAs, but no longer do so and tipping QAs is now
"completely and totally voluntary."  Roussell dep. 71:4-72:6, 105:3-6.  After this suit was filed, a
memo was posted at the Gastonia, North Carolina Chili's stating that QAs could no longer ask
for tip outs, that a lawsuit had been filed, and that "basically" anyone not in compliance would
be terminated.  Hill dep. 55:6-22.  Hanes Mall, North Carolina Chili's Managers formerly filled
QA roles and were not tipped; now the QA position is filled by Servers who tip out the QAs.

---

[31] *See also* Antley dep. 18:15-22, 19:24-20:3; Gearhart dep. 29:7-23; Meyer dep. 11:25-12:5; Buonopane dep.
63:12-20; Fisher dep. 13:9-14:13; Esquivel ¶ 6.
[32] *See* Miller dep. 21:8-18, 21:25-22:2.

Bryant dep. 68:13-20, 73:13-74:6, 74:21-23.[33]

### 3.B.(2).  Restaurant Management's Role In QA Tip Outs

The degree and type of Management involvement in QA tip outs varies by restaurant. For example, Managers at the Phoenix Bell Chili's are "completely hands off in every regard" with respect to QA tipping.  Gearhart dep. 23:8-11.[34]  The GM of the Burlington, Massachusetts Chili's held a meeting with his Managers regarding the January 2006 corporate reminder email (Df's MTD App. at ex. B79) on QA tip outs and told them the email did not affect their restaurant "because this is the way we have always handled any sort of tipping policy by not having one or mandating tip-outs." Mason dep. 61:21-62:18.

On the other hand, Managers at some restaurants allegedly required Servers to check out with management or a Server designated by management to confirm that the Servers have tipped out the QAs.[35]  Managers at the Gastonia, North Carolina Chili's allegedly gave QAs the Server roster so the QAs could mark off the names of Servers who tipped them out.  Hill dep. 52:21-54:13.  In contrast, the Regional Director of several Midwestern Chili's has never seen a

---

[33] *See also* Edwards dep. 9:20-10:4 (tipping out QAs has always been voluntary at the Wellington, Florida restaurant; when employees received a letter about this lawsuit, Managers informed the QAs that they would no longer collect tips on behalf of QAs); Spears dep. 23:22-24:20 (Stillwater, Oklahoma Chili's made the local decision to prohibit QA tipping when Managers received memo concerning lawsuit; previously permitted voluntary QA tip outs); Williams dep. 43:25-44:16, 51:3-52:12 (when QA pay rate was reduced in 2004, the American Fork, Utah Chili's QA tipping practice changed from never tipping out QAs to tipping); Hart dep. 42:12-23, 49:11-25; Held dep. 71:9-73:8; Green dep. 7:5-13, 8:5-12:15; Sandidge dep. 63:3-64:25; Meyer dep. 16:12-17:5, 17:21-21; Buonopane dep. 77:13-78:12; Wamsley dep. 31:17-32:5, 43:20-44:15.

[34] *See also* Anzini dep. 26:1-9 (Managers do not interfere with Servers' voluntary tips to QAs; tips are a way of showing gratitude); Davis dep. 46:13-19 (Manager told Server, "[you are] not required to tip the QAs and you have never been required to tip QA, and if you do so it is on your own . . . accord"); Anderson dep. 84:7-11 (has never felt pressured by a Manager at Jackson, Mississippi restaurant to tip out QAs or tip out QAs more); Leslie dep. 61:14-62:1, 102:2-5; Meyer dep. 31:3-16; Mason dep. 17:23-18:13, 20:5-21:19, 22:1-11; Buonopane dep. 92:6-11; Connolly dep. 6:3-7:15; Owens ¶ 16; Garza ¶ 3; Anderson ¶ 4.

[35] Abshire dep. 53:12-55:8 (Sulphur, Louisiana Chili's Managers required Servers to check out with Managers); Miller dep. 14:20-15:11, 17:4-24 (Closer at Clark, New Jersey Chili's writes down Servers' names and amount they tip out; although witness claims management designates the Closer to perform that role, she has never heard management direct anyone to make a list and collect tips and has only heard Managers ask "[d]id everybody tip out"); *see also* Carter dep. 22:6-23:6; Jandera dep. 53:9-24; Antley dep. 33:14-35:7; Davasher dep. 44:1-11; Lewis dep. 21:23-22:3; Nicholas dep. 22:5-21.

