IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

JENNIFER ROUSSELL, on behalf of          §        Civil Action No. 4:05-CV-03733
Herself and others similarly situated,   §
                                         §
        Plaintiff,                       §
                                         §
v.                                       §
                                         §
BRINKER INTERNATIONAL, INC.,             §
                                         §
        Defendant.                       §

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY
COLLECTIVE ACTION**

**TABLE OF CONTENTS**

I     STATEMENT OF THE ISSUES AND SUMMARY OF ARGUMENT ....................................1

II    STATEMENT OF FACTS ..........................................................................................................2

    A.    Defendant's Restaurants Are Organized Identically Around the Country ........................2

    B.    Plaintiff and All Opt-In Servers Are Similarly Situated...................................................2

    C.    Similarities Amongst QAs ................................................................................................4

    D.    Defendant Had A Class-wide Practice of Management Coercion Directing Servers To Share Tips With QAs.....................................................................................5

    E.    All Opt-in Plaintiffs Uniformly Testified that They Were Victims of the Same Class-wide Practice of Mandatory Tip Sharing With QAs...................................10

III   ARGUMENT...........................................................................................................................11

    A.    The Similarly Situated Standard ....................................................................................11

    B.    Similar Factual and Employment Settings.....................................................................13

           1.    Similar, Not Identical, Factual and Employment Settings Required And Present........................................................................................................13

           2.    Defendant Treated Plaintiffs and QAs as Uniform Groups Without Considering Individual Differences in Factual and Employment Settings......................................................................................................15

           3.    Plaintiffs Were Subjected to a Class-wide Practice of Mandatory Tip Sharing With QAs in Violation of the FLSA ...............................................16

                  a.    The DOL Test for a Mandatory Tip Pool .................................16

                  b.    Defendant Created an Environment that Encouraged Managers to Coerce Servers Into Sharing Tips With QAs......................18

                  c.    Common Evidence Supports the Generalized Determination that Plaintiffs Were Subjected to a Class-wide Practice of Mandatory Tip Pools With QAs Due To Management Coercion ...................................................................18

           4.    Defendant's Alleged Variations In Tip Pool Practices Do Not Demonstrate That Plaintiffs Are Not Similarly Situated .....................................19

           5.    Plaintiffs All Share Several Common Questions of Law and Fact Which Bind the Class Together .........................................................................20

    C.    There Are No Individual Defenses to Plaintiffs' Claims That Render Collective Treatment Inappropriate .................................................................................21

D.    Fairness and Procedural Considerations Weigh in Favor of Collective Treatment ....................................................................................................................... 22

E.    The Court Has Several Available Tools To Ensure That This Trial Is Manageable And Efficient .............................................................................................. 23

IV.    CONCLUSION ............................................................................................................................ 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page(s)

*Anderson v. Mt. Clemens Pottery Co.,*
328 U.S. 680 (1946)......................................................................................................................11

*Atlantis Dev. Corp. v. U.S.,*
379 F.2d 818 (5th Cir. 1967).......................................................................................................23

*Baldridge v. SBC Commc'n, Inc.,*
404 F.3d 930 (5th Cir. 2005).......................................................................................................12

*Berger v. Cleveland Clinic Found.,*
No. 1:05-CV-1508, 2007 WL 2902907 (N.D. Ohio Sept. 29, 2007)........................................12, 21

*Bonham v. Copper Cellar Corp.,*
476 F. Supp. 98 (E.D. Tenn. 1979)...........................................................................................16, 17

*Bradford v. Bed Bath & Beyond, Inc.,*
184 F. Supp. 2d 1342 (N.D. Ga. 2002) ....................................................................................22, 23

*In re Delta Air Lines,*
310 F.3d 953 (6th Cir. 2002) ......................................................................................................24

*Donovan v. Bel-Loc Diner, Inc.,*
780 F.2d 1113 (4th Cir. 1985) ....................................................................................................22

*Evans v. Lowe's Home Ctrs., Inc.,*
No. 3:CV-03-0438, 2006 WL 1371073 (M.D. Pa. May 18, 2006)................................................17

*Falcon v. Starbucks Corp.,*
No. H-05-0792, 2008 WL 155313 (S.D. Tex. Jan. 15, 2008)................................................ passim

*Frank v. Gold'n Plump Poultry, Inc.,*
No. 04-CV-1018, 2007 WL 2780504 (D. Minn. Sept. 24, 2007)............................................13, 18

*Glass v. IDS Fin. Servs., Inc.,*
778 F. Supp. 1029 (D. Minn. 1991).........................................................................................21, 23

*Grayson v. K-Mart Corp.,*
79 F.3d 1086 (11th Cir. 1996) ....................................................................................................12

*Hartford Accident & Indem. Co. v. Crider,*
58 F.R.D. 15 (N.D. Ill. 1973).......................................................................................................23

*Hill v. Muscogee County Sch. Dist.,*
No. 4:03-CV-60 (CDL), 2005 WL 3526669 (M.D. Ga. Dec. 20, 2005) .....................12, 17, 19, 22

*Hipp v. Liberty Nat'l Life Ins. Co.,*
252 F.3d 1208 (11th Cir. 2001) ..................................................................................................12

**Page(s)**

*Hoffmann-LaRoche, Inc. v. Sperling,*
493 U.S. 165 (1989)...............................................................................................................12, 22

*Jones-Turner v. Yellow Enter. Sys., LLC,*
No. 3:07-CV-218-S, 2007 WL 3145980 (W.D. Ky. Oct. 25, 2007)............................................21

*Lusardi v. Xerox Corp.,*
118 F.R.D. 351 (D.N.J. 1987).........................................................................................................2

*Mich. State AFL-CIO et al. v. Miller,*
103 F.3d 1240 (6th Cir. 1997) ......................................................................................................23

*Mooney v. Aramco Servs. Co.,*
54 F.3d 1207 (5th Cir. 1995) ..................................................................................................12, 13

*Moss v. Crawford & Co.,*
201 F.R.D. 398 (W.D. Pa. 2000) ..................................................................................................19

*Myers v. Copper Cellar Corp.,*
No. 3:95-CV-54, 1996 WL 766505 (E.D. Tenn. Sept. 27, 1996)..................................................24

*Nat'l Electro-Coatings, Inc. v. Brock,*
No. C86-2188, 1988 WL 125784 (N.D. Ohio July 13, 1988) ................................................21, 22

*Pendlebury v. Starbucks Coffee Co.,*
518 F. Supp. 2d 1345 (S.D. Fla. 2007) ....................................................................14, 21, 22, 23

*Reich v. Circle C. Invs., Inc.,*
998 F.2d 324 (5th Cir. 1993) ........................................................................................................22

*Reich v. S. New England Telecomm. Corp.,*
121 F.3d 58 (2d Cir. 1997).............................................................................................................22

*Rodolico v. Unisys Corp.,*
199 F.R.D. 468 (E.D.N.Y. 2001) ..................................................................................................21

*Roman v. Korson,*
152 F.R.D. 101 (W.D. Mich. 1993)...............................................................................................24

*Scott v. Aetna Servs., Inc.,*
210 F.R.D. 261 (D. Conn. 2002)....................................................................................................14

*Sec'y v. DeSisto,*
929 F.2d 789 (1st Cir. 1991)..........................................................................................................24

*Thiebes v. Wal-Mart Stores, Inc.,*
No. 98-802-KI, 1999 WL 1081357 (D. Or. Dec. 1, 1999) ...........................................................12

*Thiessen v. Gen. Elec. Capital Corp.,*
267 F.3d 1095 (10th Cir. 2001) ...............................................................................................12, 13

*Vaszlavik v. Storage Tech. Corp.,*
175 F.R.D. 672 (D. Colo. 1997) ....................................................................................................22

                                                                                  **Page(s)**

*Vela v. City of Houston,*
276 F.3d 659 (5th Cir. 2001) ............................................................................22

*Wang v. Chinese Daily News, Inc.,*
231 F.R.D. 602 (C.D. Cal. 2005)........................................................................15

*Wilks v. Pep Boys,*
No. 3:02-0837, 2006 WL 2821700 (M.D. Tenn. Sept. 26, 2006) ......................... passim

*Zhao v. Benihana,*
No. 01 Civ. 1297(KMW), 2001 WL 845000 (S.D.N.Y. May 7, 2001)........................17

## STATE CASES

*Guar. Nat'l Ins. Co. v. Pittman,*
501 So. 2d 377 (Miss. 1987) .............................................................................23

## DOCKETED CASES

*Johnson v. Big Lots Stores, Inc.,*
Nos. 04-3201, 05-6627 (E.D. La. Aug. 21, 2007) .................................................14, 23

*Johnson v. Morton's Rest. Group, Inc.,*
Am. Arbitration Ass'n, No. 11-160-01513-05 (June 27, 2007) ....................................17

