IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JENNIFER ROUSSELL, ON BEHALF OF HERSELF AND OTHERS SIMILARLY SITUATED, | § § § | |
| PLAINTIFF, | § § | CIVIL ACTION NO. 4:05-CV-03733 |
| VS. | § § | |
| BRINKER INTERNATIONAL, INC., | § § | Jury Requested |
| DEFENDANT. | § § | |

**DEFENDANT BRINKER INTERNATIONAL, INC.'S RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF PROFESSOR MICHAEL LYNN**

Respectfully submitted,

**Fraser A. McAlpine**
State Bar No. 13321300
Federal I.D. No. 3407
AKIN GUMP STRAUSS HAUER & FELD LLP
1111 Louisiana Street, 44th Floor
Houston, Texas 77002
(713) 220-5800 (telephone)
(713) 236-0822 (facsimile)

ATTORNEY-IN-CHARGE FOR DEFENDANT
BRINKER INTERNATIONAL, INC.

Of COUNSEL:
**Jordan Cowman**
Federal I.D. No. 14468
State Bar No. 4932800
**Marcia N. Jackson**
State Bar No. 24008411
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
(214) 969-2800 (telephone)
(214) 969-4343 (facsimile)

TABLE OF CONTENTS

1.   Introduction, Nature Of Case, And Summary Of Argument ...................................... 1

2.   STATEMENT OF ISSUES ............................................................................................. 2

3.   FACTS ...................................................................................................................... 3

   3.A.   PROFESSOR LYNN'S QUALIFICATIONS ...................................................... 3

   3.B.   THE EXPERT OPINIONS PROFFERED BY PROFESSOR LYNN AND THE BASES FOR
          THEM............................................................................................................ 4

          3.B.1.   Professor Lynn's Expert Opinion That The Tipping Of Chili's
                   QAs Is Voluntary...................................................................... 4

          3.B.2.   PROFESSOR LYNN'S EXPERT OPINION THAT QAS SHOULD BE ELIGIBLE
                   TO PARTICIPATE IN MANDATORY TIP POOLS............................... 7

4.   ARGUMENT............................................................................................................. 10

   4.A.   PROFESSOR LYNN'S TESTIMONY SATISFIES RULE 702'S REQUIREMENTS FOR
          ADMISSIBILITY ............................................................................................. 10

   4.B.   PROFESSOR LYNN'S UNDISPUTED EXPERTISE IN THE PSYCHOLOGY OF TIPPING
          QUALIFIES HIM TO PROFFER EXPERT OPINIONS IN THIS CASE................................. 10

   4.C.   PROFESSOR LYNN'S PROFFERED OPINIONS ARE HIGHLY RELEVANT TO THIS
          CASE AND WILL ASSIST THE TRIER OF FACT.......................................................... 12

          4.C.1.   PROFESSOR LYNN'S TESTIMONY ON THE ISSUE OF VOLUNTARINESS
                   WILL HELP THE TRIER OF FACT BY PROVIDING A FACTUAL
                   FRAMEWORK FOR CONCEPTUALIZING WHAT VOLUNTARINESS MEANS..........12

          4.C.2.   PROFESSOR LYNN'S TESTIMONY ON THE ISSUE OF WHETHER QAS ARE
                   PROVIDING A SERVICE WILL ASSIST THE TRIER OF FACT IN
                   DETERMINING WHETHER QAS SHOULD BE ELIGIBLE TO PARTICIPATE
                   IN A MANDATORY TIP POOL .......................................................... 14

   4.D.   PROFESSOR LYNN'S EXPERT TESTIMONY IS RELIABLE ............................... 15

   4.E.   THE PROBATIVE VALUE OF PROFESSOR LYNN'S EXPERT OPINIONS OUTWEIGHS
          ANY LIKELIHOOD OF PREJUDICE ................................................................ 18

5.   CONCLUSION.......................................................................................................... 19

CERTIFICATE OF SERVICE ................................................................................................ 21

i

TABLE OF AUTHORITIES

CASES

*Allen v. Pennsylvania Eng'g Corp.*
    102 F.3d 194 (5th Cir. 1996) ................................................................ 18

*Alvarado v. Shipley Donut Flour & Supply Co.*
    No. H-06-2113, 2007 WL 4480134 (S.D. Tex. Dec. 18, 2007) ........................ 18

*Burleson v. Texas Dept. of Criminal Justice*
    393 F.3d 577 (5th Cir. 2004) ................................................................ 18

*Carroll v. Otis Elevator Co.*
    896 F.2d 210 (7th Cir. 1990) ................................................................ 15

*Castellow v. Chevron USA*
    97 F. Supp. 2d 780 (S.D. Tex. 2000) ....................................................... 18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
    509 U.S. 579 (1993) ................................................... 2, 14, 16, 17, 18, 19

*Dukes v. Wal-Mart, Inc.*
    509 F.3d 1168 (9th Cir. 2007) ...................................................... 16, 17, 18

*Lavespere v. Niagara Machine & Tool Works, Inc.*
    910 F.2d 167 (5th Cir. 1990) ................................................................ 10

*Little v. Liquid Air Corp.*
    37 F.3d 1069 (5th Cir. 1994) ................................................................ 10

*Meadours v. Ermel*
    No. Civ. A. H-04-102, 2005 WL 1923596 (S.D. Tex. Aug. 10, 2005) ................ 18

*MicroFinancial, Inc. v. Premier Holidays Int'l, Inc.*
    385 F.3d 72 (1st Cir. 2004) ................................................................. 10

*Moore v. Ashland Chemical Inc.*
    151 F.3d 269 (5th Cir. 1998) ................................................................ 18

