UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JENNIFER ROUSSELL, on Behalf of Herself and Others Similarly Situated, | § § § | |
| Plaintiffs, | § § | |
| | § | CIVIL ACTION NO. H-05-3733 |
| v. | § § | |
| BRINKER INTERNATIONAL, INC., | § § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant's Motion for Summary Judgment and Motion to Decertify and Plaintiffs' Motion to Strike Expert Witness.  After considering the parties' arguments and the relevant law, the Court finds that Defendant's Motion for Summary Judgment, Doc. No. 82, should be denied.  Before deciding Defendant's Motion to Decertify, Doc. No. 65, the Court invites Plaintiffs to offer a revised trial plan that would render the use of representative testimony reasonable, as outlined below.  Finally, the Court finds that Plaintiffs' Motion to Strike Expert Witness, Doc. No. 114, should be granted.

## I.   BACKGROUND

### A.   Procedural History

Plaintiffs are over 3,500 servers at Chili's restaurants (which are owned by Defendant) who maintain that Defendant unlawfully required them to share tips with Quality Assurance employees[1] (QAs) in violation of the Fair Labor Standards Act (FLSA).  Plaintiff Roussell filed this lawsuit in November 2005, and the Court approved an agreed notice to potential class members in August 2006.  The Notice specified that servers could opt-in to the lawsuit if they

---

[1] QAs are also referred to as expeditors in some depositions and documents.

were employed at Chili's between August 2003 to August 2006 and were "coerced or otherwise required by Chili's management" to share a portion of tips with QAs or "participated in a tip pool where Chili's management collected a portion of server's tips and then shared the tips with QAs." (Doc. No. 22.)  Parties have taken over 150 depositions, including the depositions of 56 opt-in Plaintiffs.

Defendant argues in its Motion for Summary Judgment that even if Chili's were to require servers to share tips with QAs, it would not be unlawful because QAs are eligible to participate in mandatory tip pools under FLSA and the relevant regulations.[2]  Plaintiffs contend, on the other hand, that there are genuine issues of material fact that preclude the Court from making such a finding on summary judgment.  Defendant also maintains that the class must be de-certified because Plaintiffs are not similarly situated and because the issues and defenses raised require individualized determinations that cannot be fairly adjudicated collectively.  Finally, Plaintiffs urge the Court to strike Defendant's "tipping expert," Dr. Michael Lynn.

### B.    QA Job Duties

Not all restaurants employ QAs, and at those stores that do employ QAs, there is not always a QA on duty for every shift.  A store may employ or schedule a QA to work based, for example, on business volume.  (*See, e.g.*, Sandidge Dep. Tr. 139.)  On some occasions, servers—including Plaintiff Roussell and other opt-in Plaintiffs—work QA shifts, and managers may ask the most experienced servers to work as QAs.[3]  At other stores or on other occasions, a person may be employed to work exclusively as a QA.  When there is no QA on duty, servers may

---

[2] Defendant admits that Chili's requires servers to share tips with bussers and bartenders, but contends that tipping out QAs by servers is voluntary.  Parties appear to agree, however, that there is a genuine issue of material fact as to whether servers shared tips with QAs voluntarily.

[3] (*See, e.g.*, Ellis Tr. 19, 54; Hunt Tr. 9-10; Fox, D. Tr. 26-27; Skubisz Tr. 32.)

perform the tasks that would otherwise be performed by the QA.[4]  Plaintiffs point out, however, that managers sometimes perform the duties of QAs when no QA is on duty.[5]

There is a nationwide QA job description that states that the primary objective of the QA position is to "[e]nsure Guest receives the highest quality of food; make sure that orders are prepared and garnished properly, and delivered to the Guest at the appropriate hot or cold temperature."[6]  (Doc. No. 105, Ex. 102; *see also* Sandidge Tr. 57, 93 (recognizing that there was only one QA job description during the time period covered by this lawsuit, but testifying that regions or stores have the ability to stress some aspects over others or "delineate more specifically" what they expect of a QA).[7]  Parties do not dispute that QAs consistently perform certain functions.  QAs perform duties in the "pass through" area of the restaurant; they generally work on the side of the "pass through" counter opposite the kitchen.[8]  In the "pass through" area of the restaurant, cooks place food on a long stainless steel counter, and QAs inspect the food for appearance and temperature, ensure that it conforms with guests' orders*,* add garnishes and condiments as appropriate, and ensure that certain utensils such as steak knives or soup spoons are included.[9]  QAs do not work in the actual cook line.[10]  QAs often place the plated food on

---

[4] (*See, e.g.*, Antley Tr. 55-56; Brenner Tr. 30-31; Bryant Tr. 58, 67; Colbeck Tr. 37-38.)

[5] (*See, e.g.*, Allen Tr. 46 (agreeing that servers sometimes perform QA duties, but adding that managers may also perform some QA duties); Bryant Tr. 72 (testifying that managers filled QA position during some part of her employment).)

[6] The job description includes a number of other "essential functions" and "qualification standards."  (Doc. No. 105, Ex. 102.)  Most of the essential functions listed on the job description coincide with the testimony regarding QA job duties.  The "qualification standards" add, *inter alia*, that a QA "works in a hot and damp work environment" and "works with an open flame."  (Doc. No. 105, Ex. 102.)  The Court is not aware of any testimony that a QA has actually worked with an open flame or cooked food.

[7] Sandidge also testified that she "prefers" that regions run such changes by corporate, but it "doesn't always happen."  (Sandidge Tr. 176.)

[8] Plaintiffs contend that the "Pass Through" area is not visible to customers in most restaurants and if it is visible, it is only from a limited area.  (*See, e.g.*, Smith-Crowder Dep. Tr. 37; Jandera Dep. Tr. 43.)  The location of the pass through may vary slightly, depending on the restaurant.  Witnesses for both parties testified that pass through area is an "employees only" area.  (*See, e.g.*, Anzini Tr. 63; Berveiller Tr. 23; Owen. Tr. 26.)

[9] (*See, e.g.*, QA job description Doc. No. 105, Ex. 102; Berveiller Tr. 23; Carter Tr. 32, 43-44 (adding that he also "[got] the soup ready"); Evans Tr. 66-67; Flanagin Tr. 71, 72; Fox, D. Tr. 17, 24; Martino-Huffman Tr. 48, 57; Roussell Tr. 56-57;  Zayas Tr. 68-70.)

[10] (*See, e.g.*, Kaddy Tr. 35, 36, 38.)

trays in a particular "pivot point" order.[11]  QAs monitor ticket times and help ensure that food is

delivered to tables quickly.[12]  QAs communicate directly with the cooks.[13]  Some QAs wear the

same uniform as servers; some do not.[14]  Some QAs wear protective gloves.[15]

Parties dispute the extent to which QAs "run" food or otherwise have direct contact with

customers.  The Server job description specifies that servers "serve[] food and beverages to

Guests in a timely manner, which includes retrieving food orders form the kitchen and

transporting them to the Guests . . . ."  (Doc. No. 105, Ex. 98.)  The QA job description states

only that the primary objective of the QA position is to ensure, *inter alia*, that orders are

"delivered to the Guest at the appropriate hot or cold temperature."[16]  (Doc. No. 105, Ex. 102.)

After a QA puts plated food on a tray, the QA often calls for a runner—which may be a server—

to take the food to the guests.[17]  Several of Defendant's witnesses testify that QAs also often run

food to tables.[18]  Many opt-in Plaintiffs[19] and some defense witnesses[20] testify, however, that

---

[11] (*See, e.g.*, Abshire Tr. 64; Alfrey Tr. 70; Gray Tr. 43.)

[12] (*See, e.g.*, Crowder Tr. 34-35; Parrish Tr. 32-33; Beaulieu Tr. 45-46; Flanigin Tr. 71.)

[13] (*See, e.g.*, Conrady Tr. 18 (QAs get information from servers about, *inter alia*, modifications to orders, and convey that to the cooks); Allen Tr. 45 ("[T]he QA is the only person that will talk to the kitchen.").)

[14] (*See, e.g.*, Antley Tr. 57 (QAs wear jeans, t-shirt, and kitchen apron while servers wore black Polo shirts, waitress or server aprons and jeans; Bryant Tr. 60 (QAs were not dressed appropriately to be in the dining room and wore different uniform than server, including a hat); Jamison Tr. 73 (QA wears black Chili's shirt, jeans, and non-slip shoes).)

[15] (*See, e.g.*, Goodwin Tr. 57 (QAs have gloves on "all night"); Green Tr. 47.)

[16] The job description includes a number of other "essential functions" and "qualification standards."  (Doc. No. 105, Ex. 102.)  Most of the essential functions listed on the job description coincide with the testimony regarding QA job duties.  The "qualification standards" add, *inter alia*, that a QA "works in a hot and damp work environment" and "works with an open flame."  (Doc. No. 105, Ex. 102.)  The Court is not aware of any testimony that a QA has actually worked with an open flame or cooked food.

[17] (*See, e.g.*, McVicker Tr. 15; Roussell Tr. 56; McDonald, K. Tr. 33.)

[18] (*See, e.g.*, Allen Tr. 33 (QA running food "happens every day" and "might happen two, three . . . ten ties a shift"); Berveiller Tr. 23-24 (whether QA runs food "depends on the volume we are at at the time. . . .  But it happens quite often."); Carver Tr. 9 (as QA, ran food "two or three times a night"); Connolly Tr. 20 (QA delivers food to guests at Bar 20-30 times on busy shift and 8-15 times on slow shift; Edwards Tr. 42 (QA runs food "on every shift" and frequency depends on "how busy the shift is and perhaps how short staffed we are."); Folsom Tr. 33-34 (as QA would run food if food was "dying"); Gray Tr. 57-58 (QAs run food to the dining room on an average shift "about 30, 40 times"); Johnston Tr. 7 (most food delivered to the bar is delivered by QAs; during lunch QA may deliver food to guests over a dozen times, at dinner, could deliver food 20 to 50 times); Nass Tr. 36 (as QA runs food on an average shift between ten and fifteen times); Roberson Tr. 43 (estimating that QA runs food ten to twenty percent of the time); Rumski Tr. 21 (as QA runs food when servers are very busy; in one shift, did so approximately five times).  Both defense witnesses and at least one opt-in testified that QAs may run food to the bar or lounge. (*See,*

QAs never leave the pass-through area or interact with customers only rarely.  In at least a few instances, opt-in Plaintiffs have testified that QAs do not interact with guests or run food, while Defense witnesses from the same store testify to the contrary.[21]  Some defense witnesses testified that different QAs might run food more than others[22] or that it is difficult to determine how much time a QA interacts with guests because it varies depending on how busy the restaurant or shift might be.[23]

---

*e.g.*, McDonald, D. Tr. 32 (QAs would run food to the bar "whenever needed" because the bar "is right there" and because sometimes bartenders are busy and can't get the food"); Phillips Tr. 37-38 (as QA would run 50 to 75 percent of the tables in the lounge; White Tr. 29-30 (as QA, runs 100 percent of food to lounge and bar).)

[19] *See, e.g.*, Abshire Tr. 40-41 (only saw QA go to front of restaurant once or twice, and that was to talk to friends); Adams Tr. 82-83 (does not ever remember seeing QA run food); Antley Tr. 71 (never saw QA have interaction with a guest); Brenner Tr. 37, 47 (does not remember seeing QA run food); Carbone 102-03 (QA might run food if it was a "very busy night"); Carver Tr. 35-36 (as QA, spent 90 percent of time in pass through line); Carter Tr. 32 (QAs ran food "very rarely" because there was usually a food runner); Corno Tr. 81 (never saw QAs talk to customers for any reason); Crowder Tr. 37 (never saw QAs run food); Davasher  Tr. 32 (QA usually never left the kitchen); Davis Tr. 61 (saw QA run food); Dellamano Tr. 46 (QA never ran food or interacted with customers); Donahue Tr. 46 (never saw QA run food or drinks or go into dining room for any reason); Ekeler Tr. 40, 44 (never saw QA run food because often had a different dress code than front of house employees); Evans Tr. 67-69 (it was "really rare" that a QA might run food to a table); Garner Tr. 39 (QAs would run food like fajitas if server was not available); Hart Tr. 35 (observed QAs running food to tables "once or twice" if "ticket times were . . . really long and the servers were busy . . .[and] there were no managers available . . . and there was absolutely nobody in the kitchen"); Kaddy Tr. 39 (QAs would run food to a table "as a last resort"); McDonald, D. Tr. 30-31 (QA might run foods if restaurant became a "mad house"); Miller Tr. 37 (QAs at her restaurant never ran food or had any interaction with guests); Plane Tr. 66 (QAs "occasionally" ran food "if there was absolutely no one there to help."); Slomkowski Tr. 64 (QAs were not allowed to leave the kitchen because they were messy and had food on them).

[20] *See, e.g.*, Bogert Tr. 9 (as QA runs food "every once in a while.  When it slows down or right when I get there and it's not super busy and hectic. . . ."); Fox, D. Tr. 60 (testifying that it was not "typical" for a QA to run food and that as a QA, he himself never had any direct contact with customers);  Green [GM] Tr. 47 (agreeing that QAs do not have customer interaction the majority of the time they are on duty);; Jacobs Tr. 91, 92 (testifying that QAs "very rarely" give food to guests, that she has only seen it happen "maybe once or twice," and that even then only 'kind of poking their head around the corner saying here are your plates"); Jenkins Tr. 17 (QAs "rarely" take food to the table and do so "maybe once a shift . . .not always");; Linville, Tr. 58 (QAs will sometimes run food but it is not their primary duty); Luca Tr. 90-91 (in three-year tenure as QA, has seen QA run food two or three times."); McVicker Tr. 10-11 (as QA "rarely" ran food on Friday and Saturday nights but has "at times before run a tray or helped full up a drink"); Owen Tr. 26 (QAs run food on occasion, but not regularly, and spend the vast majority of time in the Pass Through).

