IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| JENNIFER ROUSSELL, on behalf of Herself and others similarly situated, | § § § | Civil Action No. 4:05-CV-03733 |
| Plaintiff, | § § | |
| v. | § § | |
| BRINKER INTERNATIONAL, INC., | § § | |
| Defendant. | § § | |

## **PLAINTIFFS' REVISED TRIAL PLAN**

25401-11

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

I.   INTRODUCTION ........................................................................................................ 1

II.  PROPOSED TRIAL PLAN .......................................................................................... 3

III. BIFURCATED TRIAL PLANS ARE WIDELY USED AND APPROVED ............... 4

IV.  LOGISTICS OF HOW THE TRIAL WOULD PROCEED ........................................ 5

    A.   Phase One – Collective Trial On The Tipped Employee Issue ......................... 5

    B.   Phase Two - Test Trial Flight Of 20 To 50 Individual Opt-In Plaintiffs As To Manager Coercion And Damages ................................................................ 7

    C.   Phase Three – Further Trial Flights As Appropriate For The Remaining Opt-In Plaintiffs .................................................................................................. 9

V.   THIS COURT SHOULD ADOPT THIS TRIAL PLAN BECAUSE IT IS THE MOST EFFICIENT AND JUST METHOD TO ADJUDICATE PLAINTIFFS' CLAIMS ...................................................................................................................... 10

VI.  CONCLUSION ........................................................................................................... 13

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946) .................................................................................................. 7

*Bradford v. Bed Bath and Beyond, Inc.*,
   184 F. Supp. 2d 1342 (N.D. Ga. 2002) ..................................................................... 10

*Cimino v. Raymark Industrial, Inc.*,
   151 F.3d 297 (5th Cir. 1998) ..................................................................................... 13

*Gasoline Products Co. v. Champlin Refining Co.*,
   283 U.S. 494 (1931) .................................................................................................. 4

*Hoffman-LaRoche Inc. v. Sperling*,
   493 U.S. 165 (1989) .................................................................................................. 10

*Mullen v. Treasure Chest Casino, LLC*,
   186 F.3d 620 (5th Cir. 1999) ............................................................... 1, 2, 4, 5, 12, 13

*Myers v. Copper Cellar Corp.*,
   No. 3:95-CV-541, 1996 WL. 766505 (E.D. Tenn. Sept. 27, 1996) ............................. 4

*Prickett v. DeKalb County*,
   349 F.3d 1294 (11th Cir. 2003) ................................................................................. 10

*Reich v. Circle C. Investments Inc.*,
   998 F.2d 324 (5th Cir. 1993) ..................................................................................... 10

*Reich v. Gateway Press, Inc.*,
   13 F.3d 685 (3d Cir. 1994) ......................................................................................... 7

*Robinson v. Food Serv. of Belton, Inc.*,
   415 F. Supp. 2d 1232 (D. Kan. 2005) ......................................................................... 6

*Thiebes v. Wal-Mart Stores, Inc.*,
   No. CIV. 98-802-KI, 2004 WL. 1688544 (D. Or. July 26, 2004) ............................... 5

*Watson v. Shell Oil Co.*,
   979 F.2d 1014 (5th Cir. 1992) .......................................................................... 1, 2, 4, 5, 12

### FEDERAL RULES & STATUTES

29 U.S.C.
§ 216(b) .................................................................................................................... 1, 10

Federal Rules of Civil Procedure
§ 23(b)(3) .................................................................................................................. 4
§ 24 ........................................................................................................................... 9, 12
§ 32(a)(4)(B) ............................................................................................................. 6
§ 42(b) ...................................................................................................................... 1, 4

Federal Rules of Evidence
§ 403.................................................................................................................6, 11
§ 611(a).............................................................................................................6, 11

## MISCELLANEOUS

Ellen C. Kearns, *The Fair Labor Standards Act* (BNA 1999)..............................................7

*Manual for Complex Litigation* (4th ed. 2004)
§ 21.5......................................................................................................................4
§ 21.141..................................................................................................................4
§ 22.93 ............................................................................................................1, 4, 9

I.   **INTRODUCTION**

As requested by the Court, Plaintiffs submit this Revised Trial Plan to address the concerns identified by the Court's Memorandum and Order ("Memorandum and Order") (July 9, 2008) [Dkt. 162].

