IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JENNIFER ROUSSELL, ON BEHALF OF HERSELF AND OTHERS SIMILARLY SITUATED, | § § § § | |
| PLAINTIFF, | § § | CIVIL ACTION NO. 4:05-CV-03733 |
| VS. | § § | |
| BRINKER INTERNATIONAL, INC., | § § | Jury Requested |
| DEFENDANT. | § § | |

# DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, RENEWED MOTION TO DECERTIFY COLLECTIVE ACTION, AND SUPPORTING MEMORANDUM

Respectfully submitted,

**Fraser A. McAlpine**
State Bar No. 13321300
Federal I.D. No. 3407
**HUNTON & WILLIAMS LLP**
Bank of America Center
700 Louisiana Street, Suite 4200
Houston, Texas 77002
Phone: 713.229.5700
Fax: 713.229.5750

ATTORNEY-IN-CHARGE FOR DEFENDANT
BRINKER INTERNATIONAL, INC.

Of COUNSEL:

**Laura M. Franze**
State Bar No. 07389600
**Holly H. Williamson**
State Bar No. 21620100
**M. Brett Burns**
State Bar No. 03447900

**HUNTON & WILLIAMS, LLP**

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs were given their day in Court and afforded the opportunity to present all purported "representative" evidence they deemed appropriate, over Defendant's objections and despite Defendant's multiple requests for decertification. Plaintiffs must now finally explain how the class-wide judgment they seek, predicated on individualized evidence of manager coercion and QA tip pool eligibility, can lawfully be issued. This lingering question cannot be avoided any longer. The trial record is complete, and the Court must now make decisions concerning judgment as a matter of law, decertification, and final judgment. Defendant believes those options to be relatively straightforward:

- The Court can enter judgment for Defendant as a matter of law, or alternatively decertify the case, based on record evidence showing that the issue of manager coercion is individualized, undisputed record evidence and offers of proof negating the possibility of a class-wide coercion finding, and the logical inability to extrapolate a limited coercion concession from the 14 testifying opt-ins to the 41 non-testifying opt-ins; or

- The Court can enter judgment for Defendant as a matter of law, or alternatively decertify the case, based on record evidence showing that the issue of QA tip eligibility is individualized, undisputed record evidence of QA customer service and customer interaction establishing that QAs in multiple locations can and should be permitted to participate in mandatory tip pools, and the same logical extrapolation problems.

Defendant anticipates that Plaintiffs will ask the Court to enter a final judgment in their favor. However, the Court cannot lawfully do so on the current record absent a finding that, *as a matter of law*, the 41 non-testifying opt-ins were coerced, as there is no factual finding on this issue, no evidence adduced at trial that the 41 non-testifying opt-ins experienced coercion, and no agreed mechanism for a post-trial fact adjudication on an issue for which Plaintiffs carried the burden of proof. Moreover, testimony presented from Defendant's witnesses at trial and in timely offers of proof negates any possibility of a class-wide coercion finding as a matter of law, and warrants

1

the issuance of a final judgment pursuant to Fed. R. Civ. P. 50 in favor of Defendant.

## II. FACTUAL AND PROCEDURAL HISTORY RELEVANT TO THIS MOTION

### Manager Coercion of Servers

1.  There is no evidence of any national corporate policy coercing or requiring Servers to share tips with QAs. *See, e.g,* Trial Tr. 379:6-8 (Dorr) (never saw policy requiring QA tipping), 472:16-18 (Downing) (never saw writing requiring server tipping of QAs), 582:19-21 (Adams) (never saw corporate policy), 895:25-896:9 (Evans) (written training materials did not mention tipping of QAs). No testifying opt-in plaintiff spoke competently to any alleged coercion or requirement to share tips with QAs at restaurants other than where he or she worked. Several admitted that they could not know what happened at their restaurants when they were not working, and certainly not at other Chili's restaurants.[1] The evidence at trial established that whether a "policy" of tipping QAs exists, and, if it exists, whether it is "mandatory" -- *i.e.*, imposed or enforced by management, varies by restaurant, by manager, server, and over time.[2]

2.  Undisputed evidence was presented at trial negating coercion as to certain non-testifying opt-ins. For example, witness Randy Nicholas, Managing Partner of the Chili's Grill & Bar in Hot Springs, Arkansas, testified at trial that his Servers are not required to tip out QAs, have never been required to tip out QAs, that Server tip outs to QAs are voluntary actions, and than Managers do not participate in the QA tip out process. *See* Df's Consolidated Summary Of

---

[1] *See, e.g., id.,* 473:11-24 (Downing); 325:8-19 (Roussell); 577:14-578:2 (Adams); 912:15-17, 912:22-913:1 (Evans); 947:25-948:3 (Ellis).

