IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| JENNIFER ROUSSELL, on behalf of Herself and others similarly situated, | § § § | Civil Action No. 4:05-CV-03733 |
| Plaintiffs, | § § | |
| v. | § § | |
| BRINKER INTERNATIONAL PAYROLL COMPANY, L.P. | § § § | |
| Defendant. | § § | |

**DECLARATION OF DAVID BORGEN IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF REASONABLE ATTORNEYS' FEES, COSTS, AND EXPENSES**

88079-16

I, David Borgen, hereby declare as follows:

1.      The statements set forth in this declaration are made of my own personal knowledge and if called as a witness, I could and would testify competently to the matters stated below.

2.      I am co-lead counsel (on behalf of my firm) for Plaintiffs in this case.  I submit this declaration in support of Plaintiffs' Motion for an Award of Reasonable Attorney's Fees and Costs.

3.      Plaintiffs' fee motion seeks an award of attorneys' fees, costs, and expenses for work reasonably and necessarily spent and costs and litigation-related expenses reasonably and necessarily incurred in this matter by Goldstein Demchak Baller Borgen & Dardarian ("Goldstein Demchak") from the time of its association with Plaintiffs' original counsel through June 18, 2009, the date on which the Court entered a Judgment regarding Defendant Brinker International Payroll Company, L.P.'s ("Brinker") liability for back pay and liquidated damages following a jury verdict in favor of the 55 opt-in Plaintiffs whose claims were tried as a collective action ("prevailing Plaintiffs").

4.      Due to the ongoing post-judgment proceedings, Goldstein Demchak, Bruckner Burch, and Shellist Lazarz have incurred and will incur additional fees and expenses in this litigation, including but not limited to, the preparation of Plaintiffs' Fees Motion, and will submit a supplemental request for fees and expenses incurred by our firms after June 18, 2009.

### Summary of Legal Education and Directly Relevant Experience and Background

5.      I am a 1981 graduate of the University of California, Hastings College of the Law (San Francisco).  I have been a member of the California State Bar since 1981.  I also have been admitted to practice before the United States District Courts for the Northern, Southern, Central and Eastern Districts of California, as well as the United States Courts of Appeal for the Third, Ninth and Eleventh Circuits.  I was admitted pro hac vice in this Court in this case.  (Dkt. 28)

6.      I have been engaged exclusively in the practice of labor and employment law since 1981.  From 1981 through 1990, I was legal counsel for the Communications Workers of

88079-16

America, AFL-CIO, representing the telecommunications union in the Western United States.  I joined the law firm now known as Goldstein Demchak in 1990, and became a partner in the firm in 1998.  Since joining Goldstein Demchak, I have been engaged nearly entirely in the litigation of employment class actions.

      7.      While at Goldstein Demchak, I have worked on some of the nation's largest employment class actions, including *Kraszewski v. State Farm Gen. Ins. Co*., No. C 79-1261 (N.D. Cal.) (statewide Title VII class action sex discrimination case; settled for $250 million); *Butler v. Home Depot, Inc.*, No. C-94-4335 (N.D. Cal.) (gender discrimination class action that resulted in monetary relief of $87.5 million and injunctive relief covering the western region of Home Depot); *Byrd v. Sprint Corp*., No. CV 92-18979 (Sup. Ct. Missouri) (common law tort and contract class action on behalf of 116,000 individuals who sold long-distance service that resulted in a recovery of $62.5 million); *Babbitt v. Albertson's, Inc*., No. C-92-1883-SBA (N.D. Cal.) (statewide Title VII class action resulting in injunctive relief and $29 million class recovery); *Barnhart v. Safeway* (N.D. Cal.) (statewide Title VII class action); and *Rosenberg v. IBM*, No. 06-00430 PJH (N.D. Cal.) ($65 million class and collective action settlement of overtime claims for technical services workers).

      8.      For the past twelve years or more, my practice has been devoted almost exclusively to complex wage and hour litigation.  During that period, I have been lead or co-lead counsel in numerous wage and hour class and collective actions including:  *Weddle v. Frito Lay, Inc.,* No. C-99-05272 PJH (N.D. Cal.) (statewide class action overtime case brought under state law, resulting in class settlement of $11.9 million); *Harrison v. Enterprise Rent-A-Car,* 1998 WL 422169 (M.D. Fla. 1998) (nationwide Fair Labor Standards Act collective action resulting in $6.2 million settlement with companion case *Elmer v. Enterprise Rent-A-Car*, No. C-98-0l571 VRW (N.D. Cal.)); *Bullock v. Auto. Club of S. Cal.*, No. SACV01-731 GLT, 2002 WL 432003 (C.D. Cal. Jan. 28, 2002) (overtime class and collective action on behalf of sales agents throughout Southern California, Texas and New Mexico resulting in $19.5 million settlement); *Otero v. Rent-A-Center*, No. BC217038 (Los Angeles Sup. Court) (overtime class action

2

resulting in class settlement of $3 million); and *Davis v. The Money Store, Inc*., No. 99AS01716 (Sacramento Sup. Court) ($6 million class settlement of overtime claims).

9.      I also have argued wage/hour cases on appeal, including *Dent v. Cox Communications Las Vegas, Inc.*, 502 F.3d 1141 (9th Cir. 2007) (successful challenge to inadequate DOL WH-58 Release Form) and *Parks v. Eastwood Ins. Svc., Inc.,* No. 05-56119, 2007 WL 1430289 (9th Cir. Apr. 11, 2007) (attorneys' fees affirmance in overtime collective action).

10.      In addition to my litigation practice, I often lecture and write on employment, wage and hour, and class action issues, including presentations at conferences sponsored by the Practicing Law Institute (PLI), the American Bar Association (ABA), and the National Employment Lawyers Association (NELA).  I also am a frequent speaker on the subject of wage/hour litigation at MCLE panels sponsored by, *inter alia*, the American Conference Institute, the California Employment Lawyers Association (CELA), the Minnesota State Bar, and the Colorado Bar Association.

11.      I co-authored *Overtime Pay – Who's Eligible, Who's Not?*, which was published in the California Labor & Employment Law Quarterly (the publication of the California State Bar's Labor and Employment Law Section), and several other law review articles.  I was the Co-Chair of the ABA's Labor and Employment Law Section ("Section") Fair Labor Standards Act Subcommittee (2000-2004), with responsibility for preparing the annual supplement to the ABA/BNA treatise on wage/hour law.  I served as co-chair of the Section's Federal Labor Standards Legislation Committee from 2004 to 2007.  I have served as the Associate Editor and a Senior Editor of BNA Books' *Fair Labor Standards Act*, Cumulative Supplements, and the Senior Editor of BNA Books' *Wage and Hour Laws:*  A State-by-State Survey (2005).  I am currently on the Editorial Board which is preparing a Second Edition of the BNA treatise on the Fair Labor Standards Act.  I have taught at Stanford Law School's Advocacy Skills Workshop and at the University of California Hastings College of the Law (Legal Writing and Research).  I have received an "A-V" rating from Martindale-Hubbell.  In 2004, I was selected to be a Fellow

3

of the College of Labor and Employment Lawyers, a national honorary society.  I have been designated as a "Super Lawyer" and "Best Lawyers in America" for the past several years.

12.    In 2008, I helped write and then appeared as a trainer in an FLSA training DVD produced by the Federal Judicial Council (Washington, D.C.) for federal district court clerks (No. 5065-v/08), entitled "Fair Labor Standards Act."  I have been informed, and so believe, that numerous federal district courts around the country have utilized this DVD in training new law clerks about FLSA litigation.

13.    A true and correct copy of my resume is attached as Exhibit 5 to this Declaration.

### Goldstein Demchak's History And Areas Of Expertise

14.    Goldstein Demchak is a twelve-attorney plaintiffs' complex and class action firm that was founded in 1972, in Oakland, California.

15.    Goldstein Demchak has a national practice.  We have litigated class and collective action lawsuits over the last twenty years in Arizona, Florida, Georgia, Illinois, Missouri, Minnesota, Maryland, New Jersey, New York, Pennsylvania, Tennessee, and Texas, as well as California, where our offices are located.

16.    Goldstein Demchak long has been recognized as one of the leading plaintiffs' class action and employment litigation firms in the country.  *The National Law Journal* listed the firm in its "A National Who's Who of the Top Lawyers in Employment Litigation."  *See* "Bias Law Booms," *The National Law Journal* (July 27, 1992) at 36 (referring to the firm as "[i]n a league of their own").  *Business Week* published an article featuring the class action litigation our firm has accomplished, referring to our firm as the "Swat Team of Bias Law."  More recently, *The Recorder*, in San Francisco, listed all of the firm's partners as among the "top attorneys" in employment law in the San Francisco Bay Area.  Goldstein Demchak partners have been named "Northern California Super Lawyers" every year since 2004.