Manager distributing Server check out sheets to QAs.  Leslie dep. 63:2-19; *see also* Jamison dep. 45:3-46:2 (not "practice" at Winston-Salem, North Carolina Chili's for Manager to post Servers' sales reports; some Servers request their reports because "that's how I like to tip the [QA] out"). Finally, Managers at some restaurants allegedly collect QA tip outs or have done so in the past. *E.g.*, Donohue dep. 61:7-23, 73:9-14; Held dep. 64:18-65:24.

Within the same restaurant, management involvement in QA tip outs can vary depending on the Manager on duty.  For instance, only one Manager at the Lebanon, Tennessee Chili's has told a Server that she must tip QAs and has solicited tips for the QAs.  Downing dep. 58:14-25, 62:4-22.  None of the other Managers there has solicited tips or told Servers to tip out QAs a certain amount.  *Id.* 62:4-22.  Indeed, another Server who works as a QA at the same restaurant testified that tipping out QAs is "voluntary," she has never felt pressured by management or other employees to tip out QAs or to tip out a certain amount, she only tips the QA one out of ten shifts she works as a Server, and she only receives tips one out of five shifts when she works as a QA.  Fisher dep. 11:8-12:13, 13:9-14:13, 19:2-20:7, 33:22-34:17.  Another witness testified that whether she feels pressured by management to tip out the QA and whether Managers are involved in collecting tip outs depends on which Manager is working.  Acosta dep. 28:1-29:23.[36]

Further, while Chili's is unaware of any employee being formally disciplined for not tipping out a QA (*see* Sandidge dep. 26:21-27:4, 27:17-23 (no formal complaints to Brinker regarding QA tip pooling)), whether there are any real or perceived management-imposed consequences for not tipping out QAs also varies by restaurant.  *E.g.*, Bryant dep. 89:6-90:12 (Manager wrote up Server at Winston-Salem, North Carolina restaurant for not getting required

---

[36] *E.g.*, Antley dep. 77:10-18; Laegel ¶ 5; Poulin dep. 43:3-44:22; Owens ¶¶ 15-16; McKelvey dep. 120:18-121:17.

signatures on Server checkout sheet; Server attributes write-up to not tipping out); *but see* Oldakowski dep. 59:21-60:19 (check out sheets ensure that all Server side work is complete).[37]

### 3.B.(3).   Perception Of "Voluntary" Or "Mandatory"

An individual's perception of whether a restaurant's QA tip out process is "voluntary" or "mandatory" is highly subjective and varies by employee, even among employees of the same restaurant.  For instance, Stallings testified that the Corsicana, Texas Chili's has never had a policy requiring Servers to tip QAs and that no one in management told him or anyone else that tipping QAs is mandatory.  Stallings dep. 12:13-24.  Hunt agreed that the restaurant has no mandatory policy, and she has never tipped a QA.  Hunt dep. 11:13-17, 12:24-13:4.  Opt-in plaintiff Evans, however, claims that felt compelled to tip the QAs at the same location, although she admittedly did not tip them every shift.  Evans dep. 21:24-22:9, 39:19-40:3.  Two Fayetteville, North Carolina Chili's employees also report diametrically opposed perceptions and experiences.  Compare Folsom dep. 9:19-12:2, 19:14-21:14 (voluntarily tips QAs; has never felt pressure to tip out or to tip out more; when she worked as a QA, she never kept a list of who tipped her, did not solicit tips, and never told Servers to tip her), with Garner dep. 57:20-59:10, 77:24-78:5 (required to tip QAs; tips are collected in the presence of a Manager; QAs track which Servers have tipped them; QAs "probably" ask for tips).[38]

Witnesses at different restaurants who have similar experiences regarding QA tip out practices vary in whether they perceive the practices as voluntary or mandatory.  A Server at the

---

[37] *See also* Antley dep. 31:21-32:19 (tip outs required, but no Server has been disciplined, terminated, reprimanded for not tipping QA); Vial dep. 75:7-76:3, 77:16-79:7 (believes less desirable shifts go to Servers who question QA tip out policy, but admits that Manager explained that desirable shifts go to Servers with the ability to handle them); Evans dep. 13:15-21; Miller dep. 14:7-19, 20:3-9, 33:1-6; Beaulieu dep. 72:18-73:20, 78:7-17; Dorr dep. 48:7-9; Jandera dep. 63:9-25; Farinato dep. 62:15-18; Abshire dep. 49:24-50:15; Nicholl dep. 11:4-9; Plane dep. 91:16-92:2.

[38] *See also* White dep. 6:21-7:6; Nass dep. 12:7-12; Hallmark dep. 55:15-21; Standifer dep. 9:22-10:10; Smith-Crowder dep. 41:15-43:14; Anderson dep. 53:7-12; Gray dep. 7:21-8:1, 10:19-11:20; Oldakowski dep. 19:23-20:3; Connolly dep. 6:3-7:15; K. McDonald dep. 48:9-14, 59:4-23; Mason dep. 9:19-22; Buonopane dep. 6:5-19.