*Nerland v. Caribou Coffee Co., Inc.,*
No. 05-1847 (PJS/JJG) (April 6, 2007) ...............................................................15

## FEDERAL RULES AND STATUTES

29 U.S.C.
§ 201 et *seq* ....................................................................................................1
§ 203(m) ........................................................................................................1
§ 216 (b)...................................................................................................1, 11, 22

Federal Rules of Civil Procedure
20....................................................................................................................12
24(a) ...............................................................................................................23
42....................................................................................................................12
42(b)................................................................................................................24

Federal Rules of Evidence
403...................................................................................................................24

## MISCELLANEOUS

DOL Field Operations Handbook (Dec. 9, 1988)....................................................1, 16

DOL Wage & Hour Div. Op. Ltr. (Nov. 4, 1997) .........................................................1

DOL Wage & Hour Div. Op. Ltr., WH-380 (March 26, 1976)..................................1, 16

**I     STATEMENT OF THE ISSUES AND SUMMARY OF ARGUMENT**

Plaintiff alleges, on behalf of herself and over 3,500 similarly situated opt-in plaintiffs, that during their employment as servers at Defendant's Chili's restaurants, Defendant operated an illegal tip pool because servers' tips were involuntarily "tipped out" to Quality Assurance ("QA") employees, also known as Expediters ("Expos"). Plaintiff further alleges that Defendant improperly applied a tip credit towards opt-in plaintiffs' minimum wage because the tip pool Defendant operated was illegal. *See* §§ 3(m) and 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

The Court should exercise its sound discretion to deny Defendant's motion to decertify the conditionally certified collective action. The opt-in plaintiffs all have similar employment settings. They all share the same job title, the same job description, work under the same supervision hierarchy, are subject to the same corporate policies and handbooks, and perform the same job duties. QAs also shared a single uniform job title, worked under a single uniform job description, and completed the same core job duties in the "pass through" area of the kitchen separated from the dining room at Chili's restaurants. The opt-in plaintiffs all allege the same FLSA claim, *i.e.* an invalid tip pool in which management pressured, coerced, encouraged and/or otherwise unlawfully facilitated opt-in plaintiffs tipping out of QAs in violation of the applicable United States Department of Labor ("DOL") standard. The Defendant's "condition of employment" test (upon which it urges decertification) must be rejected because it is only <u>one of three</u> applicable DOL indicia of voluntary tip pooling. The DOL standard for a voluntary tip pool requires employees to be "free from any coercion whatever <u>and</u> outside any formalized arrangement <u>or</u> as a condition of employment." DOL Field Operations Handbook, 30d04(c) (Dec. 9, 1988) (emphasis added) ("FOH").[1]

---

[1] *See also* DOL Wage & Hour Div. Op. Ltr., WH-380, at 1 (March 26, 1976) *available at* 1976 WL 41732 (permitting voluntary sharing with non-tipped employees only if "free from any coercion whatever") ("1976 Op. Ltr."); DOL Wage & Hour Div. Op. Ltr., at 1 (Nov. 4, 1997) *available at* 1997 WL 1049720 (tip pool not voluntary where employer relies on "peer pressures" to ensure tip sharing). DOL materials as well as unpublished cases and other authorities are collected in Plaintiffs' Appendix, filed herewith. All company documents and deposition transcript excerpts are attached to the Declaration of James Kan, filed herewith.

After extensive discovery, including approximately 120 depositions, it is clear that there is a sufficient factual nexus for this case to proceed to trial as a collective action and for the Court to deny Defendant's decertification motion. *See Falcon v. Starbucks*, No. H-05-0792, 2008 WL 155313, *4-5 (S.D. Tex. Jan. 15, 2008) (applying *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987)).

## II   STATEMENT OF FACTS

### A.   Defendant's Restaurants Are Organized Identically Around the Country

Defendant's restaurants are virtually identical throughout the United States. The country is split between two Regional Vice-Presidents. Sandidge Tr. at 184:7-185:1.[2] Each Regional Vice-President oversees several regions, each of which has one Regional Manager. *Id.* Each region is broken into areas, with their own Area Directors. *Id.* These Areas are comprised of approximately 4 – 8 restaurants. *Id.* Within each restaurant, the store staffing is also uniform. At the top of the restaurant hierarchy is the General Manager, also known as the Managing Partner, who is supported by several assistant managers. Sandidge Tr. at 117:5-15. Each restaurant's staff typically includes food servers, hosts, QAs, To-Go, bussers, bartenders, dishwashers, and cooks. *Id.* at 116:13-117:4. Importantly, restaurants regularly staff both QAs and servers – a fact confirmed by the uniform testimony from the opt-in plaintiffs that they regularly worked shifts along side QAs.[3]

### B.   Plaintiff and All Opt-In Servers Are Similarly Situated

All opt-in plaintiffs in this action share the identical job title of food server ("server"). Governing this identical server job title is a single server job description created by Defendant's corporate office and used nation-wide by all of Defendant's restaurants. *See* Server Job

---

[2] Susan Sandidge was Defendant's designated 30(b)(6) witness, while Barbara Youngman and Teresa McCaslin were Defendant's corporate witnesses with knowledge of Defendant's tip pool and credit policies.

[3] *See* Class Notice (limiting opt-in class to those who worked alongside QAs and gave them a portion of their tips from those shifts due to management coercion) (Dkt. #21); *see also* Abshire Tr. 42:13-43:2; Adams Tr. 32:9-33:2; Anderson Tr. at 48:9-15; Antley Tr. at 37:7-16; Beaulieu Tr. at 25:24-26:3; Buonopane Tr. at 60:2-11; Carbone Tr. at 120:11-121:2; Carter Tr. at 17:7-14; Donohue Tr. at 20:20-21:1; R. Fox Tr. at 17:4-14; Garner Tr. at 33:3-21; Jones Tr. at 46:18-47:1; Pedregal Tr. at 21:3-14; Skubisz Tr.at 56:4-57:13; Zayas Tr. at 91:11-19.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY COLLECTIVE
ACTION

Description; Youngman II Tr. at 53:22-54:9. Consistent with this nation-wide job description, servers share the same job duties throughout the country. *Id.* Their primary function is to service the customer by taking orders, delivering prepared food from the kitchen to the guest, completing all necessary financial transactions, and ensuring that the customer has a pleasant eating experience. *See* Server Job Description; Youngman I Tr. at 162:5-13.

All servers are required to wear a similar uniform. This uniform generally consists of dark pants or jeans, polo or current Chili's promotional shirts, non-slip shoes, and a half apron.[4] Moreover, Defendant requires that these uniforms be maintained in a professional and clean manner by all servers irrespective of their geographic location as explained in their nation-wide employee handbook.[5]

Servers are also subjected to similar pay practices while employed by Defendant. All servers are paid as hourly employees and considered non-exempt employees for purposes of overtime.[6] Defendant uniformly takes a tip credit on the direct wages paid to servers, resulting in servers being paid a sub-minimum wage and having to look to the tips they receives from customers to bring their hourly rate to at least the minimum wage.[7] Defendant requires servers to share a portion of their tips with bussers and bartenders working during their shifts. Sandidge Tr. at 127:2-16. Defendant expects servers to comply with the various identical company-wide policies included in Defendant's Hourly Employee Handbook. *See* Youngman I Tr. at 43:20-25. Moreover, servers typically receive and are required to complete the same hiring package upon starting at a restaurant.[8] The job duties, store layouts, and management hierarchy are so uniform

---

[4] *See* Bandala Tr. at 28:3-24; Colbeck Tr. at 48:22-49:2; Hart Tr. at 35:24-36:2; Jandera Tr. at 84:19-24; Kaddy Tr. at 39:23-40:15; Watson Tr. at 90:5-91:13; Winstead Tr. at 64:14-65:9.

[5] *See* Hourly Employee Handbook, Rev. 12/03 at 57.

[6] *See* Hourly Employee Handbook, Rev. 1/05 at 8; Adams Tr. at 46:20-47:2; Bryant Tr. at 21:11-15; Conrady Tr. at 12:14-17; Dellamano Tr. at 56:4-5; Fitzgerald Tr. at 15:8-10; Held Tr. at 41:17-21; Poulin Tr. at 13:19-20; Watson Tr. at 7:17-22.

[7] *See* Tip Credit and Allocation Policy, Bryant Tr. at Exh. 2; Hourly Employee Handbook Rev. 1/05 at 29-30; *see also* Adams Tr. at 46:20-47:10; Davis Tr. at 92:16-19; Ellis Tr. at 15:5-11; Hart Tr. at 28:18-24; Nicholas Tr. at 49:17-20; Vial Tr. at 17:10-15.