*Pipitone v. Biomatrix, Inc.*
    288 F.3d 239 (5th Cir. 2002) .......................................................... 16, 19

*Scott v. Ross*
    140 F.3d 1275 (9th Cir. 1998) ..........................................................11, 19

ii

*Smith v. Ingersoll-Rand Co.*
    214 F.3d 1235 (10th Cir. 2000) .................................................................... 10, 15

*Tyus v. Urban Search Mgmt.*
    102 F.3d 256 (7th Cir. 1996) .................................................................... 13, 17, 18

*United States v. Hall*
    93 F.3d 1337 (7th Cir. 1996) .................................................................... 13, 14, 16

*United States v. Johns*
    15 F.3d 740 (8th Cir. 1994) ......................................................................11, 14

*United States v. Young*
    316 F.3d 649 (7th Cir. 2002) ........................................................................11

*Viterbo v. Dow Chemical Co.*
    826 F.2d 420 (5th Cir. 1987) ........................................................................ 18

*Watkins v. Telsmith, Inc.*
    121 F.3d 984 (5th Cir. 1997) ........................................................................ 18

## RULES

FED. R. EVID. 403 .................................................................................... 18, 19

FED. R. EVID. 702 .................................................................................... passim

## OTHER AUTHORITIES

DOL Field Operations Handbook § 30d04(e) ............................................ 14

**1.**    **Introduction, Nature Of Case, And Summary Of Argument**

This case poses novel questions of fact and law.  Plaintiff Jennifer Roussell and a group of opt-in plaintiffs who worked as Servers at Defendant's Chili's restaurants allege that they were, in different ways, at different times, by different Managers, at different restaurants, coerced to share their tips with Quality Assurance workers ("QAs").  Defendant disputes Plaintiff's allegations of coerced tip-sharing, and alternatively asserts that, due to the job duties they perform, some or all QAs may lawfully be included in even mandatory tip pools.  Resolving these issues is no simple task.  The trier of fact must resolve numerous individual factual inquiries, including what it means to be "coerced" to share tips, when tipping is voluntary or coerced and, if coerced, whether QAs perform job duties that nonetheless render them eligible to participate in even mandatory tip pools, and other things.

Plaintiff argues that an act is rendered involuntary if a Server experiences any "coercion," no matter how slight, and that once "coercion" allegedly is experienced, such an act necessarily explains the Server's motivation to share tips thereafter, to the exclusion of all other decision-making factors.  This simplistic argument ignores reality.  Concepts of voluntariness and coercion involve myriad individualized factors, including, without limitation, the existence of corporate directives or policies, fear of management retribution, social pressures, social norms, personal preferences, personal objectives, and personal experiences.  Each of these factors, and not merely an alleged "coercive" experience, should be considered when deciding why a particular Server shared tips with a particular QA.

Plaintiff's claim is novel, and the law offers no easy test to analyze motivation in the context of tipping, much less a test that takes into account the many individual variables presented here.  Accordingly, to assist the trier of fact, Defendant retained Professor William Michael Lynn, the foremost expert on the psychology of tipping, to provide expert opinions on

the following issues: (i) whether Servers tip QAs voluntarily and (ii) whether QAs should be eligible to participate in mandatory tip pools. To render an expert opinion on these issues, Professor Lynn relied, *inter alia*, on his conversations with hourly employees, Managers, and executives at Chili's restaurants, his review of various Chili's employment policy documents, his review of deposition transcripts and summaries of depositions taken from Managers and hourly employees at various Chili's restaurants, and on his personal knowledge from years of working in and studying the restaurant industry. Professor Lynn concluded that: (i) Servers voluntarily tip QAs at most Chili's locations and (ii) even if Servers involuntarily tip QAs, QAs nevertheless should be eligible to participate in mandatory tip pools based on the job duties they perform. As explained below, Professor Lynn's expert testimony satisfies all requirements for admissibility under Federal Rule of Evidence 702.

## 2.   STATEMENT OF ISSUES

Under Federal Rule of Evidence 702, expert testimony is admissible if the testimony will assist the trier of fact, the testimony is based upon sufficient facts or data, is the product of reliable principles and methods, and applies the principles and methods reliably to the facts of the case. FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court highlighted a non-exclusive list of inquiries for assessing reliability under Rule 702. *Id.* at 593-94. As will be addressed further below, Professor Lynn is qualified to provide an expert opinion in this case, his proffered opinions are relevant and will assist the trier of fact, his expert opinions are sound and reliable, and the Court should find his testimony admissible under Rule 702.

3.    FACTS

3.A.    PROFESSOR LYNN'S QUALIFICATIONS

Professor Lynn received his Ph.D. in Social Psychology from the Ohio State University in 1987 and is currently employed as a tenured Associate Professor of Consumer Behavior at the School of Hotel Administration at Cornell University. *See* Revised Expert Report, Dkt. No. 83, Defendant's Appendix of Evidence in Support of Motion for Summary Judgment, Exhibit N ("Expert Report") at 1. Professor Lynn is an expert in social psychology, consumer behavior, and tipping. *See* Michael Lynn dep., taken April 14, 2007 ("Lynn dep. I") 220:16-222:20.[1]

Professor Lynn became interested in tipping as an undergraduate student when he began working for tips. *See* Expert Report at 1. At various times, he worked as a busboy, bartender and waiter to pay his way through school. *Id.* As a graduate student, he turned this personal interest into a research topic. *Id.* Since then, Professor Lynn has studied the psychology of tipping for over 20 years and has over 30 publications on this topic, roughly three times as many as the next prolific tipping researcher. *Id.*, Exs. A and B (*See* Dkt. No. 83 (Document 83-2)).