[21] (*E.g.*, *compare* Brenner Tr. 47 (never saw QAs at Stillwater, OK store deliver food or drinks to customer) *and* Spears Tr. 13-14, 65 (QAs at Stillwater, OK store help carry food to table ten to fifteen times in a shift); *compare* Jones Tr. 40-41 (never saw a QA run food at Memphis-Wolfchase, TN store) *and* Standifer Tr. 64-65 (QAs run food at Memphis-Wolfchase, TN store).

[22] (*See, e.g.*, Mason, Tr. 93 (certain QAs are more proactive about running food); Carbone Tr. 103-04 (one QA sometimes ran food although she was not supposed to because she was the friend of the server.).)

[23] (*See, e.g.*, Anzini Tr. 58; Edwards Tr. 42 (may happen once or twice on a shift or ten or twelve times); Phillips Tr. 37-38 (on slower shifts, does not run food, o busy shifts may run food 5-15 times a night).)

Defendant's witnesses also contend that QAs sometimes talk to guests about food allergies.[24]  Defense witnesses[25] and at least one opt-in Plaintiff[26] also testify that QAs sometimes take food orders or ask guests if there is anything else they need, and at least one defense witness once spoke with guests when they ordered steaks that were "frozen solid" and would take 45 minutes to cook.[27]  At least one opt-in Plaintiff testified that she knew of two incidents in two-and-a-half years in which a QA delivered food to a guest table "because an order was sent back . . . and it was someone as a representative of the kitchen."[28]  One defense witnesses said she greeted and seated guests if it was early in a shift and no hostess had arrived or was on break,[29] and one defense witness testified that she has had to "grab tables" and greet people if no one else was available.[30]

Parties also dispute whether QAs are "Front of the House" (FOH) or "Back of the House" (BOH) employees.  "Back of the House" employee usually refers to staff such as cooks, food workers, and dishwashers that work in the back area of a restaurant.  Defendant points out that QAs work under a FOH job code, are on the FOH schedule, are evaluated on FOH evaluation forms; Defendant also asserts that labor costs associated with QAs are charged to the Front of the House.  Plaintiffs, on the other hand, point to deposition testimony in which some opt-in

---

[24] (*See, e.g.*, Edwards Tr. 31-32 (adding that  as QA, he also frequently visited tables to check on an unclear order or to talk with a guest who was a vegetarian); Gray Tr. 59-61; Nass Tr. 39; Oldakowski Tr. 33-35; Pedregal Tr. 19, 21-22 (adding that as QA, she also has visited a table to check on an unclear order); White Tr. 31.)

[25] (*See, e.g.*, Allen Tr. 33-34, 45-46 (when QA runs food, will also ask if there is anything else the guest needs and on busy shifts might take orders from guests); Linville Tr. 23-24 (QAs may take orders or drink orders, but "not very often"); Nass Tr. 39 (takes drink or refill orders); Oldakowski Tr. 33-35 (asks guests if there is anything else they need); Watson Tr. 75 (when QA runs food to bar, will ask customer if they need anything).)  At least one Defense witness testified that a certain QA who "had a way with 'schmoozing'" helped resolve customer conflicts and explained problems with food to guests,  (*see* Wamsley Tr. 24-26.), at least one Defense witness testified that QAs sing Happy Birthday to guests,  (*see* Edwards Tr. 34; *but see* Tatro Tr. 42 (QAs at Williston, Vermont Chili's do not sing Happy Birthday).)

[26] (*See* McDonald D. Tr. 33 (QA might help to go person by taking phone calls an ringing up customers).)

[27] (*See* Fox, C. Tr. 18-22).

[28] (McDonald, K. Tr. 37.)

[29] (Wamsley Tr. 28-29.)

[30] (Connolly Tr. 24-25.)

Plaintiffs and one of Defendant's witnesses state that they consider QAs BOH employees or believe that QAs work "more" in the back of the house.[31]

Several opt-in Plaintiffs[32] and defense witnesses[33] testify that a good QA "helps" or "assists" a server.  According to Defendant, servers say that tips go down if there is no QA. Several opt-ins testified that QA duties such as making sure that people get the right food or that food gets to the table quickly is part of "guest satisfaction."[34]  Opt-in Plaintiffs and Defense witnesses also testified that QAs help servers turn more tables, wait on more guests, and earn more tips.[35]

### C.    Mandatory or Coercive Nature of Tip Pool

All opt-in Plaintiffs claim that their decision to share tips with QAs was not voluntary. Plaintiffs argue that deposition testimony of the 56 opt-ins deposed shows they all were coerced by management in some way to share tips with QAs.  Defense witnesses testify, however, that

---

[31] (*See, e.g.*, Abshire Tr. 26-27 (QAs were "part of back-of-the house"); Dellamano Tr. 49 (QAs "are back of the house"); Jones Tr. 74 (considers QA BOH employee "[b]ecause they didn't have any interaction with the customers. They didn't serve the food and they stated in the kitchen"); Meyer Tr. 25 (stating that QAs work more in the back of the house "[b]ecause they're in the kitchen most of the time.").)

[32] (*See, e.g.*, Antley Tr. 57 (a good QA could help with the guest experience and help server do her job if QA makes sure orders are right and getting to tables); Carver Tr. 13 (if QA is doing a good job, it assisted her in performing duties as server); Davis Tr. 90-91 (without QA, could not make all the tips he makes); Evans Tr. 69, 70 (a trusted QA allows server to provide better service to customers because server does not have to make sure food is right before it goes out).)

[33] (*See, e.g.*, Conrady Tr. 21 (QA helps server by making sure food is ready and gets out when hot); McLean Tr. 35 (QA is helpful to server because QA makes sure food goes out properly and timely).)

[34] (*See, e.g.*, Alfrey Tr. 72-73; Davasher Tr. 27-28; Farinato Tr. 20; Jandera Tr. 35-36Moodie Tr. 37; Zayas Tr. 76-77.)

[35] (*See, e.g.*, Anderson Tr. 41-42 (if QA did not fulfill responsibilities, it was harder as server to keep guests happy and harder to get better tips); Anzini Tr. 46, 51-52 (QAs help servers earn bigger tips by, *inter alia*, allowing servers to handle more tables); Beaulieu Tr. 47-48 (a good QA allowed server to spend more time with guests, get food out more quickly, make guests happy, and get better tips); Carbone Tr. 177 (unlike the work of cooks, work of QA helped server look good with customers); Carter Tr. 46, 47 (a good QA would allow server to spend more time with customers and could lead to turning tables faster and making more or bigger tips); Davasher Tr. 38-39 (if QA gets food out faster, server can turn tables faster and serve more people); Evans Tr. 38 (QA helps get food out in a timely manner, which is helpful to servers "[j]ust like the bartenders are helpful to make your drinks and the busboys to bus your tables"); Hill Tr. 44-46 (QA allowed server to serve more tables and get more tips); Martino Tr. 75 (QA allowed server to service guest better and faster); Phillips Tr. 34-35 (if no QA is present, tips are affected because, *inter alia*, food would take longer, guests would see less of server); Roussell Tr. 162-63 (if QAs help get food out with appearance and temperature and quality guests are expecting, it led to happier customers and "happier customers equals higher tips").)

that tip sharing with QAs was voluntary.  Defendant also contends that closer examination of

opt-in testimony demonstrates that 25% of the 56 opt-ins deposed were *not* required by

management to share tips with QAs.  The Court will discuss this testimony in greater detail

below, when considering whether the differences in this testimony requires a finding that the

action cannot proceed collectively.

### D.    Defendant's "Tip Credit" or "Job Code Cleanup" Project[36]

In late 2002 or early 2003, Defendant's Corporate Compliance Group began examining

the different job codes used at Chili's restaurants and whether these restaurants were taking a tip

credit for hours worked by QAs.  (*See, e.g.*, Youngman Dep. Vol. I. Tr. 30-33, 150-151;

McCaslin Tr. 31.)  Prior to 2004, there was no nationwide guidance as to whether Chili's

restaurants should take a tip credit for QAs or whether QAs were eligible to participate in tip

pools; instead, practice varied depending on the stores or "markets."  (*See* Youngman I Tr. at 79,

141.)

The parties dispute to some extent the original purpose of this investigation and whether

it should be considered a "tip credit" project or a "job code cleanup" project.  It is undisputed,

however, that on February 27, 2003, Corporate Affairs circulated a "Research Memorandum"

that included "QA positions (with little to no customer interaction), dishwashers, cooks, and

janitors" in a list of "occupations that would invalidate a tip pool."  (Research Memorandum,

Doc. No. 105, Ex. 105 at 2.)  It is also undisputed that in May 2003, Corporate Affairs issued a

Project Summary Memo regarding a "Tip Credit" project; the memorandum stated that the

purpose of the project was "to assess compliance with Federal Law regarding 'tip credits' taken

against employee wages at the unit; and implement a strategy to achieve and maintain

---

[36] The Court will address Defendant's objections to the admissibility of these documents and statements, *infra* at note 44.

compliance where gaps are noted." (Project Summary, Doc. No. 105, Ex. 103 at 1). The Project Summary sets forth a list of personnel that are allowed to participate in a valid tip pool, and the list does not include QAs. (*Id.*) The Project Summary indicates that the positions not set forth on the list "do not meet the customer interaction or customarily tipped requirements of the regulation." (*Id.*) On November 10, 2003, Corporate Affairs circulated another Project Memorandum "to summarize the regulations related to an employer taking a 'tip credit' and communicate those job codes that have been identified as tip credit eligible." (Project Memorandum, Doc. No. 105, Ex. 104 at 1.) The memorandum identified those employees for whom Chili's restaurants could take a tip credit and that could participate in a "valid" tip pool; the list did not include QAs. (*Id.*) The memo did identify "food runners (those that have contact with the customers)" as eligible. (*Id.*) At some point, Defendant also created a "tip glossary" that identified "non-tipped employees" as "Employee's [sic] who do not regularly and customarily receive tips. (Ex: cook, dishwasher, expo, manager)."[37] (Doc. No. 153, Ex. A.)

On January 19, 2006—two months after this lawsuit was filed—Brinker "Legal Compliance" issued a memorandum to "Chili's Management Teams" entitled "QA Position and Guidelines." (Doc. No. 105, Ex. 107.) The memorandum begins by explaining that "[a] QA is primarily responsible for exceptional food quality, ensuring the expo line is organized and efficient and providing leadership while on duty. A QA delegates tasks to the servers and is the primary line of communication to the cooks." (*Id.*) It goes on to explain that "the QA position does not participate in any tip pool," but recognizes that servers may voluntarily share tips with QAs. The memorandum specifies that management may not "recommend, suggest, or require an employee to tip out the QA position," and "shall not collect tips or participate in the collection of

---

[37] Defendant argues that, at some stores, there is a back of the house expo position, in addition to the QA position, and thus it is not clear to which of these positions this glossary refers.

tips for the QA position." (*Id.*)  QAs themselves "may not solicit tips from servers in any fashion, whether by passing around a bag, utilizing a roster, etc." (*Id.*)  "If a server chooses to tip out a QA, the server must give the tip directly to the individual who performed the QA function." Management is "not to talk about tipping a QA." (*Id.*)  If asked about it, the manager may only state:  "The QA position is a non-tipped position and therefore not part of Brinker's tip pool. However, you may do what you wish with your tips, including sharing your tips with co-workers.  It is totally up to you." (*Id.*)

Plaintiffs argue that the economic incentives to take a tip credit for QAs and/or to permit them to participate in the server tip pool in the absence of a nationwide policy self-evident: namely, doing so reduced the labor costs for the QA position.  As discussed below, Plaintiffs also claim that managers were incentivized to ignore Defendant's guidelines prohibiting QA participation in mandatory tip pools because these guidelines were issued at the same time that at least some stores were required to reduce QA wages.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.    Standard and Burden of Proof

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *Crawford v. Formosa Plastics Corp*., 234 F.3d 899, 902 (5th Cir. 2000).  The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Crawford*, 234 F.3d at 902.  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 130, 150-51 (2000) (quoting *Anderson*, 477 U.S. at 250-51).

The employer bears the burden of proving the validity of a tip pool, and the relevant FLSA provisions are strictly construed in favor of the employee.  *See, e.g.*, *Reich v. Priba Corp*., 890 F. Supp. 586, 595-96 (N.D. Tex. 1995) (citing *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 467 (5th Cir. 1979)); *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 549 n.4 (6th Cir. 1999) ("Because Congress designed the FLSA to remedy disparities in bargaining power favorable to employers, the courts narrowly construe the provisions of that statutory scheme, including its exemptions, in the employee's favor. Accordingly, an employer who invokes a statutory exemption from minimum wage liability bears the burden of proving its qualification for that exemption."); *Bursell v. Tommy's Seafood Steakhouse*, No. H-06-0386, 2006 WL 3227334, at *1 (S.D. Tex. Nov. 3, 2006).

### B.    Relevant Law and Regulations

When Congress passed the Fair Labor Standards Act (FLSA) in 1938, the restaurant and food-service industry was exempted from its coverage.  In 1966, Congress added restaurant workers to the FLSA and created the concept of a "tip credit," allowing employers to take a credit for tips received by a tipped employee for up to 50 percent of the minimum wage.  *See* S. Rep. 89-1487, 1966 WL 4378 (Aug. 23, 1966).  After the 1966 Amendments, however, the Wage and Hour Division of the Department of Labor took the position that an employer could

11

still choose to use an "hourly wage method," requiring an employee "to relinquish all tips to the employer and receive payment for the full minimum hourly rate." THE FAIR LABOR STANDARDS ACT 550-51 (Ellen C. Kearns et al., eds. 1999). In 1974, Congress amended the tip credit provision of FLSA, Section 203(m), to strengthen protections for tipped employees, "to make clear the original Congressional intent that an employer could not use the tips of a tipped employee to satisfy more than 50 percent of the Act's applicable minimum wage," and "to ensure that "that all tips received by such employee . . . be retained by the employee." S. REP. 93-690, at 43 (Feb. 21, 1974).