The Court's rulings on Chili's summary judgment motion, decertification motion, and Plaintiffs' *Daubert* motion suggest a fair and efficient trial plan for trying these 3,500 tip pool claims in a manner fully consistent with the remedial purposes of the Fair Labor Standards Act ("FLSA") (particularly 29 U.S.C. § 216(b)), the due process rights of all the litigants herein, and established Fifth Circuit precedent as to the management of complex multi-plaintiff litigation.

After carefully reviewing the voluminous evidence submitted by the parties on these motions, the Court adopted Plaintiffs' legal analysis of the tipped employee liability issue and further ruled that "a reasonable jury could find, based on witness testimony, internal memoranda in which Defendant treated all QAs as having similar job duties, and the relevant job descriptions, that QAs' relevant duties and level of direct customer interaction was generally the same. The jury could therefore determine that QAs generally are or are not eligible to participate in a mandatory tip pool." Memorandum and Order at 33. Therefore, given the significance of this crucial common and analytically distinct liability issue, Plaintiffs propose to bifurcate the trial so that a first jury will decide this "tipped employee" issue pursuant to Fed. R. Civ. P. 42(b). *See also Manual for Complex Litigation* ("Manual") § 22.93 (4th ed. 2004); *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999).

The Court also adopted the Plaintiffs' legal analysis as to the appropriate standard established by the Department of Labor for examining whether Servers were subject to management coercion in tipping out QAs. Going one step further, the Court acknowledged "sufficient consistency in the deposed opt-in Plaintiffs' testimony such that the *deposed* opt-ins are similarly situated." Memorandum and Order at 43. However, despite the apparent pattern and practice of management coercion as to QA tipping, the Court remained concerned that the

question of whether Servers were coerced into sharing tips may turn on the actions of individual managers at the approximately 700 stores at which the Plaintiffs worked, thus potentially giving rise to "individualized defenses." *Id.*

The Court therefore invited Plaintiffs to present a revised trial plan that would appropriately balance the remedial and collective nature of this lawsuit with the Defendant's interest in presenting its defenses. Plaintiffs continue to believe, and regard the Court's analysis as largely reinforcing this belief, that this collective action can be tried under the previously submitted trial plan, allowing the Plaintiffs to establish a pattern and practice of coerced tip sharing. However, in light of the Court's stated reservations, Plaintiffs propose that a bifurcated trial plan is superior to any other alternative (decertification and either a court docket here clogged with 3,500 unconsolidated individual claims or claims scattered to federal courts around the country) for the enforcement of these fundamental employee rights.[1]

Fortunately, the Fifth Circuit has had substantial experience in the problem of "balancing procedural fairness with judicial efficiency" in the management of complex multi-party litigation. *Watson*, 979 F.2d at 1018. Given the remedial purpose of the FLSA, the established cohesiveness of these tip pool claims, and the Court's concerns about store level or regional level management misconduct defenses, Plaintiffs propose a bifurcated trial plan in which a first jury would adjudicate the common question of the tipped employee status of the QA position, followed (if Plaintiffs prevail) by a test flight of 20 to 50 of the deposed opt-ins whom the Court has already determined to be similarly situated on the issues of coercion and damages. After that, the Court can reconsider the status of the case and, as appropriate, order organized flights of individual opt-ins or representative trials as experience at that point would dictate.

---

[1] Plaintiffs' counsel have attempted to meet and confer with Defendant's counsel regarding a revised trial plan; Defendant has taken the position that it is solely Plaintiffs' responsibility to propose a trial plan.

## II.     PROPOSED TRIAL PLAN

Plaintiffs' trial plan addresses the issues as identified by the Court: 1) whether QAs and/or Expeditors are tipped employees pursuant to the FLSA; 2) whether opt-in Servers experienced any coercion whatsoever to share tips with QAs; and 3) the amount of damages opt-ins are entitled to if they prevail.

Plaintiffs propose that the Court adopt a bifurcated trial plan whereby the tipped employee issue is adjudicated in a consolidated single trial of this common issue followed, if Plaintiffs prevail, by a test flight trial of 20 to 50 similarly situated deposed opt-ins as to the coercion issue and damages. Once the first "test" flight trial is completed, the Court would convene a case management conference after the parties meet and confer to determine what additional discovery or survey plan would be necessary to assist in the grouping of future trial flights for the remaining opt-in Plaintiffs. Finally, the parties would then try before different juries the claims of the remaining opt-in Plaintiffs in flights organized in an appropriate and efficient manner (by store, state, region, or type of coercion).