[2] The testifying opt-ins themselves established that some QA tipping was not "required" and, in fact, was purely voluntary. Some tipped QAs because they contributed to a successful shift, made their job easier, and enhanced their ability to earn tips. *See, e.g.,* Trial Tr., 572:16-573:6, 579:25-580:6 (Adams) ($15-$20); 665:15-17 (Alfrey) (sometimes tipped QA more than what was required); 897:24-898:7 (Evans) (would sometimes tip the QA more if she did an exceptional job or the shift was longer or busier). Indeed, Plaintiff Roussell herself testified at trial that at the Sugar Land, Texas restaurant the tipping of QAs stopped being mandatory in January 2007 but that she continued to tip QAs anyway because she did not mind tipping QAs if they did an exceptional job. *Id.*, 243:10-244:2 (Roussell). Some even testified that there were times when they wouldn't tip the QA at all. *Id.*, 897:7-9; 897:17-20 (Evans).

2

Trial Testimony And Offer Of Proof On Coerced Tip Sharing (Dkt. 270) at 2-3 (citing Trial Tr. 1589:25-1590:4, 1633:4-12, 1634:4-1634:24, 1635:21-1636:1, 1641:5-11, 1642:19-1643:24).[3] Similarly, witness Steve Allen, Managing Partner of the Chili's Grill & Bar in Lawton, Oklahoma, testified at trial that there is no tip pool requirement for QAs at his restaurant. *See id.* at 4 (citing Trial Tr. 1688:5-1689:20).[4] Opt-In Plaintiff Ted Davis, a former Server at the Chili's Grill & Bar in Phoenix, Arizona, testified by deposition at trial that he was informed that tipping QAs "wasn't required" but nonetheless tipped out QAs so that he would not be "talked about" by QAs. *See id.* at 4 (citing Trial Tr. 1739:14-20, 1740:17-1741:1).

3. Defendant also made timely offers of proof of testimony from numerous witnesses that Servers were not required to tip QAs. *See id.* at 5-6 (opt-in plaintiff Davis's admissions that Phoenix, Arizona Chili's managers "never" told him that QA tipping was required, expected, or made any statements that would encourage him to tip QAs); *id.* at 6-9 (witness Neefesha Gray's testimony that the Jackson, Mississippi Chili's has no policy that requires servers to share their tips with the QAs and that no one ever told her that she must tip the QA); *id.* at 9-10 (witness Kathy Connelly's testimony that the Burlington, Massachusetts Chili's managers do not " in any way, shape or form" get involved in QA tips, managers do not coerce Servers to tip QAs, and managers provide "absolutely zero" pressure to tip QAs); *id.* at 15-16 (witness Wendy Posa's testimony that Servers voluntarily tip QAs at the Waterbury, Connecticut Chili's); *id.* at 16-18 (witness Jana White's testimony that there is no requirement at

---

[3] Mr. Nicholas's testimony was uncontested. No testifying opt-in spoke to QA tipping at the Hot Springs, Arkansas Chili's. Opt-in plaintiff Devon Devasher is the only opt-in from the Hot Springs, Arkansas Chili's restaurant, but Plaintiffs did not present him as a witness.

[4] Mr. Allen's testimony was uncontested. No testifying opt-in spoke to QA tipping at the Lawton, Oklahoma Chili's. Opt-in plaintiffs Danielle McDonald and Lindsey Parrish are the only opt-ins from the Lawton, Oklahoma Chili's restaurant, but Plaintiffs did not present them as witnesses.

3

the Memphis, Tennessee Chili's that Servers tip QAs, that any QA tips are "completely voluntary," and that management has no role in the tip out process).