### Background and Experience of Other Goldstein Demchak Attorneys and Staff Who Worked On This Case.

17.    My firm assigned other well qualified attorneys and staff to work on this case.

4

      a.      Laura L. Ho graduated from Yale Law School in 1994. She has been a member of the California State Bar since 1994, and is also admitted to practice before the United States District Courts for the Northern and Central Districts of California, as well as the United States Courts of Appeal for the Ninth and Tenth Circuits. Ms. Ho was admitted pro hac vice in this Court in this case. (Dkt. 27)

      i.      Ms. Ho clerked for the Honorable John C. Coughenour, Chief Judge of the United States District Court for the Western District of Washington prior to joining Goldstein Demchak in 1998. Ms. Ho became a partner in Goldstein Demchak in 2005.

      ii.      Ms. Ho has substantial employment class action litigation experience. In 2008, she was co-lead trial counsel in *Chau v. Starbucks*, No. GIC 836925 (San Diego Sup. Court), a tip pooling case which, after a bench trial, resulted in a judgment of over $105 million in restitution (plus injunctive relief) for the class of Starbucks' baristas. The judgment was reversed on appeal and plaintiffs are seeking review by the California Supreme Court. In March 2009, Ms. Ho and her trial co-counsel received California Lawyer Attorney of the Year (CLAY) Awards from *California Lawyer* magazine for their work on the *Chau* case.

      iii.      Ms. Ho and I have co-counseled numerous successful wage/hour class actions including, but not limited to: *Mousai v. Eloan, Inc.*, No. 06-01993 SI (N.D. Cal.) ($13.6 million class settlement for misclassified mortgage loan officers); *Lin v. Siebel Sys., Inc.*, No. CIV 435601 (San Mateo Sup. Court) ($27.5 million class action settlement for certified class of over 800 misclassified software engineers); and *Butler v. Countrywide,* No. 268250 (L.A. County (Los Angeles, California) Sup. Court) ($30 million settlement for certified class of 450 mortgage sales agents).

      iv.      Ms. Ho has been *amicus* counsel on appeals of several significant wage/hour cases, including *Sav-on Drug Stores v. Superior Court,* 34 Cal. 4th 319 (2004) and *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575 (2000).

      v.      Ms. Ho also is in high demand as a speaker for MCLE panels on wage/hour litigation and has made presentations to conferences sponsored by the Consumer

Attorneys of San Diego, the American Bar Association's Labor and Employment Law Section's
EEO Committee, the National Employment Lawyers Association, and Bridgeport Continuing
Education.

       vi.     A true and correct copy of Ms. Ho's resume is attached as
Exhibit 6 to this Declaration.

    18.    James Kan is a 2005 graduate of Columbia University Law School.  He joined
Goldstein Demchak in 2005 as the firm's Columbia University Law School Civil Rights Fellow,
and became an associate with the firm two years later at the conclusion of his Fellowship.

       i.     Mr. Kan has been a member of the California State Bar since 2005,
and is also admitted to practice before the United States District Courts for the Northern and
Southern Districts of California, as well as the United States Courts of Appeal for the Fifth
Circuit.  Mr. Kan was admitted pro hac vice in this Court in this case.  (Dkt. 37)

       ii.     Mr. Kan has had extensive deposition, mediation, and oral
advocacy experience prior to his involvement in this case.  He has defended and taken over 30
depositions in his work on multiple cases while working at Goldstein Demchak, including acting
as second chair in the taking of an expert witness deposition.  Mr. Kan has attended six complex
litigation mediations where he has been a principal drafter of various mediation briefs and made
presentations on behalf of plaintiffs.  In addition, Mr. Kan briefed and successfully argued a fee
award appeal before a three judge panel of the First Appellate District for the Court of Appeals
of California on behalf a local non-profit organization client.  *Chinese Progressive Ass'n v.
Wong*, No. A115568, First Appellate District of the Court of Appeal of California (Unpublished
Order April 16, 2008).

       iii.    As the Court is well aware, Mr. Kan was part of the three-attorney
trial team representing Plaintiffs at trial.  During the trial, Mr. Kan actively participated by
presenting direct examination of witnesses, cross-examining defense witnesses, assisting in jury
selection/voir dire, arguing various motions and objections, as well as submitting and contesting
jury charges and instructions.  These responsibilities are typically handled by attorneys of much

more senior status in other firms; however, our firmed believed that Mr. Kan's skills and experience equipped to him to handle and excel at these tasks. Based on the result of the trial, our firm's belief in Mr. Kan appears well deserved.

          iv.    A true and correct copy of Mr. Kan's resume is attached as Exhibit 7 to this Declaration.

    19.    Heather Mills is a 2001 graduate of the University of Minnesota Law School, Twin Cities. She was an associate with Goldstein Demchak from 2006 to 2009. Prior to joining Goldstein Demchak, Ms. Mills was a litigation associate at Levy, Ram & Olson in San Francisco, as well as a judicial extern for U.S. Magistrate Judge Jonathan G. Lebedoff of the United States District Court, District of Minnesota.

    20.    Enrique Martinez is a 1999 graduate of the University of California, Los Angeles School of Law. He has been an associate with Goldstein Demchak since 2006. Prior to joining Goldstein Demchak, Mr. Martinez was a litigation associate at Lieff, Cabraser, Heiman & Bernstein in San Francisco. A true and correct copy of Mr. Martinez' resume is attached as Exhibit 8 to this Declaration.

    21.    Holly Herndon is a 1998 graduate of Boston College Law School. She was an associate with Goldstein Demchak from 2001 to 2008. Prior to joining Goldstein Demchak, Ms. Herndon was a litigation associate at Gursky Law Associates in Providence, Rhode Island.

    22.    Jinny Kim is a 2000 graduate of the University of California, Davis King Hall School of Law. She was an associate with Goldstein Demchak from 2007 to 2008. Prior to joining Goldstein Demchak, Ms. Kim was a litigation associate at Asian Pacific Islander Legal Outreach and Schneider & Wallace in San Francisco.

    23.    Jacqueline Thompson, Wendy Whitt, and Scott Grimes are the Goldstein Demchak Senior Paralegals who were assigned to this case. Each of them has been with Goldstein Demchak and worked exclusively on the firm's class action cases for twenty years or longer. Because of the significant paralegal experience Ms. Thompson, Ms. Whitt, and Mr. Grimes have, they are able to handle assignments that in defense side firms are handled by junior

attorneys at higher billing rates.  In addition to his significant paralegal experience, Mr. Grimes also has a Masters Degree in Statistics from California State University at Hayward.  Mr. Grimes is qualified and able to calculate class and individual plaintiff damages – as he did in this case – thereby obviating the need in many cases for our firm to retain outside, and expensive, statistical consultants.

### Goldstein Demchak's Involvement In This Case

24.     I had discussions with Martin Shellist about this case beginning in January 2005, before the case was filed.  I continued to consult with Mr. Shellist and his co-counsel Richard (Rex) Burch on the legal and factual issues in the case throughout 2005, and the first half of 2006.  In July 2006, Mr. Shellist informed me that it was likely that Brinker would not oppose Plaintiffs' motion for class notice and he requested that Goldstein Demchak associate as co-counsel with him and Mr. Burch.  Mr. Shellist explained that given the sizeable potential opt-in class, Brinker's anticipated vigorous defense, and the novel and difficult issues this case raised, he and Mr. Burch would need additional resources as well Goldstein Demchak's wage and hour litigation experience and expertise.  After reviewing the case file and further consultations with Messrs. Shellist and Burch, Goldstein Demchak agreed to associate as co-counsel for Plaintiffs.

25.     Based upon my firm's preliminary assessment of the factual and legal issues involved in, and the procedural posture of, the case it was evident that a decision by my firm to get involved in the case would require a commitment of significant resources to effectively manage the likely sizeable opt-in class, defend against Brinker's inevitable decertification motion and other pre-trial motions, prepare the case for trial, and try the case.

26.     While Ms. Ho and I did not formally enter appearances in the case until February 9, 2007 (Dkts. 25 and 26, respectively), we began working with Messrs. Shellist and Burch as soon as we agreed to co-counsel with them  For example, as my firm's time records reveal, from September 2006 though January 2007, Goldstein Demchak reviewed and edited the proposed class notice, assisted in identifying and selecting a third party administrator to oversee the notice mailing process, assisted in setting up a database to track opt-in Plaintiffs, and assisted in

8

developing a questionnaire to use in interviewing opt-in Plaintiffs and capture information relevant to the claims and issues in the case.  *See* Exh. 3 at 1-5.  During the opt-in period as class members submitted their consent to join forms (ultimately totaling over 3,500 opt-in plaintiffs), Goldstein Demchak paralegals began to contact and interview them by phone, and enter relevant data regarding each opt-in into the database.  *Id.*  This process laid the groundwork for the selection of the 55 opt-in Plaintiffs who ultimately succeeded at trial.