Buffalo Speedway Chili's in Houston, for example, believes that tipping QAs there always has been voluntary, even though until a couple of years ago she always gave 1% of her sales to QAs who collected the tip outs on their next shift from a binder kept in the Manager's office. Rumski dep. 29:1-12, 30:5-31:21 ("nobody ever said we had to;" "kind of understood that throughout the shift those people helped you out, and that's what you did."). Management has never told her to leave a percentage of her tips to the QA, and no one has been disciplined for not tipping out. *Id.* 28:14-29:7, 31:15-21. In contrast, witnesses from other restaurants where tipping QAs supposedly is "understood," even though no Manager told them to tip out, and no one has been disciplined for not tipping out, view these same practices as "requiring" QA tip outs. *E.g.*, Parrish dep. 50:11-51:16; D. McDonald dep. 40:11-22, 46:11-22, 48:1-15.

Moreover, many witnesses are internally inconsistent in their own views on whether a restaurant's practice of tipping out QAs is required or discretionary. For instance, Carbone testified on one hand that tipping out QAs is required at the Wareham, Massachusetts Chili's. Carbone dep. 129:3-21. On the other hand, she testified that she was told, "*[i]f you tip, you know, make sure you take care of everybody,*" *id.* 132:8-16 (emphasis added), and that it is possible that she was told she "should" tip instead of "must" tip (although she believes "should" and "must" are synonyms). *Id.* 154:23-158:4. Similarly, Held testified that tipping out QAs $5 per shift was "mandatory" at the LaPlace, Louisiana Chili's before 2006, even though she could not remember if the Manager told her that she "should" or "had to" tip the QAs and even though she was never disciplined for tipping out less. Held dep. 68:1-11, 70:16-71:8. Plane testified that she is "required to give" QAs a tip, even though she does not always tip the QA and has even announced to a Manager: "It's not mandatory for me to tip out a QA. And if I can't afford it, I can't afford it." Plane dep. 57:23-58:25.

15

### 3.B.(4).  Perception Of And Reaction To Alleged Pressure/Coercion

Vast variations exist regarding whether Servers feel "pressured" by coworkers to tip out the QA.  *E.g.*, Church dep. 83:24-84:22 (pressure affects different Servers differently; Servers who do not want to tip out do not tip out).  Some Servers feel no pressure.  *E.g.*, Connolly dep. 9:21-10:8 (there is "absolutely not" pressure on Servers to tip out QAs).  Some Servers apparently did not feel pressure to tip out until this suit was filed.  Spears dep. 92:15-93:5.  One Server feels peer pressure to tip out because he does not want to be "the only one not tipping out."  Carter dep. 27:15-20.  Another Server feels more pressure to tip out his friends who work as QAs.  Davsher dep. 51:23-52:11.  Even at the same restaurant, Servers vary in whether and to what extent they feel peer pressure to tip out QAs.[39]

Moreover, whether QAs solicit or "pressure" Servers for tips or not, and the way this "pressure" is perceived, also varies by Server.  *E.g.*, Sirianni dep. 105:4-21 (whether Servers feel pressured by QA to tip out depends "on the person and their personality").  For example, a QA at the Bedford, Texas Chili's made one Server feel uncomfortable by taking off his ball cap and saying, "Tip out!"  Plane dep. 60:11-20.  At the Fayetteville, North Carolina restaurant, however, the same Server "never felt uncomfortable" when the QA put a basket on the ledge, listed Server names on a piece of paper, and crossed out names when she was tipped, "[b]ecause [the QA and she] were friends."  *Id.* 71:1-74:12.[40]

---

[39] *Compare* Jandera dep. 56:7-9 (feels pressure), *with* Jacobs dep. 14:3-8 (feels no pressure); *see also* Zimmerman ¶ 16; Williams dep. 62:21-63:16; Folsom dep. 19:14-21:2; Plane dep. 9:21-10:8, 89:2-8; Buonopane dep. 77:13-78:15; Oldakowski dep. 66:17-67:7; K. McDonald dep. 74:2-75:12.

[40] *See also* Corno dep. 77:20-78:11 (QAs may call Servers "cheap" for not tipping out enough, but do not "purposefully mess with" Servers' food orders because the QAs "like their job" and "try to do their job to the best of their ability"); Buonopane dep. 62:12-16 (QAs "don't verbally complain [when she shorts them].  Facial expressions are their reactions. . . . You get rolling of the eyes. . . . A little bit of attitude."); Bogert dep. 27:4-28:23 (Servers "just kind of get on your case a little bit probably just trying to get you to tip out, but it [i]s not anything forceful or demanded"); Jamison dep. 38:14-39:1; Standifer dep. 67:19-69:7; Carbone dep. 159:8-10; Phillips dep. 16:23-17:2; Miller dep. 25:2-24; K. McDonald dep. 46:11-47:2; Adams dep. 91:18-92:3.