[8] *See* Email from T. McCaslin to B. Youngman and G. Hukill dated May 30, 2006 (noting that new hire packet was created and distributed by corporate); *see also* Abshire Tr. at 5:21-9:1; Alfery Tr. at 28:2-29:1; 22:8-24; Anderson

(continued . . .)

that servers regularly transfer between restaurants and are able to begin working immediately without any formal retraining or orientation.[9]

## C.     Similarities Amongst QAs

Companywide, QAs share the same job code. Sandidge Tr. at 123:19-124:3. Defendant uses a single job description for the QA position that is created by corporate and used by all restaurants. *See* QA Job Description; Sandidge Tr. at 56:20-57:3. According to this nation-wide job description, QAs are primarily responsible for ensuring that food orders are properly prepared and plated and leave the kitchen in time to reach to the customer at the appropriate temperature. *Id.* To accomplish this primary goal, QAs confirm that food orders comply with company standards in terms of appearance and preparation, the orders are complete, all necessary accompanying items like garnishes are included, and food leaves the kitchen in a timely manner for the customers. *Id.* Conspicuously absent from the QA written job description is any reference to serving food or interacting with customers. *Id.* The corporate QA job description accurately depicts the core duties of the position as to all restaurants.[10] *See* Sandidge Tr. at 93:25-94:19. This fact is further confirmed by the testimony of both opt-in and company deponents, including Chili's own purported expert witness.[11]

QAs all work in the back of the restaurant, which is commonly referred to as either the "Expo line," "pass through," or "pass." Sandidge Tr. at 187:17-24; Youngman II Tr. at 77:22-

---

(continued ...)

Tr. at 19:6-20; Bryant Tr. at 22:12-23:12, Exhs. 1-4; Garner Tr. at 15:4-17:16; Goodwin Tr. at 30:22-34:5; D. McDonald Tr. at 15:22-16:5; Parrish Tr. at 19:9-21:2; Slomkowski Tr. at 82:16-85:3.

[9] *See* Abshire Tr. at 23:8-19, 52:6-9; Bandala Tr. at 25:9-21; Goodwin Tr. at 10:10-18; Carter Tr. at 25:19-26:1.

[10] While regions have limited discretion to alter the national job description, any such changes must be approved by the corporate office and thus, remain virtually uniform. Sandidge Tr. at 176:1-19.

[11] QA Duties confirmed by **Servers**: Adams Tr. at 31:22-32:8; Antley Tr. at 54:4-23; Fisher Tr. at 22:3-11; Hart Tr. at 33:9-22; McKelvey Tr. at 70:13-71:20; Parrish Tr. at 32:7-33:5; Spahl Tr. at 29:22-30:21; **Server/QAs**: Hill Tr. at 36:25-38:1; Carter Tr. at 31:21-32-8; Edwards Tr. at 17:18-18:1; Lewis Tr. at 10:24-11:4; Rumski Tr. at 62:2-15; Williams Tr. at 34:15-35:17; **Managers**: Anzini Tr. at 18:9-13; Church Tr. at 15:22-16:15; Gearhart Tr. at 19:3-20:18; Green Tr. at 17:15-18:1; Mason Tr. at 24:14-19; Spears Tr. at 12:8-17; Standifer Tr. at 27:15-28:6; **Defendant's Purported Expert Witness**: Lynn II Tr. at 51:21-52:9 (identifying "core duties" of expediters as preparing food for servers to take out to tables). Prof. Lynn is Defendant's proposed expert witness who, while subject to plaintiff's *Daubert* challenge, reviewed much of the discovery herein and was able to identify these non-service "core duties."

78:11. This part of the kitchen is separated from the cooking equipment and the cooks by a row of stainless steel shelving.[12] It is in this area that QAs are expected to remain through the duration of their shift.[13] Walled off from the dining areas of the restaurant, the pass is not visible from the majority of the customer seating.[14] As a result, QAs labor almost exclusively out of the sight of most, if not, all customers.[15]

## D.   Defendant Had A Class-wide Practice of Management Coercion Directing Servers To Share Tips With QAs

Prior to 2004, Defendant had no written policies or guidelines regarding the inclusion of QAs in tip pools or the ability of General Managers to take a tip credit for that position. *See* Youngman I Tr. at 79:5-15, 141:14-19; Youngman II Tr. at 126:8-127:9. As a result, individual store managers were free to implement whatever tip credit and tip pool policy they pleased. *See* Youngman II Tr. at 41:24-42:21. This "no-policy" policy unsurprisingly resulted in many managers choosing to take a tip credit for QAs and/or to permit them to participate in the server tip pool. Sandidge Tr. at 142:10-24; Youngman I Tr. at 78:21-79:4. The reason for this was simple. Doing so significantly reduced the labor costs associated with that position as managers could either pay QAs a sub-minimum wage with the tip credit or rely on income from shared server tips to supplement lower hourly wages. Youngman II Tr. at 29:23-30:3.

In approximately November 2002, Defendant began an internal investigation about their tip pooling and tip credit practices for all positions, including QAs. *See* Brinker Int'l, Inc.

---

[12] Sandidge Tr. at 187:25-188:15; Edwards Tr. at 18:13-19:2; Anderson Tr. at 42:12-43:1; Antley Tr. at 47:10-48:3; Jandera Tr. at 30:25-31:2; White Tr. at 11:22-24.

[13] Beaulieu Tr. at 24:23-25:18; Davis Tr. at 58:18-59:3; Garner Tr. at 22:13-19; Martino Tr. at 5:8-15; Spahl Tr. at 58:3-10.

[14] Abshire Tr. at 58:23-59:3; Beaulieu Tr. at 51:10-15; Carver Tr. at 38:17-40:3; Corno Tr. at 37:21-38:7; Jamison Tr. at 87:13-88:11; Kaddy Tr. at 34:17-35:5; McVicker Tr. at 25:23-26:7; Spahl Tr. at 57:8-17.

[15] Like the servers, QAs were also required to wear clothing that met the company-wide standards set forth by Defendant's corporate office. *See* Hourly Employee Handbook, Rev. 12/03 at 57. QAs typically wore jeans, full body aprons, Chili's t-shirts, and shoes. Antley Tr. at 57:5-13; Bryant Tr. at 60:2-12; Colbeck Tr. at 51:15-52:8; Jacobs Tr. at 96:1-97:2; Slomkowski Tr. at 16:19-18:20. Because they worked out of the sight of most customers, QAs had fewer uniform restrictions than servers, which allowed them to wear damaged or ill-fitting jeans, out of date company t-shirts, tennis shoes, even baseball caps on a regular basis. Antley Tr. at 71:15-20; Bryant Tr. at 60:2-12; Colbeck Tr. at 51:15-23; Goodwin Tr. at 56:16-57:9; Jacobs Tr. at 96:13-24; Slomkowski Tr. at 16:19-18:20; Spahl Tr. at 19:25-20:11; Watson Tr. at 89:24-91:16; Winstead Tr. at 63:11-65:9.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY COLLECTIVE ACTION

Corporate Affairs Project Summary – Tip Credit Project ("Tip Credit Project Summary");
Youngman II Tr. at 14:20-15:7; 41:24-42:21. The purpose of the Tip Credit Project, which did
not conclude until late 2003, was to "assess compliance with Federal law regarding 'tip credits'
taken against employee wages at the unit; and implement a strategy to achieve and maintain
compliance where gaps are noted." Tip Credit Project Summary at 1. To this end, members of
the Corporate Affairs department conducted an analysis not only of legal requirements regarding
tip credits and pooling under the FLSA, but also of which jobs qualified for a tip credit and tip
pool participation. *See* Youngman II Tr. at 14:20-15:7; McCaslin Tr. at 31:18-24.

The Project determined that QAs, as a company-wide position, could neither participate
in a valid tip pool nor qualify to be tip credit eligible. *See* Tip Credit Project Memorandum,
November 10, 2003 ("November Project Memo") at 2 (excluding QAs from the list of tip
eligible positions); Tip Credit Research Memorandum, February 27, 2003 at 2 ("Occupations
that would invalidate a tip pool and jeopardize the tip credit provision for ALL employees
(including those above) are as follows:  QA positions (with little or no customer interaction)".)

A key component to this analysis was Defendant's treatment of both servers and QAs as
uniform positions across the entire company for purposes of determining tip credit and pool
eligibility. In the November Project Memorandum, the final list of tip credit and tip pool eligible
positions for Defendant's restaurants was based exclusively upon the corporate job descriptions
of the respective positions. November Project Memo at 1 ("The following list includes those job
codes (**based on job descriptions**) that quality to be tip credit eligible.") (emphasis added).
Barbara Youngman, a corporate witness for Defendant and Regulatory Analyst in the Corporate
Affairs department from 2002 to 2004, confirmed this fact when she testified that the
determination of tip credit eligibility depended upon the job description and duties of a particular
position. Youngman II Tr. at 51:17-52:10.