Professor Lynn's publications include articles regarding the relationship between restaurant tips and service quality, tipping customs, methods for increasing Servers' tips, the reasons for restaurant tipping, the normative, prosocial behavior of tipping, and the psychology of tipping. *See id.* As a result of his dominance in this research area, Professor Lynn is recognized as a leading expert on tipping, and has been identified as the "leading empiricist on tipping in the United States," "the country's foremost expert on tipping," the "tipping guru," and

---

[1] Defendant's Response is supported by the Declaration of Fraser A. McAlpine, as well as selected excerpts from Professor Lynn's deposition and other evidence, which are contained in the Appendix of Evidence in Support of Defendant Brinker International's Response to Plaintiff's Motion to Exclude Expert Testimony of Professor Michael Lynn ("Df's App.") filed concurrently herewith. Lynn dep. I is attached as Exhibit A.1 to the Declaration of Fraser A. McAlpine in Support of Defendant's Response to Plaintiff's Motion ("McAlpine Decl.").

even "the world's leading authority on the psychology of tipping" by *The Yale Law Journal*, *Restaurant Business*, *Restaurant Hospitality*, and *The Financial Times*.  Expert Report at 1-2.

### 3.B.    THE EXPERT OPINIONS PROFFERED BY PROFESSOR LYNN AND THE BASES FOR THEM

Given Professor Lynn's expertise in the psychology of tipping, Defendant intends to proffer Professor Lynn's testimony on the following two issues:  (i) whether Servers voluntarily tip QAs at Chili's and (ii) whether QAs should be eligible to participate in mandatory tip pools.[2]

### 3.B.1. Professor Lynn's Expert Opinion That The Tipping Of Chili's QAs Is Voluntary

Professor Lynn opines that Servers voluntarily tip QAs at most Chili's locations. According to Professor Lynn, absent some kind of corporate policy or directive requiring Servers to tip QAs or some kind of threat on the part of Managers to fire or otherwise retaliate against Servers who fail to tip QAs, the analysis of whether tipping is voluntary or involuntary demands a multi-layered, multi-factored, individualized analysis.  *See* Expert Report at 8-12; Lynn dep. I 173:9-190:5.  Professor Lynn opines that, more often than not, tipping – (i) customer tipping of Servers and likewise (ii) Server tipping of QAs – occurs as a response to the social pressures or social norms associated with tipping.  *See* Expert Report at 8-12.  Just like customers who experience various social pressures to tip Servers, Professor Lynn recognizes that there are analogous social pressures which may affect a Server's decision to tip a QA:

| Customer Tipping of Servers | Server Tipping of QAs |
| --- | --- |
| It is social custom that consumers tip 15 to 20 percent of their bills to the Server. | It is the social norm that some Servers tip 1% of their sales to QAs.  Lynn dep. |

---

[2] While Professor Lynn's Expert Report also addresses the issues of whether the tipping of QAs is customary and regular and whether Defendant's restaurants differ in ways that are relevant to the voluntariness of Server tipping, Defendant does not intend to proffer Professor Lynn's expert testimony on these issues at trial.  Accordingly, the Court should disregard as immaterial any arguments in Plaintiff's Motion that address the admissibility of Professor Lynn's testimony on these issues.

| | |
|---|---|
| Lynn dep. I 182:16-19.  "[B]ill size accounts for about 70 percent of the variance or difference in the tips that dining parties leave." *Id.* 182:20-23. "That's a very powerful social norm. And yet, the existence of that social norm doesn't preclude people from [not] tipping." *Id.* 183:3-5. | I 182:16-19. |
| Consumers experience social pressure to tip Servers.  Expert Report at 11. Nevertheless, consumer tipping in restaurants is voluntary.  *Id.* | Some trainers tell QA trainees that they can expect tips from Servers and also tell Server trainees that most people tip QAs.  Expert Report at 8-12.  Still, according to Professor Lynn, even if a Server decided not to tip a QA, "there was no evidence anywhere of punishment, apart from peer-to-peer pressure." Lynn dep. I 178:3-12.<br><br>Similarly, some QAs, some other Servers, and (in rare cases) Managers have placed social pressure on Servers to tip QAs by collecting tips for QAs from Servers.  Expert Report at 8-12. Nevertheless, "[e]ven if your manager wants you to tip, it doesn't make it compulsory, because managers need good employees so badly, they are not going to fire someone over that. . . .[I]f they simply say, I'd love it if you do this[, the suggestion does not make tipping involuntary]." Lynn dep. I 175:11-176:5.  Rather, the pressures that Servers feel to tip arise primarily from the Servers not wanting to upset their co-workers or from Servers not wanting their co-workers to think they are cheap.  Michael Lynn dep., taken Feb. 1, 2008 ("Lynn dep. II") 56:14-57:16 (attached as Exhibit A.2 to |