The amended Section 203(m) thus allows an employer to use the tips of a "tipped employee" to satisfy no more than 50 percent of the minimum wage. 29 U.S.C. § 203(m). The employer cannot take the tip credit unless the "tipped employee" is informed of the provisions of Section 203(m) and "all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips."[38] Id.; see also H. CONF. REP. 93-913, 1974 WL 11448 (Mar. 15, 1974) ("With respect to tipped employees, the tip credit provision of the act is not to apply unless the employer has informed each of his tipped employees of the tip credit provision and all tips received by a tipped employee have been retained by the tipped employee (either individually or through a pooling arrangement)."). Section 203(t) of FLSA clarifies that the term "tipped employee" means "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t).[39]

---

[38] The Department of Labor has defined a tip as "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." 29 C.F.R. § 531.52; see also S. REP. 93-960 at 42 (Feb. 22, 1974); Dep't. Labor Wage & Hour Div., Op. Ltr., WH-321, 1975 WL 40945 (Apr. 30, 1975).

[39] The relevant regulations attempt to further clarify what constitutes a "tipped employee." 29 C.F.R. § 531.57 explains that an employee is a "tipped employee," as defined by Section 203(t), "when, in the occupation in which

29 C.F.R. § 531.57 addresses what it means for an employee to receive more than $30 a month "'customarily and regularly' in the occupation in which he is engaged."  If it is known that an employee *always* receives more than $30 every month, an employer may take a tip credit under Section 203(m).  29 C.F.R. § 531.57.  However:

> [A]n employee who only occasionally or sporadically receives tips totaling more than [$30] a month, such as at Christmas or New Years when customers may be more generous than usual, will not be deemed a tipped employee. The phrase "customarily and regularly" signifies a frequency which must be greater than occasional, but which may be less than constant.  If an employee is in an occupation in which he normally and recurrently receives more than [$30] a month in tips, he will be considered a tipped employee even though occasionally because of sickness, vacation, seasonal fluctuations or the like, he fails to receive more than [$30] in tips in a particular month.

29 C.F.R. 531.57.  While this regulation seems primarily concerned with a situation in which an employee may not receive more than $30 a month twelve months out of the year, it is relevant to the pending lawsuit to the extent that it defines  "customarily and regularly" as "a frequency which must be greater than occasional, but which may be less than constant."  *Id.*

### C.   There Is a Genuine Issue of Material Fact as to Whether QAs Are Eligible to Participate in a Mandatory Tip Pool

Neither the language of FLSA nor the relevant regulations provide much clear guidance regarding which employees or occupations may participate in mandatory tip pools or tip sharing arrangements.

Section 203(m) states only that "this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips."  29 U.S.C. § 203(m).  Although 29 C.F.R. § 531.57 defines "customarily and regularly" as "a frequency which must be greater than occasional, but which may be less than constant," such a definition

---

he is engaged, the amounts he receives as tips customarily and regularly total 'more than [$30] a month.'" 29 C.F.R. § 531.56(a).  An employer may take a tip credit for such an employee.  On the other hand, "[a]n employee employed full time or part time in an occupation in which he does not receive more than [$30] a month in tips customarily and regularly is not a 'tipped employee'"  *Id.*  An employer may not take the tip credit provided for in Section 203(m) for such an employee.

has no real limiting principle, and the regulation primarily seems to be concerned with a situation in which an employee is tipped more than $30 some, but not twelve, months out of the year.

Legislative history and the Department of Labor Field Operation Handbook provide some additional guidance, setting forth examples of the kinds of employees that may be included in a mandatory tip pool.  In a report on the 1974 amendments to Section 203(m), the Senate Committee on Labor and Public Welfare explained:

> Nor is the requirement that the tipped employee retain such employee's own tips intended to discourage the practice of pooling, splitting, or sharing tips with employees who customarily and regularly receive tips—e.g., waiters, bellhops, waitresses, countermen, busboys, service bartenders, etc.  On the other hand, the employer will lose the benefit of this exception if tipped employees are required to share their tips with employees who do not customarily and regularly receive tips—e.g., janitors, dishwashers, chefs, laundry room attendants, etc.

S. REP. 93-690, at 43(Feb. 22, 1974).  The Department of Labor Field Operations Handbook echoes the Senate Report, stating that the following occupations have been recognized as eligible for participation in a tip splitting or pooling arrangement:  "1) waiters/waitresses; 2) bellhops; 3) counter personnel who serve customers; 4) busboys/girls (server helpers); 5) service bartenders."  DEPT. LABOR FIELD OPERATIONS HANDBOOK § 30d04(a).  The Field Operations Handbook likewise adds that tipped employees may *not* be required to share tips "with employees who have not customarily and regularly participated in tip pooling arrangements," noting that the following "employee occupations" would not be eligible to participate:  "1) Janitors; 2) Dishwashers; 3) Chefs or cooks; 4) Laundry room attendants."[40]  *Id.* § 30d04(c).  Neither the Senate Report nor the Department of Labor Handbook attempts to explain the commonalities between each group of employees.

---

[40] The Handbook further clarifies that employees may share in tips even if they do not receive tips directly from customers.  *Id.* § 30d04(a) ("It is not required that all employees who share in tips must themselves receive tips from customers."); *see also Marshall v. Krystal Co.*, 467 F. Supp. 9, 13 (E.D. Tenn. 1978).

The Sixth Circuit has found that the extent of employees' interaction with customers is critical to the determination of whether an employer may take a tip credit for employees or can include the employees in a mandatory tip pool. *See, e.g.*, *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 550 (6th Cir. 1999); *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 301 (6th Cir. 1998). Some district courts have taken a similar approach, finding direct customer interaction highly relevant to the question of whether an employee can participate in a mandatory tip pool. *See, e.g.*, *Morgan v. SpeakEasy, LLC*, No. 05 C 5795, 2007 WL 2757170, at *18 (N.D. Ill. Sept. 20, 2007) (finding that the participation of two employees did not invalidate a tip pool because the employees "had sufficient customer interaction to establish that they were engaged in an occupation in which they 'customarily and regularly receive[d] ... tips.'" because they "helped serve food and drinks to tables, greeted customers, and checked on tables during the dinner service" (citing 29 U.S.C. § 203(t))); *Hai Ming Lu v. Jing Fong Restaurant, Inc.*, 503 F. Supp. 2d 706, 711 (S.D.N.Y. 2007) (finding that "an issue of fact remains to be tried regarding whether the pantry workers and dim sum servers, while 'not the primary customer contact . . . have more than de minimis interaction with the customers' and are otherwise entitled to share in the tip pool, or, in the alternative, whether they are 'like dishwashers, cooks, or off-hour employees like an overnight janitor [who] do not directly relate with customers at all' and who may not share in the pool." (citing *Kilgore*, 160 F.3d at 301); *Elkins v. Showcase, Inc.*, 704 P.2d 977, 989 (Kan. 1985) (holding that "non-service bartenders" were not eligible to participate in a mandatory tip pool because they "were located behind a wall so they did not have any contact with customers and were not in a position to receive tips"). At least one district court, however, has refused to consider the amount of direct customer interaction as dispositive. *See Lentz v. Spanky's Restaurant II, Inc.*, 491 F.Supp.2d 663, 670-71 (N.D. Tex. 2007) (noting that "[n]othing in the statute specifically requires that an employee who shares in a tip pool interact

directly with customers"); *see also Louis v. McCormick & Schmick Restaurant Corp.*, 460 F. Supp. 2d 1153, 1164 (C.D. Cal. 2006) (finding, under California state law, that restaurants may "require servers to share tips with non-managerial employees such as bartenders who routinely contribute to the service of patrons, whether or not such employees provides any service, direct or indirect, to a particular server's customers.").

In *Kilgore*, the Sixth Circuit held that defendant Outback properly took a tip credit for hosts and lawfully included hosts in a mandatory tip pool.  In reaching this conclusion, the *Kilgore* court explained:

> Hosts at Outback are 'engaged in an occupation in which [they] customarily and regularly receive[] . . . tips' because they sufficiently interact with customers in an industry (restaurant) where undesignated tips are common.  29 U.S.C. § 203(t). Although the parties dispute exactly how hosts spend their time working at Outback, hosts do perform important customer service functions: they greet customers, supply them with menus, seat them at tables, and occasionally "enhance the wait." Like bus persons, who are explicitly mentioned in 29 C.F.R. § 531.54 as an example of restaurant employees who may receive tips from tip outs by servers, hosts are not the primary customer contact but they do have more than de minimis interaction with the customers. One can distinguish hosts from restaurant employees like dishwashers, cooks, or off-hour employees like an overnight janitor who do not directly relate with customers at all. Additionally, the fact that Outback prohibits hosts from receiving tips directly from customers provides some evidence that Outback hosts work in an occupation that customarily and regularly receives tips.

*Kilgore*, 192 F.3d at 301-02.

Shortly after deciding *Kilgore*, the Sixth Circuit found that servers required to work exclusively as "salad preparers" on a "salad shift" at Copper Cellar restaurants could not be included in the shift's tip pool because the salad preparers "abstained from any direct intercourse with diners, worked entirely outside the view of restaurant patrons, and solely performed duties traditionally classified as food preparation or kitchen support work."  *Myers*, 192 F.3d at 550. This was true even though servers prepared these salads as part of their server job when the restaurant was less busy.  *Id.* at 548.  In upholding the magistrate judge's decision, the *Myers*

court relied on *Kilgore*'s finding that the function of the Outback hosts "entailed sufficient customer interaction and table attendance duties to qualify their job classification as among the types which have traditionally generated service gratuities."  *Id.* at 548, 549 n.4 (noting additionally that "the proper inclusion of the salad makers within a section 203(m) compulsory tip sharing fund is also contingent upon the substantiated characterization of their employment as a 'service' vocation of a type which has traditionally received customer gratuities.").

Defendant argues that *Myers* misconstrued *Kilgore*.  According to Defendant, *Kilgore* addressed the question of whether the Outback hosts were "tipped employees" for which an employer may take a tip credit, *i.e.*, whether they were engaged "*in an occupation* in which [they] customarily and regularly receives more than $30 a month in tips"—and found only that these "tipped employees" are necessarily included "among employees who customarily and regularly receive tips" as defined by Section 203(m), making them tip pool eligible.  *Kilgore*, 192 F.3d at 301 ("[I]f a tip-pool participating employee fulfills the subsection 203(t) requirements, she necessarily fulfills the subsection 203(m) requirements as well.  Because we find that the subsection 203(t) requirements are satisfied here, it follows that the subsection 203(m) requirements are satisfied as well.").  Because *Kilgore* found that the Outback hosts qualified as "tipped employees" under Section 203(t), it did not have to decide independently whether they met the requirements of Section 203(m) for tip pooling.[41]

Although Defendant is correct that *Kilgore* may have made a finer distinction than *Myers*, the implications of this argument are unclear.  To the extent that Defendant intends to argue that an employee may participate in a tip pool as long as they are "customarily and regularly" tipped, *i.e.* with the "frequency" defined in 29 C.F.R. § 531.57, the Court agrees with Plaintiffs that such

---

[41] All 203(t) "tipped employees" are necessarily eligible for tip pooling under 203(m); according to Defendant, the opposite is not necessarily true.

an argument would lack any limiting principle and would appear inconsistent with Congressional

intent.  Such a reading would allow an employer to include virtually *any* employee in a tip pool

simply by allowing them to regularly share in tips, in apparent disregard of the fact that Congress

and the Department of Labor have explicitly listed certain types of employees that may *not*

participate in a tip pool.  *See, e.g.*, *Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048, 2006 WL

851749, at *14 n. 22 (S.D.N.Y. 2006) (observing that "[u]nder one reading of the statute, a

person who regularly shares in a tip pool is, by definition, a person who 'customarily and

regularly receives tips.'  However, to the extent this reading would allow workers to become

eligible for tip sharing simply by taking money from the tip pool, the restriction on tip sharing

would become utterly meaningless," but declining to determine whether to adopt the *Kilgore*

reading of the statute).  Indeed, the *Kilgore* court itself expressed concern about interpreting

Section 203 in a way that would lead to a problem with circularity.  192 F.3d at 301.

     At a hearing on the pending Motion, Defendant denied making this circular argument.  In

fact, Defendant acknowledges that direct customer interaction may "lend support" to the

argument that an employee is engaged in a customer service-related job.  (Def.'s Reply, Doc. No.