The first phase of this trial plan would involve a consolidated common issues trial on the issue of whether QAs are tipped employees under the FLSA. This phase would be presented to the first empanelled jury, who would decide this discrete liability issue based on representative evidence. If Plaintiffs prevail on this issue, the trial would move onto phase two. If Plaintiffs were to lose on this issue, judgment would be entered against all opt-in Plaintiffs, and the case would be concluded at that point.

In phase two, a second jury would be empanelled to try a test flight of 20 to 50 similarly situated deposed opt-in Plaintiffs representing a variety of stores and categories of coercive conduct by managers. This jury would decide whether these opt-ins were subjected to management coercion, as well as any damages owed to these 20 to 50 individual Plaintiffs.

Based on the results of the common issue trial and the test flight trial, the Court would then convene a case management conference to determine what, if any, additional discovery or survey evidence would be needed to assist in the grouping of subsequent flights of jury trials.

The Court, informed with this additional trial experience and discovery, would then adjudicate by jury trials the claims of the remaining opt-in Plaintiffs in organized flights in a manner approved by the Fifth Circuit. *Mullen*, 186 F.3d at 628-629; *Watson*, 979 F.2d at 1017-1018, 1023; *Manual* at §§ 21.5 and 22.93.

### III. BIFURCATED TRIAL PLANS ARE WIDELY USED AND APPROVED

The use of bifurcation as a tool to manage complex trials is widely recognized and approved of by courts. *See Manual* at § 21.141 ("Bifurcation and severance under Rule 42 are available as tools that might make a case more manageable by separating out discrete issues for a phased or sequenced decision by the judge or at trial."). Under Fed. R. Civ. P. 42(b), "for convenience, to avoid prejudice, or to expedite and economize", a court "may order a separate trial of one or more separate issues claims, cross-claims, counterclaim, or third-party claims." *See also Myers v. Copper Cellar Corp.*, No. 3:95-CV-541, 1996 WL 766505, at *3-4 (E.D. Tenn. Sept. 27, 1996) (bifurcated liability and damages). In using this procedure, courts must ensure that the right of trial by jury pursuant to the Seventh Amendment or provided by a statute of the United States is preserved. Fed. R. Civ. P. 42(b). However, no Seventh Amendment rights are violated so long as different juries in a bifurcated proceeding decide discrete and separable issues. *See Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 498-99 (1931); *Mullen*, 186 F.3d at 626.

Consistent with this statutory authority, courts have consistently approved the bifurcation of trials between common issues and individual issues in complex class cases. *See Manual* at § 21.5 ("In jury cases, the court may consider trying commons issues first, preserving individual issues for later determination."). The Fifth Circuit has approved the use of bifurcation in the complex litigation context. *See Watson*, 979 F.2d at 1023. In *Watson*, the Fifth Circuit, in a mass tort case under the stricter requirements of Rule 23(b)(3), approved a bifurcated trial plan that separated common liability issues from individual determinations. The first phase was a jury trial to determine common issues of liability. If liability was found, phase two would

proceed to a sample of twenty fully-tried individual plaintiff cases to clarify procedural and legal issues. The third phase involved the resolution of the individualized issues of the remaining 18,000 plaintiffs in the form of trials in waves of five tried before a different jury. These waves were grouped based on certain shared factors amongst the plaintiffs. Finally, in the last phase, the court computed the award of punitive damages. *Id.* at 1018. On appeal, the Fifth Circuit affirmed the trial plan and noted that it adequately balanced the interests in efficiently adjudicating of collective issues where possible against the due process rights of the employer. *Id.* at 1023. *See also Mullen*, 186 F.3d at 627 (approving trial plan where common issues of liability were tried first, followed by individual trials regarding individual issues in waves of five – finding this bifurcated trial plan promoted judicial economy and avoided wasteful and duplicative litigation).