## QA Tip Pool Eligibility

4. The evidence presented at trial focused exclusively on the restaurants where the testifying opt-ins worked, and Plaintiffs presented no evidence showing that any testifying opt-in has knowledge of what QAs did at other restaurants where they did not work.[5]

5. Undisputed evidence was presented at trial showing that QAs have primary duties that entail important customer service functions,[6] that QAs perform important customer service functions,[7] and that QAs assist servers and enable them to provide better customer service.[8]

---

[5] *See, e.g.,* Trial Tr., 325:11-24, 343:6-12 (Roussell) (does not know what other Chili's restaurants do in terms of tipping QAs, QA job duties, or whether they even have QAs, and has no knowledge of how other Chili's in other locations with other managers handle the assignments of QAs); 375:9-13 (Dorr) (can only speak to what she saw and experienced working part-time over a five-month period of time in one Chili's restaurant); 416:15-24 (Farinato) (admits that she was only employed in one Chili's restaurant for 10 months and has no personal knowledge of what happened in any other Chili's in the country); 473:19-24 (Downing) (does not know what happened at other Chili's restaurants; 577:14-578:2 (Adams) (no knowledge of other Chili's restaurants); 947:25-948:3 (Ellis) (testimony is limited to her experiences at the store where she worked).

[6] *See, e.g., id.,* 235:24-236:12 (Roussell) (primary function of a QA is to ensure that food comes out correctly and is run to the table in a timely manner); 376:23-377:7 (Dorr) (important component of customer service is delivering quality food in a timely and accurate manner); 404:13-21 (Farinato) (QA's primary duty is making sure order correct); 560:19-561:22 (Adams) (QA's primary objective is to ensure guests receive best quality food, make sure orders are prepared and delivered); 1749:16-1750:2 (Connolly) (primary function is "making sure the food goes out quickly, making sure the tables get exactly what they're expecting to get, making sure if there are any allergies, to go out to the table and talk to the people to make them more comfortable").

[7] *See, e.g., id.,* 556:23-557:10 (Adams) (QAs "would ensure that the food was hot, correct, and that it matched the ticket"); 560:19-561:7 (QAs ensured that guests receive the highest quality food and that food was delivered to guests at the appropriate temperature); 235:24-236:12 (Roussell) (primary function of QA is to ensure that food comes out correctly and run to the table in a timely manner); 888:24-889:6 (Evans) (QA's primary objective is to ensure guests receive highest quality food, make sure orders are prepared properly, and food is being delivered to guests at appropriate hot or cold temperatures); 630:13-22 (Walker) (customer service includes making sure that guests got the food that they ordered, including special orders they may have made; honoring the order the customer requests is customer service); 768:8-20 (Zayas) (it is important to get food orders to the table as quickly as possible, both the server and the QA have responsibility for making sure this occurs, this is a very important responsibility for the customers, this is a prime responsibility for the QA); 944:24-945:25 (Ellis) (QA is responsible for making sure that food is delivered promptly after it comes from the kitchen, checking the order against the customer's request, making sure the customer's requests were complied with (including special orders, responsible for monitoring ticket times, making sure that food is delivered appropriately and orders are delivered at the same time (appetizers before entrees, entrees before desserts)); 1394:3-1395:6 (Miller) (same).

[8] *See, e.g., id.,* 572:16-573:6, 574:4-7, 579:25-580:6 (Adams) (QA contributed to successful shifts, gave servers more time on the floor, made his shift easier, and enhanced his ability to earn tips); 665:6-14 (Alfrey)

4

Multiple witnesses referred to QAs as "the server's server," server extensions, and other similar terms.[9]

6.      Undisputed evidence was presented at trial showing that QAs have customer interaction, and many have extensive customer interaction. To illustrate the point: (i) Corsicana, Texas QAs run 25-50% of food orders to customers and service To Go customers 12 of the 14 restaurant shifts during the week, (ii) the Burlington, the Massachusetts QA delivers food to customers 10-30 times per shift and has regular customers who send her thank-you e-mails, (iii) the Memphis QA delivers 75-80% of the food to customers in the restaurant and has regular customers who know her and hug her when they see her, and (iv) the Jackson, Mississippi QA delivers food to customers 30-40 times a night. There are other examples as well.[10]