***The Extensive and Protracted Discovery***

27.     Initially, the Court entered an order setting the close of discovery for March 31, 2007, and the case for trial on August 6, 2007 (Dkt. 17); however, those dates were revised several times during the course of the litigation and included several extensions for discovery made at Defendant's request.  (Dkts. 41 and 54)

28.     Discovery was extensive and contentious.  Numerous disputes arose over Brinker's production of documents, scheduling of depositions, and other issues.  Plaintiffs' legal team spent considerable time attempting to resolve these disputes informally and, eventually, through threatened or filed motions to compel.

29.     Plaintiffs' legal team spent a significant portion of the extended discovery period defending and attending depositions of opt-in Plaintiffs and related witnesses, such as managers, QAs, or other servers who worked at the same restaurants as the opt-in Plaintiffs.

30.     In total, the parties took 120 depositions which were conducted in 26 states. These depositions, with few exceptions, *see* ¶ 31 below, were related to development of the evidentiary record linked to the claims of the 55 prevailing Plaintiffs and included depositions of these 55 Plaintiffs, witnesses who were employed in the same stores as them, corporate witnesses who provided testimony regarding the company's tipping policies and practices, and Brinker's expert witness.

31.     Through the depositions, Plaintiffs learned that tip-pooling practices in Chili's stores in Colorado were not similar to the practices in other states.  Therefore, in the exercise of billing judgment, I have deleted from Goldstein Demchak's time records entries for work in

9

connection with the Colorado depositions.  I also have deleted costs related to these depositions from Goldstein Demchak's bill of costs.

32.     Plaintiffs' counsel spent a substantial amount of time covering the 120 depositions due their large number, their disparate locations all across the nation, and the short window of time to complete them.  Notably, Brinker noticed all but six of these depositions and scheduled the vast majority of them in the four month period between August 1, 2007 and December 1, 2007.  Because of the large number of depositions scheduled in a compressed time period all over the country, it not only was necessary for all of the attorneys on Plaintiffs' legal team to cover the depositions, but it also was necessary for us to recruit other lawyers and law firms throughout the country to assist us in covering these depositions.  Plaintiffs retained local counsel to cover as many of these depositions as possible in order to reduce travel costs.

33.     I, along with Rex Burch, took the lead in recruiting these attorneys.  In all, we were able to recruit several firms to assist us.  Many of these firms agreed to assist us on a contingency basis.  The fees incurred and sought by these firms are documented in the Declarations of Yvette D. Daniels, Loren Donnell, George Hanson, Alan Kansas, Bradley Malberg, Meredith Mathews, John C. Philo, William B. Ryan, Charles P. Yezbak, and Katherine Young, which are filed with this Motion.[1]

34.     Brinker designated William Michael Lynn, Ph.D. as its expert witness and produced a report (Dkt. 30) and revised report of Dr. Lynn (Dkt. 83).  I deposed Dr. Lynn twice with both sessions lasting two days.  Subsequently, Plaintiffs successfully moved to exclude Dr. Lynn's testimony.  *See* ¶ 47, *infra.*  I took primary responsibility for all work related to the expert witness (Dr. Lynn), and handled all of this aspect of the case personally (with the exception of some assistance from Ms. Kim on the *Daubert* briefing).

---

[1] One of the attorneys we recruited (Scott Moss) covered depositions in Colorado only. Plaintiffs do not seek payment of fees and costs for these depositions.  *See* ¶¶ 31, 63(d), *infra*. The fees and costs for Harper Gerlach shall be addressed by fee motion of Bruckner Burch.

35.     Brinker also produced for inspection thousands of pages of documents in response to Plaintiffs' document requests which Plaintiffs' legal team reviewed and analyzed.  In much of this discovery, Brinker raised objections or conditions on document production that substantially increased the burdens and time required of Plaintiffs' legal team to complete the review, and ultimately required Plaintiffs to bring a  motion to compel on which they prevailed.  (Dkt. 117 and March 25, 2008 Hearing.)

36.     Plaintiffs' legal team also spent considerable time interviewing and gathering information from the opt-in Plaintiffs to identify potential trial witnesses as ordered by the Court. Dkts. 51-53 and July 9, 2007 Minute Entry.  This selection and assessment process ultimately led Plaintiffs' counsel to identify the 55 prevailing Plaintiffs.

### *Denial of Defendant's Motion for Summary Judgment*

37.     On December 17, 2007, after discovery closed, Brinker filed a motion for summary judgment asserting that there was no genuine issue of material fact that Quality Assurance employees ("QAs") were eligible to participate in a mandatory tip pool under the FLSA.  (Dkt. 82)  Plaintiffs opposed the motion and argued that QAs had minimal to no contact with customers and their primary duties were not customer service functions.  (Dkt. 105)

38.     On July 9, 2008, the Court denied Brinker's motion, finding that there were issues of material fact regarding whether QAs were eligible to participate in a mandatory tip pool and holding that "a reasonable jury could find that QAs had only minimal direct interaction with customers" and that their duties were "more akin to those of the food preparation duties" than "customer service."  (Dkt. 162 at 21-22)

39.     Plaintiffs' legal team spent considerable time responding to the motion for summary judgment.  The Court's ruling on this motion clearly benefitted all of the opt-in Plaintiffs, including those whose claims ultimately were dismissed without prejudice, as well as and, more significantly, the 55 prevailing Plaintiffs.  In fact, the focus of the inquiry on this critical motion was the evidentiary record developed in discovery as to the 55 prevailing Plaintiffs.

11

88079-16

***Partial Denial of Defendant's Motion to Decertify***

40.     On December 17, 2007, the same day it filed its motion for summary judgment, Brinker also filed a motion to decertify the FLSA class in which it argued that the 3,500 opt-in Plaintiffs were not similarly situated, asserting the need for individualized proof of QA job duties as well as coercion to share tips with QAs.  (Dkt. 65)  Brinker also contended that certification was improper because Plaintiffs' claims presented a novel theory of liability and lacked clear Fifth Circuit precedent addressing tip pool eligibility of QAs.  (*Id.* at 24-25)

41.     Plaintiffs filed their opposition to the motion to decertify on February 11, 2008.  (Dkt. 103)  In opposing the motion, Plaintiffs cited the similarity of QA job duties nation-wide, the uniformity of coercion testimony presented by the deposed opt-ins, the appropriateness of using representative testimony from this sampling, company documents reflecting a policy of coercion, and managers' economic incentive to coerce tip sharing.  *Id.*  In addition, Plaintiffs submitted, at the Court's request, a trial plan describing how they proposed to manage the trial of the 3,500 opt-in Plaintiffs.  (Dkt. 154)

42.     The Court addressed, but did not rule on, the motion to decertify in its July 9, 2008 order denying Brinker's summary judgment motion.  (Dkt. 162)  The Court noted that certification of the class on the issue of tip pool eligibility was proper because a jury could "determine that QAs generally are or are not eligible to participate in a mandatory tip pool" based the strong evidentiary record showing that QA duties were generally the same.  (July 9, 2008 Hearing Tr. at 33)  The Court found that the deposed opt-in Plaintiffs were similarly situated because they presented evidence of being coerced to share tips with QAs.  In doing so, the Court decided that a tip pool was voluntary, only if it was "free from coercion whatever" – consistent with the Department of Labor's interpretation.  However, the Court expressed hesitation regarding its ability to treat the deposed opt-ins as representatives of the entire class. Thus, the Court delayed its ruling on the motion to decertify to allow Plaintiffs to submit a revised trial plan on the issue of coercion.

43.    On August 8, 2008, Plaintiffs submitted a revised trial plan based upon established Fifth Circuit authority regarding trial management of mass tort action cases.  (Dkt. 166)  Defendant's opposed Plaintiffs' revised trial plan and continued to seek dismissal of all opt-in Plaintiffs.  (Dkt. 167)

44.    On September 30, 2008, the Court rejected Plaintiffs' revised trial plan, and granted in part Brinker's motion to decertify.  (Dkt. 172)  Although Brinker's motion to decertify was directed toward all of the opt-in Plaintiffs, the Court reiterated that the 55 deposed opt-in Plaintiffs were similarly situated as it had previously found.  *Id*. at 5-6.  Nevertheless, the Court deferred its determination of whether the deposed opt-ins and the non-deposed opt-in Plaintiffs who worked at the deposed Plaintiffs' stores were similarly situated, pending further briefing by the parties.  *Id*.  The Court granted the motion as to all other opt-in Plaintiffs and dismissed their claims without prejudice.  *Id*.