16

Indeed, every individual feels or deals with pressure differently.  Some Servers admittedly feel more pressure generally to tip out than other people might.  Carbone dep. 161:9-15 (pressure to tip out "varies from [S]erver to [S]erver.  I am very sensitive to people.").  In contrast, another Server was unaffected by purported attempts to pressure him to tip out more.  Walker dep. 38:24-39:25 (when QAs and Managers would ask him to tip out more to the QA he would say "I don't want to;" "they would just kind of just try to pressure me but it was to no avail;" QA would delay his food in "retaliation," but it "wouldn't really affect me.  It would just be like they're trying to prove a point. . . ."); *see also* Church dep. 107:13-23 (some Servers are affected by peer pressure to tip out QAs more than others; "I think most of the people that didn't want to tip-out the QA anyway just wouldn't").

### 3.B.(5).  Frequency And Amount Of QA Tip Outs

The frequency and amount that Servers tip out to QAs vary tremendously based on a number of highly subjective and arbitrary factors that are unique to each individual.  "[E]veryone [i]s different on how they tip[]."  Garner dep. 74:6-13.  Some Servers never share tips with QAs. K. McDonald dep. 47:15-25 (some Servers do not share tips "for personal reasons"); Wilson dep. 30:8-11 (Server never tips out QAs because he has six kids at home to support); Wamsley dep. 36:5-37:2.  Others always share tips. *E.g.*, Meyer dep. 10:25-11:10 (always shares tips with QAs because "I know it's the hardest job in the restaurant to do"); Folsom dep. 19:14-21:2 (always tips out QA "[b]ecause they deserve it because they helped the customer just as much as I did").  Some Servers do not share tips with the QA when they are annoyed with the QA.  Evans dep. 21:24-22:9 (tips QAs depending on "[h]ow mad I [am] at how many orders [the QA] screwed up for me"); Spears dep. 28:12-29:1, 37:3-13 (amount depends on whether QA is working hard; will not tip out if QA was only on the shift 30 or 40 minutes or did not help Server).  One Server split her tip with the QA when the QA went to a table and salvaged a forgotten order problem.

Wamsley dep. 34:8-20.

Some Servers always tip out the same amount, regardless of the QA's performance.[41] The amount other Servers tip out varies by day and shift. Phillips dep. 22:17-19.[42] Some Servers give "extra" when an unusual event occurs or they feel that the QA did a great job. Anderson dep. 58:1-6, 59:19-60:4 (amount varies "depend[ing] on how good they were that day").[43] Likewise, if QAs do not do a good job, some Servers refuse to tip them. Wilson dep. 17:8-12 ("Sometimes we had QAs that would just not do the work. . . . I'd give them a hug, but I wouldn't give them a tip."). Other Servers share tips based on "how busy the day was and how much money [the Servers] made during the shift." Meyer dep. 8:12-9:2.[44] One new Server tipped "more" or "extra" when she started so QAs would like her and not think she was cheap. Carbone dep. 111:12-23, 113:7-11. That Server also initially tipped her friend more than other QAs but then tipped her friend "the minimum" because she believed her friend knew how hard she was working for her money. Id. 111:12-23, 114:1-18. Another new Server initially tipped out roughly whatever she tipped to the Busser, but once she got better at her job and understood what QAs were doing, she would tip them out what she thought they deserved, usually between

---

[41] Smith-Crowder dep. 50:13-15, 51:6-8 (never more than 1% of sales, but other Servers at same restaurant tip more than 1%); Walker dep. 22:8-12 (50 cents per table); Hill dep. 52:21-54:13 (no less than 10% of the tips collected for each shift); Davis dep. 27:4-24, 33:8-35:11 ($5 at lunch and $10 at dinner; if his sales are under $100 he tips nothing; before 2007 he matched the highest tip the QA received per shift plus $1); Williams dep. 55:7-56:4; Antley dep. 78:13-79:16; Buonopane dep. 20:5-19; Goodwin dep. 22:24-23:5; Oldakowski dep. 20:12-16.