Moreover, Defendant's corporate witnesses have consistently testified that they treated
the various positions, including servers and QAs, as uniform across the company, while
researching their respective eligibility for tip credits or tip pool participation. In fact, the very

6

authors of the various Tip Credit Memoranda repeatedly confirmed that they did not interview any QAs or servers about their individual duties for the project. Youngman II Tr. at 45:6-11; McCaslin Tr. at 36:15-18, 44:10-17. They did not conduct any nationwide analysis of whether QA duties varied by geography. McCaslin Tr. at 130:15-21; Youngman II Tr. at 47:3-14, 57:6-18. They were not aware of any other departments or teams having conducted a shift by shift or store by store analysis of QA duties for the entire country. Youngman II Tr. at 147:18-148:9; McCaslin Tr. at 130:15-21. Nor could they recall ever being told by Defendant's Human Resources department that any jobs, including QAs and servers, were performed differently at the store or regional level. McCaslin Tr. at 66:14-21.

In 2004, Defendant apparently implemented the recommendations of the Tip Credit Project and declared that QAs were not tip credit eligible and thus, could not lawfully participate in any valid tip pools. Youngman II Tr. at 126:8-127:9. While Defendant claims its corporate policy after 2004 was to exclude QAs from any valid tip pools, it has neither produced any corporate documents announcing this alleged company-wide policy nor have any of its corporate witnesses recalled any such documents until January 2006 (after the commencement of this litigation).

At the same time, Defendant also formulated and distributed guidelines for tip pooling in the form of a corporate document entitled "Brinker International General Guidelines for Tip Pooling," which was designed to educate employees around the country about the differences between voluntary and mandatory tip pool arrangements. *Id.* ("Tip Pooling Guidelines"). **According to Defendant's <u>own</u> guidelines, "[a] practice is mandatory when management makes recommendations, suggestions, requirements, or implications to an employee regarding tipping practices."** *Id.* at 1. These guidelines were created by Corporate Affairs and governed all of Defendant's restaurants. Youngman II Tr. at 106:24-107:14; 108:13-23.

In January of 2006, notably after the filing of Plaintiff's Complaint, Defendant issued a company-wide corporate memorandum announcing that QAs could not participate in any mandatory tip pools and that management was prohibited from recommending, suggesting, or

requiring servers to tip out QAs.  QA Position and Guidelines Memorandum (Jan. 19. 2006).
This memorandum was sent to all restaurants in the United States and it was expected that all
restaurants would comply with this corporate policy.  Sandidge Tr. at 141:7-25; Youngman II Tr.
at 25:7-26:2.

      Despite its 2006 written policy against QAs participating in mandatory tip pools,
Defendant continued to encourage managers to have mandatory tip pools with QAs by making
no effort to ensure that restaurants were complying with this written policy.  As an initial matter,
the lack of a written corporate policy regarding QAs and mandatory tip pools until early 2006
and after the filing of the present Complaint suggests that this alleged policy was neither widely
distributed nor enforced prior to that memorandum.  Moreover, there is no individual or team in
the corporate office responsible for ensuring that managers actually complied with Defendant's
own tip pooling guidelines.  Sandidge Tr. at 151:15-22; Youngman II Tr. at. 137:18-25, 138:4-
18.  No reports or studies have been completed by the corporate office to determine the degree or
level of compliance with Defendant's written tip guidelines.  Youngman II Tr. at 138:19-139:7.
Given the lack of centralized oversight, compliance with this policy falls on the shoulders of the
managers at each store – ironically the individuals with the most incentive to refuse to comply.
Sandidge Tr. at 155:16-156:23.

      Given this lack of enforcement, managers did not comply with this written policy.
Defendant's 30(b)(6) witness admitted that at least two different regional guidelines, which
govern the largest group of restaurants within Defendant's organizational structure, violated its
own tip pooling guidelines by instructing their regions to maintain mandatory tip pools.[16]
Sandidge Tr. at 181:13-183:10; *see also* Leslie Regional Standards at 1 (Oct. 25, 2005) ("it is

---

[16] Plaintiff submitted a document request to Defendant asking for all Regional Standards as well as Area Director
Notes or Standards that was part of an almost 9-month meet and confer process, which Defendant unilaterally
abandoned.  What Defendant did manage to produce was a woefully incomplete set of Regional Standards.  And yet,
from that small and incomplete set, Plaintiff found two that directly contradicted Defendant's written guidelines.
Plaintiff can only surmise that had Defendant produced all of these documents, she would have found many more
examples of non-compliance.

**8**

recommended that [servers] tip the QA person …"); Forstall Regional Standards (Aug. 8, 2002) (same). Furthermore, Defendant effectively concedes in its motion that restaurants do not comply with Defendant's national written policy and instead can decide for themselves what tip policy they will implement relating to their QAs. Defendant's Motion at 10-11. This noncompliance is further demonstrated by local restaurant written policies requiring server to tip out QAs, which was confirmed by Defendant's proported expert witness. *See* Chili's Bastrop Local Policies at 2 ("Tip Distribution Policy: 1% to Bar, 1% to Busser, and 1% to QA."); Lynn-II Tr. at 44:18-22. Despite these clear examples of noncompliance, Defendant cannot identify a single manager who was disciplined for maintaining a mandatory tip pool. Sandidge Tr. at 174:9-15.

Managers had strong incentive to disregard these written guidelines particularly because they faced staffing shortages and/or budget challenges in the absence of a mandatory tip pool for QAs. Managers benefited from QAs participating in tip pools because this arrangement allowed them to attract more senior servers to work as QAs with compensation greater than just the hourly rate allotted within their respective budgets.[17] By eliminating the ability of managers to supplement the hourly compensation of QAs with the banning of mandatory tip pools, Defendant forced managers to maintain the same level and expertise of staffing with less compensation – a challenge that many managers could not lawfully overcome.[18] Moreover, managers were often simultaneously squeezed by the corporate office with nation-wide reductions of QA hourly rates to minimum wage[19] or restrictions on increasing QA hourly rates[20] and thus were not allowed to

---

[17] Managers confirmed that QAs were a select group of employees. *See* Sirianni Tr. at 74:24-75:6 (noting that better servers usually become QAs); Anzini Tr. at 41:4-16 (QAs are more experienced employees and important to functioning of restaurant).

[18] *See* Sirianni Tr. at 73:3-12 (admitting that QAs would likely want a higher hourly rate without server tip outs); Spears Tr. at 60:5-23 (conceding that it was difficult to staff QA positions when server tip outs slowed); Wilson Tr. at 95:19-96:21 (recalling QAs complaining about insufficient compensation after tip outs abated).

[19] *See* Email from M. MacPherson to B. Sabina, *et al.* (May 16, 2005, 16:50) ("Subject: QA Rate of Pay Change").

[20] *See* Email from M. Bieber to E. Powers, *et al.* at 3 (April 24, 2006, 15:02) ("**Q/A tipping** – just a reminder that we should not be jacking up the average wage rates for our QA's.")

compensate for the shortfall in compensation created by the elimination of mandatory tip pools.

These budgetary constrictions coupled with the elimination of the supplemental income tips provided to QAs resulted in a perfect storm for managers to disregard Defendant's written tip pooling guidelines and to continue to maintain mandatory tip pools.[21]

### E.   All Opt-in Plaintiffs Uniformly Testified that They Were Victims of the Same Class-wide Practice of Mandatory Tip Sharing With QAs

All opt-in plaintiffs have alleged that they not only shared tipped out with their QAs, but also did so involuntarily due to management coercion.[22]   Plaintiffs have consistently testified that they regularly shared a portion of their earned tips with QAs who worked during their same shifts.[23]   They also uniformly testified that this tip sharing was not a voluntary act because they were coerced by management to tip out QAs.[24]

---

[21] *See* Acosta Tr. at 59:17-61:14 (mandatory tip pool with QAs began right after QA hourly rates were reduced to minimum wage; Platz Tr. at 91:6-20 (noting that QA tip out announcement occurred simultaneously with decrease in QA hourly rate to minimum wage); Poulin Tr. at 41:10-24 (required tip outs to QAs occurred after hourly rate of QAs dropped); Wilson Tr. at 75:14-77:12 (concluding that the reduction in the QA hourly rate caused management to push servers to tip out QAs).

[22] *See* Plaintiffs' Class Notice (" You may opt-in to this lawsuit if...Chili's managers required you to give a portion of your tips to a tip pool distributed to a group of employees which included QAs...or...Chili's managers otherwise coerced you to contribute to a tip pool in which QAs...participated.").