| | |
|---|---|
| | McAlpine Decl.).<br><br>("[QAs] themselves want to receive tips and that exerts some social pressure on the servers [because] servers don't want a co-worker to be upset with them . . . . That I would argue is probably the strongest social pressure . . . . And you wouldn't want to appear cheap . . . and, therefore, may feel some social pressure to leave a tip.")  These social pressures, however, do not make the decision to tip involuntary.  *Id.* |
| "Managers will occasionally put recommendations on bills to consumers, saying . . . it's customary to tip 15 to 20 percent or perhaps even calculating out 15 percent is this, 18 percent is this, 20 percent is this, all in an attempt to put social pressure on the consumer to leave a tip."  Lynn dep. I 183:12-18.  This level of management involvement does not make a customer's tipping of Servers involuntary.  *See* Lynn dep. II 62:13-63:9.<br><br>Customers also know that Servers are making less than the minimum wage. Expert Report at 11. | On occasion, QAs can look at Servers' sales reports to gauge whether they are receiving the customary tip percentage amount from the Servers. Expert Report 8-12.  "That level of management involvement does not, in [Professor Lynn's] opinion, make the tipping of [QAs] involuntary."  Lynn dep. II 62:13-63:9.  Rather, the sales reports merely "contribute[] to . . . social pressure that [a QA] might want to exert on a server to tip them one percent," Lynn dep. I 181:2-12, and are no different than the 15%-20% tipping suggestions customers see on a regular basis, Lynn dep. II 62:13-63:9. |
| Other variables may lead to differences in tipping behavior, like good service or good social rapport with a Server (like a smile or extra attention), or even good weather.  Lynn dep. I 188:7-25. | Similarly, there may be any number of variables that affect Server tipping of QAs, which may or may not even be consciously known by them.  *See* Lynn dep. I 188:7-190:5. |

While customers and Servers may feel unhappy at the idea of experiencing "pressure" to tip someone, Professor Lynn likens this to the psychological pressures a customer feels to tip a

Server, which does not take away from the voluntariness of the customer's decision, and opines that such pressures do not affect the voluntariness of the Server's decision to tip a QA:

> Does the "contribution [of other servers, trainers, or even managers] toward the social norm and [does] the existence of the social norm and the social pressures that the servers face . . . does that make this involuntary?" And I concluded that it doesn't . . . . There are no employment consequences, other than perhaps your social relations with coworkers that are contingent on this. And the relationship with coworkers is outside of management's control.

Lynn dep. I 181:23-182:12. As Professor Lynn notes, this is no different from customers who say that they would like it better if they were not expected to tip at restaurants or that they disliked tipping. *See* Expert Report at 11. Nevertheless, more than ninety-five percent of customers at full-service restaurants still leave tips. *Id.*

Based upon his years of studying the psychology of tipping, Professor Lynn recognizes that a number of factors can affect a person's decision to tip. Analogizing to consumer tipping behavior, Professor Lynn concludes that despite the complex psychological factors affecting a Server's decision to tip a QA, such tipping is voluntary when it occurs on account of social pressure or social norms.

### 3.B.2. Professor Lynn's Expert Opinion That QAs Should Be Eligible To Participate In Mandatory Tip Pools

Professor Lynn also opines that QAs should be eligible to participate in mandatory tip pools because the job tasks performed by QAs are akin to the job tasks performed by other employees in tip-eligible positions, like Servers and bussers. *See* Expert Report at 6-7. Contrasting cooks and other "back of the house" employees who work to provide a product (here, the food), Professor Lynn explains that QAs: (i) enhance the customer dining experience by facilitating food delivery and performing tasks that Servers would otherwise have to perform themselves; (ii) act as "server helpers" and enable Servers to increase sales and get more tips by

allowing Servers to wait on more tables at a time, allowing Servers to spend more time on the floor with customers, and ensuring that the customers will be satisfied with the food; and (iii) occasionally have direct service interactions with customers.[3]  *Id.* at 6.  Because QAs perform these tasks, they generally share a self and social identity with the "front of the house" (customer service) team than the "back of the house" (food preparation) team.  *Id.*

Professor Lynn opines that because QAs speed up food service, they ensure that customers receive the type of service customers expect to receive at a full-service restaurant.  *See* Expert Report at 6 (QAs "speed[] up service delivery and make[] sure that guests get what they ordered and need.  Thus, [QAs] deliver part of the service guests receive."); *see also* Lynn dep. I 139:7-144:5 ("What probably – one of the key elements that the [QA] is doing is – and – and speed of service – I mean, most customers would say, my food is cold, they blame the server not the cook, right?  . . . .[T]he service is the speed element of this. . . .  And so because they impact . . . the quality of service more than. . .the quality of the food.").  According to Professor Lynn, because QAs facilitate the delivery of food rather than its preparation, QAs function more like Servers or "server helpers" than cooks.  Expert Report at 6.  Similarly, in instances where QAs interact with customers by double-checking orders with customers, asking the customers whose food they deliver if the customers need anything else, and greeting the customers whom they notice in the dining room, they are providing the same customer service that a tip-eligible Server provides.  *Id.* at 7.

---

[3] Professor Lynn notes, however, that direct customer contact is not an essential factor driving customer tipping behavior.  *See* Expert Report at 7.  A customer often tips because he or she received a service even if he or she does not directly interact with the service provider.  *See id.*  ("[C]ustomers often leave tips for hotel maids whom they never see because the maids clean the room while the consumer is out."); *see also* Lynn dep. I 144:19-145:20 ("customer contact is not a critical element . . . in differentiating tip[ped] from non-tipped" because employees who may not interact with customers are still tip-eligible).