132, at 18.)  Defendant argues, however, that an employee may contribute to "customer service"

or "perform customer service functions" even without having direct customer interaction, and

thus be eligible to participate in a valid tip pooling arrangement.  In support of this argument,

Defendant points to the fact that the Senate and DOL included "service bartenders" in the list of

employees that may properly be included in a tip pool.  According to Defendant, a service

bartender works behind the scenes filling drink orders that servers then deliver to customers, and

has "no direct contact with the public."  *See, e.g.*, *Krause v. C.I.R.*, No. 10230-90, 1992 WL

95627 (U.S. Tax. Ct. May 11, 1992) ("A service bartender works behind the bar in the game or

slot machine area and fills orders taken by the cocktail servers, but has no direct contact with the

public."). *But see Elkins v. Showcase, Inc.*, 704 P.2d 977, 989 (Kan. 1985) (finding that bartenders that were located behind a wall and had no interaction with customers were "nonservice" bartenders). Defendant cites other sources that indicate that many or even most service bars are not in direct view of customers, but these sources also suggest that there are "many combinations of front and service bars" and that such bars are "sometimes . . . a part of the dining room . . . ." *See* COSTAS KATSIGRIS & MARY PORTER, THE BAR AND BEVERAGE BOOK (2d ed. 1991) (stating that a service bar "does not serve customers directly but deals only with filling drink orders brought by waiters and waitresses" and that it is "sometimes . . . a part of the dining room, but more often it is out of sight"); LENDAL H. KOTSCHEVAR & MARY L. TANKE, MANAGING BAR AND BEVERAGE OPERATIONS 97 (1991) (stating that a service bar is "usually not directly visible to your guests, but noting that there are "many combinations of front and service bars" and clarifying that they are isolating for consideration "a type of service bar that is solely a service bar according to the strictest definition); WALLACE RANDE & LUCIANI VALENTINO, THE BEVERAGE SERVICE WORLD 37 (2001) ("The majority of service bars are not in the direct view of the customer and are not designed to be accessed by customers"); PETER E. VAN KLEEK, BEVERAGE MANAGEMENT AND BARTENDING 89 (1981) ("[The service bar] is a behind-the-scenes operation, and there is no contact between the customer and the bartender.").

Neither *Kilgore* nor *Myers* directly addressed this question.[42] In *Kilgore*, the Sixth Circuit thought it was abundantly clear that Outback hosts had sufficient interaction with the customers and performed important customer service functions, making them tip-credit and tip-pool eligible. The salad preparers in *Myers* were at the opposite end of the spectrum: the salad preparers had absolutely *no* interaction with customers and performed only food preparation duties, and thus were not tip-credit or tip-pool eligible. Neither case addressed whether an

---

[42] Neither case engaged in any discussion whatsoever regarding service bartenders.

employee who performed some "customer service functions" but had limited or no interaction with customers would be eligible to participate in a mandatory tip-pool.

The Court agrees with the Sixth Circuit that the level of customer interaction is highly relevant to the question of whether an employee may participate in a valid tip pool. Although the Sixth Circuit did not fully explain its reasons for adopting this standard, the Court believes that that the degree of direct customer interaction distinguishes to some extent the employees identified by the Senate and the Department of Labor as eligible to participate in a mandatory pool from the kind of employees that are not eligible to participate in such a pool.[43] Furthermore, employees that are visible to and interact with the public also are likely to make greater contributions to customer service. The Court agrees with Defendant, however, that an employee might be considered to "perform important customer service functions" even if the employee does not directly interact with customers, i.e. their functions are more like a server, busser, etc. than like a cook, dishwasher, etc. For example, a QA's monitoring of ticket times to ensure that food reaches a table in a timely manner might be considered an important customer service function. The inquiry, therefore, requires an examination of the employees' overall duties, as well as the extent of their direct customer interaction. If employees have more than minimal customer interaction and perform important customer service functions (i.e. functions that are more like those of waiter/waitresses, bellhops, counter personnel who serve customers, busboys/girls, or service bartenders than those of janitors, dishwashers, chefs or cooks, or laundry room attendants), they may participate in a mandatory tip pool. Employees also may be

---

[43] Although the inclusion of the service bartender in the list of employees who may participate in a mandatory tip pool might suggest a contrary conclusion if a service bartender necessarily has no customer interaction, it is difficult to know exactly what the Senate Committee or the Department of Labor (which incorporated the Senate Committee's language almost verbatim into its Field Handbook) considered a service bartender's job to entail. Furthermore, if the Court is to presume that a service bartender has no interaction with customers and simply prepares drinks to be served to guests by other employees, it is not clear why a service bartender would be included in the list of employees who may participate in a mandatory tip pool while cooks, who perform fairly analogous tasks, may not.

eligible to participate in a mandatory tip pool even if they have only minimal customer interaction, as long as their primary duties entail important customer service functions.  Where employees perform some duties that entail customer service and others that do not, the employees' level of direct customer interaction is critical to a determination of whether the employee may participate in a mandatory tip pooling arrangement.

Applying this standard, the Court agrees with Plaintiffs that there is a genuine issue of material fact as to whether QAs are eligible to participate in a mandatory tip pool.  Although the parties appear to agree on many of the duties that a QA performs, there is conflicting testimony regarding the amount of time that QAs directly interact with the customers and whether that direct interaction is minimal in relation to the QAs primary duties.  Based on the current record, and construing all facts in favor of Plaintiffs, the Court believes that a reasonable jury could find that QAs had only minimal direct interaction with customers.  Although some Defense witnesses testify that they frequently visited tables or ran food, many of Defendant's witnesses and virtually all of the opt-in Plaintiffs appear to testify that QAs, at most, performed such functions only rarely.  *See supra* Part I.B.  Furthermore, Defendant's own job descriptions and internal memos provide at least some factual evidence that Defendant itself did not think QAs had significant customer interaction.[44]  (*See, e.g.*, Research Memorandum, Doc. No. 105, Ex. 105 at

---

[44] The Court agrees that these memoranda are not admissible as an admission or lay opinion regarding a question of law, *i.e.* for purposes of establishing that QAs are not tip-pool eligible as a matter of law.  *See, e.g.*, *Lasiter v. Washington Nat'l Ins. Co.*, 412 F.2d 594, 597 (5th Cir. 1969); *Owen v. Kerr McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).  However, the documents do provide at least some support for Plaintiff's *factual* argument regarding the amount of interaction a QA has with customers.  Defendant argues that the statements are not admissions of fact because neither Ms. Youngman nor Ms. McCaslin, the authors of the memoranda, were qualified to bind Defendant to such statements. *See* FED. R. EVID. 801(d)(2)(c) (admission by a party opponent is not hearsay if it is "a statement by a person authorized by the party to make a statement concerning the subject").  Defendant does not explain, however, why the statements were not made in Ms. Youngman's or Ms. McCaslin's scope of employment.  *See* FED. R. EVID. 801(d)(2)(d) (admission by a party opponent is not hearsay if it is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship").  Defendant also contends that neither Ms. Youngman nor Ms. McCaslin conducted any detailed analysis of the functions actually being performed by QAs at different locations.  Personal knowledge is not required under 801(d)(2)(d), however.  *See, e.g.*, *Society of Roman Catholic Church of Diocese of Lafayette, Inc. v. Interstate*

2 (referring to "QAs (with little or no customer interaction)" and including QAs in a list with dishwashers, cooks, and janitors); Project Summary, Doc. No. 105, Ex. 103 at 1 (suggesting that QAs "do not meet the customer interaction or customarily tipped requirements of the regulation."). The Court may not weigh or evaluate this evidence on summary judgment; it does believe, however, that a reasonable jury could determine, based on the record, that QAs did not have more than minimal customer interaction. The question of how QAs spent their time working is a question of fact. *See, e.g.*, *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *Shockley v. City of Newport News*, 997 F.2d 18, 26 (4th Cir. 1993) (noting that the amount of time employees spend doing a particular duty is a question of fact).

Defendant argues that even if QAs had no customer interaction, their primary duties clearly entail "customer service functions" or "server helper" duties. The Court disagrees. Based on the summary judgment record, it appears that QAs perform some duties that are more akin to those of the food preparation duties of the salad preparer in *Myers—e.g.*, adding garnishes and condiments, inspecting food for appearance and temperature—and other duties that are more oriented towards customer service—*e.g.* watching ticket times to ensure food is delivered promptly to the table.[45] Given these mixed duties, their level of customer interaction is critical to the determination of whether QAs may lawfully be included in a mandatory tip pool. There is, therefore, a genuine issue of material fact, and Defendant's Motion for Summary Judgment must be denied on these grounds.

---

*Fire & Cas. Co.*, 126 F.3d 727, 732 n.3 (5th Cir. 1997). Furthermore, even if these memoranda were not admissible, the Court would find that there is a genuine issue of material fact to exist based on witness testimony alone.

[45] In addition to witness testimony, Defendant's January 2006 Memorandum again provides at least some support for Plaintiff's argument that QA duties include duties related to both food quality and service. (*See* QA Position and Guidelines Memorandum, Doc. 105, Ex. 107 ("A QA is primarily responsible for exceptional food quality, ensuring the expo line is organized and efficient and providing leadership while on duty. A QA delegates tasks to the servers and is the primary line of communication to the cooks.").)

Plaintiffs also urge the Court to consider whether other restaurants "customarily" tip QAs or expeditors.  There is an appeal to this argument, given that the statute refers explicitly to employees that "customarily and regularly" receive tips.  Furthermore, the Department of Labor Field Operations Handbook explains that employers should develop facts "showing the practices regarding their sharing of tips in the locality and type of establishment involved" when posing questions to the Department about whether employees are eligible to share in tip pooling arrangements.  DOL FIELD OPERATIONS HANDBOOK §30d04(d).  As evidence that other restaurants do not "customarily" tip QA-type positions, however, Plaintiffs rely on Defendant's Expert Report, in which Dr. Michael Lynn considered what he believed to be ten similar casual dining restaurant chains, and found that six had expeditors that were never tipped, one had an expeditor position that did not commonly receive tips, and one had expeditors who regularly ran food and were often tipped.  Plaintiffs have asked the Court to exclude Dr. Lynn's testimony, however, and the Court will grant that request, *infra*.  Thus, Dr. Lynn's report cannot serve as evidence establishing that this type of position is not customarily tipped.  Although testimony by employees of other restaurants might provide some evidence of the practices of those restaurants, the evidence cited by Plaintiffs, in its current form, does not clearly establish the restaurant industry's "custom" regarding expeditors.[46]  The Court does believe, however, that such testimony might be admissible at trial in a proper case if a witness were able to testify that the

---

[46] For example, current Chili's server and QA Bogert testified that she worked at an independently owned restaurant called Cheers in Grand Rapids, MI in a position "similar to the expediter position at Chili's" and did not receive tips, though servers did share tips with bussers.  (Bogert Tr. 16-17.)  Bogert also testified that when she worked as a server at Joe's Crabshack and at Lone Star Steakhouse, there was a position "that was similar to the expeditor position at Chili's," and that she did not share tips with the expeditor, although she did share tips with bussers and bartenders.  (*Id.* at 21-22, 24.)  Nor did Bogert share tips with expeditors when she worked as a server at Ruby Tuesday's in Michigan.  (*Id.* at 25.)  Likewise, Paul Meyer, a current manager at a New Jersey Chili's, testified that he previously worked at an Applebee's restaurant that had a QA position and that the QAs at that restaurant did not get tipped out.  (Meyer Tr. 29-30.)  At least three opt-in Plaintiffs also testified that QAs were not tipped out at other restaurants where they were employed.  (*See* Carter Tr. 51 (QAs at Bennigans not tipped out because job was performed by manager); Dellamano Tr. 58 (testifying that QAs at Red Lobster did not receive tips but failing to explain the duties of QAs at Red Lobster); Moodie Tr. 60-61 (testifying that as a server at Johnny Carinos, she did not tip out the QA, but failing to discuss the duties of the QA at Johnny Carinos).)

duties of expeditors at other restaurants were sufficiently similar to those of QAs at Chili's. Contrary to Defendant's argument, reliance on industry custom would not necessarily prevent employers from allowing employees who work in new positions from participating in a valid tip pool, despite the functions that these employees might perform.  The practice of the industry may provide some evidence of the restaurant industry's conclusion as to whether the employees' job duties are more like servers, busboys, or service bartenders or instead are more like cooks, dishwashers, and laundry room attendants.  To the extent that there is no evidence of industry custom simply because the position is a new kind of job, a restaurant could always make that clear to the Department of Labor or a court; absence of industry custom under such circumstances would not necessarily mean that an employee was ineligible to participate in a employer mandated tip pool.  The Court believes that evidence industry custom could, therefore, be considered together with direct customer interaction and customer service functions in determining whether employees are eligible to participate in a valid tip pool.

### D.    Servers That Work as QAs Are Employed in Dual Jobs

Defendant also maintains that servers who work as QAs are performing tasks incidental to their work as a server, and thus may be considered "tipped employees" during their QA shifts. All tipped employees are eligible to participate in a tip pool.  Plaintiffs, on the other hand, argue that servers who work as QAs are employed in dual jobs, and may not be considered "tipped employees" during those shifts.

There are special provisions in the relevant regulations for employees that work "dual jobs" or that perform maintenance, preparatory, or closing activities incidental to their regular duties.

An employer may take a tip credit for an employee that works "dual jobs," but only for the time the employee spends working in his "tipped employee" capacity.  29 C.F.R. 531.56(e).

For example, if an employee works both as a maintenance person in a hotel and also serves as a waiter, "and customarily and regularly receives at least $30 in tips a month for his work as a waiter," he is a "tipped employee only with respect to his employment as a waiter." *Id.*  As such, "[h]e is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man." *Id.*

The regulation distinguishes the "dual job" situation from "that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses" and from "the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group." *Id.* "Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips." *Id.*  The Department of Labor Field Handbook adds:

> Reg. 531.56(e) permits the taking of the tip credit for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips (i.e. maintenance and preparatory or closing activities.)  For example a waiter/waitress who spends some time cleaning and setting tables, making coffee, and occasionally washing dishes or glasses may continue to be engaged in a tipped occupation even though these duties are not tip producing, provided such duties are incidental to the regular duties of the server (waiter/waitress) and are generally assigned to the servers.  However, where the facts indicate that specific employees are routinely assigned to maintenance, or that tipped employees spend a substantial amount of time (in excess of 20 percent) performing general preparation work or maintenance, no tip credit may be taken for the time spent in such duties.