Courts in other circuits have also endorsed the use of bifurcation to address challenges presented by complex litigation. For example, the district court in *Thiebes v. Wal-Mart Stores, Inc.*, No. CIV. 98-802-KI, 2004 WL 1688544 (D. Or. July 26, 2004) adopted a trial plan in an off-the-clock overtime case that bifurcated the class wide liability issue from the determination of individual issues. A second jury then determined whether each of the plaintiffs worked overtime and what, if any, damages they were owed. *Id.*

### IV.   LOGISTICS OF HOW THE TRIAL WOULD PROCEED

#### A.   Phase One – Collective Trial On The Tipped Employee Issue

The common liability issue of whether QAs are tipped employees would be tried efficiently and fairly, on a representative basis before a single jury. Plaintiffs intend to use the following types of evidence to try this issue:

1.   Chili's company documents, including uniform company-wide job descriptions for both servers and QAs and detailed research memoranda and policies (including, but not limited to Research Memorandum, Project Summary Memorandum, and the QA Position and Guidelines Memorandum);

2.  Chili's managers would testify on company policies and practices, including on the company-wide uniform job description for servers and the company-wide uniform job description for QA [Doc. No. 105, Ex. 102] and on Chili's "tip credit" project in which Chili's determined on a company-wide basis that QAs were legally ineligible to participate in a valid tip pool. These witnesses would include, but not be limited to: Susan Sandidge, Barbara Youngman, Teresa McCaslin, and Leslie Denny.

3.  Testimony from a representative sample of opt-ins who will testify that QAs did not engage in duties required of a tipped employee under the FLSA.[2]

Plaintiffs anticipate that this phase of the trial would take approximately two to four weeks for both sides to present their evidence. Plaintiffs believe that 36 opt-in witnesses representing a cross-section of the opt-ins will be more than enough, when combined with Chili's own corporate documents and witnesses, to establish liability for the common issue of whether QAs are tipped employees. The Court has already summarized the bulk of the evidence of this common issue in ruling on Chili's summary judgment motion. *See* Memorandum and Order at 21-24.

---

[2] Out of an abundance of caution, Plaintiffs have identified over 50 trial witnesses, all of whom Defendant had the opportunity to depose (whether or not Defendant decided to take advantage of that opportunity). Thus, Plaintiffs reserve the right to call any or all of these witnesses, if the Court determines that it wants or needs to hear from them. As this Court has rightfully observed, however, even 36 opt-in witnesses may become cumulative and redundant, so Plaintiffs are prepared to present fewer opt-in witnesses if and when the Court determines that they are unnecessarily cumulative. *See* Fed. R. Evid. 611(a) and 403 (cumulative evidence may be excluded). Plaintiffs also believe that the presentation of opt-in witnesses can be streamlined through the use of deposition testimony. While all of the trial witnesses were screened by Plaintiffs' counsel for their availability and willingness to attend trial in Houston, many of the trial witnesses identified by Plaintiffs reside more than 100 miles from this Court and may have limitations on their ability to travel to Houston for trial at a particular time (that is as of yet unknown). Plaintiffs will endeavor to present as many live witnesses as possible, but to the extent any trial witnesses cannot travel at the time he/she is needed, Plaintiffs will present deposition testimony from those witnesses pursuant to Fed. R. Civ. P. 32(a)(4)(B); *see also Robinson v. Food Serv. of Belton, Inc.*, 415 F. Supp. 2d 1232, 1237 (D. Kan. 2005) (deposition of plaintiff allowed in lieu of live testimony at trial), and may also seek to call them live via video link.

As this Court correctly determined, "a reasonable jury could find, based on witness testimony, internal memoranda in which Defendant treated all QAs as having similar job duties, and the relevant job descriptions, that QAs' relevant duties and level of direct customer interaction was generally the same. The jury therefore could determine that QAs generally are or are not eligible to participate in a mandatory tip pool." Memorandum and Order at 33. Moreover, this Court has already concluded that a reasonable jury could find, based on the representative evidence, that QAs, as a group, had only minimal direct interaction with customers and perform some duties that are more akin to those of food preparation duties. Memorandum and Order at 21-22.

This approach is also consistent with well-established precedent approving the use of representative evidence to try liability issues under the FLSA collectively. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946); *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701 (3d Cir. 1994) ("Courts commonly allow representative employees to prove violations with respect to all employees."); Ellen C. Kearns, *The Fair Labor Standards Act* 1333-4 (BNA 1999) ("representative testimony has been widely accepted by courts" in FLSA cases); *see also* Plaintiffs Brief on Trial Witnesses (filed on June 15, 2007) [Dkt. 44]. In addition, Defendant's defenses can be resolved on a representative basis, including its dual job defense, that QAs allegedly performed customer service functions, and the lack of an industry custom regarding the tipping out of QAs. Finally, resolving common issues of liability for the class on a representative basis separate and apart from other liability and damages issues is consistent with previously referenced Fifth Circuit authority.