---

(QAs helped her help customers, made a huge difference in how her shift went, and a good QA could help her make more money as a server); 633:18-634:15, 636:7-10 (Walker) (QA helps server by ensuring quality food and traying food in a timely manner; server's job would be more difficult on a busy night without a QA); 905:18-20 (Evans) (without the QA position, her job as a server would be more stressful); 771:1-3, 777:17-22 (Zayas) (a good QA helped servers and could help turn over tables faster); 257:5-13, 310:20-311:4 (Roussell) (as a QA, she would serve the server by performing some of the server's side duties). In fact, some QAs were so helpful that they were tipped either voluntarily by certain opt-in plaintiffs or above the alleged required amount. *See, e.g, id.*, 572:16-573:6, 579:25-580:6 (Adams) ($15-$20); 665:15-17 (Alfrey) (sometimes tipped QA more than what was required).

[9] *See, e.g., id.*, 305:19-21 (Roussell) (QAs were "the server's server"); 377:14-16 (Dorr) (QAs are at the restaurant to serve the server); 665:6-14 (Alfrey) (QAs helped her with her job in helping customers, made a huge difference in how her shift went, and helped her make more money as a server); 771:1-3 (Zayas) (a good QA can really help a server during her shift); 1227:8-15 (Brenner) (QAs did a great job, worked hard, and enhanced and helped servers with guest customer service); 1393:24-1394:2 (Miller) (QA was helpful in some ways, was like her friend); 1439:8-19 (Biller) (QAs are like "quarterbacks"); 1684:11-25 (Allen) (QAs assist the servers and are like an extension of the servers); 1747:6-11 (Davis) ("[QAs] – they're my right-arm man, I would say. If it wasn't for them, I couldn't be making all the tips that I could make"); 1760:20-22; 1763:2-4 (Connolly) (QAs "work hand-in-hand with the servers"); 1782:2-3 (Berveiller) (QA is "an extension of the server"); 2097:3-7 (Johnston) (QAs are "absolutely" an extension of the server).

[10] *See, e.g., id.*, 1433:25-1434:12, 1452:14-1453:8, 1447:1-20, 1448:25-1449:7 (Biller) (Corsicana QAs have direct customer contact, run 25-50% of food to customers, and service To Go customers 12 of the 14 restaurant shifts during the week); 1761:24-1762:11, 1766:3-8 (Connally) (Burlington QA delivers food to customers at the bar 20-30 times per shift on a busy shift and 8-15 times on a slow shift and regular customer send her thank-you e-mails); 1782:11-1783:11 (Berveiller) (Phoenix QA delivers food to guests at bar 25% of time); 1880:5-25 (Standifer) (Wolfchase QAs regularly handle To Go all responsibilities and directly interact with customers in person and on the telephone); 1961:19-1962:3, 1962:12-22; 1963:24-1964:11, 1975:7-13 (White) (Memphis QA delivers 90% of the food to customers in the lounge and bar areas, delivers 75-80% of the food to all customers in the restaurant, and has regular customer who know her and hug her when they see her); 2023:21-2024:9, 2029:15-22 (Gray) (Jackson QAs at her restaurant – including her – run food to customers in the restaurant "all the time," and estimates this to be 30-40 times a

5

## IV. ARGUMENT[11]

A. **Defendant Is Entitled To Judgment As A Matter Of Law, Or Alternatively To Decertification, Because A Reasonable Jury Would Not Have A Legally Sufficient Evidentiary Basis To Make Class-Wide Findings Of Manager Coercion.**

   1. **The Record Evidence At Trial Establishes That Manager Coercion Turns On Individualized Issues And No Class-Wide Finding Is Appropriate.**