45.    Following further briefing, the Court, on January 26, 2009, denied Brinker's motion to decertify with respect to the 55 deposed opt-in Plaintiffs, but dismissed the opt-in Plaintiffs who worked at their stores or under various regional standards.  (Dkt. 197) Accordingly, the 55 opt-in Plaintiffs who had been the focus of the discovery proceeded to trial as part of a FLSA collective action.

46.    My firm took the lead in briefing the opposition to Brinker's decertification motion.  Plaintiffs' legal team spent considerable time responding to the motion to decertify and the additional briefing the Court requested.  The Court's ultimate ruling on this motion clearly benefitted the 55 prevailing Plaintiffs.  However, I recognize that the briefing on the non-deposed, same store opt-in Plaintiffs and Plaintiffs' supplemental briefing as to the scope of the decertification order did not necessarily advance the claims of the 55 prevailing Plaintiffs – although in its responsive briefs, Brinker continued to argue that the 55 prevailing Plaintiffs should be decertified, and therefore, Plaintiffs' briefing preserved these Plaintiffs' claims – and I have exercised billing judgment by deleting time and costs my firm billed in connection with

13

briefing on the non-deposed, same store opt-in Plaintiffs and the scope of the decertification order.  *See* ¶ 63(d), *infra.*

### Plaintiffs' Successful Daubert Motion

47.    On February 14, 2008, Plaintiffs moved to exclude the expert reports of Professor Lynn (Dkt. 114) on the ground that his methodology was unsound, that he was not qualified in the area of expertise for which he was offered, and thus, his opinions were not reliable and would not assist the jury as required by Federal Rule of Evidence 702.  I took the lead in researching and drafting this motion, which the Court granted on July 9, 2008.  (Dkt. 162).  While this motion was brought in the context of Brinker's motions for summary judgment and decertification, which were consolidated for hearing, the Court's ruling on the *Daubert* motion benefited the 55 prevailing Plaintiffs and the time related to the review of Brinker's expert's report, deposing Brinker's expert and bringing the successful *Daubert* motion cannot be segregated between the 55 prevailing Plaintiffs and the opt-in Plaintiffs who ultimately were dismissed.

### Plaintiffs' Motion to Intervene

48.    Following the Court's September 30, 2008 decertification order, Plaintiffs moved to intervene several hundred dismissed opt-in Plaintiffs.  (Dkt. 183)  The Court denied this motion.  (Dkt. 197)  I have deleted the time and costs Goldstein Demchak spent on this motion because in my judgment, the work on this motion did not advance the claims of the prevailing Plaintiffs.  *See* ¶ 63(d), *infra*.

49.    In connection with this motion, Plaintiffs also filed a motion to toll the statute of limitations for the dismissed opt-ins (Dkt. 173), which the Court granted.  (Dkt. 182)  I have deleted Goldstein Demchak's time spent on this motion because it did not directly advance the claims of the prevailing Plaintiffs despite the benefit conferred on the dismissed opt-in plaintiffs.

### Trial and Post-Trial Briefing

50.    The case was tried on a representative basis to a jury over two weeks from March 9, 2009 through March 23, 2009.  Plaintiffs presented testimony of 12 of the 55 Plaintiffs

in person and two (2) by video conference; Plaintiffs also relied on company document exhibits and corporate witness testimony.  Defendants presented six witnesses by deposition and nine live, including a corporate representative witness.

51.    Prior to trial, the parties negotiated a stipulation on the amount of Plaintiffs' total back pay if they prevailed at trial, a three-year statute of limitations, and that Brinker waived its good faith defense to liquidated damages.  (Dkt. 274)  In addition, Brinker conceded that it coerced all 14 representative trial witnesses to share tips with QAs.

52.    The jury returned a verdict for Plaintiffs – finding that all 55 Plaintiffs were similarly situated on the issue of QA job duties and that based on those duties, Brinker maintained an illegal mandatory tip pool because QAs were not tip pool eligible.  The issue of coercion was reserved for the Court, which, on April 29, 2009, held that Brinker's concession of coercion as to the 14 representative trial witnesses could be extrapolated to the remaining Plaintiffs due to their similarly situated status.  (Dkt. 295 at 6)

53.    Plaintiffs' legal team staffed the trial leanly.  Mr. Kan from Goldstein Demchak participated in the trial, rather than a more senior Goldstein Demchak attorney.  I made this decision both because of my confidence in Mr. Kan's skills and abilities, and also to minimize Goldstein Demchak's fees.  I provided back up support for the trial team from my office in Oakland, California during the trial.

54.    Brinker filed a number of pre- and post-trial motions, including motions in limine (Dkts. 212, 222, 226, 233, 257), a motion for a mistrial (Dkt. 251) and several renewed motions for decertification and judgment as a matter of law (Dkts. 276, 290).  These motions – all of which were denied by the Court – nonetheless required the expenditure of considerable attorney and staff resources.  On July 2, 2009, Brinker filed yet another motion again reiterating its request for decertification and judgment as a matter of law repeatedly rejected by this Court. (Dkt. 301)  That motion was recently denied by the Court.  (Dkt. 305)

55.    On June 18, 2009, the Court entered judgment in favor of Plaintiffs and ruled that they were entitled to an aggregate monetary award of $271,878.04, which included the maximum

three year statute of limitations and all unpaid minimum wages as well as liquidated damages. (Dkt. 298)  Thus, the 55 Plaintiffs whose claims were tried obtained all relief for which they were eligible.[2]

### Goldstein Demchak's Attorneys' Fees, Costs, and Expenses

56.     Goldstein Demchak seeks payment of $1,022,810.00 for attorneys' fees through June 18, 2009, $43,154.60 for reimbursement of taxable costs and $118,048.99 for reimbursement of all other litigation-related expenses advanced through June 18, 2009, for a total payment of $1,184,013.59.  A summary of Goldstein Demchak's requested attorneys' fees and costs is attached as Exhibit 1.

57.     Goldstein Demchak actually expended 6,009.20 attorney and staff hours prosecuting this case through June 18, 2009.  I have adjusted Goldstein Demchak's lodestar hours to reflect billing judgment, *see* ¶ 63, below, and seek payment for hours reasonably and necessarily expended.

### Factors Supporting Plaintiffs' Fees Request

### Reasonableness of Hours

58.     The complete, detailed contemporaneous time records of all Goldstein Demchak attorneys, paralegals, and other timekeepers who billed legal services to this case and for which payment is sought are appended as Exhibit 3 to this Declaration.

59.     The complete detailed contemporaneous time records of all attorneys and other timekeepers with Bruckner Burch who billed legal services to this case and for which payment is sought are attached to Mr. Burch's Declaration, which is filed contemporaneously with Plaintiffs' Fees Motion.

---

[2] Prior to the commencement of trial, Plaintiffs voluntarily dismissed the claims of Tammy Parsons from Colorado.  As I note elsewhere in this Declaration, I have deleted time and costs Plaintiffs' legal team incurred on the Colorado depositions.  *See* ¶¶ 31, 63(d).

60.     The complete detailed contemporaneous time records of all attorneys and other timekeepers with Shellist Lazarz who billed legal services to this case and for which payment is sought are attached to Mr. Shellist's Declaration, which is filed contemporaneously with Plaintiffs' Fees Motion.

61.     The complete detailed contemporaneous time records of all attorneys and other timekeepers with ten law firms that were recruited to assist with deposition coverage, and for which payment is sought, are attached to the Declarations of Yvette D. Daniels, Loren Donnell, George Hanson, Alan Kansas, Bradley Malberg, Meredith Mathews, John C. Philo, William B. Ryan, Charles P. Yezbak, and Katherine Young, which are collected in an Appendix of Attorney Declarations filed herewith.[3]  A summary of their requested attorneys' fees and litigation costs is attached as Exhibit 2.

62.     As the lead counsel from my firm in this case, I have reviewed Goldstein Demchak's time records described above and certify to the Court that these records reflect work reasonably and necessarily performed by Goldstein Demchak in connection with the litigation of this case.

63.     ***Exercise of Billing Judgment***:

a.     Due to the contingent nature of this demanding case, Goldstein Demchak, has had enormous incentive to litigate the case as economically and efficiently as possible.  We have attempted at all times to allocate and coordinate work assignments among attorneys and staff so as to promote efficiencies and avoid unnecessary duplication.

b.     I believe all of the time Goldstein Demchak billed to the case was appropriate and reasonable.  Nevertheless, in reviewing Goldstein Demchak's time records in preparation for this fee motion, I exercised billing judgment and deleted 1,360.30 hours of

---

[3] Although Plaintiffs recruited another attorney to assist with deposition coverage, that attorney (Scott Moss) covered depositions in Colorado only.  Plaintiffs do not seek payment of fees and costs for these depositions.  *See* ¶¶ 31, 63(d), *infra*.  Furthermore, the fees and costs incurred by Harper Gerlach in covering depositions will be addressed in the fee motion of Mr. Burch.