[42] See also Wamsley dep. 33:7-24 (tips vary from day to day and shift to shift; may be as low as $3 and as high as $10-15); C. Fox dep. 27:3-28:2 (largest tip is $20; smallest tip is "none," which happens "[a] couple of times a week"); Jenkins dep. 40:4-14 (Servers may tip out QAs on busier dinner shifts but not lunch shifts); Luca dep. 18:17-19:7 (tips out more on Friday or Saturday night and when QA makes no mistakes); McKelvey dep. 118:18-119:10 (tips out more around the holidays because guests are more generous with their tips); Held dep. 74:13-76:4, 77:2-20; Antley dep. 78:17-79:13; Wilks dep. 34:22-35:21; Connolly dep. 8:9-9:7; Zimmerman ¶¶ 14-16; Laegel ¶ 4; Johnston dep. 7:22-8:5, 23:17-24:1; Connolly dep. 47:9-18; K. McDonald dep. 50:10-13, 57:4-58:16.

[43] See also Flanagin dep. 33:16-18 (tips more to QAs who "d[o] a much better job than others" because it is "right or nice" to do); Antley dep. 78:17-79:13; Hill dep. 56:5-57:9; Latka dep. 22:1-15; Edwards dep. 12:18-13:23.

[44] See also Garner dep. 62:6-17, 74:6-13 (amount varies based on busyness and amount of tips Server receives); Goodwin dep. 22:14-23 (same); Smith-Crowder dep. 41:15-20, 46:13-15 (1% of sales unless she does not receive any tips that shift); Alfrey dep. 47:18-48:23, 79:14-80:6; Wamsley dep. 33:7-24; C. Fox dep. 26:10-20, 29:1-6.

$5-15. Folsom dep. 59:14-60:4.[45]  One Server tends to tip QAs well because she has worked QA

shifts and knows the amount of work they do.  Wamsley dep. 33:7-24.  In addition to the wide

variances in the frequency and amount they tip out to QAs, most Servers keep no records of what

they tip out, do not tell Chili's how much they tip out to QAs, and believe it would be impossible

to determine those amounts.  *E.g.*, Plane dep. 63:13-64:10 (did not write amount of QA tip outs

on Server check out sheet; no way to calculate tip outs – "I have zero record of that."); Held dep.

89:11-90:12 (has no record of how much she tipped out); Zayas dep. 128:14-23 (same).

4.   ARGUMENT

   4.A.   Plaintiff Is Not "Similarly Situated" To The Class Members She Seeks To
          Represent.

   The deposition testimony of approximately 100 current and former restaurant Managers,

Servers, and QAs, a strong majority of whom deny that they, or others with whom they worked,

were "required" to tip out QAs, demonstrates compellingly that Plaintiff is not "similarly

situated" to the class members she seeks to represent.  The witnesses in this case report

substantially different experiences, as compared to Plaintiff, as compared to each other, and as

even they personally experienced over time.  There is wide variation in specific QA job

responsibilities, whether and to what extent Servers tip out QAs, why some Servers voluntarily

tip out QAs and other Servers allegedly feel required to tip out QAs, Manager involvement in the

tip out process, and how much Servers decide to tip out QAs.  *See* Section 3.A.-B., *supra*.  That

some opt-in Servers denied that they tipped QAs at all, other opt-in Servers denied that they were

"required" to tip QAs, several Servers testified that they did not agree with the lawsuit, and

---

[45] *See also* Carbone dep. 105:19-106:11 (tipping out QAs generously benefits Server because she believes in "energy" and "the transfer of moods" and "if [the QAs] are in a good mood, I am in a good mood, then I can pass that energy onto my customers"); Owen dep. 12:5-23 (QAs "do a lot for me because I was in a severe accident [and ] had back surgery and everybody knows that and so they do a lot for me."); Corno dep. 74:4-12 (tips out extra because he is friends with the QAs).

several other Servers disparaged the lawsuit as "silly," "ridiculous," "screwing the system however which way they can do it to get money," "unjust," and "petty," further reinforces the point. *See* note 3, *supra*.

### 4.B.   There Is No Evidence Of A Single Decision, Policy, Or Plan That Violates The FLSA.

To maintain a collective action at the "second stage" analysis, a plaintiff must demonstrate that, among other things, she and the class members she seeks to represent are subject to an unlawful "single decision, policy, or plan" that violates the FLSA. *Mooney*, 54 F.3d at 1214 n.8, 1215; *accord Simmons v. T-Mobile USA, Inc.*, No. CIV. A. H-06-1820, 2007 WL 210008, at *4-5 (S.D. Tex. Jan. 24, 2007) (common policy or plan and a factual or legal nexus); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 508 (M.D. La. 2005) ("some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice").[46]  Individualized violations of the FLSA resulting from "specific circumstances," "local policies of various managers located at various sites," or from differing applications of a common policy "by different supervisors made on a decentralized employee-by-employee basis" are inappropriate for collective action treatment. *See, e.g.*, *Hinojos v. The Home Depot, Inc.*, No. 2:06-CV-00108 (D. Nev. Dec. 1, 2006) (specific circumstances); *England*, 370 F. Supp. 2d at 511 (local policies); *Brooks v. Bellsouth Telecomms., Inc.*, 164 F.R.D. 561, 569 (N.D. Ala. 1995) (different supervisors); *Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 465 (D.N.J. 1988) (*Lusardi II*) (same); *see also Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 363 (M.D. Ala. 1999) (refusing conditional certification of proposed class