[23] Abshire Tr. 26:18-20, 80:5-9; Acosta Tr. 36:1-7; Adams Tr. 55:22-56:6, 68:4-69:18; Alfrey Tr. at 7:21-8:4, 32:14-33:6, 37:14-19, 54:2-6, 54:16-19, 83:2-6, 85:9-86:10, 89:23-90:4; Anderson Tr. at 52:25-53:19, 62:9-64:21, 75:19-76:25; Antley Tr. at 22:6-22, 24:2-11, 74:8-24, ; Baker Tr. 42:18-21, 129:14-130:2; Bandala Tr. at 68:20-69:19; Beaulieu Tr. at 58:6-11; Brenner Tr. at 24:9-18, 42:9-11; Bryant Tr. at 68:13-22; Buonopane Tr. at 61:7-12; Carbone Tr. at 141:1-7; Carter Tr. at 18:16-18; Colbeck Tr. at 34:25-35:25, 57:4-58:4; Corno Tr. at 61:13-17; Crowder Tr. at 41:15-42:11; Davasher Tr. at 39:21-40:2, 45:25-46:18, 51:9-19; Davis Tr. at 39:15-40:21; Dellamano Tr. at 22:12-14, 27:6-14, 28:3-14; Donohue Tr. at 57:24-60:10, 61:7-62:21, 63:22-64:11, 66:24-67:2, 71:21-72:8; Dorr Tr. at 50:19-51:24; Downing Tr. at 53:15-25; Edwards Tr. at 14:10-19; Ekeler Tr. at 49:23-50:2; Ellis Tr. at 40:12-22; Evans Tr. at 21:24-22:1; Farinato Tr. at 36:16-37:7; Fitzgerald Tr. at 41:22-42:16; Flanagin Tr. at 19:15-20, 30:9-13; R. Fox Tr. at 21:9-22:5; Garner Tr. at 13:1-16; Hallmark Tr. at 43:2-23; Hart Tr. at 41:5-24; Held Tr. at 65:6-66:25; Hill Tr. at 52:21-53:5; Jandera Tr. at 49:17-21; Jones Tr. at 48:12-18; Kaddy Tr. at 48:3-14; Martino Tr. at 63:19-21; D. McDonald Tr. at 39:1-3; K. McDonald Tr. at 55:10-56:12; McKelvey Tr. at 114:21-115:20; Miller Tr. at 14:7-19; Moodie Tr. at 48:25-49:2; Parrish Tr. at 40:17-41:21; Pedregal Tr. at 8:12-19; Plane Tr. at 53:13-54:6; Poulin Tr. at 50:1-9; Roussell Tr. at 39:9-23; Skubisz Tr.at 76:12-14; Slomkowski Tr. at 45:19-46:9; Spahl Tr. at 38:22-39:5; Vial Tr. at 59:11-60:4; Walker Tr. at 21:23-22:7; Williams Tr. 51:15-52:17; Zayas Tr. at 103:8-104:16.

[24] Abshire Tr. 47:4-16; Acosta Tr. 15:1-15; Adams Tr. 65:7-66:5; Alfrey Tr. at 38:10-39:2; Anderson Tr. at 53:7-54:21; Antley Tr. at 25:1-15; Baker Tr. at 149:24-151:10; Bandala Tr. at 37:16-38:24; Beaulieu Tr. at 62:25-64:1; Brenner Tr. at 18:2-19:20; Bryant Tr. at 69:9-70:21; Buonopane Tr. at 34:8-35:11; Carbone Tr. at 154:23-155:22; Carter Tr. at 23:25-24:16; Colbeck Tr. at 55:4-15; Corno Tr. at 79:8-21; Crowder Tr. at 41:21-42:7; Davasher Tr. at 48:8-18; Davis Tr. at 66:14-67:15; Dellamano Tr. at 37:7-38:8; Donohue Tr. at 57:24-58:22; Dorr Tr. at 44:9-17; Downing Tr. at 58:14-23; Edwards Tr. at 14:10-14; Ekeler Tr. at 57:2-58:23; Ellis Tr. at 27:5-16; Evans Tr. at 37:9-16; Farinato Tr. at 36:16-37:13; Fitzgerald Tr. at 41:25-43:2; Flanagin Tr. at 26:12-27:4; R. Fox Tr. at 73:24-74:12; Garner Tr. at 58:17-59:23; Hallmark Tr. at 52:3-53:1; Hart Tr. at 60:22-61:11; Held Tr. at 65:9-67:2; Hill Tr. at

(continued . . .)

The coercion, manifested as management involvement in the tip pool, took three basic forms: (1) management required servers to tip out QAs either verbally or in writing;[25] (2) management suggested or recommended that servers tip out QAs either verbally or in writing;[26] and/or (3) management implied that servers should tip out QAs verbally, in writing, or by facilitating QA tip outs.[27]  Regardless of the degree of coercion suffered, the fact remains that all opt-in plaintiffs were subjected to a single overarching practice of management coercion to share tips with QAs.[28]

## III   ARGUMENT

### A.   The Similarly Situated Standard

The FLSA permits employees to bring an action as a collective action on "behalf of himself...and other employees" as long as they are "similarly situated." 29 U.S.C. § 216 (b). Collective actions are the appropriate mechanism for vindicating the rights of many employees who have been harmed by an employer's violations of the FLSA. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946). Courts routinely endorse the use of collective actions to

---

(continued ...)
52:21-55:5; Jandera Tr. at 54:6-20, 86:6-15; Jones Tr. at 16:9-18:14; Kaddy Tr. at 51:7-52:8; Martino Tr. at 76:3-77:17; D. McDonald Tr. at 53:24-55:2; K. McDonald Tr. at 59:14-60:16; McKelvey Tr. at 128:3-12; Miller Tr. at 14:12-19; Moodie Tr. at 61:5-62:1; Parrish Tr. at 43:17-44:2; Pedregal Tr. at 9:3-18; Plane Tr. at 58:7-59:8; Poulin Tr. at 44:6-13; Roussell Tr. at 39:15-19; 100:4-16; Skubisz Tr.at 75:16-23; Slomkowski Tr. at 89:3-90:7; Spahl Tr. at 54:20-55:2; Vial Tr. at 52:6-14; Walker Tr. at 29:5-30:17; Williams Tr. at 52:13-53:6; Zayas Tr. at 103:15-104:9.

[25] *See, e.g.,* Acosta Tr. at 20:22-21:24 (told by manager that if she refused to tip out QAs, "I could go out the same door I came in"); Bryant Tr. at 69:9-70:21 (received written and verbal instructions from management that tip out was mandatory); Corno Tr. at 79:8-21 (told by management that tip out requirement for QAs had no "if[s], ands, or buts"); Poulin Tr. at 43:3-15 (given choice of either tipping out QAs or getting a written reprimand from management); Skubisk Tr. at 75:16-23 (tipping QAs was required in order to checkout at the end of her shift); *see also* Lynn II Tr. at 44:18-22 (admitting that one location made tipping out of QAs a condition of employment).

[26] *See, e.g.,* Jones Tr. at 16:9-18:14 (told by manager that tipping out QA was "highly suggested" with District Manager in the office); Colbeck Tr. at 55:4-15 (managers gave sales reports to QAs to facilitate tip outs from servers); Edwards Tr. at 51:2-15 (manager would ask servers for explanations if they did not tip out QAs); Slomkowski Tr. at 89:18-90:7 (had photographic proof that managers posted written reminders for servers to tip out QAs); *see also* Lynn II Tr. at 65:8-14 (noting that QAs often have access to sales reports to facilitate tip collection).

[27] *See, e.g.,* Davis Tr. at 67:5-68:4 (management's implied support of tipping QAs comparable to saying "[w]e have water here and I'm going to drink this water, but we don't drink water."); K. McDonald Tr. at 59:14-60:16 (when asked if QA tip out was voluntary, manager answered with a shoulder shrug and did not verbally respond); Jandera Tr. at 54:6-20 (poor tips to QAs resulted in management posting notes reminding staff to be more generous with each other); *see also* Lynn II Tr. at 65:15-66:1 (confirming that trainers tell QAs to expect tips from servers).

[28] Even Chili's own proposed "tipping expert" (subject to *Daubert* challenge) found uniform evidence of management coercion (as defined by the DOL). Lynn II Tr. at 63:24-66:3, 70:18-72:14.

---

address FLSA violations because these actions not only promote the broad remedial purposes of the Act, but also allow courts to efficiently manage multiple lawsuits alleging similar FLSA violations. *See Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989); *Falcon*, 2008 WL 155313, at \*10.