Professor Lynn relies on his understanding of QA job tasks from interviews and from reviewing deposition summaries and transcripts, as well as from his decades of study on the difference between a consumer's perception of a product and a service, to conclude that QAs should be eligible to share in mandatory tip pools. Lynn dep. I. 95:1-103:4; Expert Report at 6-7, Exs. S-W (*See* Dkt. No. 83-84 (Documents 83-6, 84-2, 84-3, 84-4, 84-5)); Lynn dep. II 51:1-10 ("Q. . . . you conclude that: [QAs] should be eligible to share in mandatory tip pools; is that correct? . . . Q. You do that as a educated layperson . . .? A. I do it as an expert in tipping and in the restaurant industry . . . ."). According to Professor Lynn, like Servers, QAs provide what a customer would perceive to be a service and not a product:

> Q.    *Now, can you just briefly walk us through how you determined that [QAs]*
>       *were more like the tip-eligible employees on the list that you looked at, as*
>       *opposed to the non-tip-eligible employees that you looked at on the list?*
>
>                                   . . . .
>
> A.    *Okay. Well, first, I look at the tasks that are performed by [QAs]. And I*
>       *ask myself first, is this a product or are they creating the product or are*
>       *they participating in the delivery of the product to the customer? And I*
>       *concluded that they, in fact, were not creating the product. The product is*
>       *created by the cooks. And that they were participating in the delivery of*
>       *the product to the customer by taking the prepared meals, putting them on*
>       *a tray, getting appropriate condiments and facilitating the servers'*
>       *delivery of those things. And so what they did was more of a service than*
>       *a product. I mean, we can also get into marketers frequently talk about*
>       *there's a core product and services and whether what's the difference*
>       *between product and services; product are tangible; services tend to be*
>       *intangible. Services – products are produced and consumed at different*
>       *points in time. Services tend to be produced and consumed simultaneously*
>       *or near simultaneously. One way of thinking about that is you can stock*
>       *product; you can't build a stock of services, et cetera. . . . I conclude that*
>       *cooks prepare product and [QAs] are providing a service.*

9

*See* Lynn dep. I 137:5-144:5. After applying his expert knowledge of tipping to the facts of this case, Professor Lynn concluded that the service-oriented tasks performed by QAs are akin to those performed by other tip-eligible employees and thus QAs are eligible to participate in a mandatory tip pool.

4.    <u>Argument</u>

    4.A.    <u>Professor Lynn's Testimony Satisfies Rule 702's Requirements For Admissibility</u>

Under Federal Rule of Evidence 702, expert testimony is admissible if (i) the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, (ii) the testimony is based upon sufficient facts or data, (iii) the testimony is the product of reliable principles and methods, and (iv) the witness has applied the principles and methods reliably to the facts of the case. FED. R. EVID. 702. As demonstrated below, Professor Lynn's expert testimony satisfies all of the requirements for admissibility under Rule 702.

    4.B.    <u>Professor Lynn's Undisputed Expertise In The Psychology Of Tipping Qualifies Him To Proffer Expert Opinions In This Case</u>

"Rule 702 provides that a witness may be qualified as an expert 'by knowledge, skill, experience, training, *or* education.'" *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir. 1990) (emphasis in original), abrogated on other grounds by *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994). "The disjunctive conjunction, which [a court] must assume the drafters of the rule chose deliberately, suggests that an expert may be qualified on any of the five basis listed." *Id.* "When . . . an expert is 'qualified . . . by knowledge, skill, experience training, or education,' . . . he need not have first-hand dealings with the precise type of event that is at issue." *MicroFinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 80 (1st Cir. 2004). "[T]o the extent that lack of firsthand experience by [an] expert is relevant, it goes . . . to the weight and not the admissibility of the testimony." *Smith v. Ingersoll-Rand Co.*,

214 F.3d 1235, 1244 (10th Cir. 2000). Here, unable to attack Professor Lynn's undisputed expertise in the area of tipping, Plaintiff attempts to create a false dichotomy between customer tipping and Server tipping to challenge Professor Lynn's qualifications. *See* Pl's mot. at 5 (contending that Professor Lynn's "expertise . . . in the field of social psychology around consumer tipping" does not qualify him to testify on the voluntariness of tip-outs amongst employees). Plaintiff's argument is wrong for several reasons.

Professor Lynn's expertise is broader than just consumer tipping. He has researched and published numerous articles on the normative, prosocial behavior of tipping and the overall psychology of tipping. Expert Report, Exs. A and B (*See* Dkt. No. 83 (Document 83-2)).

Even if Professor Lynn's expertise were limited to the field of consumer tipping, this does not mean that Professor Lynn lacks the expertise to draw analogies between consumer tipping and Server tipping to support his opinion that both types of tipping are voluntary. The law recognizes, for example, that psychologists can draw upon their knowledge and expertise of human conditions and behaviors to proffer opinions on particular cases. *See, e.g., Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998) (expert can testify regarding general practice of deprogramming and origin and practices of anti-cult movement without having studied defendant's deprogramming practices); *United States v. Johns*, 15 F.3d 740, 743 (8th Cir. 1994) (psychologist's testimony regarding dynamics of long-term familial sexual abuse admissible even though she had never met, talked to, or evaluated victim); *United States v. Young*, 316 F.3d 649, 658 (7th Cir. 2002) ("there is no legal authority supporting the proposition that [the expert] must interview [the victim] before forming her expert opinion"). Similar to these cases, Professor Lynn relies on his expert understanding of the complex social pressures and social norms affecting consumer tipping to recognize similar types of pressures and norms affecting

Server tipping and to conclude that both types of tipping are voluntary.[4]  Lynn dep. I 173:9-174:3 (discussing "parallels or analogies between the forces at work that influence a server's decision about . . . whether to tip and how much to tip the [QA]"), 181:23-184:1 ("I mean, this whole notion that social pressure and a norm don't preclude consumer tipping from being voluntary, I believe is analogous and the same kinds of arguments can be used to argue that servers tipping of [QAs] is voluntary.").  A background of academic research on Server tipping is not necessary in this context.  And even if Professor Lynn's expertise were limited to the field of consumer tipping, this does not preclude him from offering expert testimony as to Issue Two – whether from a customer perspective, QAs are providing a service which qualifies them to participate in a mandatory tip pool.