DOL FIELD OPERATIONS HANDBOOK, § 30d00(e).  A Department of Labor Opinion Letter similarly declares: "where there is a clear dividing line between the types of duties performed by a tipped employee . . . no tip credit may be taken for the time spent by a waitress performing maintenance duties," however, where certain maintenance tasks "are assigned generally to the waitress/waiter staff" and specific employees are not "routinely assigned" to such tasks, an employer may take a tip credit for the time the tipped employee works on these "incidental

tasks."[47]  Dep't. Labor Wage and Hour Div., Op. Ltr., 1980 WL 141336, WH-502 (Mar. 28, 1980).  Thus, an employer may take a tip credit for all of an employee's time even if the employee is required to perform certain duties incidental to her main job that are not considered "tipped" work, as long as those duties are generally assigned to employees in that position and the employee does not spend more than 20 percent of her time performing the incidental tasks.

Chili's servers may perform QA tasks intermittently during their shifts as servers when no QA is on duty.  The Court agrees that such work likely can be considered incidental to a server's job when performed intermittently.  In this lawsuit, however, this issue before the Court is the status of specific servers that work entirely separate shifts as QAs.  On these shifts, servers perform only QA duties.  They are clocked in under the QA job code, as opposed to the server job code.  They are paid as a QA would be paid, *i.e.* if QAs are paid minimum wage, the server working as a QA will be paid minimum wage.  There is a separate job description setting forth QA duties, which differs from the duties set forth on the server job description.  (*Compare* Doc. No. 105, Ex. 102 *and* Doc. No. 105, Ex. 98.)  There was, therefore, a "clear dividing line" between the servers' duties as a server and the server's duties as a QA.

The Court believes that servers who work separate QA shifts are more like the kind of employees that the regulations and DOL Opinion letter consider to be employed in a "dual job." That the servers would have performed the QA tasks themselves when no QA was on duty does not make the QA shift work "incidental" to the server job.  In *Myers v. Copper Cellar*, Corp., the Sixth Circuit held that servers who spent entire shifts working as "salad preparers" were employed in dual jobs, even though severs prepared the very same salads when no "salad

---

[47] The Fifth Circuit recognizes that "[o]pinion letters, which are issued without the formal notice and rulemaking procedures of the Administrative Procedure Act, do not receive the same kind of *Chevron* deference as do administrative regulations."  *Owsley v. San Antonio Independent School Dist.*, 187 F.3d 521, 525 (5th Cir. 1999) "This does not mean that such opinion letters are to be completely disregarded. For instance, [the Fifth Circuit] has held that opinion letters of an administrative agency, although less authoritative than regulations or formal decisions, are entitled to be 'weighed carefully' and to 'great deference' if they state a reasonable conclusion."  *Id.*

preparer" was on duty.  192 F.3d 546, 549-50 (6th Cir. 1999).  Furthermore, as the Court

explained above, some QA duties are more related to food production than to duties "themselves

directed towards producing tips."[48]

Importantly, the QA shifts were not assigned generally to all servers.  Defendant's

reliance on *Pellon v. Business Representation Intern., Inc.* is therefore misplaced.  In *Pellon*, the

court refused to find that skycaps were performing a dual job when they were engaged, *inter

alia*, in collecting bag service fees.  528 F. Supp. 2d 1306, 1312-15 (S.D. Fla. 2007).  Although

the *Pellon* court stressed that the skycap's duties were not "those of another occupation," it also

took into account the fact that the skycaps performed the alleged "dual job" tasks intermittently

during the course of performing their ordinary skycap duties; no single skycap exclusively

performed the alleged "dual job" duties on any one shift.  528 F. Supp. 2d at 1313.  In reaching

its conclusion, the *Pellon* court relied on *Townsend v. BG-Meridian, Inc.*, a case in which the

Western District of Oklahoma held that a waitress's duties as cashier and phone order

receptionist were incidental to her work.  No. CIV-04-1162-F, 2005 WL 2978899, at *6-7 (W.D.

Okla. Nov. 7, 2005).  The *Townsend* court emphasized that the plaintiff did "not allege that a tip

credit was applied for shifts where she exclusively took phone orders or ran the cash register.

Rather, her complaint is limited to shifts where she primarily performed duties as a waitress, but

was also called upon to answer phones and check out customers."  *Id.* at *7; *see also Myers*, 192

F.3d at 549 (noting that 29 C.F.R. § 531.56(3) "illustrat[es] that an employee who discharges

distinct duties on diverse work shifts" may qualify as a tipped employee on one shift but not the

other).  In the instant lawsuit, servers who work QA shifts are, in fact, alleging that they were

required to work shifts in which they exclusively performed QA tasks.  Defendant's argument

---

[48] The Court presumes, for purposes of this argument, that a reasonable jury could find that QAs are not tip pool
eligible based on an assessment of QA duties and level of customer interaction.

that servers are eligible to participate in a tip pool because they are engaged in work incidental to server tasks fails.

## III.     MOTION TO DECERTIFY

Defendant argues that the Court must decertify this collective action because the opt-in Plaintiffs are not similarly situated.  According to Defendant, the viability of the claims and defenses in this lawsuit turn on individualized proof that particular Managers acted to coerce servers into sharing tips with QAs and an individualized inquiry into whether each QA's duties rendered them eligible to participate in a mandatory tip pool.  Defendant claims that allowing this case to proceed collectively would be unmanageable, unduly burdensome, and unfair to Defendant.  Plaintiffs, on the other hand, argue that there is a meaningful factual and legal nexus binding together the opt-in Plaintiffs' claims, and that the use of procedural mechanisms such as bifurcation, subclasses, and representative testimony would render a trial of this collective action both manageable and fair.

Based on the current record and Plaintiff's proposed trial plan, the Court finds that individualized inquiries renders this case unsuitable for collective action under Section 216 of FLSA.  Recognizing the remedial purposes of FLSA and the clear intent of Congress that appropriate FLSA actions be allowed to proceed collectively, however, the Court invites Plaintiffs to offer a revised trial plan that could resolve the current difficulties and that would render the use of representative testimony reasonable, as outlined below.

### A.     Decertification Standard

Section 216 of FLSA provides that a person may maintain an action on "behalf of himself . . . and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in

the court in which such action is brought."[49]  29 U.S.C. § 216(b).  "A collective action allows . . .

plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.

The judicial system benefits by efficient resolution in one proceeding of common issues of law

and fact arising from the same alleged . . . activity."  *Hoffman v. LaRoche*, 493 U.S. 165, 170

(1989); *see also Prickett v. DeKalb County*, 349 F.3d 1294, 1297 (11th Cir. 2003) ("Congress'

purpose in authorizing § 216(b) class actions was to avoid multiple lawsuits where numerous

employees have allegedly been harmed by a claimed violation or violations of the FLSA by a

particular employer.").

The Fifth Circuit has not specifically defined the term similarly situated, but it has upheld

the use of a two-step ad hoc method for making this determination.  *See Mooney v. Aramco

Servs. Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995) (refusing to specifically endorse a particular

methodology for making a class certification decision under Section 216); *see also Thiessen v.

Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001); *Hipp v. Liberty Nat. Life. Ins.

Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001).  Unlike many other collective actions, parties in this

lawsuit agreed to a joint notice to potential class members, and the Court did not, therefore, make

an initial ruling at the first step of the two-stage process used by most district courts to determine

whether putative class members are similarly situated so that they may proceed collectively.

(*See* Agreed Notice, Doc. No. 22.)

After discovery is largely completed, the Court at step two "makes a factual

determination on the 'similarly situated' standard."  *Id*.  The step two standard is "less 'lenient,'"

and at least one Circuit has concluded that the "similarities necessary to maintain a collective

action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions."

---

[49] Congress also incorporated section 216 of the FLSA into the Age Discrimination Employment Act, 29 U.S.C. §
626(b), and several of the cases cited in this opinion were brought under the ADEA.

*Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) (refusing to define "less lenient" and noting "the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action" (citing *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002)).   Courts have repeatedly stressed that Plaintiffs must only be similarly— not identically—situated to proceed collectively.  *See, e.g., Chabrier v. Wilmington Finance, Inc.,* No. 6-4176, 2008 WL 938872, at *3 (Apr. 4, 2008); *Hipp*, 252 F.3d at 1217; *Reyes v. Texas EZpawn, L.P.*, No. V-3-128, 2007 WL 101808, at *1 (S.D. Tex. Jan. 8, 2007); *Hill v. Muscogee County School Dist.*, 2005 WL 3526669, at *2 (M.D. Ga. 2005); *Basco v. Wal-Mart Stores, Inc.*, No. Civ. A. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004).   At step two, courts generally consider the following factors when determining whether a lawsuit should proceed collectively: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *See, e.g., Mooney*, 54 F.3d at 1213 n. 7, 1215-16 (citing *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 352 (D.N.J. 1987)); *Thiessen*, 267 F.3d at 1105; *Anderson*, 488 F.3d at 953; *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *3 (Sept. 26, 2006); *Basco*, 2004 WL 1497709, at *4.   The decision whether to decertify a collective action is within the district court's discretion.  *See, e.g.*, *Mooney* 54 F.3d at 1213 ("[T]he district court's application of the [legal] standard must be reviewed for abuse of discretion."); *Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1348-49 (S.D. Fla. 2007).

### B.    Disparate Factual and Employment Settings

Several courts have held that putative class members must show they were affected by a common policy, plan, pattern or practice in order to proceed collectively under Section 216(b) of the FLSA.  *See, e.g., Aguirre v. SBC Communications, Inc.*, No. Civ.A. H-05-3198, 2006 WL 964554, at *5 (S.D. Tex. 2006) (noting that, at least at the first step, "A court may deny

plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice." (citing *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005)), *Hill*, 2005 WL 3526669, at *3 ("[I]f there is sufficient evidence of an employer's pattern of subjecting employees to the same improper practice, that would be sufficient to warrant a finding of similarity justifying collective adjudication."); *O'Brien v. Ed Donnelly Enterprises, Inc.*, No. 2:04-CV-00085, 2006 WL 3483956, at *3 (S.D. Ohio Nov. 30, 2006) ("Plaintiffs must demonstrate that the Defendants had a common policy or plan in violation of the FLSA that negatively impacted the original and opt-in Plaintiffs." (internal citations omitted)); *Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1139 n. 6 (D. Nev. 1999) ("In order to be similarly situated, the action must not be distinct and specific to individual plaintiffs; rather, there must be some general policy or practice." (internal citations removed)).  At least one circuit has held, however, that "a unified policy, plan, or scheme of discrimination may not be required to satisfy the more liberal 'similarly situated' requirement of § 216(b)."  *Hipp*, 252 F.3d at 1219 (citing *Grayson v. KMart Corp.*, 79 F.3d 1086, 1095, 1097 (11th Cir. 1996) (discussing similarly situated requirement in an ADEA suit); *see also Frank v. Capital Cities Communications, Inc.*, No. 80-CIV-2188-CSH, 1983 WL 643, at *2 (S.D.N.Y. Oct. 11, 1983) (refusing to decertify a collective action where plaintiffs' "specific complaints were not identical" and stressing that "to deny them class treatment would be tantamount to declaring that any employer can escape ADEA class liability so long as it discriminates against a diverse group of aged employees over a wide geographic range in a number of ways . . . .").  The District Court for the Southern District of Florida also recently held that the "unified policy, plan or scheme" standard "is more appropriately applied at the first stage of the analysis."  *Pendlebury*, 518 F. Supp. 2d at 1348 n. 3.  This Court has held that "at a minimum, there must be meaningful identifiable facts or legal nexus that bind the [opt-in

plaintiffs'] claims, so that hearing the cases together furthers the purposes of section § 216, is fair to both parties, and does not result in an unmanageable trial." *Falcon v. Starbucks*, No. H-05-0792, 2008 WL 155313, at *5 (S.D. Tex. Jan. 15, 2008) (internal quotation marks omitted (citing *Simmons v. T-Mobile*, No. H-06-1820, 2007 WL 210008, at * 8 (S.D. Tex. Jan. 24, 2007); *Hill*, 2005 WL 3526669, at *3; *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548 n. 2 (E.D. Mich. 2004)).

In this case, each opt-in Plaintiff is a Chili's server who allegedly was required to share tips with QAs.   According to Plaintiffs, because QAs could not lawfully be included in a mandatory tip pool, the tip pooling arrangement was invalid.   Resolution of these claims therefore requires at least two inquiries:  1) Given their job duties and level of direct customer interaction, could QAs lawfully be included in a mandatory tip pool?; and 2) Did Chili's require Plaintiffs to share tips with QAs or did Plaintiffs share tips with QAs voluntarily?   Defendant bears the burden of proving the validity of its tip-pooling arrangement.  *See, e.g.*, *Reich v. Priba Corp.*, 890 F. Supp. 586, 595-96 (N.D. Tex. 1995) (citing *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 467 (5th Cir. 1979)).

### 1.    Could QAs Lawfully Be Included in a Mandatory Tip Pool?

Defendant argues that the Court must consider whether each individual QA at all of the stores where Plaintiffs worked was eligible to participate in an employer-required tip pool. Defendant also maintains that, because there is a genuine issue of material fact as whether each QA was tip-pool eligible, Plaintiffs may not be similarly situated.  For example, if QAs at some stores are eligible to participate in a valid tip pool based on their level of customer interaction and overall duties, but QAs at other stores are not, then the legality of requiring servers to share tips with QAs might vary from store to store.  Defendant argues, furthermore, that determining

each QA's level of customer interaction requires individualized determinations and renders this lawsuit unfit for collective treatment.

It will be necessary to resolve questions of credibility to make a determination regarding QAs' duties.  The Court has already found that there is a genuine issue of material fact regarding QAs' duties.  Although a court must attempt to make a preliminary factual determination as to whether the opt-in plaintiffs are similarly situated at step two of the certification process, the court should not resolve the case on the merits as part of a decertification decision.  *See, e.g.*, *Thiessen*, 267 F.3d at 1106-07.  After reviewing the current record, the Court believes that a reasonable jury could find, based on witness testimony, internal memoranda in which Defendant treated all QAs as having similar job duties,[50] and the relevant job descriptions, that QAs' relevant duties and level of direct customer interaction was generally the same.  The jury could therefore determine that QAs generally are or are not eligible to participate in a mandatory tip pool.  *See Kilgore*, 192 F.3d at 301 (finding that Outback hosts, in the aggregate, perform important customer service functions).