**B.    Phase Two - Test Trial Flight Of 20 To 50 Individual Opt-In Plaintiffs As To Manager Coercion And Damages**

In this phase of the trial, a second jury would decide the coercion and damages issues for a test flight of 20 to 50 similarly situated deposed opt-in Plaintiffs. This sample of opt-in Plaintiffs would be selected to cover a wide range of different types of coercion as well as locations and/or stores.

Because the tipped employee issue will have been resolved for all participants in this collective action, any tip outs made to QAs by the opt-in plaintiffs will necessarily be illegal unless determined to be voluntary. The burden of proof and persuasion will fall on Chili's to prove that any tipping out of QAs by opt-in plaintiffs was voluntary pursuant to the Department of Labor standard adopted by this Court. *See* Memorandum and Order at 37 ("The Court believes that the standard set forth by the Department of Labor is both persuasive and workable...if the employer's actions 'might well' dissuade a reasonable employee from not sharing tips with a QA, then the employee's tip sharing is not 'free from any coercion whatever.'").

Plaintiffs intend to use the following types of evidence to try these issues during this second phase of the trial:

1. Direct testimony from 20 to 50 similarly situated opt-in plaintiffs regarding their individual claims, including management coercion they experienced.

2. Chili's company documents that demonstrate management coercion directed towards the sample of opt-in plaintiffs. These documents could include, but are not limited to Local Options, Regional Standards, and the Brinker Tip Pooling Guidelines.

3. Any rebuttal witnesses or evidence necessitated by Defendant's presentation of its defense.

4. Chili's company payroll data regarding Plaintiffs' wages and hours worked.

Plaintiffs anticipate that this phase of the trial would take approximately two to three weeks for both sides to present their evidence.

The purpose of this phase is two fold: 1) to resolve fully the claims of the 20 to 50 opt-in plaintiffs; and 2) to clarify any legal or evidentiary issues necessary to fully adjudicate such claims. In addition, this phase of the trial would allow the jury to conduct an analysis of whether the sample of opt-in plaintiffs were coerced while affording Chili's the opportunity to raise any defenses it has plead. Moreover, this process preserves the opt-in plaintiffs' rights to adjudicate their claims before this court without having to deal with the logistical and procedural expense of

decertifying the class only to have the opt-in plaintiffs intervene by right into Ms. Roussell's individual case. *See* Fed. R. Civ. P. 24.

Furthermore, a determination of damages can be easily tried on a class and/or representative basis as Defendant has payroll data that will show the sub-minimum wage rates they paid to opt-ins. A simple mathematical computation of the difference between the federal minimum wage and the sub-minimum wage rates paid by Chili's will show the amount of damages due the class. Since the calculation will be based on Defendant's own records, Defendant may even stipulate to the amount of the wage differential. Absent a stipulation, Plaintiffs may present their analysis of the data through a witness who can attest to the wage differential based on a mathematical calculation. Once the proper damage calculation is determined from this representative sample, it can be easily applied to the claims of the remaining opt-in plaintiffs to mechanically determine their damages once the remaining liability issues are resolved.

C. **Phase Three – Further Trial Flights As Appropriate For The Remaining Opt-In Plaintiffs**

Plaintiffs propose that the Court conduct a case management conference following the test flight trial to allow the parties to discuss and schedule any discovery[3] that would be necessary to enable the Court to efficiently organize and/or group the remaining opt-in plaintiffs' claims. Having the benefit of the first test flight trial, the parties and the Court will identify key evidentiary and legal issues and opportunities for streamlining the litigation. *See Manual* at § 22.93 ("Similarities among the cases tried and cases pending trial may allow use of a standard pretrial order and application of rulings on evidentiary and trial issues … and use of a standard set of exhibits can streamline presentation of evidence.").

---

[3] Any depositions of opt-ins would be quite brief at this stage. The previous round of depositions as to all issues was characterized by short depositions. The next wave would be shorter still as there would be no need to examine witnesses as to their duties (tipped employee issue) but only as to the coercion issues.