Plaintiffs failed to establish evidence of a pattern, practice, single decision, policy, or plan of unlawful coercion that violates the FLSA. *See* Section II(1) of this Motion, *supra*. Doing so was required. *See Mooney v. Aramco Services Co. et al.*, 54 F.3d 1207, 1214 n.8, 1215 (5th Cir. 1995), *overruled on other grounds*; *accord Simmons v. T-Mobile USA, Inc.*, No. CIV. A. H-06-1820, 2007 WL 210008, at *4-5 (S.D. Tex. Jan. 24, 2007); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 508 (M.D. La. 2005). At best, Plaintiffs presented individualized violations of the FLSA resulting from "specific circumstances," "local policies of various managers located at various sites," or from differing applications of a common policy "by different supervisors made on a decentralized employee-by-employee basis," all of which are inappropriate for collective action treatment. *See, e.g., Hinojos v. The Home Depot, Inc.*, No. 2:06-CV-00108, 2006 WL 3712944, at *2 (D. Nev. Dec. 1, 2006); *England*, 370 F. Supp. 2d at 511; *Brooks v. Bellsouth Telecomms., Inc.*, 164 F.R.D. 561, 568 n.10 (N.D. Ala. 1995).

Moreover, undisputed evidence negating coercion as to certain non-testifying opt-ins was

---

night, couple got engaged and QA brought ring on a plate); 2197:13-19; 2198:7-25) (2199:10-2201:9, 2202:6-2203:1; 2199:1-9 (Posa) (Waterbury QAs deliver food to customers in the restaurant 10-15 times per shift, interact with "regulars," and play games with customers); 2301:7-18 (Smith) (Stillwater QAs run food to customers 10-15-25 times a shift). This stated, Defendant repeats that it makes this and other customer interaction arguments subject to and without waiving its position that customer interaction is not required. *See, e.g., id.* at 2441:17-2442:24; Df's Motion for Summary Judgment (Dkt. No. 82) at 12-13, 14-17, 19-20; *see also* Reply (Dkt. No. 132) at 18-20.

[11] Defendant incorporates and reasserts all evidence, arguments, and authorities set forth in its Motion for Judgment as a Matter of Law, Renewed Motion to Decertify Collective Action, and Supporting Memorandum (Dkt. 276). Defendant also makes these arguments subject to and without waiving its previously-stated positions that decertification is appropriate, including, without limitation, the reasons stated in Defendant's Application for Immediate Relief (Dkt. 202), and all prior decertification and trial plan filings.

presented at trial. The trial testimony of Hot Springs, Arkansas Managing Partner Randy Nicholas, Lawton, Oklahoma Managing Partner Steve Allen, and Phoenix, Arizona Opt-In Plaintiff Ted Davis that QA tip outs were voluntary, and not coerced or required, are uncontested, preclude any class-wide coercion finding, and warrant judgment as a matter of law, or alternatively decertification. *See* Section II(2) of this Motion, *supra*. The offers of proof of testimony from Davis, Jackson, Mississippi Server Neefesha Gray, Burlington, Massachusetts QA Kathy Connelly, Phoenix, Arizona QA Tamara Berveiller, Waterbury, Connecticut Bartender Wendy Posa, and Memphis, Tennessee QA Jana White also were uncontested, further preclude any class-wide coercion finding, and also warrant judgment as a matter of law, or alternatively decertification. *See* Section II(3) of this Motion, *supra*.

2. **The Court's Concerns About Manager Coercion Are Valid -- Plaintiffs Cannot Logically Extrapolate Coercion Evidence From The Testifying Opt-Ins To The Non-Testifying Class.**

The Court will recall that, prior to trial, it repeatedly expressed serious concerns about using representative testimony to prove manager coercion. *See, e.g.*, July 9, 2008 Order at 43, 45-46, 48 (stating, among other things, that "the question of whether Managers coerced Servers into sharing tips with QAs, under the particular facts of this case, does appear to turn on the actions of individual Managers at hundreds of stores across the country and does appear to require individualized defenses"); September 30, 2008 Order at 1 ("the question of coercion by management could not be fairly tried using representative testimony"). These concerns always have been legitimate and never have been resolved. Defendant has long contended that the very nature of the coercion claim Plaintiffs assert requires by definition a highly individualized analysis of the interactions between particular managers and servers that necessarily vary by restaurant, by manager, by server, and over time. The evidence at trial proved Defendant to be

7

correct (*see* Section II(1)-(3) of this Motion, *supra*) and confirmed that coercion cannot logically be extrapolated from the testifying plaintiffs to the non-testifying plaintiffs.[12]