17

attorney and staff time that originally had been billed to the case. This represents 23% of the time my firm actually spent on the case. Goldstein Demchak has further exercised billing judgment by seeking rates lower than their customary rates in this case for reasons I discuss in paragraph 66 below.

        c.    I am informed that Bruckner Burch and Shellist Lazarz also exercised billing judgment as reflected in the Declarations of Mr. Burch and Mr. Shellist which are filed contemporaneously with Plaintiffs' Fees Motion.

        d.    Goldstein Demchak's deleted time includes:

        i.    All time billed by my firm for consultation with Messrs. Shellist and Burch regarding the legal and factual issues involved in this case and litigation strategy from January 1, 2005 through June 2006 (*i.e.*, 18 months).

        ii.    Time spent in connection with the Colorado depositions.[4] *See* ¶ 31, *supra*.

        iii.    Time spent related to the unsuccessful motion to intervene and successful motion to toll statute of limitations.[5] *See* ¶¶ 48-49, *supra*.

        iv.    Time spent between July 9, 2008 and September 8, 2008 on the development of a revised trial plan (which the Court ultimately rejected) to address whether all 3,500 opt-in plaintiffs could adjudicate their claims collectively despite the fact that this briefing led to the Court's denial of decertification as to the prevailing Plaintiffs.[6]

        v.    Time spent related to supplemental briefing as to the scope of the decertification order between September 9, 2008 and January 25, 2009 addressing whether non-

---

[4] Goldstein Demchak also has exercised billing judgment as to costs associated with this time.

[5] Goldstein Demchak also has exercised billing judgment as to computer research and other costs associated with this time.

[6] Goldstein Demchak also has exercised billing judgment as to computer research and other costs associated with this time.

deposed same store opt-in Plaintiffs were similarly situated to the 55 prevailing Plaintiffs, despite the fact that this briefing led to the Court's denial of decertification as to the prevailing Plaintiffs.[7]

       vi.    Time spent on preparing and mailing notice to the dismissed class members following the Court's order partially granting Brinker's motion to decertify.[8]

       vii.    Time spent on matters that, in my judgment, may appear to have been peripherally, but not directly, related to the legal theories and/or factual claims of the case.

       viii.    Time spent on research of other possible legal claims (including state law claims) Plaintiffs considered bringing, but ultimately did not bring.

       ix.    Time that, in my judgment, may appear in hindsight to have been unproductive or unnecessarily duplicative of work performed by others.

       x.    Time of timekeepers whose work, while necessary and productive, amounted to relatively small individual amounts (*i.e.*, ten (10) or fewer hours per timekeeper).

       e.    In exercising billing judgment, I did not delete all of the time my firm spent on defending Brinker's decertification motion, notwithstanding that the Court ultimately granted the motion as to all but the 55 prevailing Plaintiffs (Dkt. 197), because the time spent in defending that motion was necessary to the successful preservation of the legal claims of those 55 opt-in Plaintiffs. Therefore, the claims of the prevailing Plaintiffs and the opt-in Plaintiffs who were dismissed were joined by "related legal theories," which [are] compensable under *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). Moreover, the claims of the non-deposed opt-in Plaintiffs were dismissed without prejudice and therefore, they were free to pursue their individual or other collective claims in other courts. Some of these individuals, in fact, have filed separate lawsuits.

---

[7] Goldstein Demchak also has exercised billing judgment as to computer research and other costs associated with this time.

[8] Goldstein Demchak also has exercised billing judgment as to costs associated with this time.

f.      Additionally, I did not delete all of the time my firm spent gathering information from, and responding to, opt-in class members because it was through this process that the prevailing 55 opt-in Plaintiffs were identified.

g.      Likewise, I have not deleted time spent on losing arguments lodged in support of successful claims.  So, for example, I did not delete time spent on work related to Plaintiffs' motions in limine, which the Court denied in part or in whole, because, in my judgment, this work was done in pursuit of, and related to, Plaintiffs' successful claims.

### *Reasonableness of Hourly Rates*

64.      Goldstein Demchak has a uniform set of current hourly rates which are based on prevailing market rates for attorneys and paralegals of comparable levels of experience at law firms of comparable reputation and experience.  Goldstein Demchak examines its hourly rate structure annually and, in doing so, consults with attorneys who handle complex and class action litigation.  In addition, through the many fee litigation matters in which Goldstein Demchak has participated, my firm has obtained extensive information regarding billing rates and practices of both plaintiff and defense-side attorneys and law firms who handle complex and class action litigation.

65.      Goldstein Demchak's customary hourly rates, which for the attorneys who worked on this case currently range from $340-650 an hour and from $125-195 an hour for paralegals and other support staff, are consistent with the market rates for law firms like mine that practice large complex and class action litigation nationally.  Based upon information and belief, they also are consistent with rates of comparable firms in the Houston legal market.

66.      In this case, however, Goldstein Demchak is seeking hourly rates lower than their customary billing rates.  Goldstein Demchak seeks reimbursement at hourly rates lower than their customary rates in this case only and not as a concession that our customary rates are not reasonable or consistent with the Houston market.  The reasons Goldstein Demchak is seeking reimbursement at lower rates in this case are:

a.      Although Bruckner Burch and Shellist Lazarz sought the assistance of Goldstein Demchak because of my firm's experience and expertise in litigating wage and hour collective and class actions and my experience co-counseling other cases with Mr. Burch, Bruckner Burch, Shellist Lazarz, and I are aware of other Houston and Texas law firms and attorneys who handle complex wage and hour litigation who were able and willing to litigate this case with Bruckner Burch and Shellist Lazarz.

b.      Messrs. Burch and Shellist are both experienced wage and hour collective action litigators, who have successfully litigated and resolved numerous such cases.

c.      Unlike other cases in which my firm has associated with local counsel, both Messrs. Burch and Shellist remained active throughout the litigation and took the lead in the trial of the collective action.

d.      Thus, under these circumstances, unique to this case, and in a further exercise of billing judgment, I believe it is appropriate that Goldstein Demchak seek reimbursement at lower than our customary hourly rates.

67.     Goldstein Demchak's customary 2009 billing rates and the rates we are seeking in this case for the attorneys and paralegals who worked on this case are shown below:

| Timekeeper | 2009 Customary Hourly Rate | Rate Sought in This Case |
|------------|----------------------------|--------------------------|
| David Borgen | $650 | $550 |
| Laura Ho | $550 | $475 |
| Associates | $325 – 495 depending on year of law school graduation | $275 |
| Senior Paralegals | $195 | $150 |
| Paralegals | $150-175 | $125 |

68.     I believe the rates Goldstein Demchak seeks in this case are reasonable as demonstrated by the following.

69.     Goldstein Demchak's hourly rates have been approved by numerous state and federal courts, including in the following matters: *Turner v. American Ass'n of Med. Colleges*,

21

88079-16

No. RG04-166148, (Alameda County (Oakland, California) Sup. Court, Dec. 28, 2006) Order

Granting Motion for Plaintiffs' Attorneys' Fees and Costs (awarding Goldstein Demchak's 2006

rates in a case challenging the application of the MCAT to test-takers with learning disabilities);

*Butler v. Countrywide Home Loans, Inc.*, No. 268250 (L.A. County (Los Angles, California)

Sup. Ct., June 27, 2005) (wage and hour class action, approving Goldstein Demchak's 2005

hourly rates for attorneys and paralegals); *Mitchell v. Metro Life Ins. Co., dba MetLife*, No. 01-

CIV-2112 (WHP) (S.D.N.Y. November, 2003) (Order approving plaintiffs' attorneys' fees in

class action gender discrimination case in which the court found plaintiffs' counsel's rates to be

"reasonable because they are consistent with the market rates of lawyers with comparable skills,

experience and reputations in this community, the Southern District of New York, and nationally

among lawyers who litigate complex class action employment cases throughout the country.");

*Byrd v. Sprint*, Case No. CV92-18979 (Jackson County (Kansas City, Missouri) Sup. Court, June

20, 1998) Order Certifying Cause as Class Action, Approving Stipulation of Settlement, Denying

Application to Intervene and Awarding Attorney Fees, Costs and Expenses, finding Goldstein

Demchak's "billing rates are within the market rates applicable for attorneys specializing in

complex class action litigation practicing in a national market."); *Camalo v. Macy's West, Inc.*,

No. C98-02350 MHP (N.D. Cal.); *Shores v. Publix, Inc.*, No. 95-1162-CIV (M.D. Fla.); *Butler v.

Home Depot*, *Inc.*, No. C94-4335 SI (N.D. Cal.).