---

[46] The challenged "decision, policy, or plan" must be unlawful. *See West v. Border Foods, Inc.*, No. 05-2525, 2006 WL 1892527, at *9 (D. Minn. Jul. 10, 2006); *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *7 (E.D. La. July 2, 2004); *Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. Mar. 18, 1996). Here, the only policy is lawful. *See* Section 3.B. and note 30, *supra*.

of servers who worked at different restaurants in different states under different managers).

Here, there is no evidence of an unlawful national decision, policy, or plan requiring all Servers to share tips with QAs, much less any policy authorizing Managers to pressure or coerce Servers to tip out QAs. To the contrary, corporate policy expressly prohibits mandatory tip sharing with QAs. *See* Section 3.B. and note 30, *supra*. The absence of any unlawful national policy of required QA tipping is further confirmed by the strong majority of Servers deposed in this lawsuit who testified that tipping out QAs is voluntary, not mandatory (*see* Section 3.B., *supra*), as well as the meager opt-in rate of less than six percent.

### 4.C.   Highly Individualized Fact Determinations Are Necessary To Resolve The Claims Of Each Server.

At the "second stage" analysis, a plaintiff must also demonstrate that, among other things, individual fact determinations are not necessary to resolve the claims of each class member. *See Mooney*, 54 F.3d at 1213-15; *Anderson*, 488 F.3d at 953; *accord Reyes*, 2007 WL 101808, at *2 (decertifying in part because employees had significant differences in their jobs depending on the practices of individual store managers, store demographics, and location); *O'Donnell v. Robert Half Int'l, Inc.*, 429 F. Supp. 2d 246, 250 (D. Mass. 2006) (proposed class would include "individuals in different departments and locations . . . working under different management"); *Johnson*, 2005 WL 1994286, at *4 (decertifying where "highly variable" violations, "depending to a great extent upon circumstances and the attitudes and perceptions of individual managers," presented "numerous variations of complaints alleged, and concomitant individual inquiries").

Plaintiff's claims, by their very nature, require individual fact determinations.[47]   Plaintiff

---

[47] It is well established in the analogous context of class certification that determinations of commonality require an examination of the law applicable to the causes of action alleged. *See, e.g., Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001); *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981); *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 251 (C.D. Cal. 2006).

alleges that she and other Servers were "required" to tip out parts of customer gratuities to QAs, and that the sharing of tips was "not voluntary." *See* Pl's Compl. at ¶¶ 5, 10, 12, 16-17. Plaintiff's counsel has represented to the Court that he deems the "key issue" in this case to be whether the Servers were "coerced." *See, e.g.*, Jul. 9, 2007 Status Conf. Trans. at 5, Df's MTD App. at ex. B97 ("the underlying key issue" is "that all employees were coerced"), *id.* at 10 (stating "[w]e have people that say, 'We were coerced by our management at our store,'" and framing the relevant inquiry as whether the employee felt "coerced or compelled"). Against this backdrop, such a claim appears to necessarily invite an assessment adapted from *Burlington Northern & Santa Fe Railway Co. v. White*, namely, that plaintiff must show that a reasonable Server would have found the Manager's action materially coercive, which in this context means it well might have dissuaded, by force or threat, a reasonable Server from believing that tipping out a QA was voluntary, but instead was required. 126 S. Ct. 2405, 2415 (2006); *see also* BLACK'S LAW DICTIONARY (8th ed. 2004) (defining "coerce" as "[t]o compel by force or threat"). It is axiomatic that such a claim is not amenable to class treatment.[48]

Determining whether a particular Manager pressured, coerced, or otherwise "required" a Server to tip out a QA is a quintessential individualized inquiry that necessarily turns on a careful analysis of the Manager's actions, the Server's interpretation thereof, the Server's response, and the credibility of the witnesses, all of which can and do vary significantly. *See* Section 3.B., *supra*. Moreover, if Server tipping out to QAs was found to be "required" in a particular case,

---

[48] Courts routinely deny certification of similar "manager coercion" claims, such as meal and rest break claims, due to the need for individual inquiries. *See, e.g., Polion v. Wal-Mart Stores, Inc.*, 22 Mass. L. Rep. 31, 44-50 (Mass. Sup. Ct. 2006) (whether associate was coerced to miss or voluntarily missed a rest break requires an individualized inquiry); *Jackson v. Wal-Mart Stores, Inc.*, No. 258498, 2005 WL 3191394, at *5 (Mich. Ct. App. Nov. 29, 2005) (rest breaks claims require inquiries into whether supervisors "expressly required" associates to miss breaks or whether they "simply chose to do so for a number of personal reasons"); *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 557 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (same).