The key inquiry for maintaining a collective action is whether the plaintiffs are "similarly situated." The "similarly situated" standard is not a difficult one to meet and in fact, is "more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)." *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir. 1996). Plaintiffs need only establish that "a factual nexus [] binds [plaintiffs] together as victims of an alleged policy or practice," for courts to conclude that they are similarly situated. *Thiebes v. Wal-Mart Stores, Inc.*, No. 98-802-KI, 1999 WL 1081357, \*2 (D. Or. Dec. 1, 1999); *Falcon*, 2008 WL 155313, at \*5. While this factual nexus can be established with proof of a unified policy, such a finding is not required if plaintiffs can establish that they hold the same position and allege similar, though not necessarily identical, FLSA violations. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001); *Grayson*, 79 F.3d at 1095; *Hill v. Muscogee County Sch. Dist.*, No. 4:03-CV-60 (CDL), 2005 WL 3526669, at \*2. (M.D. Ga. Dec. 20, 2005). Plaintiffs need only be similarly situated and not identically situated to proceed as a collective action. *See, e.g., Falcon*, 2008 WL 155313, at \*4; *Hill*, 2005 WL 3526669, \*2; *Hipp*, 252 F.3d at 1217.[29]

The decision whether to decertify a collective is within the district court's sound discretion. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995); *Falcon*, 2008 WL 155313, at \*4. In exercising this discretion, the Court's focus is on whether plaintiffs are sufficiently similar, *i.e.* being subjected to non-voluntary tip pools with QAs, and not on the merits of whether those arrangements violate the FLSA. *See Thiessen v. Gen. Elec. Capital*

---

[29] Furthermore, the Fifth Circuit has suggested that the burden of persuasion shifts to defendants to prove the merits of decertification once a finding of conditional certification is made. *See Baldridge v. SBC Commc'n, Inc.*, 404 F.3d 930, 932, n.3 (5th Cir. 2005) ("the burden of persuasion shifts from plaintiffs (to show the merits of certification) to defendants (to show the merits of decertification)").

12

*Corp.*, 267 F.3d 1095, 1106-07 (10th Cir. 2001) (reversing decertification because district court made merits determinations in the guise of deciding whether plaintiffs were similarly situated); *Berger v. Cleveland Clinic Found.*, No. 1:05-CV-1508, 2007 WL 2902907, *21 (N.D. Ohio, Sept. 29, 2007) (finding plaintiffs similarly situated, but deferring the determination of whether the defendant's uniform actions violated the FLSA).

When a defendant moves for decertification at the close of discovery, courts look to three factors that assist them in determining whether plaintiffs are similarly situated to survive decertification: 1) the factual and employment settings of the individual plaintiffs; 2) whether defenses individual to each plaintiff are present; and 3) fairness and procedural considerations. *See Mooney*, 54 F.3d at 1215-16; *Falcon*, 2008 WL 155313, at *5; *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *3 (M.D. Tenn. Sept. 26, 2006). All of these factors weigh in favor of maintaining this collective action through trial.

**B.     Similar Factual and Employment Settings**

   **1.     Similar, Not Identical, Factual and Employment Settings Required And Present**

All opt-in Plaintiffs have similar factual and employment settings. Defendant effectively concedes that servers are similarly situated as it has failed to raise a single argument against such a finding; nor could it given the undisputed facts surrounding the uniform employment settings of servers and QAs at Chili's restaurant throughout the country.

Defendant misdirects the Court's attention to minor variations in the job duties of QAs to argue that opt-in plaintiffs are not identically situated. However, Plaintiffs must show only that they are similarly situated – not identically situated. After all, "[i]f one zooms in close enough on anything, difference will abound…But plaintiffs' claims need to be considered at a higher level of abstraction." *Frank v. Gold'n Plump Poultry, Inc.*, No. 04-CV-1018, 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007). So long as the core duties of the position are the same or similar, courts are not bothered by the specter of other tangential duties, particularly if they are

incidental or occur infrequently. *Johnson v. Big Lots Stores, Inc.*, Nos. 04-3201, 05-6627 (E.D. La. Aug. 21, 2007) (order denying motion to decertify the case) at 17.[30]

The variations raised by Defendant are simply distinctions without significance as they relate to incidental peripheral duties rather than the core job responsibilities that all QAs share and spend the majority of their work shifts doing. In fact, almost every single variation raised by Defendant is not a duty even mentioned in the uniform job description. This supports the conclusion that these "variances" are in fact, peripheral non-essential duties. Glaringly absent from the testimony collected by Defendant alleging variations in QA duties is any discussion of the frequency with which QAs engage in the alleged variety of duties or the number of restaurants where such variation occurs.[31] Many of these alleged practices (*e.g.* staffing of food runners for special occasions, QAs singing Happy Birthday, etc...) occurred only in one or two restaurants or happened in rare circumstances.

Other alleged variations have absolutely no significance. For instance, whether QAs are staffed by employees who worked exclusively as QAs or by those who split time as a server has no impact on the duties they completed when scheduled to work a QA shift. Similarly, variation in restaurant staffing of QAs (day of the week and number of QAs per shift) is irrelevant so long as QAs were staffed for shifts that plaintiffs worked – a fact that plaintiffs have uniformly confirmed with their testimony.

Finally, the Defendant's scattershot representation of testimony regarding QAs and customer interaction fails to establish that QAs do not share similar job duties. Contrary to Defendant's assertions, QAs do not typically interact directly with customers but instead, stay in the pass and out of the sight of most customers. This fact is confirmed by the QA job description

---

[30] *See also Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1362 (S.D. Fla. 2007) (concluding that degrees of activities did not detract from the fact that the plaintiffs had the same tasks and duties and thus, were similarly situated); *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 265 (D. Conn. 2002).

[31] Chili's expert has made no attempt "to determine how much time expediters spend on ... core duties as opposed to the occasional direct service interaction with customers." Lynn II Tr. at 52:10-14.

14

(no reference to delivering food to customers).  In contrast, the <u>server</u> job description specifically states that this duty is an essential responsibility of the <u>server</u> position.  Furthermore, the infrequency with which Defendant's own witnesses claimed they ran food or interacted with guests reveals that such instances, to the extent that they did occur, were neither typical nor a core duty of the position.

Some degree of variations amongst restaurants is expected given that Defendant is a nation-wide franchise.  However, plaintiffs need not prove their duties are identical, merely similar – a showing they have clearly satisfied.  *See Falcon*, 2008 WL 155313, at *6:

> Although the incentives created by Starbucks' conflicting mandates may not have led all managers nationwide to act in lockstep…the deposition testimony supports a finding that the opt-in plaintiffs currently before the Court were, in fact, affected similarly.  It would certainly not be in the interest of judicial economy to decertify a class of similarly situated plaintiffs simply because, after discovery, it becomes apparent that the alleged policy was not as uniform as plaintiffs believed at step one.  An employer should not be allowed to escape class liability simply because some managers do not commit FLSA violations as long the evidence shows that there is a factual or legal nexus that binds together the claims of the opt-in plaintiffs before the Court.

### 2.   Defendant Treated Plaintiffs and QAs as Uniform Groups Without Considering Individual Differences in Factual and Employment Settings

Defendant's past treatment of servers and QAs as uniform groups belies its current self-serving assertion that the positions are too varied to treat collectively.  *See Nerland v. Caribou Coffee Co., Inc.*, No. 05-1847 (PJS/JJG) Report and Recommendation at 17-18 (April 6, 2007) ("disingenuous [for defendant]. . .to collectively and generally decide that all store managers are exempt from overtime compensation without any individualized inquiry, while . . .claiming the plaintiffs cannot proceed collectively to challenge the exemption"); *Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602, 613 (C.D. Cal. 2005) (same).  Defendant's ability to distill the core duties of both servers and QAs into a singular corporate job description demonstrates not only that it has a fundamental corporate expectation of what these positions entail, but also its ability to treat the respective positions uniformly.

Moreover, Defendant's current written policy against mandatory tip pools involving QAs reflects a history of treating QAs as a uniform group of employees. The fact that Defendant made a policy regarding the entire QA position indicates that those employees share sufficient characteristics to warrant collective treatment. This policy is uniformly applied to all QAs and servers irrespective of their individual employment settings further revealing Defendant's comfort with collective treatment of these positions.

In addition, the Tip Pool Project treated these positions collectively as its recommendations were explicitly based on the corporate job descriptions of servers and QAs and it did not involve any individualized inquiry of their respective duties. By deciding which positions were tip credit eligible at the conclusion of the project, Defendant admitted that it could accurately analyze each position's uniform job duties. Defendant's uniform treatment of both the server and QA position is further supported by the fact that as part of the Tip Pool Project, Defendant did not conduct interviews of individual employees or store-by-store or state-by-state surveys.

Even now, Defendant continues to argue that its QAs are similar, while still insisting on decertification. In its Motion for Summary Judgment, Defendant argues that this Court should make generalizations of QA duties for purposes of <u>that</u> motion, despite its protestations to the exact contrary in <u>this</u> motion for decertification. This Court should treat plaintiffs collectively as Defendant has done.

### 3. <u>Plaintiffs Were Subjected to a Class-wide Practice of Mandatory Tip Sharing With QAs in Violation of the FLSA</u>

#### a. <u>The DOL Test for a Mandatory Tip Pool</u>

The DOL mandates that a tip pool is not voluntary unless it is "free from any coercion whatever."[32] Phrased slightly differently, a mandatory tip pool exists when management is involved in the process of tip sharing. *See Bonham v. Copper Cellar Corp.*, 476 F. Supp. 98,

---

[32] 1976 Op. Ltr. at 1; FOH at 30d04(c).