### 4.C.   PROFESSOR LYNN'S PROFFERED OPINIONS ARE HIGHLY RELEVANT TO THIS CASE AND WILL ASSIST THE TRIER OF FACT

Rule 702 requires that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue."  FED. R. EVID. 702.  There are two novel issues to assess in this case for which Professor Lynn can assist.

### 4.C.1.   PROFESSOR LYNN'S TESTIMONY ON THE ISSUE OF VOLUNTARINESS WILL HELP THE TRIER OF FACT BY PROVIDING A FACTUAL FRAMEWORK FOR CONCEPTUALIZING WHAT VOLUNTARINESS MEANS

The first novel issue for the trier of fact to assess is whether the Servers' tipping of QAs

---

[4] Plaintiff contends that Professor Lynn lacks the qualifications to opine on the issue of "voluntariness" because he applies his own definition of voluntariness and not a legal definition.  *See* Pl's mot. at 5.  This argument, of course, presumes that a legal definition of voluntariness in the context of tipping even exists.  As argued in Defendant's Reply in Support of its Motion to Decertify, this is a case of first impression presenting a novel claim, and there is no established legal definition for voluntariness in the specific context of tip pools.  The appropriate legal standard for determining coercion is whether a reasonable Server would find the Manager's action materially coercive, i.e., it dissuaded, by force or threat, a reasonable Server from believing that tipping out a QA was voluntary.  *See generally Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2415 (2006) (defining legal standard for retaliation).  Regardless of what definition is applied, as discussed in Section 4.C, *infra*, Professor Lynn's expert testimony on the issue of voluntariness will aid the trier of fact to understand that while various pressures may affect a person's decision to tip, they do not necessarily affect the voluntariness of that decision.

is voluntary or coerced.  While Plaintiff contends that "[t]he DOL mandates that a tip pool is not voluntary unless it is 'free from any coercion whatever,'" Pl's Opp. to Df's MTD at 16, this is not the established legal standard.  Moreover, Plaintiff's answer to the question – what is voluntary? – inevitably leads to another question – what is coercion?  Since no common proof of "coercion" exists, and the issue of "coercion" must, by its very nature, be decided on an individualized basis, the trier of fact will have to analyze myriad individual issues to determine whether any particular Server was coerced to share tips, including, without limitation, (i) whether an allegedly coercive communication existed or was merely inferred; (ii) who was responsible for the communication; (iii) what the communication was; (iv) whether other employees were applying allegedly "coercive" pressure to tip; (v) whether particular Servers were motivated to share tips with QAs due to personal beliefs, social pressures, or social norms; (vi) whether particular Servers were motivated to share tips with QAs for providing good service or other merit-based reasons; and (vii) whether particular Servers were motivated to share tips with QAs for purely personal reasons, such as because they were in a good mood, they received an unexpected tip they wanted to share, or even that the weather was nice.

Although the definition of voluntariness applied by Professor Lynn is a commonly accepted definition of the term, *see* Lynn dep. I 157:6-158:17, 167:7-168:12, Professor Lynn's testimony would provide the jury with a factual framework for how to assess the various psychological factors that affect an individual's decision to tip someone and whether those factors can affect voluntariness.  His expert testimony will therefore help the trier of fact understand the evidence or determine a fact in issue.  *See, e.g., Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) (citing *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996)) ("Social scientists in particular may be able to show that commonly accepted explanations for

behavior are, when studied more closely, inaccurate."); *Johns*, 15 F.3d at 743 (permitting the

testimony of a psychologist where the testimony "was circumscribed so as to educate rather than

to usurp the role of the jury"); *Hall*, 93 F.3d at 1345 (remanding case to district court to test

admissibility of expert testimony under the standards of Rule 702 and *Daubert* because expert's

testimony regarding voluntariness of defendant's confusion and his proclivity to make false

confessions would potentially assist trier of fact).

### 4.C.2. PROFESSOR LYNN'S TESTIMONY ON THE ISSUE OF WHETHER QAS ARE PROVIDING A SERVICE WILL ASSIST THE TRIER OF FACT IN DETERMINING WHETHER QAS SHOULD BE ELIGIBLE TO PARTICIPATE IN MANDATORY TIP POOLS

The second novel issue for the trier of fact to assess is whether a particular QA, by virtue

of his or her specific job duties and performance, is eligible to participate in a mandatory tip

pool.  The U.S. Department of Labor's Handbook provides a non-exclusive list of employees

who customarily and regularly receive tips and can therefore participate in mandatory tip pools.

*See* DOL Field Operations Handbook § 30d04(e).  (*See* Dkt. 100 (Document 100-3)).  While a

QA is not on the list, the list includes "busboys/girls (server helpers)." *Id*.  Determining whether

QAs should be eligible to participate in mandatory tip pools naturally leads to inquiries such as:

(i) what does a Server do; (ii) what does a QA do; (iii) how do individuals performing these jobs

interact and overlap; (iv) what does it mean to customarily and regularly receive tips; (v) why do

some employees customarily and regularly receive tips; and (vi) why do other employees not

receive tips?  Professor Lynn's expert opinions regarding the customary practice of tipping and

notion of service versus product distinctions will provide the trier of fact with helpful factors to

assess some of the issues which will be posed to him or her in this case.  Even Plaintiff concedes

that an understanding of "social habit" is important to the analysis of determining "customary"

for purposes of analyzing whether a QA "customarily and regularly receives tips." *See* Pl's

Resp. to Df's MSJ at 13 ("'[C]ustomarily' speaks to conduct practiced so commonly within a group, population or industry that it has become 'social habit' within that group, population or industry.").