The Court recognizes that there may not be testimony in the current record regarding QAs at every store at which opt-in Plaintiffs work.  It is, however, Defendant's burden to prove the validity of the tip pool and that QAs are, in fact, eligible to participate in a mandatory tip pool.  Defendant has identified, deposed and proposed as trial witnesses dozens of witnesses that will testify as to QAs job duties.  Of course, if, after hearing testimony at trial, the Court were to determine that the evidence overwhelmingly demonstrated that QAs' relevant duties and level of

---

[50] The Court recognizes that Defendant has presented testimony that it treated all QAs similarly in an attempt to establish a conservative position on tip-outs and tip credits and in an effort to comply with various state employment laws.  Defendant will, of course, be able to present this evidence at trial.  Defendant's treatment of QAs as having similar job duties provides at least some evidence, however, in support of the argument that QAs duties were consistent across stores.

customer interaction vary so greatly that it is not possible to generalize as to QAs duties, the
Court could entertain a subsequent Motion to Decertify.[51]

### 2. Mandatory or Voluntary Nature of Tip-Sharing With QAs

Plaintiffs also contend that all opt-ins were coerced by management to share tips with
QAs.  Defendant maintains, however, that adjudication of this issue requires individualized fact
determinations that renders Plaintiffs' claims unsuitable for collective treatment.

### a. Legal Standard

Neither FLSA nor the relevant regulations define a mandatory or "coerced" tip pooling
arrangement; indeed, the words "mandatory," "voluntary," "required" or "coerce" are not even
included in the language of the statute.  Section 203(m) states only that an employer may take a
tip-credit for a tipped employee provided that "all tips received by such employee have been
retained by the employee, except that this subsection shall not be construed to prohibit the
pooling of tips among employees who customarily and regularly receive tips."  29 U.S.C. §
203(m).  In a report on the 1974 amendments to FLSA, the Senate Committee on Labor and
Public Welfare did observe that an employer "will lose the benefit of [the tip credit] exception if
tipped employees are required to share their tips with employees who do not customarily and
regularly receive tips."  S. Rep. 93-690, at 43 (Feb. 22, 1974).  The Department of Labor Field
Operations Handbook likewise explains that "all tips received . . . by a 'tipped employee' must
be retained by the employee except to the extent that there is a valid pooling arrangement," and
notes that "[t]ipped employees may not be required to share their tips with employees who have
not customarily and regularly participated in tip pooling arrangements."   DOL FIELD
OPERATIONS HANDBOOK §30d01(a), §30d04(c).  The Field Handbook elaborates:

---

[51] To the extent Parties believe it would be of assistance, it might also be possible to pose a question to the jury
regarding the representative nature of the testimony.  At least one other Court that allowed a FLSA collective action
to proceed to trial included a question regarding representativeness in the jury instructions.  *See Thiebes v. Wal-Mart
Stores, Inc.*, 2004 WL 1688544, at *5 (D. Or. July 26, 2004).

> [I]t does not appear that the Congress, even in requiring as a general principle that tipped employees retain all their tips, intended to prevent tipped employees from deciding, free from any coercion whatever and outside of any formalized arrangement or as a condition of employment, what to do with their tips, including sharing them with whichever co-workers they please.

*Id.*; *see also* Dep't. Labor Wage and Hour Div, Op. Ltr., 1976 WL 41732, WH-380 (Mar. 26, 1976).  In a 1997 Opinion Letter, the Department of Labor also questioned whether a tip pooling arrangement was voluntary where the employer "advise[d] [employees] that tip pooling is permissible," but also "recommend[ed] certain percentages on dollar amounts be shared" and "expect[ed] that waters/waitresses who fail to share will find their service adversely affected and their continued employment could be jeopardized, which  . . . is an added incentive for them to share."  Dept. Labor Wage and Hour Div, Op. Ltr. 1997 WL 1049720 (Nov. 4, 1997) (adding that "where a tipped employee, as a condition of his or her employment, is required to share tips with other employees . . . who do not meet the definition of a tipped employee, the tip pool is invalid.").

A few district courts have also interpreted Section 203(m).  In *Zhao v. Benihana*, the district court found that sharing tips was mandatory where a manager "oversaw and helped enforce the tip [sharing] policy."  2001 WL 845000, at *2  (S.D.N.Y. 2001).  Another district court held that plaintiff waitresses could reasonably conclude that tip sharing was required by an employer where the waitresses were told that 15 percent of their tips would be shared equally with bartenders, busboys and kitchen personnel, a manager urged the guidelines be followed and spoke personally to waitresses that were not sharing 15 percent, and, on one occasion, the manager directed in writing that if 5 percent were not given to busboys, a flat fee would be deducted from all waitresses.  *Bonham v. Copper Cellar Corp.*, 476 F. Supp. 98, 101-02 (E.D. Tenn. 1979).  Although waitresses were not disciplined for failing to obey these guidelines, and although bartenders and busboys, but not kitchen staff, were eligible to participate in a

mandatory tip pool, the court held that plaintiffs were justified in assuming that *all* parts of the tip pooling arrangement were mandatory. *Id.*

Based on this precedent, Plaintiffs argue that the Court can find that servers shared their tips with QAs voluntarily only if the servers did so "free from any coercion whatever." Plaintiffs point to Defendant's own internal guidelines regarding tip pooling as an adequate standard for determining whether such coercion took place. (*See* Tip Pooling Guidelines, Doc. 105, Ex. 106 ("A practice is mandatory when management makes recommendations, suggestions, requirements, or implications to an employee regarding tipping practices.").) Specifically, Plaintiffs ask the Court to find that sharing tips with QAs was mandatory if management: 1) required servers to tip out QAs orally or in writing; 2) suggested or recommended that servers should tip out QAs verbally, in writing, or by facilitating tip outs; and/or 3) implied that servers should tip out QAs verbally, in writing, or by facilitating QA tip outs.

Defendant, on the other hand, urges the Court to adopt a variation of the standard set forth by the Supreme Court in the Title VII retaliation context. In *Burlington Northern*, the Supreme Court held that an employer violates Title VII's prohibition against discriminating against an employee because the employee opposed a practice made unlawful by Title VII if the employer's actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53, 67, 68 (2006) (internal quotation marks and citation omitted). Relying on this case, Defendant asks the Court to consider whether the actions of Chili's management "well might have dissuaded, by force or threat, a reasonable Server from believing that tipping out a QA was voluntary."[52]  (Doc. No. 65 at 22.) Defendant also appears to insist that the Court consider each server's subjective perception of whether management was

---

[52] *Burlington Northern* did not, of course, define "coercion" as "force or threats." Defendant takes this definition, instead, from BLACK'S LAW DICTIONARY.

"pressuring" or "coercing" him to tip out QAs.  (*See* Doc. No. 65 at 14-17 ("An individual's perception of whether a restaurant's QA tip out process is 'voluntary' or 'mandatory' is highly subjective and varies by employee . . . ."); June 6, 2008 Hearing, Tr. 46 (arguing that question of coercion requires the court to determine what was said to each opt-in plaintiff, "how they reacted to it, whether that overcame their free will" so that "they felt dissuaded from not tipping").)

The Court believes that the standard set forth by the Department of Labor is both persuasive and workable.  Employees may share tips with other workers who are not customarily and regularly tipped if they do so "free from any coercion whatever and outside any formalized arrangement or as a condition of employment."  This position is supported by the language of the statute and the legislative history.  To the extent that *Burlington Northern* provides any guidance into this inquiry, it is to suggest that the question of employer coercion should be an objective inquiry.  Namely, if the employer's actions "might well" dissuade a reasonable employee from not sharing tips with a QA, then the employee's tip sharing is not "free from any coercion whatever."  Employer actions that "might well" have such an effect could include the categories proposed by Plaintiffs—requiring the servers to share tips with QAs orally or in writing; suggesting or recommending that the servers share tips with QAs orally or in writing or by facilitating tip outs to QAs; or implying that servers should tip out QAs orally, in writing or by facilitating tip outs to QAs.

### b.    Analysis

Plaintiffs do not argue that Defendant had an official, nationwide policy requiring servers to tip out QAs.[53]  Plaintiffs recognize that, prior to 2004, Defendant had no national

---

[53] Plaintiffs do point to two written "Regional Standards" indicating that "it is recommended that [servers] tip the QA person, but this is <u>voluntary</u> . . . ."  *See* Leslie Regional Standards (Oct. 25, 2005) (emphasis in original); Forstall Regional Standards (Aug. 8, 2002).  It is at least plausible, therefore, that stores in those regions did, in fact, operate under a uniform policy "recommending" that servers share tips with QAs, while trying to maintain,

written policies or guidelines as to whether QAs could be included in mandatory tip pools or whether managers could take tip credits for QAs.  (*See, e.g.*, Youngman I Tr. at 79, 141.) Plaintiffs also agree that, prior to 2004, different stores or markets may have addressed these issues differently.  (*Id.*)  In 2004, after conducting the "Tip Credit" or "Job Code" Project, Defendant did, in fact, determine that QAs could not participate in mandatory tip pools.  Parties dispute whether Defendant distributed or communicated this policy to stores in 2004 or 2005. There is at least some evidence indicating that the policy was, in fact, communicated to stores. (*See, e.g.*, Doc. 105, Ex. 111 (2005 email providing talking points to managers about voluntary QA tip sharing).)  The record reflects that Defendant issued a corporate-wide memorandum in January 2006 providing guidelines to managers regarding QA tipping.  (Doc.  105, Ex. 107.) Plaintiffs claim, and Defendant denies, that Defendant made no effort to ensure that restaurants were complying with this policy.  According to Plaintiffs, Defendant reduced QA wages at some stores around the same time that it determined that QAs were not eligible to participate in mandatory tip pools, and managers = therefore had incentives to disregard the written guidelines because they faced staffing shortages and budget challenges if QAs did not receive tip-outs. (*See, e.g.*, Doc. 105, ex. 111 (email discussing QA wage decrease); Acosta Tr. 59-61; Platz Tr. at 91; Poulin Tr. 41; Wilson Tr. at 75-77.)

Defendant appears to concede that some stores may have required servers to tip out QAs. (*See* Doc. No. 65 at 10 ("Whether a 'policy' of tipping QAs exists, and if it exists, whether it is 'mandatory' . . . varies by restaurant, by Manager, by individual Server perception, and can also vary over time.")  Defendant argues, however, that there was no nationwide policy or consistent pattern and practice of doing so at all stores or in all regions.  For example, Defendant points out

---

nevertheless, that such tip outs were voluntary.  It is unclear, however, from the current record how these standards were enforced and for what time periods.

that some states such as Colorado regulate tip pool participation, and that all 37 opt-ins from Colorado signed acknowledgments recognizing that they only were required to tip out Bartenders and Bussers and were not required to share tips with cooks or any other employee.[54]   (*See* Doc. 65, Ex. B98.)  Defendant also points out, for example, that policies regarding QA tip-outs may have varied at some restaurants over time.   (*See, e.g.*, Roussell Tr. 71, 105; Hill Tr. 55.)  Defendant also argues that the type of manager involvement in QA tip outs or the type of alleged manager "coercion" varies by restaurant.

Plaintiffs have provided some evidence suggesting that at least a few managers may have been motivated to coerce servers to tip out QAs despite the official policy to the contrary due to wage decreases, but the evidence is fairly weak and may be limited to certain stores.  Even if there was no clear nationwide policy requiring or strongly motivating managers to require servers to share tips with QAs, it might be possible for Plaintiffs to demonstrate through testimony that there was a pattern or practice at the stores where opt-ins worked of managers requiring severs to share tips with QAs.  The testimony of the opt-ins deposed, with the exception of opt-in Parsons, does at least suggest such a pattern.[55]  Several QAs testified that managers directly told them they had to tip out QAs or posted statements requesting tips for QAs.[56]  Other QAs testified that managers themselves were involved in collecting tip outs for

---

[54] The Court cannot tell from the current briefing whether Plaintiffs contend that the Colorado opt-ins were "coerced" to share tips by managers even after signing these acknowledgments.  Plaintiffs do not address the Colorado opt-ins specifically.  The Court is aware that one opt-in from Colorado, Tammy Parsons, testified that she did not ever share tips with QAs.  *See infra* note 55.

[55] Opt-in Parsons testified that she never shared tips with QAs.  *See* Parsons Tr. 67-68.  Clearly, this opt-in plaintiff and any other opt-in in her position would need to be dismissed from this case, but such an exclusion does not require decertification.  *See, e.g., Chabrier v. Wilmington Finance Inc.*, No. 06-4176, 2008 WL 938872, at *3 (E.D. Pa. Apr. 4, 2008).

[56] (*See, e.g.*, Acosta Tr. 57-61 (there was a posting by a manager on a bulletin board that said servers need to tip out the QA at the end of each shift and a manager led a meeting saying that it was mandatory to do so); Adams Tr. 65-66 (management told her that she had to tip out QAs and "if you don't like it, then you don't have to work here"); Anderson Tr. 53-54 (all managers said tipping out QAs was mandatory); Antley Tr. 25 (managers would make sure that servers knew to tip out QAs); Baker Tr. 149-51 (manager posted a note that said "don't be cheap; tip your [QA] one percent"); Bandala Tr. 37-38 (managers told servers to tip out QAs and collected money); Beaulieu Tr. 62-64

QAs.[57]  At least two opt-ins and Plaintiff Roussell testified that a manager threatened to write servers up for not tipping out QAs.[58]  Another opt-in testified that an unspecified person trained her to tip out QAs.[59]

Defendant's allegation that 25% of the opt-ins were not "required" or "coerced" to tip out QAs is not fully supported by the testimony.  For example, Defendant alleges that opt-in Plaintiff Jones testified that management never told her that sharing tips with QAs was required.  (Jones Tr. 47-48.)  However, Jones also testified that a manager told her that they "highly suggest that you tip out QAs here."  (Jones Tr. 16-18.)  Opt-in Plaintiff Buonopane did testify that she had never seen anyone disciplined for not tipping out a QA nor had she seen a written policy suggesting that servers be disciplined for not tipping out QAs.  (Buonopane Tr. 8.)