Once this discovery is completed, the parties would then try flights of the remaining opt-in plaintiffs before different juries; the organization of these flights would depend upon the information gleaned from the first test flight and the subsequent discovery. However, Plaintiffs note that these flights could be grouped in a number of ways, including by type of coercion, geographic location (store, state, region) or some other criteria. Moreover, Plaintiffs recognize that these flights could be comprised of trials requiring individual determinations of liability and damages for each participating opt-in plaintiff or could be adjudicated with representative evidence as the Court may later deem to be appropriate.

## V. THIS COURT SHOULD ADOPT THIS TRIAL PLAN BECAUSE IT IS THE MOST EFFICIENT AND JUST METHOD TO ADJUDICATE PLAINTIFFS' CLAIMS

This proposed trial plan presents the most efficient and just method to adjudicate Plaintiffs' claims in this case given the concerns raised by the Court. First, this plan, by allowing Plaintiffs to proceed collectively, succeeds in preserving the remedial nature of the FLSA as well as the purposes of 29 U.S.C. Section 216(b). Memorandum and Order at 47 ("the purposes of Section 216 militate strongly in favor of allowing [FLSA] cases to proceed collectively"); *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (citing congressional intent to "vindicate rights by the pooling of resources"); *Reich v. Circle C. Invs. Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) (recognizing FLSA's remedial purposes); *Prickett v. DeKalb County*, 349 F.3d 1294, 1296 (11th Cir. 2003) (remedial purpose of FLSA requires liberal application); *Bradford v. Bed Bath and Beyond, Inc.*, 184 F. Supp. 2d 1342, 1351 (N.D. Ga. 2002) (holding that plaintiffs can "hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action"). To require each opt-in plaintiff to shoulder the burden and costs of bringing an individual lawsuit for their claims raised in this case would be manifestly unjust and unfair. Maintaining this collective action ensures that Plaintiffs can assert their FLSA rights.

Second, by bifurcating the trial between the discrete common issue of tipped employee status and the remaining liability and damages issues, this trial plan maximizes the efficiencies of this litigation. The effective use of representative evidence and testimony to adjudicate the common liability issue of whether QAs are tipped employees avoids duplicative and wasteful testimony during that phase of the trial. *See* Fed. R. Evid. 611(a) and 403. It also avoids duplicative and inconsistent judgments that could result from myriad courts adjudicating the same legal issue. Moreover, structuring the dispositive liability issues in this sequence streamlines the trial moving forward by disposing of one key issue at a time. If Plaintiffs prevail on the tipped employee issue, then that issue will not need to be litigated again and the parties can focus on whether Plaintiffs were subject to manager coercion. Conversely, if Chili's prevails on the tipped employee issue, Plaintiffs' claims are extinguished and the parties and the Court would not need to waste any resources, time, and/or energy adjudicating other trial issues mooted by that determination.

Third, this trial plan effectively and fairly addresses Defendant's due process concerns. The separation of the coercion issue from the tipped employee issue provides the Court with the flexibility to provide more individualized analysis on the issue of coercion to the extent that it deems it necessary. As an initial matter, the first test flight trial will provide Chili's with the opportunity to present its defenses on the issue of coercion and damages regarding these 20 to 50 opt-in plaintiffs' claims. These plaintiffs will also each be required to present their proof of being subjected to management coercion and of damages suffered. Furthermore, for the remaining flights of opt-in plaintiff trials, the Court can organize these trials to involve individualized determinations for the opt-in plaintiffs or to break the remaining opt-in plaintiffs into cohesive groups where representative evidence can fairly resolve those claims as the circumstances at that time dictate. In addition, Chili's due process rights, as they relate to determining the issue of tipped employee status of QAs and calculating damages, are preserved as those issues are well suited for proof by representative evidence as already defined by this Court. *See* Memorandum and Order at 33.

This trial plan maximizes the efficiencies available for this FLSA collective action in light of the Court's recent order and reduces the burdens on this Court (and others around the country) if this collective action were to be decertified. It permits a single determination on a crucial common issue (tipped employee status) applicable to all opt-in plaintiffs. This would result in the early final adjudication of all claims should Chili's prevail at this phase (which is ready for trial on the evidence presented at the summary judgment motion). If plaintiffs were to prevail, the ruling will truncate future discovery and trial for the individual opt-ins.