**B.  Defendant Is Entitled To Judgment As A Matter Of Law, Or Alternatively To Decertification, Because A Reasonable Jury Would Not Have A Legally Sufficient Evidentiary Basis To Find For Plaintiffs On The QA Tip Eligibility Issue.**

**1.  The Record Evidence At Trial Establishes That QA Tip Eligibility Turns On Individualized Issues And No Class-Wide Finding Is Appropriate.**

The evidence demonstrates that Defendant's QAs are tip pool eligible because they perform important customer service functions and have primary duties that entail important customer service functions. *See* Section II(4)-(6) of this Motion, *supra*. Witnesses characterized QAs as "the server's server," "quarterbacks," "extensions of the servers," a server's "right-arm," and other things. *See id.* The evidence shows that Defendant's QAs have at least as much "customer service" as a "server helper" or a "service bartender," and therefore should be deemed tip eligible as a matter of law, warranting judgment, or alternatively decertification. *See* Df's Motion for Summary Judgment (Dkt. No. 82) at 12-13, 14-17, 19-20; *see also* Reply (Dkt. No. 132) at 18-20.

Moreover, assuming for purposes of this Motion that customer interaction is required, and reserving all challenges to that legal standard, the evidence demonstrates that Defendant's QAs are tip pool eligible because they have more than minimal customer interaction, and many

---

[12] As discussed in prior filings, the fact that courts regularly decertify collective actions presenting conceptually similar challenges further emphasizes this point. *See, e.g., Reyes*, 2007 WL 101808, at *2; *O'Brien v. Ed Donnelly Enterprises, Inc.*, No. 2:04-CV-00085, 2006 WL 3483956, at *4 (S.D. Ohio Nov. 30, 2006) (granting motion to decertify where "each claim would require extensive consideration of individualized issues of liability and damages"); *Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 WL 2085312, at *4-5 (N.D. Ga. July 25, 2006) (no certification where "every employee must testify about his awareness of the overtime policy, and his violation of that policy – and whether it was compelled by his or her branch manager"); *Johnson v. TGF Precision Haircutters, Inc.*, No. Civ.A. H-03-3641, 2005 WL 1994286, at *4-5 (S.D. Tex. Aug. 17, 2005 ) (granting decertification where alleged violations were "highly variable" and depended on "attitudes and perceptions of individual managers"); *Bayles v. Am. Med. Response of Co., Inc.*, 950 F. Supp. 1053, 1061 (D. Colo. 1996) (individualized inquiries of "how or whether defendant's policy was implemented by individual managers").

have substantial customer interaction. *See* Section II(4)-(6) of this Motion, *supra*. Multiple witnesses testified that QAs have direct customer contact, deliver varying amounts of food to customers (25%, 50%, 75%, 90% of food, and 15, 25, 40 times a shift), regularly service To Go customers, and other things. *See id.* Several QAs testified to special customer interaction experiences -- the Burlington QA confers with guests about allergies and gets thank-you e-mails from them, the Memphis QA has regular customers and hugs them when she sees them, the Jackson QA was asked to present a ring on a plate to a couple getting engaged, and the Waterbury QA play games with customers at the bar. *See id.* These sort of personal experiences far exceed the minimal legal standards contemplated by the Court. They also are *undisputed*. They preclude any class-wide coercion finding as a matter of law, and warrant judgment as a matter of law, or alternatively decertification.

2. **The Court's Concerns About Variance In QA Job Duties Are Valid -- The Record Evidence Clearly Establishes That Some QAs Were Entitled To Participate In Mandatory Tip Pools, And This Precludes Extrapolation And A Class-Wide Finding On QA Tip Eligibility.**

The Court will recall that, after the first day of Defendant's case, it expressed serious concerns about the variance in evidence of job duties actually performed by QAs. *See, e.g.*, Trial Tr. 1788:2-12 (noting "one of the points I'm struggling with in terms of the class and whether the 14 can serve as representative of the 55, is . . . the fact that the QA's duties seem to differ so much from store to store," "[i]t seems like some stores they would be tip eligible," and "we've had such wide differences in the descriptions of what QAs do"). Plaintiffs never explained how these problems could be resolved, either, and even admitted -- on the record -- that "of course" there were "outliers," even under their theory of the case. Trial Tr. 1792:16-17. However, these were not irrelevant, abstract "outliers" who can be disregarded -- they were witnesses who worked with non-testifying opt-in plaintiffs and who clearly established that QAs can and should

9

participate in mandatory tip pools.