      70.    ***Houston Market Rates:***  Attached to this Declaration as Exhibit 9 is the Amended

Declaration of Christopher V. Bacon, Counsel to Vinson & Elkins, ("V&E Fees Decl.") which

was produced to my firm on January 15, 2009 pursuant to court order in *McClain v. Lufkin

Industries, Inc.*, No. 9:97-cv-063 (E.D. Tex.), an employment discrimination class action in

which my firm represents the plaintiff class and the defendant is represented by the Houston

office of Vinson & Elkins ("V&E).

           a.    Based upon information contained in the V&E Fees Declaration and

information on V&E's firm website, V&E's hourly rates for the services of its attorneys,

paralegals, and other timekeepers appear to be comparable to, if not slightly higher than, the

customary billing rates of Goldstein Demchak. Importantly, V&E's hourly rates are materially higher than the reduced rates sought by Goldstein Demchak in this case.

        b.      According to V&E's website, Douglas E. Hamel, who is a V&E partner and like I, specializes in labor and employment law (albeit from the defense side) and handles class actions, graduated from law school in 1976, and appears to have engaged in law practice ever since then.[9] Mr. Hamel's experience thus is generally comparable to mine. Mr. Hamel's billing rate is higher than mine – $675 compared to my customary rate of $650 per hour and requested rate of $550 per hour. *See* V&E Fees Decl. p. 2.

        c.      According to V&E's website, V&E partner Gwendolyn Samora graduated from law school in 1992.[10] Ms. Samora, like Ms. Ho, clerked for a federal judge following graduation from law school. Ms. Samora's experience thus is generally comparable to Ms. Ho's. However, Ms. Samora's billing rate is considerably higher than Ms. Ho's – $625 compared to Ms. Ho's customary rate of $550 per hour and requested rate of $475 per hour. *See* V&E Fees Decl. p. 2.

        d.      According to V&E's website, V&E associate Corey Devine graduated from law school in 2006.[11] Mr. Devine thus has one year less experience than Mr. Kan. Mr. Devine's billing rate of $280 is higher than Mr. Kan's requested rate of $275. *See* V&E Fees Decl. p. 2. Not only is Mr. Kan more senior than Mr. Devine, but he has had extensive deposition and oral advocacy experience that associates with comparable years of experience at firms like V&E rarely get. *See* ¶ 18, *supra*. Additionally, as the Court is aware, Mr. Kan logged a significant number of hours in trial preparation and at the trial of this case, as is reflected in the detailed time records attached to this Declaration as Ex. 3 and summary chart attached as Ex. 1

---

[9] http://www.velaw.com/lawyers/DouglasHamel.aspx

[10] http://www.velaw.com/lawyers/GwendolynSamora.aspx

[11] http://www.velaw.com/lawyers/lawyer_detail.aspx?id=1656

to this declaration. Mr. Kan's considerable experience relative to his years as an attorney, justifies his customary billing rate and clearly supports his requested rate of $275 per hour.

71.    Jacqueline Thompson, Wendy Whitt, and Scott Grimes are the Goldstein Demchak Senior Paralegals who were assigned to this case. Each has 20 or more years of experience as paralegals in leading paralegal teams and coordinating with Goldstein Demchak and co-counsel lawyers on large and complex employment class action cases. Their current customary rate is $195 per hour and their requested rate is $150 per hour. The V&E Fees Decl. shows that the 2009 hourly rates for three V&E paralegals –Beverly Palmer, Donna Marsh, and Carolyn Wood – are $200, $280, and $230, respectively. V&E Fees Decl., p. 2. In addition, the "Current [*i.e.*, 2009] Rate if Still Employed" for four other V&E paralegals – Carol Green, Connie Brown, Christianne Chambers, and Dawn Crider – would be $245 to $280 per hour. *Id.*

72.    Goldstein Demchak assigned several other paralegals to this case who were not "Lead Paralegals," with the most hours being logged by Natasha Gurtner and Damon Valdez. Their current customary rate is $150 per hour and their requested rate is $125 per hour. These individuals and most of the other paralegals employed by our firm who were assigned to this case have at a minimum several years of experience as paralegals working on employment class actions. The V&E Fees Decl. shows that the hourly rates for at least three other V&E paralegals – Penny Milbouer, Jean Altom, and Patricia Rios – are $160 to $185 at the (unspecified) times in the past when they were still employed by V&E. *See* V&E Fees Decl., p. 2. Based on the paralegal billing information summarized in this paragraph and the preceding paragraph, it appears that V&E's hourly rates for paralegal time are significantly higher than those sought to be recovered by Plaintiffs in their Fees Motion.

73.    In addition to the V&E rates, I also am informed that the 2009 hourly rate of a senior litigation partner at Seyfarth Shaw's Houston office is $565.

74.    A 2004 survey of the *National Law Journal* found that the mean (median) partner hourly billing rate for the Houston office of Andrews & Kurth was $503, and the mean hourly billing rate for an associate in that office was $288. *See* 2004 Firm Mean Billing Rates

24

*(Compiled from a Survey in The National Law Journal, December 2004)*, attached as Exhibit 10 to this Declaration.  This same survey found that the 2004 mean partner hourly billing rate for the Houston office of Bracewell & Patterson was $513 and that firm's mean associate hourly rate was $278.  *Id.*  Finally, the survey found that the 2004 mean partner hourly billing rate for the Houston office of Locke, Liddell & Sapp was $498 and that firm's mean associate hourly rate was $250.  *Id.*  The 2009 hourly billing rates of these firms undoubtedly are higher than their 2004 rates.  For example, even assuming a modest 3% per annum increase, the estimated 2009 Andrews & Kurth's mean partner hourly billing rate would be $583 and its associate billing rate would be $327.  Similarly, assuming a 3% per annum increase, the estimated 2009 Locke, Liddell & Sapp's mean partner hourly billing rate would be $577, and its associate billing rate would be $290.

75.    I am aware that there is a range of reasonable rates in the Houston legal market for attorneys with comparable skills and experience as the Goldstein Demchak attorneys who worked on this case.  I believe that the rates Goldstein Demchak seeks in this case are well within that range and are in fact, significantly lower than many Houston rates.

76.    Goldstein Demchak's combined exercise of billing judgment and lower billing rates has resulted in a significant reduction of Goldstein Demchak's actual lodestar amount in this case as demonstrated below:

a.    Goldstein Demchak's actual lodestar (i.e., all hours billed to the case at our customary hourly rates) is $1,604,442.50.

b.    After exercising billing judgment, I deleted 1,360.3 hours, which at my firm's customary hourly rates would represent $327,488.50, in attorneys' fees and a lodestar of $1,276,954 for 4,648.90 hours.

c.    Recalculating the reduced hours by the reduced hourly rates produces a lodestar of $1,022,810.00, *i.e.*, the amount of fees Goldstein Demchak is seeking, which represents 64% of Goldstein Demchak's actual lodestar in this case.  At the reduced hourly rates, the time deleted for the exercise of billing judgment represents a reduction of $262,505.00.

77.     The hourly rates for Bruckner Burch, Shellist Lazarz, and ten of the recruited law firms are addressed in other Declarations filed contemporaneously with Plaintiffs' Fees Motion.

*Other Factors Supporting Reasonableness of Plaintiffs' Fees*

78.     ***Results Obtained***:  Plaintiffs obtained an exceptional result in defeating Brinker's motion for summary judgment and its motion to decertify the class as to the 55 prevailing Plaintiffs who then obtained a jury verdict and full compensatory relief, including three years back pay and liquidated damages.

79.     ***Novelty And Difficulty Of The Legal Questions Involved***:  This case was one of few nation-wide tip-pooling cases successfully tried in the Fifth Circuit.  It is undisputed that the case involved novel and difficult issues.  As noted above, in its motion to decertify the class Brinker contended that certification was improper because Plaintiffs' claims presented a "novel theory of liability" and lacked clear Fifth Circuit precedent addressing tip pool eligibility of QAs. (Dkt. 65 at 24-25)  In fact, while this case was pending, the court in *Lentz v. Spanky's Rest. II, Inc.*, 491 F. Supp. 2d 663 (N.D. Tex. 2007), an FLSA tip pooling case in which the plaintiff who worked for defendants as a waiter alleged that he and similarly situated waitstaff were required to share their tip pool with "expediters," denied the plaintiff's motion for class certification in part on the ground that "[t]here is no clear precedent in this circuit or any other circuit that defines expediters as employees who do not customarily and regularly receive tips. … To allow certification on a claim that has never been determined as a violation of the FLSA would unnecessarily burden all parties."  491 F. Supp. 2d at 670.  Plaintiffs in this case were successful in obtaining certification of the class of 55 prevailing parties and distinguishing *Lentz* and other cases Brinker cited as applicable.