Defendant would also be entitled to defend itself by showing that the particular QA regularly and customarily received tips and thus could lawfully be included in a mandatory tip pool in accordance with 29 U.S.C. § 203(m). This defense raises additional individualized inquiries that can and do vary significantly from QA to QA and even from week to week.[49]  *See* Section 3.A., *supra*.[50]

Finally, because fact findings as to one Manager, Server, and QA in one restaurant cannot logically or lawfully be extrapolated to others in different restaurants, evidence of particular deviations from the nationwide policy that sharing tips with QAs is voluntary would not permit the Court to find that Defendant requires its Servers to share tips with QAs nationwide. Stated differently, evidence that one opt-in Server was required to tip out the QA during one period of time does not speak to whether other Servers who worked at other locations, at other times, under other Managers, were required to tip out QAs.[51]

### 4.D. Allowing This Case To Proceed As A Collective Action Would Be Unfair, Unmanageable, And Unnecessarily Burdensome.

Given the wide variance in the evidence, the absence of common proof, and the necessity of highly individualized fact determinations for more than 3,200 opt-ins across the country,

---

[49] Where employees "perform a variety of different jobs, an employee's status as one who 'customarily and regularly receives tips' will depend on the total fact situation and will be determined on the basis of such employee's activities over the entire [workweek]." DOL Field Operations Handbook § 30d00(c)(2) (Dec. 9, 1988).

[50] Not even damages are immune from individualized scrutiny, since Plaintiff seeks to recover all monies tipped out to QAs, and those tips vary considerably in frequency, calculation, and amount from Server to Server, shift to shift, and even between QAs on the same shift. *See* Section 3.B.(5), *supra*.

[51] The fact that courts regularly decertify collective actions presenting similar challenges further emphasizes this point. *See, e.g., Reyes*, 2007 WL 101808, at *2; *O'Brien*, 2006 WL 3483956, at *4 (granting motion to decertify where "each claim would require extensive consideration of individualized issues of liability and damages"); *Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 WL 2085312, at *4-5 (N.D. Ga. July 25, 2006) (no certification where "every employee must testify about his awareness of the overtime policy, and his violation of that policy – and whether it was compelled by his or her branch manager"); *Johnson*, 2005 WL 1994286, at *4-5 (granting decertification where alleged violations were "highly variable" and depended on "attitudes and perceptions of individual managers"); *Bayles v. Am. Med. Response of Co., Inc.*, 950 F. Supp. 1053, 1061 (D. Colo. 1996) (individualized inquiries of "how or whether defendant's policy was implemented by individual managers").

allowing this case to proceed as a collective action would be unfair and unmanageable. As Judge

Werlein recently observed when decertifying a proposed collective action in *Johnson*:

> Plaintiffs' disparate and various claims do not present common issues of law and
> fact arising from the same alleged activity but depend upon varied and sundry
> activities of individual [ ] Managers of different shops in [ ] different locations . . .
> . [Defendant's policies and directions] were perceived, understood, and applied in
> various ways by different Managers in different store locations, understandably
> resulting in Plaintiffs having dissimilar claims. These highly individualized
> defenses as to the great majority of all opt-ins, with the layers of fact findings
> required [ ] as to each of those Plaintiffs, present a case where the individualized
> claims and individualized defenses, all of which are highly fact intensive, would
> not only dominate but would swallow and consume the entire case. Fairness and
> procedural considerations weigh persuasively in favor of decertification.