101-102 (E.D. Tenn. 1979) (concluding tip pool was mandatory where management encouraged it despite uneven participation and the fact that servers created the arrangement); *Zhao v. Benihana*, No. 01 Civ. 1297(KMW), 2001 WL 845000, \*2 (S.D.N.Y. May 7, 2001) (finding mandatory tip pool where manager encouraged tip sharing even though the tip sharing arrangement was established by the employees); *Johnson v. Morton's Rest. Group, Inc.*, Am. Arbitration Ass'n, No. 11-160-01513-05, Class Determination Award (June 27, 2007) (concluding that management involvement constituted a coerced tip pool).  Unsurprisingly, Defendant adopted this very standard with its Tip Pooling Guidelines and internal definition of a mandatory tip pool.

Applying the DOL requirements as well as Defendant's own internal standard, management coercion results in a mandatory tip pool when any one of three objective indicia are present: (1) management required QA tip outs verbally or in writing; (2) management suggested or recommended QA tip outs verbally or in writing; or (3) management implied that servers should tip out QAs verbally, in writing, or by facilitating QA tip outs.  Thus, the fact that there is a range as to how managers coerced opt-in plaintiffs to tip QAs is immaterial and does not justify decertification.  *See Falcon*, 2008 155313, at \*7 (finding plaintiffs similarly situated where they asserted both off the clock work and time shaving because these allegations were part of a common claim of uncompensated worked); *Wilks*, 2006 WL 2821700, at \*4-6 (same); *Hill*, 2005 WL 3526669 at \*1-4 (plaintiffs similarly situated despite the fact that they worked off the clock at different times while doing different specific duties).  So long as the ultimate common question of liability can be addressed by relying upon objective rather than subjective evidence, courts will certify a class even if the plaintiffs allege multiple theories for the same FLSA violation.  *See Evans v. Lowe's Home Ctrs., Inc.*, No. 3:CV-03-0438, 2006 WL 1371073, \*4 (M.D. Pa. May 18, 2006).

### b.   Defendant Created an Environment that Encouraged Managers to Coerce Servers Into Sharing Tips With QAs

Whether it was the "no-policy" policy prior to 2004 or the unenforced policies after 2004, Defendant created an environment which allowed managers to coerce their servers into sharing tip with QAs in an effort to save labor costs. This environment is similar to the one in *Falcon v. Starbucks Corp.*, where this Court recently denied a motion to decertify on the grounds that the plaintiffs provided sufficient evidence that the defendant created an environment that led to a pattern and practice of off-the-clock work and time shaving in violation of the FLSA. 2008 WL 155313, at *1. Despite a written policy of paying employees for all time worked, this Court concluded that the Starbucks plaintiffs were similarly situated because they shared the same job title, job description, and supervision hierarchy, all opt-ins either worked off the clock or had their time shaved by management, and defendant's policies discouraged overtime while functionally requiring employees to work it. *Id.* at *6-7. The underlined combination of these factors resulted in a company-wide environment that strongly encouraged managers to commit FLSA violations, which satisfied the similarly situated requirement of 216(b). *Id.* at *9.[33]

### c.   Common Evidence Supports the Generalized Determination that Plaintiffs Were Subjected to a Class-wide Practice of Mandatory Tip Pools With QAs Due To Management Coercion

All plaintiffs have uniformly testified that they shared tips with QAs who worked during their shifts. All plaintiffs have also uniformly testified that they did so under management coercion. Moreover, plaintiffs have uniformly testified that they were subjected to at least one of the three objective types of management coercion that constitutes a mandatory tip pool. Thus, while the exact form of coercion may have varied between restaurants, all plaintiffs were exposed to at least a minimum amount of coercion that transformed the existing tip pool into a

---

[33] *See also Wilks*, 2006 WL 2821700, *4-6 (finding plaintiff similarly situated in an off the clock case because there was sufficient evidence of an environment that encouraged a common and improper practice of FLSA violations); *Hill*, 2005 WL 3526669, at *3 (permitting action to proceed collectively at stage two due to a consistent pattern of FLSA violations); *Gold'n Plump Poultry Inc.*, 2007 WL 2780504, at *3 (finding plaintiffs similarly situated even where the employer had no affirmative policy because the practice of not having a policy itself constituted a no-policy policy that injured the class in a similar and collective manner).

mandatory one. Even Defendant's own purported expert witness admitted that there was evidence of a mandatory tip pool in all of the restaurants he reviewed when he applied the appropriate (DOL) test. Lynn II Tr. at 63:24-66:3, 70:18-72:14.

Moreover, this consistent plaintiff testimony creates a strong inference that "the pattern of violations was not coincidental but resulted from the application of a central policy." *Hill*, 2005 WL 3526669, at *3; *Falcon*, 2008 WL 155313, at *6. Plaintiffs have more than satisfied the first prong of the similarly situated analysis by demonstrating similar employment and factual settings.[34]

### 4.   Defendant's Alleged Variations In Tip Pool Practices Do Not Demonstrate That Plaintiffs Are Not Similarly Situated

While some servers may have tipped out QAs at different frequencies or amounts, the undisputed fact remains that all plaintiffs tipped out QAs at some point during their tenure as a result of an unlawful coerced tip pool. This common allegation of an FLSA violation is sufficient to overcome any minor factual variations amongst the class.[35] *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) (finding plaintiffs similarly situated because "[i]rrespective of these differences, each of the plaintiffs assert a common claim, i.e., that [defendant] violated the FLSA by failing to compensate them overtime wages for their work"); *Wilks*, 2006 WL 2821700, at *5 ("Regardless of these acknowledged differences, however, each of the plaintiffs asserts a common claim.").

Like the defendant in *Falcon*, Defendant attempts to impugn plaintiffs' similarly situated showing by pointing to instances where managers did not coerce servers to participate in a mandatory tip pool with QAs. But as this Court noted in *Falcon*, "[a]n employer should not be

---

[34] Defendant's attempt to equate opt-in percentage with the existence of a policy or plan is an argument that this Court has soundly rejected. *See Falcon*, 2008 WL 155313, at *7 ("Individuals may have myriad reasons for not wishing to opt-in to a lawsuit against their employer ranging from fear of retaliation to sheer inertia, and the Court declines to draw any particular inference from the response size."). Moreover, to suggest that over 3,500 individuals alleging the same FLSA violation does not suggest the presence of a policy or practice strains credulity.

[35] Moreover, these variances can and should be dealt with at the damage phase of trial and do not form a basis for decertifying a collective action. *See supra* Section III.C.

allowed to escape class liability simply because some managers do not commit FLSA violations as long as the evidence shows that there is a factual or legal nexus that binds together the claims of the opt-in plaintiffs before the Court." 2008 WL 155313, at *6. Here, plaintiffs have evidence of a factual nexus (similar job duties, tip sharing practices, and exposure to management coercion, encouragement, facilitation) and legal nexus (common allegations of FLSA violations) that sufficiently bind the class together to warrant collective treatment.

### 5.   Plaintiffs All Share Several Common Questions of Law and Fact Which Bind the Class Together

The many common questions of law and fact shared by all plaintiffs provide another reason for this lawsuit to proceed on a collective basis. The first and most salient common question facing this class is whether Defendant violated the FLSA by maintaining mandatory tip pools involving servers and QAs. To answer this question, this Court must make a number of secondary class-wide determinations applicable to each opt-in, including:  determining the correct legal standard for what is and what is not voluntary in this context; determining what was Defendant's policy with respect to servers tipping out QAs; determining whether there was a class-wide practice of management coercing, encouraging and/or assisting opt-ins to tip out QAs; determining whether Defendant's actions were willful so as to entitle the class to a three year statute of limitations; determining whether Defendant acted in good faith in creating its tip pooling policy; determining whether Defendant's actions warrant liquidated damages; determining whether Defendant viewed servers by their general position rather than a store-by-store analysis for internal purposes, including determining tip pool eligibility; determining whether Defendant viewed QAs by their general position rather than a store-by-store analysis for internal purposes, including determining tip pool eligibility; and determining whether QAs "customarily and regularly received tips" to be eligible to participate in the tip pool.

All of these legal and factual questions must be answered to determine whether Defendant is liable under the FLSA for maintaining unlawful mandatory tip pools inclusive of QAs.