While it may be the case that, as a consumer, a trier of fact may have some inclinations as to whether a QA may be eligible for a tip, "[u]nder Rule 702 expert opinion concerning matters about which jurors have general knowledge is admissible if the expert opinion 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) (quoting FED. R. EVID. 702); *see also Smith*, 214 F.3d at 1246 ("[A]n expert may be 'called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.'"). Here, Professor Lynn's expert testimony will assist the trier of fact by providing the trier with insight into reasons why customers are inclined to give tips to certain types of employees and why an employee may therefore be eligible for tips in the hospitality industry. His ability to assist the trier of fact does not depend on whether he has legal training on the Fair Labor Standards Act.[5] Professor Lynn's expertise regarding tipping, consumer behavior, and the hospitality industry more than qualifies him to provide an expert opinion on QA tip eligibility. Professor Lynn's testimony regarding the eligibility of QAs for tips is relevant and helpful to the trier of fact in this case and thus satisfies this admissibility requirement under Rule 702.

## 4.D.   PROFESSOR LYNN'S EXPERT TESTIMONY IS RELIABLE

In assessing reliability for purposes of expert testimony, "the court should address whether the proffer demonstrated that a sufficiently reliable body of specialized knowledge

---

[5] Plaintiff's argument that Professor Lynn lacks legal training is a straw man argument. An expert cannot define the legal parameters within which the jury must exercise its fact-finding function. *Smith*, 214 F.3d at 1246. Legal

existed." *Hall*, 93 F.3d at 1342. "Social science in general, and psychological evidence in particular, have posed both analytical and practical difficulties for courts attempting to apply Rule 702 and *Daubert*." *Id.* "Notwithstanding these difficulties, however, social science testimony is an integral part of many cases, ranging from employment discrimination actions, to family law matters, to criminal proceedings." *Id.* at 1342-43.

"[T]he *Daubert* analysis is a 'flexible' one, and . . . 'the factors identified in *Daubert* may or may not be pertinent in assessing the reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). Accordingly, "in [a] case [where] the expert's testimony is based mainly on his personal observations, professional experience, education and training[, t]he trial court . . . must probe into the reliability of these bases when determining whether the testimony should be admitted." *Id.* at 247 (also quoting the Advisory Committee's note to Rule 702: "'Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide sufficient foundation for expert testimony. . . . "[A]n expert may be qualified on the basis of experience."'"); *see also Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168 (9th Cir. 2007) ("evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence' . . . and relevance standard 'is a liberal one'"). Accordingly, courts have accepted that properly analyzed social science expert opinions based on, among other things, deposition testimony, company organizational charts, correspondence, memoranda, reports, company

---

training would thus only be required if Professor Lynn was providing testimony which he would not be permitted to provide in the first place. Legal training is not required for Professor Lynn to testify on tipping psychology matters.

presentations relating to personnel policy and practice, diversity, and equal employment

opportunity issues, documents describing the culture and history of the company, and a large

body of social science research on organizational policy and practice and on workplace

discrimination may be reliable under the *Daubert* test. *See Dukes*, 509 F.3d at 1178-80 (finding

that evidence from plaintiffs' sociologist expert on Wal-Mart's strong corporate culture of

gender stereotyping may add probative value to plaintiffs' class action claims);[6] *Tyus*, 102 F.3d

at 263-64 (reversing exclusion of social scientist's testimony on how advertising campaigns send

messages to target markets and how an all-white campaign affects African Americans because

the expert properly relied on peer-reviewed articles, his extensive background, and the "focus

group" method). Here, Professor Lynn relies primarily on his review of Defendant's

employment documents, his interviews with Chili's employees, his review of deposition

summaries and transcripts, and on his research on the psychology of tipping to proffer his expert

opinions on whether Servers voluntarily tip QAs and whether QAs should be permitted to

participate in mandatory tip pools.[7] *See* Expert Report at 2-4, 5-12; Lynn dep. I 148:7-157:3,

155:5-16.[8] Professor Lynn bases his social psychologist opinions on reliable evidence, *see*

---

[6] While the reliability of the sociologist's opinion was analyzed at the class certification stage, and not the merits stage, the court gives no indication that its finding would be any different at the merits stage. *Dukes*, 509 F.3d at 1179-80.

[7] Plaintiff contends that Professor Lynn's testimony is not reliable because there is no academic literature on the question of voluntariness of tip-outs amongst restaurant employees and because there is no generally accepted theory on this issue. *See* Pl's mot. at 8, 9. As argued in Section 4.B *supra*, however, the lack of a specific academic study on the voluntariness of tip-outs among restaurant employees should not, in and of itself, preclude Professor Lynn from applying his years of experience and knowledge regarding the psychology of tipping to the particular case of Servers tipping QAs.

[8] Plaintiff's *Daubert* challenge relies heavily on Professor Lynn's site visits to two or three chain restaurants, phone calls to ten restaurants which he believed to be similar to Chili's, Google internet searches, and blog reviews. *See* Pl's mot. at 7-10. These activities relate solely to Professor Lynn's opinions regarding whether the tipping of QAs is customary and regular or whether Chili's restaurants differ in any ways that are relevant to the voluntariness of Servers' tipping of QAs. As Defendant does not intend to proffer these particular opinions, the evidence relied upon by Professor Lynn supporting them (like the blogs, Google searches, phone calls, and site visits to non-Chili's restaurants), *see* Expert Report at 4 and 12-14, is immaterial.