---

(after telling a manager she had not tipped out a QA, manager told her she needed to go tip them out); Brenner Tr. 18-13 (manager told him to tip out QAs and would provide a print out of nightly sales and ask the server to tip the QA one percent); Bryant Tr. 69-70 (instruction to tip out QAs on schedule board); Carbone Tr. 23-24 (managers told her to tip out QAs); Corno Tr. 79 (all managers told him he was required to tip out QAs); Davasher Tr. 48 (managers had a policy requiring tip outs to QAs); Donahue Tr. 57-58 (managers posted "don't forget to tip out your [QA]" on a briefing board); Dorr Tr. 44 (managers told her to tip out QA one percent); Downing Tr. 58 (manager frequently came around with a tip basket and asked servers to put in money for QAs); Edwards Tr. 14-15 (managers told her to tip out QAs, although she was told in training that it some part of tipping out was voluntary); Farinato Tr. 36-37 (managers told her to tip out QAs); Fitzgerald  Tr. 41-43 (managers told her to tip out QAs and "it was either tip him or you're fired"); Hallmark Tr. 52-53; Hart Tr. 60-61 (manager told her to tip out QAs and manager would ask "where [is] your one percent to QA?" at end of night); Hill Tr. 52-55 (manager told her to tip out QAs); Kaddy (manager told him several times to tip out QAs); McKelvey Tr. 128 (managers told her to tip out QAs); Skubiz (tip-out policy for QAs posted on bulletin board and servers could not leave until they tipped out QA); Slomkowski Tr. 89-90 (managers wrote on dry erase board "don't forget to tip-out your QA, busser, and bartender); Smith-Crowder Tr.. 41-42 (managers told servers in orientation to tip out QAs and servers could not leave until they did so); Spahl Tr. 54-55 (manager told her to tip out QAs); Vial Tr. 52 (general manager told her to tip out QAs); Williams Tr. 52-53 (managers told servers to tip out QAs in shift meeting); Zayas Tr. 103-104 (manager told her to tip out QAs).

[57] *See, e.g.*, Abshire Tr. 47 (management collected tip outs for busser, bartender, and QA and "it was mandatory, no questions asked"); Alfrey Tr. 38-39 (a manager refused to check her out for the night until she got her QA to verify by signature that she had been tipped out); Colbeck Tr. 55 (QAs got tip-out sheets from managers and managers would take sales slip indicating tip outs in writing and sign it before servers could leave); Dellamano Tr. 37-38 (managers would ask for tips for QAs); Ellis (servers were not allowed to leave until tip outs were given to managers); Held Tr. 65-67 (manager had an envelope and said "this is for the QA and you should tip at least $5); Martino Tr. 76-77 (management asked for tip for QA at end of the night); Miller Tr. 14 (when she failed to tip out QA, manager reminded her the next day); Moodie Tr. 61-62 (manager would collect tip-outs for QAs at end of the night and ask if they had tipped out QAs); Pedregal Tr. 9 (when she first started, would tip out QA directly to manager at check-out); Walker Tr. 29-30 (prior to a particular meeting, servers were required to tip out QAs before managers allowed them to leave).)  It is possible, though unclear to the Court, whether these servers also contend that managers directly told them on other occasions that tipping out QAs was required.

[58] (*See* Fox, R. Tr. 73-74; Poulin Tr. 44 (a manager told her that if she didn't tip out QA she would be written up); Roussell Tr. 100 (manager said if she found out who didn't tip out QA, the person would be written up).)

[59] (*See* Parrish Tr. 43-44.)

Buonopane added, however, that managers "reminded" her to tip out, that QAs were provided

with her total sales for the evening, and that "it was an unwritten rule that you are supposed to tip

out 2 percent to the [QA]."  (Buonopane Tr. 6, 12.)  Although Buonopane's managers never

specifically said "did you remember to tip out the QA?", as in *Zhao*, it may have been reasonable

for her presume that if it was mandatory to tip out the bussers and bartenders, it was also

mandatory to tip out the QAs.  Defendant also notes that opt-in Plaintiff Garner admitted that no

one specifically told her that she "had to" share with QAs.  (Garner Tr. 60-61.)  Garner

explained, however, that managers would watch as someone circulated a basket collecting tips

for all tipped-out employees, that from the time she began working, servers "automatically"

tipped out QAs, and that she had no reason to believe that it was voluntary.  (Garner Tr. 58; *see*

*also* Hart Tr. 50-51 (manager never told her she had to tip out QAs a specific amount of money,

but at one point, servers would bring their check out to managers at the end of the night, and the

manager would ask where her "one percent to the QA" was; at a later date, a manager told her to

give the money directly to the QA, but did not indicate that it was now voluntary).  Opt-in

plaintiff Jandera admits that managers never told him tip outs to QAs were required and he never

felt "forced" to tip QAs out (i.e. no one "physically reached in [his] hand and made [him] put

money in a bag"); however, Jandera also claims that management would "say something to you"

if a server's tip out to a QA was low and that managers would sometimes include a paragraph in

daily shift notes about "taking care of fellow employees in the expo."  (Jandera Tr. 51, 54, 86;

*see also* Plane Tr. 56-57 (stating that she was trained to tip out QAs $1-$2 a table;  if she did not

tip out QA, the QA would inform the manager, and the manager would question her about it, and

on one occasion, she refused to tip out a QA and does not recall the manager's precise response,

but knows that it was "strongly urged" that she do so.)  Opt-in Kerry McDonald testified that no

manager told her she was required to tip out QAs, but she was told in orientation to tip out a QA

a certain percentage, she would sometimes pass tip-out money to QAs through a manager, and

when she approached a manager to complain about tipping out QAs, the manager "basically held

up his shoulders and . . .  gestured with his hands like he was washing his hands of it."

(McDonald K. Tr. 48-49, 56, 59-60; *see also* Flanagin Tr. 19-20, 26-27 (managers did not tell

him directly to tip out QAs, but he was trained to give QAs one percent of total sales and

managers would collect the tip out money for QAs); McDonald, D. (management never directly

said that she had to tip out QAs, but servers "always" took up a collection for the QA at the end

of the shift, and some managers would occasionally collect tips for QAs and say "hey, you need

to tip out your QA" ).)

Opt-in Plaintiff Ekeler's testimony is somewhat more troubling, but could be construed

as supporting an allegation of manager coercion.  Ekeler testified that when he complained about

tipping out QAs, a manager responded "well, if you don't think you need to tip them out, then

you can . . . essentially do what you think you need to do." (Ekeler Tr. 57-58.)  Ekeler testified

that the consequence of not tipping out QAs was that the QA might intentionally

"inconvenience" the server at a peak business hour, and that management was aware of such

actions and allowed such behavior to occur.  (*Id.*)  Also of some concern is opt-in Plaintiff

Davis' testimony that managers never told him that tipping was required nor did they directly

encourage him to tip out QAs, and instead, it was a "suggested thing" that you tip out QAs.  This

does provide at least some support for the argument that managers coerced him, but it is a much

closer call.  (Davis Tr. 46, 49, 67).  Furthermore, opt-in Plaintiff Goodwin testified only that

other servers told her to tip QAs two percent, and admits that no Chili's manager ever instructed

her to tip out QAs.[60]  (Goodwin Tr. 15.)

---

[60] Defendant also points out that Plaintiff Roussell testified that as of 2007, tipping out QAs was completely
voluntary and that the only other opt-in Plaintiff that worked in 2007 also testified that tipping out QAs at that point

Defendant does present deposition testimony from dozens of its own witnesses (including servers, QAs, and managers) stating that management did *not* require servers to tip out QAs at the opt-in Plaintiffs' stores.[61]  Evaluation of the credibility of these witnesses and the contradictions between the opt-in Plaintiffs and Defense witnesses' testimony is, however, clearly a question for the jury.

The Court therefore concludes that there is sufficient consistency in the deposed opt-in Plaintiffs' testimony such that the *deposed* opt-ins are similarly situated.  As explained below, however, the Court does believe that there are serious problems with the use of representative testimony on this issue and that individualized defenses may preclude collective adjudication of this issue under Plaintiffs' proposed trial plan.

### C.      Individualized Defenses and Fairness Concerns

The most troubling question in this case is whether the testimony of the 56 deposed opt-in Plaintiffs can be considered representative of the experiences of the entire class and whether resolution of the question of coercion requires such individualized inquiries that the case cannot proceed collectively.  *See, e.g.*, *Johnson v. Big Lots Stores, Inc.*, Nos. 4-3201, 05-6627, 2008 WL 2488629, at *17-18 (E.D. La. June 20, 2008) (discussing the difficulties of representative testimony and defendants' individualized defenses); *Polion v. Wal-Mart Stores, Inc*., No. 01-03645, 2006 WL 4472492, at *15 (Mass. Super. 2006) ("In this case, to determine whether any associate was injured—e.g., whether an associate was coerced to miss a rest break or not—

---

was not mandatory.  Plaintiffs appear to recognize that Defendant might be entitled to a directed verdict if they are not able to produce testimony that servers were required to tip out QAs in any given year.

[61] (*See, e.g.*, Leslie Tr. 61 (managers "stayed out of" QA tipping); Carver Tr. 20 (managers at orientation told servers that tip-out to QA is voluntary); Platz Tr. 49 (there has never been a requirement by management that servers tip out QAs at any restaurant that he has managed); Wilks Tr. 29 (servers at Canon City Chili's were not required to tip out QAs).)  Plaintiffs have not contested Defendant's assertion that these witnesses worked at or testified about opt-in Plaintiff's stores, and the Court therefore presumes this to be true.

mandates individualized inquiry of the associates. In this court's view, such a determination cannot be made on a class-wide basis.").

Plaintiffs claim that individualized defenses and differences among witness testimony regarding the nature of management coercion can be managed by representative testimony. Plaintiffs' trial plan proposes utilizing representative testimony from 36 opt-in plaintiffs, which represents approximately one percent of the class.  Plaintiffs add that they have identified over 50 trial witnesses that could be called if the Court so desires.  At a hearing on the pending motions, Plaintiffs further clarified that they would be willing to call further witnesses if the Court so desired, and pointed out that Defendant has proposed 170 trial witnesses of its own. Plaintiffs intend to call some opt-in witnesses by deposition testimony.  It is not clear how Plaintiffs selected particular opt-ins to testify at trial.  Plaintiffs ask the Court to limit each party to 50 hours of testimony, and estimate that the case could possibly be tried in four weeks.

Defendant complains that Plaintiffs have not met their burden of showing how up to 50 opt-ins that worked at 57 of the 775 affected restaurants in 26 of the 45 states at issue would be able to represent the experiences of opt-in servers at the 718 unrepresented restaurants. Defendant also notes that the proposed witnesses worked during different time periods.

Although Courts have regularly endorsed the use of testimony by a relatively small number of representative witnesses in FLSA collective action lawsuits, *see, e.g.*, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88; *Falcon*, 2008 WL 155313 at *8 (collecting cases), the use of representative testimony is justified only where it is reasonable to believe that the testifying witnesses' experiences are sufficiently similar to those of the rest of the non-testifying plaintiffs.  "[T]here is no bright line formulation that mandates reversal when the sample is below a percentage threshold. It is axiomatic that the weight to be accorded evidence is a function not of quantity but of quality, and that, depending on the nature of the facts to be

proved, a very small sample of representational evidence can suffice." *Reich v. Southern New England Telecommunications Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) (internal citations omitted). Representative testimony is often justified because it reduces redundancy and the presentation of cumulative evidence. *See Sec'y v. DeSisto*, 929 F.2d 789, 794-95 (1st Cir. 1991); FED. R. EVID. 403.

In this case, the Court must consider whether testimony from a relatively small number of opt-in Plaintiffs will be sufficient to show that *all* opt-in servers' tip-outs to QAs were coerced or mandatory. Defendant argues that adjudication of a claim that particular managers coerced servers to share tips with QAs requires an individualized analysis of the particular manager's actions, and that these actions vary significantly from manager to manager, restaurant to restaurant, and over time. Defendant maintains that Plaintiffs' trial plan and proposed use of representative testimony violates Defendant's due process rights because it deprives Defendant of the ability to assert individualized defenses to the opt-in Plaintiffs' claims of coercion.

Although the Court believes that Plaintiffs have made a sufficient showing that all of the opt-ins *deposed* were subjected to some form of coercion by managers, Defendant has presented a number of witnesses controverting that testimony. Furthermore, Defendant's evidence at least suggests that servers at other stores may have had different experiences. Even if it were possible for a reasonable jury to conclude, based on the testimony of the deposed Plaintiffs, that opt-ins working at the stores at which the deposed opt-ins worked all experienced some kind of coercion by management, it is not clear that it is reasonable to assume that the opt-in servers from 718 other stores were similarly coerced. Furthermore, if the jury were to conclude that some of the testifying opt-in Plaintiffs were coerced while others were not, it is not at all clear how those findings would be attributed to the non-testifying opt-in Plaintiffs. The question of whether managers coerced servers into sharing tips with QAs, under the particular facts of this case, does

appear to turn on the actions of individual managers at hundreds of stores across the country and does appear to require individualized defenses.