By maintaining this collective action, this Court, which has already spent considerable energy learning and mastering the facts and issues of this case, will continue to oversee these proceedings. Dispersing the opt-in plaintiffs to different fora will result in the loss of significant time and energy to work through the procedural machinations that will inevitably bring them back into this court via intervention as a matter right. *See* Fed. R. Civ. P. 24. Even if some of these Plaintiffs could not intervene by right, adjudication of these claims in new courts would result in a loss of efficiencies as those fora would require additional time and duplicative resources familiarizing themselves with the case. Furthermore, should the proceedings herein be sequenced as proposed, they will become more streamlined with each subsequent flight of jury trials as numerous evidentiary and legal issues would be resolved and established. In fact, after several of these flights or waves, the parties could expect "a reasonable judgment value for each category of claims would emerge so as to facilitate settlements." *Watson*, 979 F.2d at 1018.

Finally and perhaps most importantly, this trial plan is consistent with the controlling authority in the Fifth Circuit. As noted above, the Fifth Circuit has approved of bifurcated trial plans that separate common class wide issues from issues that could require more individualized analysis. Just as the trial courts did in both *Watson* and *Mullen*, Plaintiffs here propose trying a common question of liability on a collective basis followed by more individualized determinations to be tried in efficient groupings before other juries. This type of trial plan has been recognized by the Fifth Circuit as not only promoting judicial economy, but also satisfying pertinent due process consideration. Moreover, bifurcation in this manner is consistent with

protecting the Seventh Amendment right to a jury trial because the issues that would be tried by separate juries are discrete and separable – determining whether QAs are tipped employees would not overlap with determining whether managers coerced servers to tip QAs. *See Mullen*, 186 F.3d at 628 (holding that the "Seventh Amendment does not prohibit bifurcation of trials as long as 'the judge [does] not divide issues between separate trials in such a way that the same issue is reexamined by different juries.'") (quoting *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 320 n. 50 (5th Cir. 1998)).

## VI. CONCLUSION

For the above reasons, Plaintiffs urge the Court to DENY the pending motion to decertify this collective action and to ADOPT Plaintiffs' proposed revised trial plan.

Dated: August 8, 2008	Respectfully submitted,

By: __/s/ James Kan__
DAVID BORGEN
State Bar No. 099354
*Pro Hac Vice*
LAURA L. HO
State Bar No. 173179
*Pro Hac Vice*
JAMES KAN
State Bar No. 240749
*Pro Hac Vice*
GOLDSTEIN, DEMCHAK, BALLER, BORGEN & DARDARIAN
300 Lakeside Drive, Suite 1000
Oakland, CA 94612-3534
(510) 763-9800 (phone)
(510) 835-1417 (facsimile)

RICHARD (REX) J. BURCH
State Bar No. 24001807
Federal ID No. 21615
BRUCKNER BURCH PLLC
1000 Louisiana, Suite 1300
Houston, TX 77002
(713) 877-8788 (phone)
(713) 877-8065 (facsimile)

>MARTIN A. SHELLIST
>State Bar No. 00786487
>Federal ID No. 16456
>DARYL J. SINKULE
>State Bar. No. 24037502
>Federal ID No. 12308
>SHELLIST LAZARZ LLP
>3D/International Tower
>1900 West Loop South, Suite 1910
>Houston, TX  77027
>(713) 621-2277 (phone)
>(713) 621-0993 (facsimile)
>
>ATTORNEYS FOR PLAINTIFFS

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that true and correct copies of the following documents have been forwarded to all counsel of record via the Southern District's CM/ECF electronic filing system on August 8, 2008:

**PLAINTIFFS' REVISED TRIAL BRIEF**

| | |
|---|---|
| Fraser A. McAlpine<br>HUNTON & WILLIAMS LLP<br>Bank of America Center, Suite 4200<br>700 Louisiana Street<br>Houston, Texas 77002 | Richard J. Burch<br>BRUCKNER BURCH PLLC<br>1000 Louisiana, Suite 1300<br>Houston, TX 77002 |
| Brett Burns<br>HUNTON & WILLIAMS LLP<br>575 Market Street, Suite 3700<br>San Francisco, CA 94105 | Martin A. Shellist<br>SHELLIST & LAZARZ LLP<br>3D/International Tower<br>1900 West Loop South, Suite 1910<br>Houston, TX 77027 |

/s/ James Kan
James Kan