It is inconceivable that the Corsicana, Texas QAs who run 25-50% of food orders to customers and service To Go customers 12 of the 14 restaurant shifts during the week cannot participate in mandatory tip pools. The same is true for the Burlington, Massachusetts QA who delivers food to customers 10-30 times per shift, discusses food allergies with customers who ask for her, and receives thank-you e-mails from those customers. The Memphis QA who delivers 75-80% of the food to customers in the restaurant and has regular customers who know her and hug her when they see her plainly exceeds the Court's requirements as well, as does the Jackson, Mississippi QA who delivers food to customers 30-40 times a night. There are multiple other examples as well. Thus, notwithstanding Plaintiffs' Counsel's "outlier" characterizations, the Court cannot ignore this undisputed evidence.

Can QAs from Burlington, Corsicana, Jackson, Lawton, Memphis, Phoenix, Stillwater, Waterbury, Wolfchase, and others about whom Defendant's witnesses testified participate in mandatory tip pools? Absolutely. And since they can, no class-wide finding on QA tip eligibility can be made, and judgment as a matter of law, or alternatively decertification, is warranted.

**C.     No Final Judgment Can Or Should Be Made In Favor Of Plaintiffs.**

The current record cannot support entry of final judgment in favor of Plaintiffs absent a finding that, *as a matter of law*, the 41 non-testifying opt-ins were coerced, as there is no factual finding by the jury on this issue, no evidence adduced at trial that the 41 non-testifying opt-ins experienced coercion, and no agreed mechanism for a post-trial fact adjudication on an issue for which Plaintiffs carried the burden of proof. Moreover, testimony presented from Defendant's witnesses at trial and in timely offers of proof negates any possibility of a class-wide coercion

finding as a matter of law. *See* Section II(1)-(3) of this Motion, *supra*.

## IV. CONCLUSION

For the foregoing reasons, Defendant requests that the Court grant Defendant's motion for judgment as a matter of law and dismiss the claims of all opt-in plaintiffs with prejudice. Alternatively, Defendant requests that the Court grant Defendant's renewed motion to decertify and dismiss the claims of all opt-in plaintiffs without prejudice.

Dated: April 6, 2009

Respectfully submitted,

/s/ Fraser A. McAlpine
**Fraser A. McAlpine**
State Bar No. 13321300
Federal I.D. No. 3407
**HUNTON & WILLIAMS LLP**
Bank of America Center
700 Louisiana Street, Suite 4200
Houston, Texas 77002
Phone: 713.229.5700
Fax: 713.229.5750

ATTORNEY-IN-CHARGE FOR DEFENDANT
BRINKER INTERNATIONAL, INC.

OF COUNSEL:

**Laura M. Franze**
State Bar No. 07389600
**Holly H. Williamson**
State Bar No. 21620100
**M. Brett Burns**
State Bar No. 03447900

**HUNTON & WILLIAMS, LLP**

<u>CERTIFICATE OF SERVICE</u>

   I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all counsel of record via the Southern District of Texas' CM/ECF electronic filing system on April 6, 2009:

| |
|---|
| Martin A. Shellist, Esq.<br>Daryl J. Sinkule, Esq.<br>SHELLIST & LAZARZ LLP<br>1900 West Loop South<br>Suite 1910<br>Houston, Texas 77027 |
| Richard J. Burch<br>BRUCKNER BURCH PLLC<br>1415 Louisiana #2125<br>Houston, TX 77002 |
| David A. Borgen<br>James Kan<br>Laura L. Ho<br>GOLDSTEIN, DEMCHAK, BALLER, BORGEN & DARDARIAN<br>300 Lakeside Drive<br>Suite 1000<br>Oakland, CA 94612 |

                /s/ Fraser A. McAlpine
                **Fraser A. McAlpine**