80.     In addition, defeating Brinker's motion to decertify represents a significant achievement in the FLSA collective action context, which required the considerable skill of Plaintiffs' counsel.  While courts routinely grant conditional certification in FLSA collective actions, the survival of a motion to decertify is a challenge rarely overcome by plaintiffs due to the heightened scrutiny applied at that stage.  *See*, *e.g.*, *Johnson v. Big Lots Stores, Inc.*, 561 F.

26

Supp. 2d 567, 578-79 (E.D. La. 2008) (granting decertification at trial after initially denying motion for decertification at the end of the discovery).  The Court's denial of decertification of the 55 prevailing Plaintiffs also is noteworthy because there were no other published decisions of plaintiffs surviving a motion to decertify in the FLSA tip pooling context at the time of the Court's July Order.

81.     As further evidence of the novelty of issues raised by Plaintiffs' claims, the Court adopted a coercion standard in the context of FLSA tip pools that provided significant clarity to the developing case law surrounding the tip pooling defense of voluntariness.  In deciding the voluntariness affirmative defense, the Court had to determine first the appropriate legal standard for coercion under the FLSA for tip pooling.  Because the FLSA did not provide a statutory definition of the term, the Court had to look to the Department of Labor and only a handful of other courts who had addressed this defense.  The Court ultimately adopted the standard set by the Department of Labor, which interpreted voluntary to mean "free from any coercion whatever."  This objective analysis focused on whether an employer actions "might well" cause employees to share tips.  The Court's interpretation clarified this developing tip pooling defense by explicitly defining a standard consistent not only with the Department of Labor's position, but also with the current practices of the restaurant industry in excluding QAs from mandatory tip pools.

82.     *Undesirability of the Case*:  Based on my personal knowledge and communications with other plaintiffs' class action attorneys nationwide, I am aware of only a few collective action cases that have been brought and successfully withstood decertification in the Fifth Circuit in recent years.  For example, on June 20, 2008, while the parties in this case were briefing Brinker's decertification motion, the court in *Big Lots* entered its order decertifying the class.  *Big Lots* was an FLSA collective action in which the plaintiffs alleged that the defendant had misclassified its store managers and assistant store managers and failed to pay them overtime.  Following notice to the class, approximately 1,000 opt in plaintiffs opted-in to the case.  The court earlier denied *Big Lots*' motion to decertify and the case proceeded to trial.

27

However, at the conclusion of a week long trial, the Court granted the defendant's renewed motion to decertify the class. The court found that instead of plaintiffs building upon their earlier efforts to show similarity among opt-in plaintiffs, the evidence at trial disclosed "substantial variations among the opt-in plaintiffs." *Id*. at 578. Plaintiffs in this case were successful in withstanding Brinker's repeated motions to decertify the class of 55 prevailing Plaintiffs.

83.    In addition to the increasing difficulty of successfully litigating collective class actions in the Fifth Circuit, this case had other elements of undesirability. It was an expensive case to litigate, in particular because of Brinker's insistence in conducting more than 100 depositions across the country. Brinker is a well-financed defendant and was willing to spend whatever it takes for as long as it takes to litigate the case (and apparently still is as demonstrated by its second renewed motion for a new trial filed on July 8, 2009 (Dkt. 301)). Brinker was defended by not one, but two, formidable law firms which combined, have 1,800 attorneys and arguably unlimited resources[12] while Plaintiffs' counsel's three firms have a combined total of 21 attorneys. Few plaintiffs' firms have the resources to go toe-to-toe with such an aggressive and well-financed defendant for several years before a decision on the merits, as was required in this case.

84.    ***Contingency Nature of The Fee***: The reasonableness of Plaintiffs' requested fee is further justified by the fact that Plaintiffs' counsel accepted this case on a contingency basis with no guarantee that any of the fees they incurred or costs they advanced would ever be recovered. My firm's practice is almost exclusively a contingent risk practice. Few of our clients can afford to pay for the legal services or expenses that typically are required to prosecute a major complex or class action against the nation's largest and wealthiest corporations. My firm therefore accepts these cases on a contingent risk basis expecting no payment of our fees or costs

---

[12] *See* http://www.akingump.com/about/overview/ and http://www.hunton.com/home.aspx

unless we prevail in the litigation.  Typically, we anticipate that we will work on some cases for several years without payment and with the risk that we will be paid nothing if we lose. Therefore, it is vital to our practice to be able to anticipate that we will recover our lodestar and all expenses when we prevail.  If we could not obtain such recoveries, when successful, we could not afford to accept and litigate FLSA and other employment class actions at all.

85.    ***Awards In Similar Cases***:  My firm has been awarded attorneys' fees in other cases that are consistent with the rates sought in this case.  *See* ¶ 66, *supra*.

86.    ***Customary Fee for Goldstein Demchak's Services***:  My firm also charges and receives payment from the few paying clients that we have (*i.e.*, in non-contingency cases) based upon the same hourly rates presented to the Court with this Motion.  Since 1998, my firm has represented several corporate clients which wish to have their identities remain confidential, which have retained our services for which they paid our current hourly rates.  In addition to these matters, I have been retained and paid my regular billing rate by the Popham Law Firm of Kansas City, Missouri to serve as an expert witness in *Williams v. Sprint*, No. 03-2200-JWL-DJW (D. Kan.), a collective action brought under the Age Discrimination in Employment Act.  I also was paid my full hourly billing rate by the Thierman Law Firm (Reno, NV) and Hoffman & Lazear (Oakland, CA), for representing them in two arbitrations before JAMS arbitrators (retired judges) in San Francisco, CA in 2008, regarding class action attorneys' fees allocation disputes arising from the settlement of several related wage/hour class actions.

*Goldstein Demchak's Costs and Expenses Are Reasonable and Compensable*.

87.    Goldstein Demchak, along with ten of the recruited law firms, has submitted a separate Bill of Costs pursuant to 28 U.S.C § 1920, for $43,154.60 in taxable costs that include filing and other court fees, transcript costs, service of process fees, witness fees and disbursements, and expenses for photocopies of documents related to the case.  A detailed statement of these costs is provided in the Bill of Taxable Costs filed together with Plaintiffs' Fees Motion.  As I note in paragraph 63(d) above, I have exercised billing judgment by deleting

29

costs associated with the activities for which I have reduced Goldstein Demchak's hours.  In all, I have deleted $910.77 in taxable costs Goldstein Demchak actually incurred.

88.    A summary detailing the $118,048.99 in additional litigation-related costs and expenses that my firm incurred through June 18, 2009, for which reimbursement is sought pursuant to Federal Rule of Civil Procedure 54(b), is attached as Exhibit 1.  The underlying documentation associated with these costs and expenses is included in Exhibit 4, attached to this Declaration.  I have exercised billing judgment by deleting costs associated with the activities for which I have reduced Goldstein Demchak's hours.  In all, I have deleted $11,629.16 in litigation related expenses Goldstein Demchak actually incurred.  Documentation of the non-taxable litigation costs for which Bruckner Burch, Shellist Lazarz, and the law firms who were recruited to assist with deposition coverage, seek reimbursement are attached to Mr. Burch's, Mr. Shellist's, and other Declarations filed contemporaneously with Plaintiffs' Fees Motion.  These costs and expenses are those that attorneys normally and routinely bill to their clients and are necessary components of the reasonable fee Plaintiffs seek.  These costs have been advanced by Plaintiffs' counsel and reimbursement of them is strictly contingent on an award of payment of them by Brinker.  The specific costs and expenses include:

89.    *Copying Costs*:  Goldstein Demchak incurred costs associated with in-house copying of case-related documents as well as for expenses for copying done by professional copier services, and directly to the custodian of records who made copies of documents Plaintiffs requested and then billed us for their costs.  My firm's usual practice is to separate the in-house copying from the outbound copying.  We do as much copying as possible in-house, but where the task would overly burden our facilities, we send copying to a professional copying service.  With regard to in-house copying, my firm has set a $.15 per page rate based on annual surveys of what other law firms charge for in-house copying.  My firm's procedure for tracking in-house copying is to assign a billing code to each case.  When copies of documents related to a case are made, the employee making the copies enters the billing code into the copier, and the number of copies is automatically charged to that case.  Each month a bill for the number of copies made is

30

generated for, and charged to, each case.  It was necessary for Goldstein Demchak to copy documents to (i) file with the Court; (ii) serve on Brinker's counsel; (iii) circulate among the lawyers who worked on the case; (iv) send to opt-in plaintiffs and witnesses; and (v) use at depositions.  For the period of time through June 18, 2009, it was necessary for Goldstein Demchak to copy the following categories of documents for use in this case:  case-related correspondence, pleadings, and orders; documents produced by Brinker in response to Plaintiffs' discovery requests; documents produced to Brinker in response to its discovery requests; transcripts of depositions taken by Plaintiffs and Brinker; drafts of correspondence, pleadings, and briefs for editing; and case decisions used by Goldstein Demchak to draft pleadings, briefs, and correspondence and to prepare for oral arguments, hearings, and conferences with opposing counsel.  I have reviewed the copying costs related to this case as reflected in Exhibit 4, and I am confident that all such costs were reasonably and necessarily incurred by my firm.