*Johnson*, 2005 WL 1994286, *7; *accord Reyes*, 2007 WL 101808, at *6-7.[52] That rationale

applies with even more force here, where no identifiable factual or legal nexus exists to bind

claims arising from different actions of different Managers, and different interpretations of those

actions, at more than 700 different restaurants across the country. There is no homogeneous

policy or practice that lends itself to collective inquiry. The resulting multitude of acute

differences from Server to Server necessarily results in grossly dissimilar claims not amenable to

generalized evidence and renders this case unfair, unmanageable, and unsuitable for collective

treatment. *See England*, 370 F. Supp. 2d at 509-11; *Basco*, 2004 WL 1497709, at *7-8.[53]

Finally, given the lack of clear precedent in the Fifth Circuit (or any circuit) that defines

---

[52] Other courts have reached similar conclusions. *See, e.g.*, *Smith v. T-Mobile USA, Inc.*, No. CV-05-5274, 2007 WL 2385131, at *8 (C.D. Cal. Aug. 15, 2007) (lawsuit that would involve "individual plaintiffs from nearly every state, working in dozens – if not hundreds – of stores, under hundreds of managers" would be "unmanageable"); *Carlson v. C.H. Robinson Worldwide, Inc.*, No. CIV 02-3780 JNE/JJG, 2006 WL 2830015, at *11 (D. Minn. Sept. 26, 2006) ("The Court cannot fairly and efficiently administer collective actions that require individualized inquiry into the exempt status of several hundred individuals."); *Ray*, 1996 WL 938231, at *4 ("the significant manageability problems inherent in a trial of 1000 plus individuals demonstrate[d] that it [was] inappropriate to pursue [the] case as a class action").
[53]Due process compels that Defendant be permitted to exercise the right to assert individual defenses to the claims asserted in this case and defend itself, even if individual jury trials are required. *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 370-73 (D.N.J. 1987) (*Lusardi I*) (collective actions permitted "only where employees are similarly situated in order that a defendant be afforded an opportunity to effectively defend. Requiring less would preclude [a defendant] from asserting defenses . . . in violation of the Due Process Clause").

24

the elements of Plaintiff's claim or Defendant's defenses, the present lawsuit should not be allowed to proceed as a collective action. *See Lentz v. Spanky's Restaurant II, Inc.*, 491 F. Supp. 2d 663, 670 (N.D. Tex. 2007) (denying even conditional certification, noting "[t]here is no clear precedent in this circuit or any other circuit that defines expediters as employees who do not customarily and regularly receive tips"); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 749-50 (5th Cir. 1996) (reversing certification of Rule 23 class presenting a "novel theory" of liability, reasoning "certification of an immature tort brings with it unique problems that may consume more judicial resources than certification will save," and "[t]hese problems are not speculative").

## 5.    CONCLUSION AND PRAYER

Plaintiff cannot meet her burden to show that she is "similarly situated" to the proposed class of Servers she seeks to represent.  For all of the foregoing reasons, Defendant respectfully requests that the Court grant Defendant's motion to decertify collective action, dismiss the claims of the individual opt-in plaintiffs without prejudice, and grant Defendant such other and further relief deemed just and proper.

DATED:  December 17, 2007.

Respectfully submitted,

s/ Fraser A. McAlpine
**Fraser A. McAlpine**
State Bar No. 13321300
Federal I.D. No. 3407
AKIN GUMP STRAUSS HAUER & FELD LLP
1111 Louisiana Street, 44th Floor
Houston, Texas 77002
(713) 220-5800 (telephone)
(713) 236-0822 (facsimile)

ATTORNEY-IN-CHARGE FOR DEFENDANT
BRINKER INTERNATIONAL, INC.

Of COUNSEL:
**Jordan Cowman**
Federal I.D. No. 14468
State Bar No. 4932800
**Marcia N. Jackson**
State Bar No. 24008411
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas  75201
(214) 969-2800 (telephone)
(214) 969-2828 (facsimile)

## CERTIFICATE OF CONFERENCE

I certify that I conferred with Plaintiff's Counsel and was advised that Plaintiff opposes the relief requested in Defendant's Motion to Decertify Collective Action.  As counsel for Plaintiff and Defendant cannot agree about the disposition of this motion, the motion is therefore submitted to the Court.

s/ Fraser A. McAlpine
**Fraser A. McAlpine**

26

<u>CERTIFICATE OF SERVICE</u>

I certify that on December 17, 2007, I served a true copy of in Defendant's Motion to Decertify Collective Action and Memorandum in Support by Notice of Electronic Filing on known Filing Users or by certified mail, return receipt requested, on unknown Filing Users addressed as follows:

| |
|---|
| Martin A. Shellist, Esq.<br>Shellist & Lazarz LLP<br>1900 West Loop South<br>Suite 1910<br>Houston, Texas 77027 |
| Daryl J. Sinkule, Esq.<br>Shellist & Lazarz LLP<br>1900 West Loop South<br>Suite 1910<br>Houston, Texas 77027 |
| Richard J. Burch<br>BRUCKNER BURCH PLLC<br>5847 San Felipe, Suite 3900<br>Houston, Texas  77057 |

s/ Fraser A. McAlpine
**Fraser A. McAlpine**

27