**C.** **There Are No Individual Defenses to Plaintiffs' Claims That Render Collective Treatment Inappropriate**

Continued collective treatment of plaintiffs' claims is appropriate because Defendant's defenses can be addressed on a class wide basis. *See Falcon*, 2008 WL 155313, at *9 ("The Court is not convinced that Defendants' defenses are so individualized that collective adjudication of this claim is unworkable"); *Pendlebury*, 518 F. Supp. 2d at 1362-1363; *Wilks*, 2006 WL 2821700, at *7.[36] Defendant's "subjectivity" argument is contradicted by Defendant's own policies. A mandatory tip pool is present if at least one of the three objective forms of coercion is found. Because this test relies upon objective criteria, the subjective beliefs of servers or QAs are irrelevant to this analysis.[37] Moreover, because this same DOL test for mandatory tip pooling was expressly adopted by Defendant in its tip pooling guidelines, it has demonstrated through its prior conduct that enforcement of this standard does not require any investigation into the subjective beliefs of the tip pool participants. Defendant's own guidelines fail to make a single reference about any need to consider the subjective feelings of servers in order to conclude that a mandatory tip pool is present. *See* Tip Pooling Guidelines. Even one of the co-authors of the Guidelines admitted that the application of its criteria did not need to account for the feelings of the participating employees. *See* Youngman II Tr. at 146:12-147:3. Thus, the Court can analyze the server and QA positions collectively, just as Defendant did in the past with its various policies and tip pool projects.

Furthermore, the Court can make its determination based on representative testimony. *See Falcon*, 2008 WL 155313, at *9; *Nat'l Electro-Coatings, Inc. v. Brock*, No. C86-2188, 1988

---

[36] Moreover, the presence of individualized defenses does not preclude class certification. *See Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 484 (E.D.N.Y. 2001); *Glass v. IDS Fin. Servs. Inc.*, 778 F. Supp. 1029, 1081 (D. Minn. 1991)

[37] Courts regularly certify cases involving management coercion contrary to Defendant's blanket assertions. *See Berger*, 2007 WL 2902907, at *1 (certifying collective action alleging supervisor coercion); *Falcon*, 2008 WL 155313, at *7 (plaintiffs similarly situated where they asserted unpaid hours worked due to management coercion); *Wilks*, 2006 WL 2821700, at *4-6 (same); *Jones-Turner v. Yellow Enter. Sys., LLC*, No. 3:07-CV-218-S, 2007 WL 3145980 (W.D. Ky. Oct. 25, 2007) (certifying class where management instructed plaintiffs to report a meal period irrespective of whether one was actually taken).

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY COLLECTIVE
ACTION

WL 125784 (N.D. Ohio July 13, 1988); *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116
(4th Cir. 1985); *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997).
Here, Plaintiffs have more than adequately demonstrated that Defendant had an unwritten policy
whereby managers engaged in a class-wide practice of subjecting Plaintiffs to mandatory tip
pools with QAs. Given this identifiable class-wide practice, findings of fact and liability can be
extrapolated from one restaurant to another as proof of this practice and thus, adjudicating this
case on a representative basis is appropriate. *See Falcon*, 2008 WL 155313, at \*9; *Wilks*, 2006
WL 2821700, at \*5. Moreover, this arrangement does not prejudice Defendant in any way as it
still permits it the opportunity to raise all of its defenses, examine representative plaintiffs, and
present its own evidence at trial. *Id.*

In passing, Defendant raises issues of credibility and damages under the guise of factual
variations as requiring individualized fact determinations. It is well settled that issues of
credibility and damages are not defenses that can preclude a finding of similarly situated. *See*
*Pendlebury*, 518 F. Supp. 2d at 1362 (finding that matters of credibility are not individualized
defenses); *Hill*, 2005 WL 3526669, at \*4 (holding that damages do not preclude finding of
collective treatment); *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342, 1351 (N.D.
Ga. 2002) (same). Accordingly, Defendant's issues of damages and credibility are merely red
herrings that do not affect this Court's analysis of whether Plaintiffs are similarly situated.

**D.    Fairness and Procedural Considerations Weigh in Favor of Collective Treatment**

The broad remedial purpose of the FLSA creates a strong presumption in favor of
protecting employees and restricting the applications of the Act's protections. *Falcon*, 2008 WL
155313, at \*10; *Reich v. Circle C. Invs. Inc.*, 998 F.2d 324, 329 (5th Cir. 1993); *Vela v. City of*
*Houston*, 276 F.3d 659, 666-67 (5th Cir. 2001) (construing exemptions to FLSA narrowly).
Moreover, in applying Section 216(b), courts are mindful of the statute's dual objectives of
lowering costs to plaintiffs for vindicating their employment rights as well as effectively
resolving common issues of law and fact in one proceeding. *Hoffman-La Roche, Inc.*, 493 U.S.
at 170; *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997).

These dual objectives weigh heavily against Defendant's motion to decertify and in favor of collective treatment. Decertification of the present case would result in over 3,500 individual suits that would be impractical to pursue given the amount in controversy for each opt-in and the resources available to them individually. *Bradford*, 184 F. Supp. 2d at 1351; *Pendlebury*, 518 F. Supp. 2d at 1363.

Furthermore, the creation of over 3,500 individual suits would prevent the efficient resolution of common issues of law and fact in a single proceeding. A number of outstanding common questions face all members of this class, including Defendant's Motion for Summary Judgment. To disband all of the opt-ins and disperse them to courts across the nation would raise a whole host of problems surrounding issue preclusion and/or stare decisis. *Pendlebury*, 518 F. Supp. 2d at 1363.[38]

While this Court can consider Defendant's right to due process, that interest must be balanced against the competing rights of plaintiffs who likely would be unable to afford an individual trial. *Falcon*, 2008 WL 155313, at *11. In doing so, most courts, including this Court, conclude that the plaintiffs' interests outweigh due process concerns in the FLSA context. *Id.*; *Glass*, 778 F. Supp. at 1081-82 (denying decertification despite due process interests of defendant because collective treatment was necessary to protect the rights of the more vulnerable plaintiffs); *Wilks*, 2006 WL 2821700, at *8 (same).[39]

## E.    The Court Has Several Available Tools To Ensure That This Trial Is Manageable And Efficient

To the extent this Court may have concern about managing this case, it has several procedural tools at its disposal to streamline the proceedings. For example, this Court may and

---

[38] If this class were decertified, this Court could also be faced with over 3,500 parties seeking to intervene by right into the case. *See* Fed.R.Civ.P. 24(a); *Guar. Nat'l. Ins. Co. v. Pittman*, 501 So. 2d 377, 384 (Miss. 1987) *citing Hartford Accident & Indem. Co. v. Crider*, 58 F.R.D. 15, 18 (N.D. Ill. 1973); *see also Mich. State AFL-CIO et al. v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997); *Atlantis Dev. Corp. v. U.S.*, 379 F.2d 818, 825 (5th Cir. 1967).

[39] Moreover, Defendant actually benefits from continued collective treatment of plaintiffs since a single judgment in its favor on the issue of liability would be binding on all opt-in plaintiffs. *Big Lots*, Nos. 04-3201, 05-6627 (E.D. La. Aug. 21, 2007) (order denying motion to decertify the case) at 26, 27.

should allow Plaintiffs to utilize representative testimony to prove liability in this case not only because Plaintiffs have established an identifiable class-wide practice, but also because such testimony avoids redundancy, undue delay, and needless presentation of cumulative evidence. *Sec'y v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991); Fed. R. Evid. 403. Additionally, under Federal Rule of Civil Procedure 42(b), this Court may bifurcate damages issues from the determination of liability. *See Myers v. Copper Cellar Corp.*, No. 3:95-CV-54, 1996 WL 766505, at *3-4 (E.D. Tenn. Sept. 27, 1996). The Court may also create a separate subclass for any distinct group that it foresees raising separate issues at the liability or damages stages of the trial. *See In re Delta Air Lines*, 310 F.3d 953, 956 (6th Cir. 2002); *Roman v. Korson*, 152 F.R.D. 101, 109 (W.D. Mich. 1993).

## IV.    CONCLUSION

Therefore, the Court should DENY Defendant's motion to decertify this FLSA collection action.

Dated: February 11, 2008        Respectfully submitted,

By:   /S/    James Kan
DAVID BORGEN
State Bar No. 099354
*Pro Hac Vice*
LAURA L. HO
State Bar No. 173179
*Pro Hac Vice*
JAMES KAN
State Bar No. 240749
*Pro Hac Vice*
GOLDSTEIN, DEMCHAK, BALLER, BORGEN &
  DARDARIAN
300 Lakeside Drive, Suite 1000
Oakland, CA  94612-3534
(510) 763-9800 (phone)
(510) 835-1417 (facsimile)

RICHARD (REX) J. BURCH
State Bar No. 24001807
Federal ID No. 21615
BRUCKNER BURCH PLLC
1000 Louisiana, Suite 1300
Houston, TX  77002
(713) 877-8788 (phone)
(713) 877-8065 (facsimile)

MARTIN A. SHELLIST
State Bar No. 00786487
Federal ID No. 16456
DARYL J. SINKULE
State Bar. No. 24037502
Federal ID No. 12308
SHELLIST LAZARZ LLP
3D/International Tower
1900 West Loop South, Suite 1910
Houston, TX  77027
(713) 621-2277 (phone)
(713) 621-0993 (facsimile)

Attorneys for Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY COLLECTIVE
ACTION