*generally Dukes*, 509 F.3d at 1178-80, and *Tyus*, 102 F.3d at 263-64, and his testimony is thus

admissible under Rule 702 and *Daubert*.[9]

### 4.E. The Probative Value Of Professor Lynn's Expert Opinions Outweighs Any Likelihood Of Prejudice

Evidence may be excluded pursuant to Federal Rule of Evidence 403 if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury. Fed. R. Evid. 403. Plaintiff contends that Professor Lynn's testimony

should be excluded because his opinions are unreliable and would confuse the issues. *See* Pl's

mot. at 10. As argued in Section 4.D., however, Professor Lynn's expert opinions are reliable.

Accordingly, Professor Lynn's expert testimony poses no danger of unfair prejudice, confusion

of the issues, or misleading the jury. Moreover, even if Plaintiff could somehow show that

Professor Lynn's testimony could be minimally prejudicial – which she cannot – as discussed in

Section 4.C., the risk of such prejudice cannot outweigh the highly probative value of his expert

---

[9] The cases cited by Plaintiff to attack the reliability of Professor Lynn's expert testimony, *see* Pl's mot. at 11, are factually distinguishable from this case and accordingly do not warrant the exclusion of his testimony. *See Meadours v. Ermel*, Case No. Civ. A. H-04-102, 2005 WL 1923596, at *3-4 (S.D. Tex. Aug. 10, 2005) (excluding testimony of medical examiner because examiner admitted that his method of injury causation is different from most others, is a method of pattern analysis that he developed on his own, and is a malleable model that can accommodate whatever he is evaluating); *Alvarado v. Shipley Donut Flour & Supply Co.,* Case No. H-06-2113, 2007 WL 4480134 (S.D. Tex. Dec. 18, 2007) (excluding psychiatrist's opinions on plaintiffs' alleged psychological injuries and human resources practices in business settings because psychiatrist failed to use accepted psychological measurement tools or tests and because plaintiffs' response to motion to exclude did not address psychiatrist's human resources opinion testimony); *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 786, 790 (S.D. Tex. 2000) (excluding testimony from expert witnesses because court was convinced that expert witnesses began with conclusion that plaintiff's illness was caused by exposure to harmful levels of benzene and from that conclusion "'worked backward'" to find medical and scientific support); *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194 (5th Cir. 1996) (affirming exclusion of expert testimony because expert relied on scarce epidemiological evidence, unreliable animal studies, and inconclusive cell biology data to conclude that EtO exposure lead to brain cancer, when numerous reputable epidemiological studies indicated that there was no correlation between the two); *Moore v. Ashland Chemical Inc.*, 151 F.3d 269 (5th Cir. 1998) (affirming exclusion of testimony on causation in toxic tort action because expert lacked knowledge of toxic chemical in question and length of plaintiff's exposure to it); *Watkins v. Telsmith, Inc.*, 121 F.3d 984 (5th Cir. 1997) (affirming exclusion of civil engineer proffered as mechanical engineering expert); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir. 1987) (affirming exclusion of expert testimony in toxic tort situation where expert could not establish causal link between chemical in question and plaintiff's symptoms); *Burleson v. Texas Dept. of Criminal Justice*, 393 F.3d 577 (5th Cir. 2004) (affirming exclusion of expert testimony

opinions. *See Pipitone*, 288 F.3d at 250 ("[T]he trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system. Rather, as *Daubert* makes it clear, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence'. . . . The fact-finder is entitled to hear [the expert's testimony] and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility."); *Scott*, 140 F.3d at 1286 ("Because [the expert] provided the jury with useful information about the anti-cult movement and was available for cross-examination, defeating in large part any concerns of prejudice, the probative value of his testimony outweighed any prejudicial effect.").

Accordingly, Rule 403 cannot bar the admissibility of Professor Lynn's expert testimony.

## 5.   CONCLUSION

For all of the foregoing reasons, the Court should deny Plaintiff's Motion to Exclude Expert Testimony of Professor Michael Lynn in its entirety.

DATED:  March 17, 2008.

Respectfully submitted,

/s/ Fraser A. McAlpine
**Fraser A. McAlpine**
State Bar No. 13321300
Federal I.D. No. 3407
AKIN GUMP STRAUSS HAUER & FELD LLP
1111 Louisiana Street, 44th Floor
Houston, Texas 77002
(713) 220-5800 (telephone)
(713) 236-0822 (facsimile)

ATTORNEY-IN-CHARGE FOR DEFENDANT
BRINKER INTERNATIONAL, INC.

in toxic tort case because expert could not show proof of statistically significant link between exposure to chemical in question and plaintiff's lung cancer).

Of COUNSEL:

**Jordan Cowman**
Federal I.D. No. 14468
State Bar No. 4932800
**Marcia N. Jackson**
State Bar No. 24008411
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas  75201
(214) 969-2800 (telephone)
(214) 969-4343 (facsimile)

CERTIFICATE OF SERVICE

I certify that on March 17, 2008, I served a true and correct copy of Defendant's Response to Plaintiff's Motion to Exclude Expert Testimony of Professor Michael Lynn on known Filing Users or by certified mail, return receipt requested, on unknown Filing Users addressed as follows:

| |
|---|
| Martin A. Shellist, Esq.<br>Shellist & Lazarz LLP<br>1900 West Loop South<br>Suite 1910<br>Houston, Texas 77027 |
| Daryl J. Sinkule, Esq.<br>Shellist & Lazarz LLP<br>1900 West Loop South<br>Suite 1910<br>Houston, Texas 77027 |
| Richard J. Burch<br>BRUCKNER BURCH PLLC<br>5847 San Felipe, Suite 3900<br>Houston, Texas  77057 |

s/ Fraser A. McAlpine
**Fraser A. McAlpine**