The Eastern District of Louisiana recently confronted a similar problem in a collective action brought by 936 current and former Assistant Store Managers that alleged that they were misclassified as exempt employees under FLSA.  *See Johnson v. Big Lots Stores, Inc.*, Nos. 4-3201, 05-6627, 2008 WL 2488629, at *17-18 (E.D. La. June 20, 2008).  The court denied Defendant's first Motion to Decertify, but subsequently decertified the class after a bench trial, finding that individualized inquiries rendered the case unsuitable for collective treatment.  The court in *Johnson* emphasized that a survey of all of the opt-in plaintiffs demonstrated that the job duties of the opt-in plaintiffs varied substantially.  *Johnson*, 2008 WL 2488629 at *10-*17.  These differences rendered the use of representative testimony problematic.  *Id.* at *17 ("Using representative proof is problematic if for every instance in which an opt-in plaintiff reported that she hired subordinates, there is an alternative response to the contrary.").  The court went on to explain, "Because Big Lots could not call the managers and co-workers of the hundreds of plaintiffs to refute the individual plaintiffs' deposition or survey answers, opt-in plaintiffs could characterize their experiences without a realistic fear of direct rebuttal."  *Id*. at *18.  The court concluded:

> "One of the purposes of trying . . . claims in a collective action is to avoid the inefficiencies of conducting multiple individual trials on the same factual and legal issues.  Those efficiency gains, however, cannot come at the expense of a defendant's ability to prove a statutory defense without raising serious concerns about due process.  [Defendant] cannot be expected to come up with "representative" proof when the plaintiffs cannot reasonably be said to be representative of each other. . . .  The collective action device does not effect its salutary purposes when it only puts the defendant between a rock and a hard place.

*Id.* at *18.

46

In this case, and unlike the plaintiffs in *Johnson*, Plaintiffs have not attempted to survey all of the opt-ins regarding manager coercion.  Instead, Plaintiffs, according to their current proposed trial plan, ask the Court and the jury to find that the testimony of 36 to 50 witnesses from 52 stores is sufficient to demonstrate that managers at over 700 stores coerced servers to tip out QAs.  Unlike the plaintiffs in *Falcon*, Plaintiffs have not made a strong showing that there was a general nationwide plan strongly motivating managers at all stores to act in a similar fashion.  See *Falcon*, 2008 WL 155313 at *6, *9.  Furthermore, unlike the defendant in *Falcon*, Defendant in this case has pointed to direct evidence contradicting the opt-ins' claims that they were coerced to tip out servers.  *Id.* at *4.

The Fifth Circuit has also expressed some reservations as to whether claims that turn on individual oral representations can properly be tried as a class action.  *See, e.g.*, *Simon v. Merril, Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973) ("If there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action.  Thus, courts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action.").  Although the Court disagrees that this case requires an analysis of how each individual server subjectively interpreted or relied on mangers' oral statements, there is some variation in the representations made by individual managers that makes collective treatment or trial by representative testimony in this case at least more difficult.

This Court has recognized that the remedial nature of the FLSA and the purposes of Section 216 militate strongly in favor of allowing cases to proceed collectively.  *See, e.g.*, *Hoffman*, 493 U.S. at 170 (Congress intend to give "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources"); *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir.1993) (recognizing FLSA's remedial purposes); *Prickett*, 349 F.3d at

1296 ("FLSA is a remedial statute that has been construed liberally to apply to the furthest reaches consistent with congressional direction." (internal citations removed)); *Bradford v. Bed Bath and Beyond*, 184 F. Supp. 2d 1342, 1351 (N.D. Ga. 2002) (noting that plaintiffs can "hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action.").   The Court is also concerned about Plaintiff's argument that, if the Court were to decertify, the opt-in Plaintiffs might then seek to intervene in the case as a matter of right.   Nor does this Court believe that FLSA actions cannot proceed collectively just because they include a large number of plaintiffs.   *See Falcon*, 2008 WL 155313 at *9.

Ultimately, however, the Court does not believe that the question of manager coercion can be fairly tried by representative testimony based on Plaintiff's current proposed trial plan.[62] Plaintiff has suggested that the Court could remedy problems of groups raising "separate issues" by creating subclasses among the current opt-ins.   Furthermore, other courts have narrowed collective action classes to a smaller, more manageable class.   *See, e.g.*, *Thiebes*, 2004 WL 1688544 at *1.   The Court is not in the best position to delineate workable subclasses at this juncture.   The Court will provided Plaintiff with the opportunity, however, to propose an alternative trial plan that renders the use of representative testimony regarding manager coercion more workable by, for example, further explaining how the selection of testifying opt-ins is adequate to represent all members of the class or by defining subclasses of opt-ins.   It also might be possible, for example, for Plaintiffs to demonstrate that certain management coercion techniques were used regularly in certain regions and/or in certain time periods.   It is impossible

---

[62] Plaintiffs have represented to the Court that they only seek damages of the difference between the subminimum and minimum wage, and that this calculation may be easily determined based on payroll records.  Defendants point out, however, that this damages calculation would also require a determination of whether Servers were coerced to share tips with a QA on a particular shift.  The Court agrees that this renders the damages issue somewhat more complicated, but does not believe that the case should be decertified on these grounds alone.

for the Court to make these types of determinations on its own based on the current record. Alternatively, Plaintiffs at a hearing on the pending motions suggested that it might make sense to proceed with a trial of a small number of opt-in Plaintiffs at one store or in one region in an effort to clarify whether it is possible to proceed with this lawsuit collectively. The Court would also be willing to entertain such a possibility. Although it was Plaintiffs' burden to come forth with evidence demonstrating that collective treatment is appropriate in response to Defendant's motion, the Court believes that Plaintiffs should be afforded a final opportunity to demonstrate how this case might proceed collectively.

Plaintiffs shall, therefore, have until July 21, 2008 to file with the Court either a proposed revised trial plan or a request for additional time explaining the steps Plaintiffs intend to take to remedy the problems identified by the Court. Defendants will have twenty days to respond to Plaintiffs' revised trial plan.

## IV.     MOTION TO STRIKE

Plaintiffs have asked the Court to exclude the testimony of Defendant's expert, Professor Michael Lynn.

### A.     Dr. Lynn's Background and Methodology

Dr. Lynn is a social psychologist and Associate Professor of Consumer Behavior at the School of Hotel Administration at Cornell University. He has been called the "leading empiricist on tipping in the United States." Ian Ayres, Fredrick E. Vars, and Nasser Zakariya, *To Insure Prejudice: Racial Disparities in Taxicab Tipping*, 114 YALE L. J. 1613, 1635 (2005). Dr. Lynn's academic research has focused primarily on consumer tipping. Dr. Lynn has not previously written on the issue of tip sharing among employees. (Lynn II Tr. 46.) Dr. Lynn has never before served as an expert witness.

Although Dr. Lynn's Expert Report addresses other matters, Defendant intends to proffer Dr. Lynn's testimony on only two issues:  1) Whether expeditors should be eligible to participate in mandatory tip pools; 2) Whether the tipping of expeditors at Chili's is voluntary.  Specifically, Dr. Lynn opines that QAs or "expeditors" should be eligible to participate in mandatory tip pools because their job tasks are akin to those performed by employees in tip-eligible positions like servers and bussers.  He also opines that servers voluntarily tip QAs at most Chili's locations. According to Dr. Lynn, such tipping is voluntary because managers and hourly employees are generally aware of Defendant's policy that tipping QAs is not required and express a belief that tipping is voluntary and because managers generally do not get involved in the tipping of expeditors.  Dr. Lynn also concludes that although some servers may be unhappy about tipping QAs, they share tips based on social pressure, and such pressure does not render their behavior involuntary.

Dr. Lynn formed these opinions by reviewing deposition transcripts and summaries and by interviewing Chili's employees.  Dr. Lynn was provided with 34 deposition transcripts selected by Defense counsel and summaries of these depositions created by Defense counsel. (Lynn Report 3; Lynn II Tr. 30.)   He reviewed the complete transcripts of 11 of the 34 depositions.  (*Id.*)  Dr. Lynn also interviewed employees and managers at five Chili's restaurants in upstate New York.  Dr. Lynn does not know how the particular restaurants were selected, though he was told they were selected based on convenience.  (Lynn I. Tr. 130.)  He also was told that Defense counsel had not talked to anyone at the locations.  (*Id.*)  Dr. Lynn was accompanied by Defense counsel during these interviews, and Defendant's counsel herself questioned the employees.  Defense counsel also selected the employees to whom Dr. Lynn spoke.  (Lynn I Tr. 21, 126-132.)

Dr. Lynn also claims that his opinions are based on his general expertise in tipping and the restaurant industry.  For example, Defendant claims that Dr. Lynn may apply his expertise regarding the voluntary nature of consumer tipping by analogy to the context of server tip-sharing.  Dr. Lynn admits that he is not fully familiar with the legal standards under the Fair Labor Standards Act, though he did review the relevant statutory and regulatory provisions.

Plaintiffs complain that Defense counsel was present in Dr. Lynn's office as he wrote his report and that Defense counsel reviewed his report.  Dr. Lynn concedes that Defense counsel "conceivably" might" have influenced his opinions.  (Lynn I. 105-06.)

### B.    Legal Standard

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.  In determining whether expert testimony is admissible, the Court must consider whether the testimony is "not only relevant, but reliable."  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  Among the factors the Court may consider are:  whether the expert's theory can be (and has been) tested; whether the theory or technique has been subjected to peer review and publication; the known or potential rate of error; whether there were standards and controls; and the "general acceptance" of the theory in the scientific community.  *Daubert*, 509 U.S. at 594; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-51 (1999) (recognizing that the *Daubert* factors may be relevant to non-scientific expertise, but stressing that the factors are flexible and are not definitive).  The trial judge has "considerable leeway in deciding in a particular case how to go about determining whether

particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152.  The Fifth Circuit has held

that even though the *Daubert* factors are not mandatory or exclusive, "the existence of sufficient

facts and a reliable methodology is in all instances mandatory" *Hathaway v. Bazany*, 507 F.3d

312, 317-18 (5th Cir. 2007); *see also Curtis v. M&S Petroleum, Inc*., 174 F.3d 661, 668 (5th Cir.

1999) (noting that to be reliable, the testimony must be "grounded in the methods and procedures

of science and must be more than unsupported speculation or subjective belief.").  The  party

offering expert testimony bears the burden of establishing that the testimony is admissible.

*Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 585 (5th Cir. 2003).

### C.     Analysis

The Court finds that Dr. Lynn's testimony as to whether expeditors are eligible to

participate in a mandatory tip pool and whether the tipping of Chili's expeditors is voluntary

should be excluded.

The Court recognizes that Dr. Lynn has considerable expertise in the field of consumer

tipping.  It is not at all clear, however, that the opinions he offers on the issues in this case, which

are not about consumer tipping, meet any of traditional measures of reliability.  Dr. Lynn's

opinions as to whether QAs are eligible to participate in mandatory tip pools or whether server

tip sharing is voluntary have not been published or subjected to peer review, nor has his theory

been tested.  His opinion is based on a very small sample, and it is not at all clear that the sample

provides sufficient support for his conclusions.  Dr. Lynn's reliance on a small number of

depositions selected by Defense counsel and conversations with employees at five Chili's

restaurants in Upstate New York to draw general conclusions about QAs' duties and the

voluntary nature of their tip sharing is particularly troubling in light of the arguments advanced

in Defendant's Motion to Decertify.

Dr. Lynn's attempt to draw conclusions regarding the voluntary nature of server's tip-sharing based on his expertise in the area of consumer tipping is particularly troublesome.  Dr. Lynn points to research on consumer tipping indicating that consumers are primarily motivated by social pressures when tipping and that many consumers dislike having to tip waiters and waitresses.  Dr. Lynn concludes that server tip sharing with QAs at Chili's is similarly voluntary "despite the presence of a social norm and social pressure to comply with that norm."  (Lynn Report 11.)  Dr. Lynn acknowledges that the "actions or inactions of company representatives (i.e. managers, trainers, etc.) at some stores contribute to the maintenance of those norms." (Lynn Report 12.)  He concludes, however, that "[e]ven expressions of support for the norm from managers are not coercive unless the managers threaten to alter employee's conditions of employment."  (Lynn Report 10.)  It is not at all clear that Dr. Lynn's recognized expertise in the area of consumer tipping can easily be analogized to the employee tip-sharing context given the different power dynamics that exist between managers and employees.  Furthermore, Dr. Lynn's definition of "voluntary" appears to rely on a standard that is inconsistent with the standard set forth by the Court in this Order.

Although social science expertise may be admissible under certain circumstances,[63] the Court finds that Dr. Lynn's testimony is not based on a reliable methodology and is inconsistent with the factors set forth in *Daubert*.  Furthermore, to the extent that Dr. Lynn's assessment of the voluntary nature of server tip sharing is based on an incorrect legal standard, there is a substantial risk that his testimony will confuse issues, and should thus be excluded under Federal

---

[63] The Court does not find any of the cases allowing social science expert testimony proffered by Defendant to involve circumstances directly analogous to those present in this case.  For example, in *Scott v. Ross*, the Ninth Circuit allowed a sociologist that had studied and written about the "anti-cult" movement to testify despite the fact that he had not specifically studied defendant's practices.  140 F.3d 1275, 1286 (9th Cir. 1998).  In *Scott*, however, the expert's testimony was directly related to the expert's nineteen years of academic research and writing.  *Id.*  Dr. Lynn, on the other hand, purports to testify as to opinions that do not stem directly from his academic research.

Rule of Evidence 403.  *See Daubert*, 509 U.S. at 595.  The Court will therefore grant Plaintiff's Motion to Exclude Expert Testimony of Dr. Michael Lynn.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 9th day of July, 2008.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS
ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY
AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN
SENT ONE BY THE COURT.**