90.     *Faxes, Telephone, Postage, Courier and Messenger Services*:  Goldstein Demchak necessarily incurred these expenses to communicate with co-counsel, our clients, opposing counsel, potential witnesses, and the Court.  My firm's procedure is to assign a billing code to each case and to record that code to any case-related faxes, telephone, postage, courier, and messenger services to enable us to track and bill the charges to each case accurately and contemporaneously.  I have reviewed the fax, telephone, postage, courier, and messenger service costs related to this case as reflected in Exhibit 4, and I am confident that all such costs billed by my firm were reasonably and necessarily incurred.

91.     *Travel and Meal Expenses*:  The travel and meal expenses my firm incurred in this case for which Goldstein Demchak seeks reimbursement are itemized in Exhibit 4.  These charges are for travel related to attending meetings with opposing and co-counsel, our clients and other potential witnesses, depositions, on-site witness interviews and trial preparations, and court appearances and trial.  A substantial part of the travel costs Goldstein Demchak incurred was precipitated by the more than the 100 depositions Brinker noticed all over the country.  While Plaintiffs retained local counsel to cover many of these depositions where possible in order to

31

reduce travel costs, given the intensity of the deposition schedule and the limited period of time over which these depositions were conducted, Goldstein Demchak necessarily had to incur costs to travel to the deposition sites. Where possible, Plaintiffs' counsel attempted to arrange for multiple depositions to be scheduled in the same location or within close proximity of one another and within close temporal proximity so that one attorney could cover these related depositions in one trip, thereby minimizing travel expenses. Additionally, it was necessary for Goldstein Demchak to advance travel expenses to some opt-in Plaintiff deponents.

92.    It is necessary to provide some explanation for Goldstein Demchak's travel costs.

a.    During the intensive deposition proceedings, it generally was necessary for Plaintiffs' counsel to book refundable (and therefore more expensive) rather than non-refundable (and less expensive) airline reservations because many of the depositions were scheduled on short notice and because of the possibility that a deposition might be cancelled or rescheduled at the last minute.

b.    The date related to a particular travel expense as recorded on my firm's case expense ledger does not always correspond to the date on which the event related to the travel occurred, but in most instances to the date on which the travel expense was paid. So, for example, airline or hotel charges may be recorded on my firm's case expense ledger after the event for which the travel even occurred. This is because we were billed for and paid the travel expense (usually charged on and paid upon receipt of credit card invoices) after the event (*i.e.* deposition, hearing, etc.). I have reviewed the travel expense invoices related to this case as reflected in Exhibit 4, and I am confident that all such costs were reasonably and necessarily incurred by my firm.

93.    *Taxis, Airport Shuttles, Rental Cars, and Parking.*  My firm's usual practice is to charge clients for taxi expenses reasonably incurred in connection with the representation. My firm's usual practice with respect to the cost of parking is to charge the client for reasonable parking costs incurred in connection with the representation. In this case, the vast majority of parking expenses were incurred in connection with out-of-town trips (*e.g.*, parking at the airport)

or depositions.  In this case, our firm advanced or prepaid costs of taxis/airport shuttle service and parking for those witnesses who traveled to Houston for trial.  I have reviewed the taxi, airport shuttle, rental car, and parking costs related to this case as reflected in Exhibit 4, and I am confident that all such costs were reasonably and necessarily incurred by my firm.

94.    ***Computerized Legal Research***:  We incurred costs for computerized research services to do the legal research necessary to prosecute this case.  My firm's practice is to assign a billing code to each case and have the attorney or paralegal doing research related to the case enter that code electronically in the computerized legal research service to which we subscribe. We receive a monthly statement from these services for all usage by case billing code, which allows us to allocate our expenses for such research services by case.  In the exercise of billing judgment, all computerized legal research conducted in relation to Plaintiffs' revised trial plan, motion to intervene, motion to toll statute of limitations, and subsequent decertification briefing between July 9, 2008 and January 25, 2009 has been excluded as that underlying time was also excluded.  Therefore, I am confident that all charges for computerized electronic research billed by my firm to this case were in fact directly and actually related to this case.

95.    ***Accurint***:  This is an electronic service that allows the user to research and locate an individual's address and other contact information.  It was necessary for Goldstein Demchak to use this service to locate opt-in Plaintiffs with whom we had lost contact as well as potential witnesses for whom we did not have contact information.  I have reviewed the Accurint service invoices related to this case as reflected in Exhibit 4, and I am confident that all such costs were reasonably and necessarily incurred by my firm.

96.    ***Binetix***:  Plaintiffs' counsel contracted with Binetix to establish and maintain a database system that allowed us to enter and electronically track data regarding the opt-in Plaintiffs and other witnesses.  I have reviewed the Binetix invoices related to this case as reflected in Exhibit 4, and I am confident that all such costs were reasonably and necessarily incurred by my firm.

33

97.     ***Deposition Transcripts.***  My firm's usual practice is to pass deposition costs on to the client.  I have deleted costs incurred in connection with the Colorado depositions.  *See* ¶¶ 31, 63(d), *supra*.  I have reviewed the deposition transcript invoices related to this case as reflected in Exhibit 4, and I am confident that all such costs were reasonably and necessarily incurred by my firm.

98.     ***Deposition Reporter Fees.***  Plaintiffs necessarily incurred the costs of deposition reporter fees in the course this litigation for the depositions they noticed, including several corporate representative witnesses as well as the two depositions of Dr. William Lynn.  For Dr. Lynn, two depositions were necessary because Brinker initially disclosed an expert report and then several months later produced a revised report.  Due to traveling and scheduling conflicts, Dr. Lynn could only appear for his deposition by video conferencing.  Goldstein Demchak, therefore, had to incur the additional cost of video conferencing equipment and services to complete his second deposition.  It was important for Plaintiffs to depose Dr. Lynn in anticipation of the possibility of impeaching him at trial as it was unclear, at that time, whether Dr. Lynn would be a witness (Plaintiffs had not yet filed their *Daubert* motion and the Court had not yet ruled on it).  Furthermore, the cost of expediting the deposition transcript was reasonable in light of Plaintiffs' need to file their *Daubert* motion to strike Dr. Lynn's testimony just two weeks after the second deposition, of which Goldstein Demchak was the principal drafter.  The resulting depositions were integral to Plaintiffs' prosecution of their claims, the development of case issues, and various motions (*i.e.* succeeding on Plaintiffs' *Daubert* motion striking Dr. Lynn).  All of these deposition reporter fees were reasonably and necessarily incurred by Goldstein Demchak.

99.     ***Class Notice and Other Class Mailings***:  Goldstein Demchak seeks reimbursement for costs of preparation and mailing of the class notice and other class mailings paid to Rosenthal & Company.  In all, there were three mailings to the class: the class notice advising potential class members of their right to opt in to the case; the mailing of a questionnaire to the 3500 opt-in Plaintiffs.  The costs for these mailings were reasonably and

34

necessarily incurred in connection with this litigation.  Moreover, two of the mailings were directly tied to the process of identifying the 55 opt-in Plaintiffs who ultimately prevailed on their claims.  In the exercise of billing judgment, Goldstein Demchak does not seek reimbursement for the final mailing, totaling $9,116.38, which advised the dismissed opt-in Plaintiffs that their claims had been dismissed with prejudice and to advise them of their legal rights.  I have reviewed Rosenthal & Company's invoices as reflected in Exhibit 4, and I am confident that all such costs were reasonably and necessarily incurred by my firm.

100.    ***Videographer***:  Two of the 14 representative opt-in Plaintiffs who were scheduled to testify at trial were unable to attend the trial in person; one because of personal health reasons and the other because of health reasons of his spouse.  These Plaintiffs testified at trial by way of video conference.  Therefore, it was necessary for Goldstein Demchak to incur the costs of a videographer to facilitate these Plaintiffs' appearances at trial.

## CONCLUSION

101.    In light of all of the above and the reasons set forth above, in Messrs. Shellist's and Burch's, and the other supporting declarations Plaintiffs submit with their fees motion, I believe Goldstein Demchak's demand for $1,022,810.00 in attorneys' fees and $161,203.59 in costs, for a total payment of $1,184,013.59 is reasonable and well supported by the record and applicable case law.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and accurate.

Executed this 3rd day of August 2009 at Oakland, California.

/S/ David Borgen
David Borgen

35